1 | Name: Faisal Ahmed
2 | Address: 4055 Porte La Paz, Unit 149, San Diego, CA 92122
3 | Telephone: 858-245-8445
4 | Email: faisahmed1@gmail.com

**FILED**

APR 0 6 2017

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

Case No: 17CV 0709 MMA NLS

Faisal Ahmed,

Plaintiff,

v.

University of California San Diego,
Dr. Hyong Kim, Debby Leedy, Sarah
Walter, Devon Gessert, Ellen Mathews,
Gregory A. Spire, Linda Morgan,
Dr. Gary N. Bogart,

Defendants.

**COMPLAINT FOR DAMAGES
AND OTHER RELIEF ARISING
FROM:**

(1) failed to engage in a timely good
faith interactive process

(2) retaliation due to a need for an
accommodation

(3) Conspired to deprive workers'
compensation , disability benefits, and
contracted wages.

(4) discrimination based on religion,
race, ethnicity, and country of origin

1

## I.   RELATED CASES

a.  Do you have other Civil Case(s) in this or any other federal court?

No

b.  If yes, please list the case numbers here:

## II.   STATEMENT OF CLAIM *(Briefly state the facts of your case. Describe how each defendant is involved, and tell what each defendant did to you that caused you to file this suit against them. Include names of any other persons involved, dates, and places.)*

Plaintiff Faisal Ahmed ("plaintiff"), pro se, files this complaint and alleges as follows:

<u>General Allegations</u>

1. The plaintiff filed a Title II Complaint Regarding University of California, San Diego ("UCSD") on January 23, 2014. Linda A. Garrett, Civil Rights Program Specialist Disability Rights, referred the complaint, U.S. Department of Justice ("DOJ") Number: 205-12-0, to the United States Equal Employment Opportunity Commission ("EEOC") in a letter dated March 28, 2014 (Exhibit 1). He received a DISMISSAL AND NOTICE OF RIGHTS to sue from the EEOC dated January 3, 2017 (Exhibit 2) on January 6, 2017.

2. Defendant Dr. Hyong Kim ("Kim") is a resident of San Diego County. From approximately September 15, 2008, defendant Kim was a principal investigator and supervisor employed by the University of California, San Diego ("UCSD" or "the University") and obligated to comply with federal labor law and the Americans with Disabilities Act ("ADA").

3. Defendant Debby Leedy ("Leedy") is a resident of San Diego County. From approximately September 15, 2008, defendant Leedy was employed by UCSD as a Human Resources Manager for the Pulmonary Department at UCSD Medical Center.

2

4. Defendant Sarah Walter ("Walter") ") is a resident of San Diego County. From approximately March 4, 2013, defendant Walter was a supervisor employed by the UCSD and obligated to comply with federal labor law and the ADA.

5. Defendant Devon Gessert ("Gessert") is a resident of San Francisco County. From approximately March 4, 2013, defendant Gessert was a supervisor employed by the UCSD and obligated to comply with federal labor law and the ADA.

6. Defendant Ellen Mathews ("Mathews" or "the department") is a resident of San Diego County. From approximately March 4, 2013, defendant Mathews was and is a Human Resources ("HR") manager employed by UCSD and obligated to comply with federal labor law and the ADA.

7. Defendant Gregory Spire ("Spire"), is a resident of San Diego County. From approximately March 4, 2013, defendant Spire was and is a Business Office Director and HR Coordinator for UCSD Recreation employed by UCSD and obligated to comply with federal labor law and the ADA.

8. Defendant Linda Morgan ("Morgan") is a resident of San Diego County. From approximately March 4, 2013, defendant Morgan was a HR manager employed by the UCSD and obligated to comply with federal labor law and the ADA.

9. Defendant Dr. Gary Bogart ("Bogart") is a resident of San Diego County. From approximately March 4, 2013, defendant Bogart was a physician employed by the UCSD and obligated to comply with the Criminal Health Care Fraud Statute.

10. The plaintiff's employer, UCSD, failed to engage in a timely good faith interactive process even after he sought a reasonable accommodation, in violation of the ADA of 1990 (42 U.S.C. §12101 et seq.), which requires a company to "reasonably accommodate" the known physical or mental limitations of an "otherwise qualified individual" unless the company can

demonstrate that providing accommodations would impose an undue hardship on its business.

    A. UCSD initially failed to initiate any Interactive Process (IP) at all

    B. UCSD Claimed Undue Hardship Where No Analysis Has Been Performed

    C. UCSD Reliance on Job Description Portions Inapplicable to Actual Job

    D. UCSD Used FMLA Blinders and Termination Deadlines

    E. UCSD Withdrew of Accommodations Already Proven to be Reasonable

    F. UCSD Created Ambiguities That Hold Up Returning Employees to Work

11. UCSD utilized a "performance process" creating negative performance reviews by excessive documenting and denying the plaintiff adequate training to perform his job after his symptoms started and in retaliation for his need for accommodations, in violation of the ADA of 1990 ("ADA"), (42 U.S.C. §12203 et seq.)

12. UCSD also violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961(1)(B), 1962(c), and 1964(c) ("RICO"). UCSD engaged in multiple acts of racketeering activity to deprive and devalue the plaintiff his Workers' Compensation, Part-time Earnings and Disability benefits. UCSD denied the existence of a completed and signed Designation of Physician Form from the plaintiff. Even though he had submitted the form designating his preferred provider, signed by both he and the provider, UCSD first denied its existence, and denied then its validity. Thereby UCSD removed his ability to utilize Workers' Compensation without having to switch to a UCSD Occupational Medicine physician (Exhibit 3), also known as a 'cut off' doctor . UCSD deprived the plaintiff of contracted wages he had earned both as a Martial Arts and a Yoga instructor. UCSD also further conspired with a

1   physician employed by the university to deprive the plaintiff of his disability
2   benefits.

3   13. UCSD violated Title VII of the Civil Rights Act of 1964, as amended, 42
4   U.S.C. § 2000e et seq. prohibiting workplace discrimination based on religion,
5   ethnicity, country of origin, race and color. The plaintiff was required to obtain
6   excessive documentation pertaining to medical appointments and medical
7   condition based on his country of origin, race, and religion. UCSD
8   disproportionally requires documentation from their immigrant employees than
9   from their native born workers.

### Background

11  14. The plaintiff has a rare form of leprosy known as, Pure or Primary Neuritic or
12  Neural Leprosy ("PNL"), which is endemic in India and the country of his
13  origin, Bangladesh. The plaintiff's matrilineal home is Khulna, which has a
14  relatively high incidence of PNL (Ishida et al., Exhibit 4). Leprosy is difficult
15  to diagnose, taking an average of three years to receive a diagnosis after first
16  onset of symptoms, and PNL is particularly challenging to diagnose. Often the
17  first symptoms to appear is a grade II disability, which was what occurred to the
18  plaintiff. For more information regarding the challenges of diagnosing PNL
19  please refer to Best Diagnostic Practices for Pure Neuritic Leprosy (Ahmed;
20  Exhibit 5), authored by the plaintiff.

21  15. Another symptom of the plaintiff's disease is a condition known as trigeminal
22  neuralgia. "Trigeminal neuralgia (TN) is considered to be one of the most
23  painful disorders to affect patients [12–14]." (Benes, et al; Exhibit 6). The
24  plaintiff's condition was similar to the cases discussed in the following excerpt
25  from "Trigeminal neuralgia: a presenting feature of facial leprosy" (Mishra et
26  al.; Exhibit 7):

5

Trigeminal neuralgia is a well recognized clinical entity... Of the 3 cases reported here, 2 initially presented with neuralgic symptoms similar to that seen in trigeminal neuralgia and later developed borderline lesions on the face. The 3 rd case demonstrated a tingling sensation along with firm and palpable supraorbital nerve (a branch of trigeminal nerve), and a very early skin lesion on the face pointed to the need to consider neuritic type leprosy...

16. Leprosy is considered a disability under the ADA of 1989. The ADA of 1989 states:

A person is disabled if he or she has a "record" of or is "regarded" as being disabled, even if there is no actual disability. A "record" indicates that a person has a history of having a disability or has been misclassified as such. This provision protects persons who have recovered from disability or disease, such as cancer survivors.

The term "regarded" includes individuals who do not have disabilities but are treated as if they did. This concept protects people who are discriminated against in the false belief that they are disabled. It would be inequitable for a defendant who intended to discriminate on the basis of disability to successfully raise the defense that the person was not, in fact, disabled. This provision is particularly important for individuals who are perceived to have stigmatized or disfiguring conditions, such as persons with HIV, leprosy, or severe burns.

17. On October 7, 2003, the plaintiff began working for the UCSD Recreation Department as a part-time Martial Arts Instructor after being hired by Laurel Dean ("Dean"), Director of Recreation Classes. He was later hired by the UCSD Department of Medicine on September 15, 2008 and continued working for both the Recreation Department and the Department of Medicine. His first knee injury was in November 2008 shortly after he began working his first job within the UCSD Medical Center for the Department of Medicine Pulmonary Division. He required surgery and extensive rehabilitation to restore him to functionality.

18. His supervisor at the time, Dr. Victor Test ("Test"), was very understanding and accommodating throughout that period and during the period around August 2010, when the plaintiff's father passed away following a protracted

illness and extended hospitalization in the Intensive Care Unit at University of Southern California University Hospital, in Los Angeles. The first anterior cruciate ligament ("ACL") knee surgery failed, and he re-injured his left knee in October 2010, necessitating a meniscus repair as well as an ACL revision surgery for his left knee on January 25, 2011. Test's departure from UCSD Department of Medicine was shortly after his second knee injury around December 2010 but was prior to the revision surgery he had to undergo. Under Test, his performance reviews were flawless, but during his recovery period following the revision ACL surgery, while he was on a restricted schedule, his new supervisor, Kim, was not supportive and expressed dissatisfaction with the limitations his disability placed on his work.

19. Unfortunately, the second ACL reconstruction surgery also failed duplicating the result of the first surgery and the ACL in his right knee was also suddenly injured on the evening of February 17, 2012 (Exhibit 8). During this time when the plaintiff was becoming disabled due to his condition, the plaintiff's UCSD supervisor, Kim failed to initiate an interactive process or offer any accommodation even though the plaintiff had to utilize crutches to ambulate.

20. Due to the lack of any reasonable accommodation made by Kim, the plaintiff could not return to his position and had to medically separate from the Department of Medicine on December 12, 2012.  On March 1, 2013, the plaintiff auditioned and was hired as a Yoga instructor by Alexia Cervantes ("Cervantes"), Director of FitLife Program for the UCSD Recreation Department. On March 4, 2013, he began working as a Senior Data Analyst under defendant Walter, Clinical Operations Manager for the Alzheimer's Disease Cooperative Study ("ADCS"), in the Department of Neuroscience, at UCSD.

21. Within his first week of work at the ADCS, he began to experience rashes and, as a result, he had multiple dermatology appointments. On April 1 and 2, 2013, he was absent from work because of flu-like symptoms. He was able to resume work at the ADCS the following day, on April 3, 2013. The following Saturday, April 6, 2013 he began teaching one Yoga class per week on Saturday afternoons in addition to one Martial Arts class per week on Thursday evenings for the Recreation Department.

22. He had jury duty at the San Diego County, Central Courthouse on April 18, 2013 and he again experienced flu-like symptoms from exposure to the air conditioning in that older building. His symptoms were similar to those he had been experiencing at work, which is what made him suspect the air conditioning at work as being related to his illness. April 19, 2013 was a Friday, and because court was not in session for jurors on Fridays, he would have been at work had his symptoms not been so severe that he had to stay home that day. Following that weekend, he again had jury duty on April 22, 2013, and by the end of the day he realized that once again the air conditioning in that building was making him feel more ill.

<div align="center">FIRST CAUSE OF ACTION</div>

<div align="center">**Failure to engage in a timely good faith interactive process**</div>

<div align="center">**(Against Kim, Leedy, Walter, Mathews, and Morgan)**</div>

**A. There Was a Complete Absence of any Interactive Process**

23. Once the plaintiff was obviously and significantly disabled, with two bad knees, Kim started to document so called "performance" issues that he claimed were completely unconnected to the plaintiff's disability. Kim widely expressed his views regarding the plaintiff within the small department creating an extremely hostile work environment for the plaintiff, where even new hires were

<div align="center">8</div>

comfortable disrespecting and defaming him.  Even though the plaintiff had carried over twenty research studies simultaneously alone, suddenly nearly the entire department began to manage the studies by applying pressure on the plaintiff, who was the study coordinator for almost all the studies for the group. Logistically, research study information is usually kept in large binders, which are nearly impossible to carry when having to use crutches, but he received no offer of accommodation or assistance of any kind from anyone in the Pulmonary Department at UCSD Medical Center, La Jolla.  It was during this period, while he was barely able to walk, that the first mention of any performance related issues during his employment at the UCSD Medical Center arose from his UCSD Medical Center supervisor, Kim. Prior to the failure of his second surgery, Kim expressed that the research program the plaintiff was responsible for was "... doing better" than it had been when Kim first became the principal investigator ("PI").

24. However, after the plaintiff's right knee was injured, Kim started to scrutinize the plaintiff's activities to an extreme degree and express dissatisfaction with his work performance, particularly after an incident on Monday, February 27, 2012.  The plaintiff exacerbated his knee injuries while rushing, because he was told to "hurry" by Kim to prepare a box to take to the hospital (about 1500 feet) and while using on crutches in a heavy downpour, he turned to put the box down and twisted his already injured right knee. Later that day, while walking to the parking structure north of the Sulpizio Cardiovascular Center, because his knee was extremely unstable at that point and the sidewalk was muddy from the rain and construction, he slipped off the sidewalk landing awkwardly on the pavement.  This caused further injury to his right knee (Exhibit 9). Kim had ordered the plaintiff  to "hurry" even though he was well aware that the plaintiff had two injured  knees. (Exhibit 10)

9

25. The plaintiff had a doctor's appointment that day at that time, but unfortunately for him, the doctor's office rescheduled due to an emergency surgery for another patient (Exhibit 11). Otherwise, he would probably have had the Work Restrictions (Exhibit 12), stating that he "should avoid uneven terrain", in place to protect him from being placed in such a precarious situation. It is also unfortunate that he had not managed to have a MRI done prior to that day to be able to determine to what extent events on that day further injured him.

26. There was a direct relationship between the days of work he lost due to making his injury worse on that day and his reduced output. He was working at a sub optimal level of efficiency, but the fact is that this was due directly to the instability of his knees and decreased mobility from having to use crutches to get around. Instead of being understanding, Kim commented to the plaintiff that "You're too young to be having these problems." Even though Kim is a medical doctor, he did not seem to understand that this injury caused the plaintiff's knees to be unstable, therefore there was slippage of the knee joint where bones were moving out of place and running into other bones and/or causing meniscal damage. The plaintiff tried to be stoic and continue with his work the best he could. However, there was no appreciation for his efforts, but rather a constant questioning of his time, effort and productivity, which made it almost impossible to continue working under those circumstances. At times it seemed like there was a complete refusal on the part of some to believe that his injuries and disability were real. He was still expected to do all of the tasks he would normally have to do to perform his job, from moving binders, having to negotiate the cramped space of the clinical trials supplies/chart room, to getting laboratory samples for patient visits, and using crutches to ambulate to the hospital.

27. Many of those activities violated the work restrictions placed on him by his orthopedic surgeon. There was no consultation of any type as to how to help accommodate his limited ability to work. He was expected to carry on as usual and if he couldn't perform as well, then his time, effort and productivity were called into question. The plaintiff had informed Kim that the surgeon had confirmed that his right ACL was also torn and that it would take at least a couple of months to heal from that injury so a surgical intervention would be possible. Since both his ACLs were torn at that point he would need two surgeries that year, spaced about by three to four months apart. During that period his activities would have to be "limited to desk work." (Exhibit 12) ACL reconstruction requires extensive rehab and physical therapy, for up to a year post surgery. Which meant that he was not completely back to normal for most of that year. Therefore, the plaintiff plead to Kim in order to initiate an interactive process, eventually leading to a medical separation from UCSD Medical Center. (Exhibit 13)

28. Kim's hyper vigilant documentation of the plaintiffs alleged "performance" issues began with logging every minute of his work activity, requiring him, and only him of everyone in the Pulmonary division where the plaintiff worked, to email Kim when the plaintiff arrived at work and when he left. After receiving a Departure email from the plaintiff on March 15, 2012 12:00 AM, Kim replied by stating "Thanks for the daily updates. As you know, the time spent at is not the only concern -- it's your **productivity** I am also (more) concerned with..." (Exhibit 13)

29. When it became clear that he was spending much more than 40 hours at work each week, he changed his focus to state that he was more concerned about the plaintiff's "productivity" then his attendance at work. Kim began to demand more and more from the plaintiff, at a time when he was severely disabled and

11

could only hobble around on crutches. Kim wanted him to travel to and from their office building to the clinic building and back many times a day even though the plaintiff was clearly disabled.

30. His physical health required him to restrict his activities and movement, and there was a clear correlation between his injury and his inability to do what Kim demanded. However, instead of working with the plaintiff to develop accommodations that would allow him to perform his job, Kim initiated the excessive documentation of the alleged "performance" issues, what UCSD HR calls "the performance process" or code for initiating excessive documentation.

31. It was in this dire situation that the plaintiff reached out to Wendie Sandvik ("Sandvik") Disability Management Counselor in Human Resources at UCSD. She was very helpful and explained the obligations supervisors have towards disabled employees under the ADA to Kim. It was only with her assistance that the plaintiff received any accommodations such as help carrying the large research binders. The excessive documentation of alleged "performance" issues restarted in the context of the plaintiff's position in the ADCS, with an informal review on May, 16, 2013 by Walter, two weeks after he first requested an accommodation for an environment that was exacerbating the symptoms of his illness. The tactics and phrases being used by UCSD supervisors and HR managers were almost identical.

**B. UCSD Claimed Undue Hardship Where No Analysis Has Been Performed**

32. The plaintiff started his new position with ADCS in the Department of Neurosciences in March 2013, after which he started to become ill. His first request for an accommodation was made in an email dated April 26, 2013 (Exhibit 14). That is when his supervisor began to excessively document his performance instead of continuing to train him properly for the role he was hired, as a Senior Research Associate ("SRA") III Senior Data Analyst.

12

33. As part of their delay tactics, UCSD claimed undue hardship in having certain equipment moved when no detailed analysis had been performed. Simply asserting undue hardship without first engaging in a good faith analysis of the proposed accommodation is a key indication of a violation of the ADA.

34. Undue hardship is not inconvenience, or difficulty, or cost, or some effect on other employees, without more. Undue hardship is a fact-specific analysis which concludes that a particular accommodation would require significant difficulty or expense when considered in light of multiple factors.

35. The following are examples of reasonable accommodations that have been considered not an undue hardship: extension of finite unpaid leave to complete ·healing or complete recovery (Jensen v. Wells Fargo Bank (2000) 85 Cal.App.4th 245, 263; Hanson v. Lucky Stores, Inc. (1999) 74 Cal.App.4th 215, 226), allowing telecommunication or working from home (See, e.g., Chan v. Sprint Corp. (D. Kansas 2005) 351 F.Supp.2d 1197, 1207), transferring the employee to a vacant position (Hastings v. Department of Corrections (2003) 110 Cal.App.4th 963, 972-973), giving the disabled employee preference over non-disabled employees in reassignments (Jensen, supra, 85 Cal.App.4th at page 265), and, depending on the size of the particular employer, upwards of several thousand dollars to modify workspaces or provide tools, technology or physical assistance to the disabled employee.

36. The threshold for a determination of what is truly undue hardship under the ADA disability laws analysis is relatively high. It is a violation of ADA to claim an accommodation creates an undue hardship if in reality the accommodation is just different from the normal, or requires simple departure from established practices or policies.

37. Because the determination of undue hardship requires an analysis of cost, disruption and other hardship to the employer, it is similarly a violation of ADA

13

to take such a position before actually engaging in that analysis. (See, 29 C.F.R. Part 1630 Appen. §1630.15(d); see also U.S. v. City & Co. of Denver (D. Colo. 1996) 943 F.Supp. 1304, 1312.) So, often employers have taken the position that certain accommodations would constitute an undue hardship, when it is later learned that no one at the company actually evaluated the costs and the effects of the accommodation on the business. Simply asserting undue hardship without first engaging in a good faith analysis of the proposed accommodation is a violation of ADA.

38. Presentation of a return to work note from a doctor with restrictions is often sufficient to constitute a request for accommodation. The plaintiff provided such a note from Bogart from May 20, 2013 (Exhibit 15), and also , in an email dated August 2, 2013 (Exhibit 16), the plaintiff provided Morgan, a link from the Job Accommodation Network (JAN), which lists the accommodations he required among the top to maintain air quality for those requiring the same accommodation of maintaining air quality ("JAN: Job Accommodation Network Accommodation and Compliance Series: Employees with Respiratory Impairments," 2013; Exhibit 17), but these were dismissed without analysis or indication that implementing them would constitute an undue hardship.

39. When the plaintiff sent Morgan information from JAN pointing to the EPA's suggestions, she claimed "It provides good overall information but ... cannot address each individual's situation. We must rely on each individual's medical provider to give us guidance in this regard." (Exhibit 16) and then the department took nine months to simply to allow him to move across the hall where there were many suitable available rooms. She wrote this even though all the accommodations suggested by the plaintiff's physician were already included in the U.S. Environmental Protection Agency (EPA) suggestions for

14

improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html:

Maintain Air Quality:

The U.S. Environmental Protection Agency (EPA) provides suggestions for improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html . Employers should keep

indoor air quality concerns in mind for employees with and without respiratory impairments. Good IAQ can improve worker productivity for everyone. To maintain air quality, it may be necessary to:

- **Provide an office or workspace that has working windows**
- **Maintain the heating, ventilation, and air conditioning (HVAC) system**
- **Test indoor air quality**
- **Use air purification systems throughout the building or in personal workstations**
- **Reduce workplace pollutants**
- **Provide a mask**
- **Adjust indoor temperature to meet the individual's needs**
- Institute a fragrance-free workplace
- Provide pre-notification of construction and cleaning in the workplace
- Use non-toxic building materials, furnishings, supplies, and flooring
- Use non-toxic solvents, primers, stains, paints, etc.

40. All accommodation requests were deflected on needing excessive documentation from a doctor. The department refused to simply move the plaintiff across the hall to a vacant office with a window. They refused to make any accommodation, no matter how small, such as moving his workstation to a different desk, without excessive documentation from a doctor. According to an email from Morgan to Bogart dated June 03, 2013 (Exhibit 18), "The department does not want to have the special sit/stand work station, computers and phone moved only to realize the problem has not been solve." Moving furniture across a hallway can hardly constitute an undue burden.

41. The only practical limitation in this process is that the accommodation must not constitute an undue hardship to the employer, which can only be determined by a detailed analysis of the financial and other costs in providing the accommodation. The employer cannot short cut these required processes by simply stating that they do "not want to have the special sit/stand work station, computers and phone moved only to realize the problem has not been solve" as UCSD did by way of Morgan's email to Bogart dated June 03, 2013 (Exhibit 18). In fact, such a statement is an admission that UCSD never considered modifying the plaintiff's job description or job placement and is a direct violation of its duties under the ADA. In addition, any employer refusal to allow an employee to return to work with restrictions because the employer does not offer a reduced duty or a modified work schedule should be considered a red flag that the employee's rights are being violated as UCSD did in this case when the plaintiff's physician released him back to work in December 2013 but UCSD would not allow him to return to work.

42. On Feb 4, 2014, Iris Sim ("Sim"), Staff Research Associate II Data Analyst, with whom the plaintiff shared an office since returning to work, suddenly started switching offices while he was on a lunch break. When he asked her about the sudden move, her reply was that "There was space available" and "I move frequently". Clearly there was a difference between the ease with which Sim was able to change offices and how much difficulty the plaintiff experienced in being permitted to do so by their supervisor.

**C. UCSD Reliance on Job Description Portions Inapplicable to Actual Job**

43. Walter assigned the plaintiff an arbitrary task not applicable to the plaintiff's actual job without adequate training to set him up to fail and be able to allege issues with his performance. The excessive documentation started with feedback on an assignment he was tasked with dealing with job description

16

1    portions inapplicable to the actual job he was hired for. Walter assigned the

2    plaintiff a task she called "Real Time Edit Check Specifications ("ECS"), which

3    was a new initiative put forth by Walter, herself, around the time of the

4    plaintiff's start with the group, and had nothing to do with the SQL or Perl

5    programming that he was originally hired to do. Instead he was assigned this

6    arbitrary task, created and chosen for him by his UCSD supervisor, Walter. The

7    Clinical Operations Real Time Edit Check Specification (ECS) Work

8    Instruction (Exhibit 19) coauthored by Walter, and Sim who was in a

9    subordinate role as SRA II with no programming knowledge either as can be

10   verified from an organizational chart. The task they co created focused on using

11   peculiar and unnecessary common language translations of programming logic

12   for lay people who did not understand code, such as themselves, to translate the

13   code into words that made sense to them with a lot of help from those who

14   actually did understand the code, such as the plaintiff.

15   44. In an email regarding the programming Practicum the plaintiff was working on

16   dated May 13, 2013 (Exhibit 20), Walter states:

17   **That's great- no need to continue working on this. Please turn your**
18   **attention to the review of the entire ECS for hba, with my edits.** I believe
19   your email said you would be looking only at highlighted cells- but please
20   re-review all of the non experimental forms, each field tomorrow, and send
21   me an update when completed.

22   45. This email clearly marked the point from which the plaintiff was relegated to an

23   assignment which was not what he was specifically hired for, and he was not

24   allowed to perform any other job functions by Walter.

25   46. The excessive documentation of the plaintiff's alleged "performance" issues

26   started anew with an informal review on May 16, 2013, two weeks after he first

27   requested an accommodation for an environment that was exacerbating the

symptoms of his illness. Walter was clearly no longer interested in his training, she was only concerned with documenting his alleged performance problems.

47. Walter even acknowledges in an email from that same day, May 16, 2013 (Exhibit 10) that there might be gaps in his training by stating "The other purpose of reviewing the current ECS is I want to ensure that you have the opportunity to ask for more training on anything that isn't clear to you at this point." Her statement clearly indicates that the "reviewing the current ECS" was to check for gaps in his training but her attitude towards the plaintiff completely changed once he required an accommodation.

48. Despite making multiple requests for training and guidance, he was reprimanded for asking questions of clarification and he was not provided with the same training given to others who were asked to perform similar tasks. In an email dated May 10, 2013 (Exhibit 21), Walter, wrote: I do not want to receive work back with a disclaimer - 'I wasn't sure how to perform'..."

49. He was excluded from group meetings and training sessions in which he had previously participated. When he repeatedly requested more training to fill in gaps starting the first day he was finally allowed to return to work, January 17, 2014, she denied him that critical training, citing a lack of staff, even though she had delayed his return to work because the department could not accommodate his return to work needs earlier and even though his physician had released him to return to work. He stated his objections regarding not being provided the adequate database specific training required for the task he was being told to complete as detailed below. The task required special knowledge of the ADCS' unique and proprietary database structure.

50. On February 14, 2014, his supervisor demanded an impromptu meeting as he was leaving to have lunch with his wife for Valentine's Day. Late in the afternoon, right before a three-day weekend, Walter walked into his office and

18

ordered him into a meeting with her. She insisted on this unscheduled meeting even though he explained to her that he was planning to take his wife to lunch and his wife was actually at the door waiting for him at that moment. After seeing his wife at the door, Walter gave him just 30 minutes to have lunch and return before the meeting.

51. In hindsight it is clear that the meeting, guised as an "informal evaluation", was a thinly veiled ambush by Walter in preparation to terminate the plaintiff two weeks later. She attacked him for being disrespectful in his communications to her as well as being accusatory and critical or instructing in communications to his peers. Her criticisms were extremely subjective, as is apparent in the emails that she cites in the "PLANNING FOR SUCCESS Performance Update" that she gave him following the meeting. In it and during the meeting, she made the false claim that he lacked analytical skills. This was a set up so that Deborah Tobias ("Tobias"), Director of Administration for the ADCS, whom they had to wait for to start the meeting because Walter insisted that she be present, could wrongfully terminate him two weeks later, while Walter was on vacation.

52. Although he was made to wait an entire month to return to work because the department could not support his return to work at the time his physician had released him, when he did finally make it back to work and asked for the database specific training that was offered to him previously in an email (Exhibit 22) by Melissa Davis, Data Manager at the ADCS, he was essentially told that there was nobody to train him because Davis was leaving for another position and Walter was obviously unable to convey the necessary knowledge herself.

53. He communicated the training deficiency on the database system and requested further training on the database system functionality directly to his supervisor. In an email he sent on January 17, 2014 (his second day back) he indicated that

19

this critical aspect of training was not adequate for the task he was assigned and that he required review of the training that had taken place over nine months earlier. He repeated his request for additional training on the database again in person, but he was told the database manager "... didn't have time to train me". Instead he was only provided access to some powerpoint slides. Ironically, the slides served to make even more clear the inadequacy of his training. The database training slides contained 12 sessions, of which he had only been provided three during his initial hands-on training. In addition, the hands-on training had occurred over nine months prior in April 2013, during a time when he was becoming very ill from a serious medical condition. This training was provided to everyone else in the department who had started working at the ADCS before the plaintiff, even those who were in subordinate roles to his position had received this essential training. As the ADCS organizational chart shows (Exhibit 23), nobody else at the ADCS was in the Senior Data Analyst role other than the plaintiff at the time, and therefore there was no set standard to measure him against. As he responded in an email dated February 21, 2014 (Exhibit 24) to Walter's second performance feedback:

> Regarding productivity, please do not take offense for me asking, but are the calculations for how long it took to complete the ECS tables based on the period "1/12/14 to 2/13/13", as indicated on the evaluation form? If so, there might be a miscalculation, as I did not actually return to work until 1/16/14. Moreover, please consider the additional time for training/reorientation that I have had to do on my own, because I have received only about an hour of training following my return to work.
>
> Examples of inadequate retraining:
> -Inappropriate questions that resulted from a lack of understanding of the EDC system.
> -Database training slides that Melissa created contained 12 sessions over 2 days. I was only provided with 3 sessions over nine months ago...

Edit Check Specifications

The database training that I was provided on the ADCS' unique system was not sufficient to enable me to meet the expectations for my position. In an email I sent on January 17. 2014 (the day after my first day back at work) I indicated that this critical aspect of training was not adequate for the task I was assigned and that I required review of the training that had taken place over nine months earlier. I requested additional training on the database in person as well, identifying it as a deficit in my training. It is the only training that I have specifically requested, but that training opportunity was denied to me.

Being deprived of this opportunity reduced my ability to assimilate the information contained in the written resources that were provided. Without adequate training on the database systems, it is difficult for me to know which differences between the studies are superficial due to study design versus significant differences in logic...

Testing for TCAD UAT:

I agree that I should not have had the question I did regarding the functioning of the database system. I did communicate the training deficit on the database system and requested further training on how the EDC system functions directly from supervision.

However the resources I was directed to did not compensate for the deficit of a demonstration of database functions and some time to do hands-on training on the system. Although I had been using the system to write the edit checks by looking at each eCRF and at times submitting forms, I did not submit any blank forms with blank fields because the work instructions (ECS WID V3) I received did not say to do so. I realize that there is a statement in the EDC training mentioning this function, but I had misunderstood the meaning... Although there is an assertion that knowledge and understanding of how the database system functions is not necessary to write the edit checks, I respectfully disagree. Writing logical checks for an unfamiliar system is similar to trying to check grammar in an unknown language. For example, the rules for the field labels are dependent on the data types, which are defined by the keywords. Innovation is not possible for a system when one does not have good understanding of how the system functions and what constraints it has. Assigning tasks for me to perform for which I am not properly trained and denying my requests for training is priming me for failure.

54. The limited training that the plaintiff was provided on the ADCS' unique system was not sufficient to enable him to meet the expectations for his position. Although hands-on training was the only training that he specifically requested, he was denied this training opportunity that had been provided to everyone hired before him. Being deprived of this critical training opportunity prevented him from assimilating the information in the written resources he received. The resources he was given did not adequately compensate for the lack of hands-on demonstration and training on the unique database system and its custom made functions. What was required was a chance to have hands-on training on the specific implementation of the database system. An example of his inadequate training is when he was reprimanded for asking a question regarding the implementation of a specific function of the database system to his colleague in an email on which his supervisor was copied. Had he been given the proper training required for his position, he would have known the answer. Instead he was assigned tasks without adequate training and reprimanded when he asked for clarification. By denying his repeated requests for training, his supervisor and the Department set him up for failure.

55. Not only was the evaluation highly subjective in many respects, the few apparently objective parts it contained were also full of errors. For instance, the form indicated that the productivity calculations for how long it took to complete the assigned tables were based on the period "1/12/14 to 2/13/13[sic]". There is a miscalculation here, since he did not actually return to work until 1/16/14. The evaluation also failed to take into account the additional time that was required for self-training and reorientation. He had to do almost all of the training on his own because he only received about an hour of training following his return to work

22

56. The only evaluation of the plaintiff's performance prior to his request for an accommodation by the ADCS occurred before he was offered the position. He was hired only after completing a practicum utilizing MicroSoft ACCESS and SQL that he successfully submitted to Auntre Hamp, Data Manager at the ADCS on December 14, 2012. That was one of the reasons he was offered the SRA III position at the ADCS in the first place (Exhibit 25). Obviously his performance was sufficient to get an offer from the ADCS to hire him for his programming skills. The only other external evaluation of his performance is from his completion for an online programming course through the O'Reilly School of Technology and paid for by the ADCS, for which he received an "A" Grade and was completed on June 11, 2013 (Exhibit 26).

57. In addition, his supervisor was on vacation for the last week of his employment prior to his termination, and he was never given a genuine opportunity to remedy any of the performance issues made in the performance evaluation from February 14, 2014. Walter is the only person who was supposedly able to evaluate his performance on the ECS task, since Gessert, Director of Clinical Operations for the ADCS, did not respond to any of his emails. Even though he was originally hired to work closely with Gessert, it never transpired, regarding that task he had been assigned by Walter. In fact there were only two times when Gessert communicated with the plaintiff at all during the time he was employed at the ADCS, one of which was to demand doctors' notes for past visits. Technically, she was the only supervisor he had who had the programming knowledge required to truly evaluate his performance. However, she was unavailable to supervise his training or evaluate his performance. In fact Walter was hired due to Gessert's lack of availability since Gessert was employed and physically located at the University of California, San Francisco, thus unable to manage the Clinical Operations group in San Diego directly.

Unfortunately that meant that Walter, who had little to no programming knowledge had to manage programmers, and evaluate their performance. This was difficult both for her and the programmers there.

58. Since Walter was not present to evaluate the plaintiff's work at the time of his termination, and had been on vacation for at least a week, UCSD did not provide him the opportunity to demonstrate his performance to the end of his probationary period, which they had extended to April 12, 2014, while he was still out on medical leave due to their lack of accommodating for his medical needs. His supervisor, Walter, did not engage in either the interactive or performance evaluation process in good faith, and never had any intention of allowing him to stay past what UCSD considered to be letter of the law, after amending his probationary period.

59. While Walter was on vacation after the meeting, he received a notice dated February 13, 2014 (the day before the "informal evaluation" although he did not receive it until a week later; Exhibit 27). The notice stated that his probationary period, which originally would have ended in September 2013, had been extended until April 12, 2014.

60. In her final email to the plaintiff dated February 21, 2014 (Exhibit 24), his supervisor indicated that we would set up weekly meetings after she returned from vacation, but it was clearly not something she ever really intended to follow through with. She states, "Thank you for your input. We will set up weekly meetings when I return from vacation." However, she had no intention of returning before he was terminated, which demonstrates once again the lack of good faith in the interactive and performance evaluation process by Walter. When the plaintiff was terminated one week later, on February 28, 2014, the morning he completed the sole ECS task that he was supposedly being evaluated on, she was still away on vacation, and only she could evaluate his

24

performance. This a common violation of disability discrimination laws such as the ADA and failure to follow ADA proscriptions can and should result in significant employer liability, even when the employer is acting in good faith and without knowledge of its wrongdoing let alone, as in this case, where there is clear pattern of discrimination based on the plaintiff's disability and facial disfigurement.

**D. UCSD Used FMLA Blinders and Termination Deadlines**

61. While he was on unpaid disability leave, the plaintiff sought the help of various medical professionals in an attempt to understand his illness and provide UCSD with the more detailed letter clarifying his accommodation requirements that they had demanded. In an email from Mathews, dated June 25, 2013 (Exhibit 28), she demands "we need a recertification of your medical condition from your health care provider on which to base continued leave. . . . Please provide this by this Friday 06/28/13 or further personnel action may be taken." This was the department's first of many attempts to dismiss him while he was on disability leave. She again wrote in an email dated July, 4, 2013 "We need this update certification no later than Wednesday July 10th." (Exhibit 27)  Due to his illness, and his inability to respond quickly to Mathews' demands, he was just barely able to meet the deadlines for providing recertifications. Had he not been able to, they likely would have used that opportunity to dismiss him while he was on leave.

**E. UCSD Withdrew of Accommodations Already Proven to be Reasonable**

62. When the plaintiff's physician advised him to take an additional week of unpaid leave to finish his healing the department removed the accommodations already agreed to be reasonable. On August 05, 2013 (Exhibit 29), Morgan sent the plaintiff an email with the subject "Office Switch Completed" where she states, "I wanted to let you know that I spoke with Ellen on Friday and your office

furniture/equipment has been moved, per your request, to an office with a window." but then in an email on November 25, 2013 (Exhibit 30), Morgan claims that the department was no longer able to provide the accommodations. Then in an email dated December 2, 2013 (Exhibit 31), Linda Morgan even asks "Do you still need the sit/stand desk?" even though that accommodation was agreed to when the plaintiff was originally hired at the ADCS through an Interactive Process.

**F. UCSD Created Ambiguities That Hold Up Returning Employees to Work**

63. UCSD used ambiguity to hold up the interactive process and kept asking for excessive and unnecessary clarification from a doctor, hoping that the plaintiff would simply find other employment as he became frustrated with the inability to get back to work and earn an income. The law requires that the employer engage in a timely good faith interactive process when presented with a request for accommodation. Furthermore, additional delays occurred because UCSD repeatedly used ambiguity as an excuse to send the plaintiff back to get additional excessive and unnecessary clarifications from his physicians. They made him provide three different letters from his doctor, making the interactive process unnecessarily protracted and instead placed an undue additional economic hardship on him. All simply to allow him to essentially move to a vacant room across the hall.

64. On May 10, 2013, during the plaintiff's mandatory weekly meeting with Walter, he again requested a room change due to his worsening health. She now stated that a doctor's note would be required for the accommodation to be even considered by the department. Walter also began documenting the minutest of errors she could find in his work and reprimanding him for asking for clarifications from then on. She did this while continuing to force him to work

26

in an environment that was making him feel more sick, affecting his

performance, and resulting in the continued to deterioration of his health.

65. On May 20, 2013 he received a letter from his physician, Bogart (Exhibit 15),

The letter from Bogart indicated that he was being evaluated for chronic

allergic sinusitis and related his need for an accommodation, which included a

room change with alternate ventilation as follows:

> It is the case that his symptoms are exacerbated by air conditioning. I am
> apprised, his current work condition is such that he is in a room that places
> him at risk, and as such he needs to be changed to a room more conducive to
> his long term health."

66. The plaintiff provided the note to UCSD, along with a couple of photographs

of his face in order to show the seriousness of his condition, in an email dated

May 21, 2013 (Exhibit 32) as requested and again asked to be moved to the

vacant office across the hall with a window for access to fresh air. with a

window for access to fresh air, because by May 21, 2013 his symptoms had

become so severe that he had to stop going to work and had to go on disability

leave. After this request for an accommodation, he received an email from Ellen

Mathews, on May 22, 2013 (Exhibit 33) stating "If you feel you are unable to

work in your current work environment you should stay home... Please note, if

you do not have any accrued sick leave available, provisionally this will be

unpaid leave." Since UCSD continued to deny his accommodation request, he

was forced to take an unpaid leave of absence.

67. On May 29, 2013, while the plaintiff was on out on leave and over a month

after he first requested an accommodation, there was an Interactive Process (IP)

meeting to discuss his accommodation request. Ironically the meeting was

being held in the same building that was so severely affecting his health.

However, he had been given no choice but to attend, since that was the only

option he was provided by the department. The meeting included the plaintiff,

27

Walter, Mathews, Morgan, and Tobias. During the meeting, the department raised some concerns regarding whether the building's regulations would impair the effectiveness of the accommodations the plaintiff had requested. It seemed that they nearly reached an agreement on the accommodation request, which included moving him to a workspace with a window, reducing the airflow from the vent, and procuring an air filter, while he sought clarifications from his physician regarding the department's concerns.

68. However, at the last minute, Tobias decided that Bogart's note was not specific enough even to initiate the room change, which was the most critical aspect of the plaintiff's accommodation request. At this point, another, more detailed note was demanded before UCSD would again consider his request for an accommodation. They did not state that there would be any undue hardship in providing the accommodations that they almost agreed upon. The only reason ever provided by UCSD to deny his repeated requests came from a correspondence on which he was copied from Morgan to Bogart on June 3, 2013. In her correspondence, Morgan indicated that the department was reluctant to make the accommodation because they did "not want to have the special sit/stand work station, computers and phone moved only to realize the problem has not been solve[d]." (Exhibit 18)

69. On July 19, 2013 the plaintiff provided the more detailed letter demanded by the department. Richard Wolf, M.D.'s correspondence articulated that he suffered from a medical condition and he required an accommodation. The pertinent part of Dr. Wolf's letter states (Exhibit 34):

> What is needed on Mr. Ahmed's behalf, therefore, are steps to be taken to improve his air quality so that there is hopefully a reduction in the various environmental triggers that can exacerbate his respiratory condition. These steps would include a work space or office that has a window to allow in fresh air, and an attempt to reduce the airflow from the air conditioning in

28

the office so that he has access to more fresh outside air rather than the air from the air conditioning. In addition, an air purification system within the aforementioned space or office would also be helpful.

70. On November 18, 2013 he had recovered to the point that he and Wolf believed that he was fit to return to work. As such, he prepared a Return to Work Certification indicating that he was cleared to work on a gradually increasing basis starting December 2, 2013. On November 22, 2013, it became clear that he required an additional week to heal. He submitted a revised Return to Work Certification (Exhibit 35) and Letter (Exhibit 36), to UCSD indicating that he was now cleared to return gradually starting on December 9, 2013.

71. The letter also noted that his previous work environment had exacerbated his symptoms and detailed the necessary accommodations to avoid a recurrence of his illness. In it Dr. Wolf writes:

> I refer the reader to a letter dated July 18, 2013 in which recommendations were made in reference to certain accommodations necessary in his work environment. Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face. Facial pain as a result of this sensitivity to cold air blowing directly on these areas, as well as visual impairment from the injury near his eye during April and May of 2013, exacerbated his symptoms....As a result of the above it is recommended that he return to work gradually, allowing him to get reacclimated to his work environment.

72. Morgan emailed him on November 25, 2013 (Exhibit 30) relaying the departments' concerns regarding his return to work. She wrote:

> ... your department is experiencing a severe hardship with regard to staffing and has an urgent need for the current staff to be available to work. It is unclear at this point whether or not your leave can be extended. We understand your intentions are to return to work as soon as you are able however your leave has been extended numerous times over the past six months leaving the department no clear expectation that 12/9/13 will be the actual date you will be able to return. . . . We are very concerned that Dr. Wolf is not confident changes to the work environment will provide a safe environment for you. We are also not clear on the specific

29

accommodation(s) being requested. Finally, based on the urgent staffing needs, it is not certain your leave can be extended to 12/9/13.

73. Morgan also suggested having another IP meeting with her, Mathews, and the plaintiff on December 2, 2013 and added Aimee Gallagher, Labor Relations Specialist for UCSD Health Sciences, to the meeting on the grounds that "she is the expert on the collective bargaining agreement". Having been through a similar process the previous year, he realized that they were intending to claim that the additional week of leave would be an undue hardship on the department and they needed a medical separation at that time. He replied on November 29, 2013 (Exhibit 30), tentatively agreeing to the meeting, and also making them aware that he had retained an attorney by telling them that he must seek his attorney's advice prior to the meeting. Due to this information they altered their course of action, and during the meeting, instead of claiming that the additional week of leave was a hardship, they now contradictorily demanded that he take an entire month of leave beyond the date that his doctor had released him to return to work.

74. The following is a summary of the IP meeting on December 2, 2013. Mathews indicated the plaintiff's office had been moved to a space with a window and the department would ensure the desk was away from the vent. The plaintiff purchased an air purifier prior to returning to work on July 8, 2013 and could use this as indicated by Wolf. The doctor indicated the ability to come in to work later in the mornings would be helpful to the plaintiff. Morgan noted that without specific information about the needed schedule it would be up to the department to determine the schedule. The plaintiff would request that Wolf provide additional information. Mathews said the department had a "skeleton" crew in December due to the holidays. There was a great deal of work that had to be done during this time with only a few people working, and it would be

30

impossible for Walter to provide the training/reorientation/supervision required for his return to work to be supported during this time. Mathews claimed the department would like him to "... have the greatest opportunity for a successful return to work..." and therefore, the department would not provide the graduated return to work with full supervisory support until January 2014. The department demanded he remain off work until January 7, 2014 and begin the graduated return then, once all of the equipment was installed and the requested office environment could be provided. He reasserted that his doctor believed that returning to work sooner rather than later would be better for him. Morgan reiterated that the department was not willing to let him return before January 7, 2014. The outcome of the meeting was that Mathews would talk with Walter about the accommodations. They would make sure the new office for him had the desk away from the HVAC vent and his personal air purifier would stay in the office.  He would remain off work until all of the equipment had been obtained and his supervisor was available to support his re-entry to the work place on January 7, 2014.

75. On December 12, 2013 (Exhibit 37), Morgan sent the plaintiff an email with an additional question "about the specific arrangement of your work station relative to the window in the new office. Do you need to sit adjacent to the window or is it necessary only for there to be a window in the office?" A follow-up letter from Dr. Wolf, dated December 20, 2013 (Exhibit 38), addressed all of the department's other requests for clarification from the IP meeting as well as the answer to this question, as follows:

> As previously stated in my note of 07/18/13 Mr. Ahmed's office should have '...a window to allow in fresh air, and [there should be] an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning.' This means that his workstation should be located much closer to the window

31

than the vent but it is not necessary for the workstation to be directly
adjacent to the window.

76. On December 23, 2013 (Exhibit 37), Morgan confirmed receipt of the letter, and said she would "forward this note to Walter so that she will understand what's needed". On January 6, 2014 (Exhibit 37), the plaintiff emailed Morgan for confirmation that the accommodations were in place and that he could finally resume work the next day. He received replies from both Morgan and Mathews confirming that all accommodations had been made in preparation for his return to work. However, when he arrived at work on January 7, 2014, it was readily apparent that the accommodations had not been implemented.

77. When he arrived at work he had no idea where his office was located, because none of the offices had his name beside their door, and to add insult to injury his name placard was lying on the floor, as if it had been taken out of its holder and tossed on the ground. He was only able to ascertain which office his workstation was in by asking his colleagues. After finding the office, he saw that the air purifier he had purchased was not in the room, much less plugged in and operational.  He was only able to locate his air purifier by searching through the other offices, and he moved it to the office with his workstation.

78. By the time he set up the air purifier, he began to feel unwell and he realized that the window was completely closed. He had to request the other occupant of the office, whose desk was actually by the window, to open the window for him, because the desk with his workstation was located on the opposite side of the office from the window. After the window was opened, he also realized that the air vents in the room were positioned between his desk and the window. The location of his workstation relative to the window and the vents completely contradicted the recommendations of his doctor, which had even been further clarified upon the request of the department.

32

79. Despite having an additional month to set up an office for him and having additional clarification regarding the specifics of his doctor's recommendations, the department still failed to provide the necessary accommodations. Through the interactive process, the notes from his doctor, and his answers to the department's questions, the specifics of his accommodations should have been abundantly clear.

80. However, even with all of these clarifications, specifically regarding the location of his workstation relative to the window, to have it placed on the opposite side of the room from the window is indicative of deliberate sabotage of his health and therefore his ability to return to work.

81. At the very least, the air purifier he purchased should have been moved along with the rest of his equipment when the office move was completed. It was very clear from the IP meeting and from the letters from his doctor that it needed to be in the same office as his workstation and plugged in so that it was ready to use when he arrived, but the department failed even to secure and provide him his own air purifier to the plaintiff when he arrived at work as agreed. As a result, he had to go searching for this costly piece of equipment that is critical for his health in other people's offices.

82. Once again, he was forced to make the choice between working in an environment that could re-aggravate his illness or leave work, not receive pay, and risk losing his job. Even though the department had mandated an entire extra month of leave for him after his doctor had released him back to work, based on the fact that his supervisor would not have the time to manage him, no one from management or HR was present when he returned to work in order to ensure that the accommodations were adequate. In fact, they didn't even provide a chair for him to sit in.

33

83. Furthermore, where previously he had his own office, his workstation had now been relocated to a shared office space. When he spoke to Sim, the other occupant of the room to which he was moved, he learned that his equipment was originally moved to an office with a window where he would have been the sole occupant. This move was presumably made in August, when he first received confirmation from Morgan that the accommodations he requested had been made.

84. About two weeks before he was scheduled to return to work, the department (Walter and Mathews) inexplicably moved his workstation, computer, phone, etc. for a second time from that room to a desk half the size of his old one in another office. Cramming him into the corner of a shared office, with very limited space, and forcing him to work at a much smaller desk that was on the opposite side of the room from the window, in direct contradiction to his doctor's recommendations was obviously a demotion and penalization for requesting an accommodation due to his illness. Despite the only reason ever given for denying his initial and repeated requests for accommodations having been that the department did "not want to have the special sit/stand workstation... moved only to realize the problem has not been solve[d]", they did in fact move the workstation, computer, phone, etc. multiple times in order to place him in the current location and to move the former occupant of that desk, whose position is junior to his, to be the sole occupant of the office with the window that was previously vacant.

85. On January 7, 2014 (Exhibit 37), he alerted Morgan to the fact that the accommodations had not been made. She stated in response that Walter had "made her very best effort to have your office arranged the way your physician indicated would be best". The plaintiff's attorney also sent a letter (Exhibit 39) to Mathews and Morgan on January 7, 2014 with their analysis of the events

34

detailed above and stating that in spite of the fact that his physician cleared him to return to work in December, the department insisted on extending his leave until January. While he agreed to this condition, because he had no choice in the matter, UCSD's failure to return him to work in December caused him to suffer additional and unnecessary economic loss. When he made it clear that he would not return to work under conditions that would further jeopardize his health, Morgan agreed to meet with Mathews and Walter to inspect the room. Once she inspected the room on January 10, 2014 (Exhibit 37), she contacted him with the details of the modifications that would be made within a week to ensure the workspace met the accommodation requirements.

86. On January 15, 2014 (Exhibit 37), Morgan emailed the plaintiff stating "the requested accommodations have been implemented in your office" and that she would meet him there the following morning to make sure everything was in place and determine if there was any need for further follow-up. He met her at the office on January 16, 2014. The accommodations he requested had finally been made, nine months after his initial request.

87. The University also performed some irrelevant environmental testing, which was completely unrelated to his medical problem, so they could claim they did their due diligence. However, when he requested them to test for the microbes related to his condition, they refused and insisted on yet another note from his doctor to detail his personal medical information that he would prefer to keep private. They did this even though Bogart indicates the diagnosis in his letter dated May 20, 2013, where he states that the plaintiff has been evaluated for chronic allergic sinusitis and that his symptoms are exacerbated by the air conditioning at work. In addition, his workspace was still located in a shared office, where he had his own office previously, and this lowered his status relative to other members of the department over whom he had a supervisory

role, thereby diminishing his authority and impeding his ability to perform his duties as a manager.

## SECOND CAUSE OF ACTION

### Retaliation for plaintiff requests for accommodations
### (Against Kim, Walter, Gessert, Mathews and Morgan)

88. The plaintiff's UCSD supervisor Kim started to cite "performance" issues when he was becoming disabled due to the bilateral ACL tears.  Due to Kim's refusal to find an accommodation for the plaintiff, he had no choice but to medically separate from the Department of Medicine on December 12, 2012 (Exhibit 40). On March 1, 2013, the plaintiff auditioned and was hired as a Yoga instructor by Cervantes. On March 4, 2013, He began working as a Senior Data Analyst under Walter, Clinical Operations Manager for the ADCS, in the Department of Neuroscience, at UCSD.

89. After some sporadic absences due to illness and jury duty, Walter, his supervisor, began to treat him differently as compared to his colleagues. She mandated weekly meetings with him, began documenting even the minutest of errors, and put him under much greater scrutiny than before. Their first weekly meeting was on Friday, April 26, 2013, the same week as the last day of his jury duty.

90. Following the meeting, when he returned to his office, he felt very sick and he had to go home. At home he had to lie down for a few hours before he was able to resume working. He was finally able to complete the assignment that Walter gave him to finish that day and sent her an email at 8:59 PM on Friday, April 26, 2013 that the work was completed (Exhibit 14). Walter reprimanded him for leaving work early and finishing his work from home. He informed her that he felt very sick and had to leave the office and that there may be a problem with

36

the ventilation system in his office. She replied "I will find out from facility services if something can be done about the vents. If your office is not satisfactory there may be other work spaces available that you can use...." On April 27, 2013, he emailed Walter his first written request for an accommodation to change rooms to a workspace with a window, as follows: "Perhaps another workspace, possibly one with a window that allows for fresh air to come in, would be better suited for me." (Exhibit 14)

91. The discriminatory treatment increased and became more overt after he requested an accommodation. He was still very ill after the weekend, and he could not go to work on April 29 and 30, 2013, both because he was seriously ill and also because he was concerned about being contagious to others. He kept Walter informed of his condition each day he was not able to go to work.

92. On April 30, 2013, he was prescribed medication for his illness by a physician. He attempted to return to work on May 1, 2013, but Walter ordered him to leave and not return without a doctor's note because he had been absent for "... 3 continuous days" (Exhibit 41). He returned to work on May 2, 2013 with a note (Exhibit 42) from his doctor for the absences.

93. During a mandatory weekly meeting, on May 3, 2013, Walter handed the plaintiff a piece of paper with the following dates handwritten on it: April 19, April 29, and April 30. She ordered him to retroactively change already approved time sheets from sick leave to unpaid leave for those dates. He knew from his previous experience working at UCSD, that employees can carry a negative sick leave balance that would be adjusted with sick leave accumulation earned during the following pay periods. She had previously approved the timesheets knowing that it would leave him with a negative sick leave balance. Henceforth, she forced him to take leave without pay for all absences, while continuing to deny his requests for an accommodation to move his office to a

vacant office across the hall with a window in order to prevent the symptoms of his illness from worsening.

94. About a week later, on May 9, 2013 (Exhibit 43, he received an email from Cervantes requesting that he call her ASAP regarding his position with the Recreation Department. Spring classes had started in April, and he was teaching two classes on a weekly basis for the Recreation Department, expecting to be compensated for his time as contracted. As requested, he called Cervantes and spoke with her. During their conversation, she informed him that his department (Neurosciences) had denied him the ability to continue to teach for the Recreation Department. Furthermore, even though he had been teaching both classes since the beginning of that quarter in April, he would not be paid for the classes he had already taught that quarter. Cervantes indicated that if he wanted to continue to teach the remainder of the classes, he could do so only as a volunteer, and if he had any questions regarding this matter he should contact Spire.

95. During the course of the IP meeting on May 29, 2013, the plaintiff also brought up the issue of teaching for Recreation. Mathews' response this time was that it was "standard policy" for the Neuroscience department to not allow probationary employees to teach for Recreation. This contradicted what he had been told previously by her and Walter. She made this false claim in front of Morgan, and did not mention the decision being related to absences at all.

96. When his health allowed, the plaintiff contacted Dean regarding the refusal of his department to allow him to teach for Recreation, asking if she had experienced the issue of a standard policy during the probationary period preventing other employees from teaching in the past. She indicated in an email on August 27, 2013, that it was extremely unusual and she was "... more than a little confused by what's going on with your teaching...." It was quite disturbing

to him also that he would no longer be allowed to teach, which he had been doing for nearly a decade, and that he would be only permitted to continue to teach classes on a volunteer basis, but not for pay, and even worse that he would not be paid for the classes that he had already taught that quarter.  He also contacted Spire at this time. Spire later stated in a voicemail, dated September 5, 2013 (Exhibit 44), that it was the HR Staffing Manager for Neuroscience, Mathews', decision not to allow the Recreation Department alternate access to the plaintiff. When he asked Walter for an explanation, she relayed the following response from Mathews, as the reason why he was not allowed to teach for Recreation (Exhibit 45):

> We received the request to grant alternate access for you to do some teaching with recreation, but based on the fact that you are on probation, have missed quite a few days already and are still learning the job, we feel it is in your best interest and the department's best interest at this time that you focus your efforts on learning this new job.

97. The above text refers to absences due to the illness for which he had requested an accommodation and absences due to jury duty. It became clear that Walter and Mathews were discriminating against him and making things as difficult as possible for him. Their actions made the environment at work even more toxic in addition to an already harmful environment. Together they worked to figure out how they could make things more unbearable for him, taking advantage of the fact that he was still in his probationary period and probably hoping he would quit.

98. On May 13, 2013, he submitted a working program for a project that he had been assigned to gauge his programming skills. He was told by Walter that it should take no more than four hours, but the task took an entire week to complete because the source files that Walter had attached and emailed to him contained unusual characters that made the program crash. Though he sent her

daily emails regarding the difficulties he was having with the program, she did not provide him with any helpful guidance. She only directed him to ask others, who were either not there at the time or unwilling to help him. She, herself, was unable to help him, because she has little to no programming experience and was clueless as to the fact that the files she sent was causing the problem.

99. Due to her lack of experience and understanding, she also mistakenly believed that an introductory course in a programming language would enable to him to complete this task without any further study. Earlier in May he was also assigned the additional ECS task, for which he only received three hours of training in a system that all of his colleagues had been using for years. However, his performance was being assessed on the same scale as them. These were attempts to set him up for failure, so that she could use the reason of poor performance as justification to dismiss him during his probationary period and/or make the work environment so unbearable that he would be forced to quit. This was the most stressful period he had ever experienced at work, and later that week he became more seriously ill than he had ever been before.

100.   Furthermore, his condition was exacerbated by the environment in which he was forced to work and train by his supervisor, as stated in the note from his doctor dated November 18, 2013. Also, in July of 2013, he was still struggling with his disability and suffering because he had to continue working in an environment that was having a detrimental effect on his health as indicated in the note from his doctor dated December 20, 2013.  It should also be noted that during June of 2013 he was actually out of the office on disability leave because of his illness and could not have worked on the tasks as stated in the evaluation. he was only able to return to work for a couple of weeks in July before having to go out again due to his serious medical condition. Due to the length of time he was away from the job and the interruptions in his training due to his illness,

he had understandably he did not recall all the information that he learned so many months earlier. It was unrealistic to expect him to perform at an optimal level immediately upon returning to work without proper retraining following a serious illness and having been unable to work for an extended period. As a result, there were gaps in his knowledge. In addition to being sick, he remembers feeling ill equipped to perform these tasks even when he was first assigned them close to a year ago without adequate training. That was the reason why he immediately requested additional hands-on training on the database system when he returned to work and was assigned these tasks once again.

101.   Following that, on May 16, 2013, his illness became so severe, that he had to make an urgent appointment to see his physician. The doctor initially confirmed the relationship between the plaintiff's illness and his work environment. When he returned to the office, Walter asked him to go by her office so she could go over his errors on the additional task he was asked to perform without adequate training. Despite the severity of his illness, he continued to work overtime in order to manage the heavy workload his supervisor was placing on him at the time. The day after his urgent appointment, he left work after emailing Walter at 7:40 PM. By the time he left that day, he was feeling extremely sick and tired.

102.   As mentioned previously by May 21, 2013 his symptoms were so severe that he had on disability leave. However n July 8, 2013 the plaintiff was forced to make a choice between returning to work in the same environment which had previously exacerbated the plaintiff's illness or risk losing his job because his UCSD physician kept the plaintiff hanging, stating he would write a letter, but did never. Since he could not afford to lose his job or his health insurance, he had no option but to return to work in the same environment while finding a

41

physician who could help him with his serious medical problem. During this time he was forced to wear a respiratory mask for more than eight hours a day while at work, which was very uncomfortable and hindered his ability to do his job. He was ostracized by his peers because in addition to the mask, he had numerous rashes and lesions on his face, which he tried to keep bandaged up. Discrimination simply means noticing the differences between things or people that are otherwise alike, and making decisions based on those differences. Due to severe leprosy reactions the plaintiff was experiencing it would have been nearly impossible not to notice how horribly disfigured he was at the time and severity of his facial lesions.

103.   He also had to purchase an air purifier at his own expense to use at work in an attempt to reduce the risks of his exposure to the harmful environment. Despite these measures and medication prescribed by his physicians at the time, his illness continued to worsen each day he was at work.

104.   With the July 19, 2013 note from Wolf (Exhibit 34), he again made a plea to be moved into the vacant office across the hall. He worked on Monday, July 22, 2013, but with the requested accommodation still being denied, his symptoms became so severe that he was unable to work on July 23 and 24, 2013.

105.   He also requested clarification from Gessert on the new requirements, while pointing out that they differed from the timekeeping policy he had been provided when he was hired. Instead of receiving a response from Gessert, Mathews replied (Exhibit 46):

> You have exhausted all sick leave accruals. As an exempt employee you are only required to report absences in full day increments. Until further notice, if you have any partial day absences for any illness, you must provide a doctor's note in order for this to be an excused absence. Otherwise, if a note is not provided, you will not be paid for the time you are absent. This is a standard practice of the department for any employee in a similar situation and who is still in their probationary period.

106. On August 2, 2013 (Exhibit 48), the plaintiff replied to Mathews' email, asking for clarification on a number of items in her email including whether, if he was unable to provide a doctor's note for a visit during normal work hours, the entire day would be considered an unexcused absence. He also requested clarification regarding the standard practices and asked where he could find a copy of these standards to which she kept referring and that he was apparently subject to. A satisfactory response was not forthcoming.

107. Soon after that, on August 5, 2013 (Exhibit 29, the plaintiff received an email from Morgan indicating that the office change was completed pursuant to his request. However, this was too late and he was unable to return to work at that time because his work environment had exacerbated his condition such that he required much more additional time off work to recover. On August 13, 2013 (Exhibit 48), he received an email from Mathews in which she either gave nonsensical replies to his questions or avoided the questions altogether. She defended the department's right to demand the doctors' notes "due to recurring absences during [his] probationary period" but failed to provide a copy of the "standard practices" that she had referred to earlier.

108. In a letter dated February 28, 2014 (Exhibit 47), Dr. Paul Aisen states:

> The reason for this release is due to your limited knowledge and basic understanding of data logic and analysis required to perform the essential functions at the Staff Research

The fallacy of the assertion that the plaintiff has "limited knowledge and basic understanding" of logic and analysis should be abundantly evident to any reasonably minded person who reads this complaint filed pro se by the plaintiff.

THIRD CAUSE OF ACTION

**Violation of Racketeer Influenced and Corrupt Organizations Act (RICO)**

**(Against Leedy, Spire, and Morgan)**

109.   UCSD violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961(1)(B), 1962(c), and 1964(c) ("RICO"). Racketeer Influenced and Corrupt Organizations Act (RICO). UCSD committed several acts of racketeering activity to deprive and devalue the plaintiff his Workers' Compensation, Part-time Earnings and Disability benefits. Mathews and Spire conspired to deny the existence of a completed and signed Designation of Physician Form from the plaintiff. (Exhibit 3) Even though he had submitted the form designating his preferred provider, signed by both of them,  Mathews and Spire at first denied its existence then it's validity. Then, Pam Thompson ("Thompson"), Workers' Compensation Analyst for UCSD, invalidated the designation on the form and with it the plaintiff's ability to utilize Workers' Compensation without having to switch from his preferred providers to UCSD Occupational Medicine (Exhibit 3) physician, also known as a 'cut off' doctor. This was not a possible choice for the plaintiff given his need for highly specialized orthopedic care that he was receiving his bilateral ACL tears.

110.   UCSD deprived the plaintiff of contracted wages he had earned as both as a Martial Arts and a Yoga instructor. UCSD also further conspired with a physician employed to deprive the plaintiff of his disability benefits. Even though the plaintiff had to medically separate from the Department of Medicine, he should have never been taken off the payroll as an instructor for the Recreation Department, a position he had held for over a decade. Cervantes hired him on Mar. 1, 2013, prior to his start with the Neurosciences department, and he starting teaching a weekly Yoga class beginning on Apr. 6, 2013.  Each week he taught class, he looked for the timesheet. When it wasn't there, he

44

1    reported that fact to Alexia, and she assured him that sooner or later Spire

2    would process the paperwork and make sure the timesheets were there. (Exhibit

3    48) He told her that was fine as long as he was paid before the end of the

4    quarter. He taught five classes under the agreement that he would be paid for

5    those classes, before being notified by Alexia on May 9, 2013 that he would not

6    be paid for the classes he had already taught, and he could only teach the

7    remaining classes for the quarter as a volunteer. During the same period, he was

8    also teaching for the martial arts program, and filling out my timesheets there,

9    assuming he would be at least paid for those hours.  The plaintiff never received

10   pay for those hours either as he expected to, since the timesheets with his name

11   were in the binder, and he filled them out following the appropriate procedures

12   and deadlines. Clearly there was a contracted wage he had been earning for

13   decade, therefore an expectation that in due course he would be paid his

14   contracted wages.

15   111.   When the plaintiff pressed Spire by asking "Why did it take so long to

16   determine that my department would not grant Recreation alternate access and

17   to inform me of that fact?" The responses he received were "Any non-student

18   that wishes to work for Recreation who holds a career position on campus,

19   needs to be approved by that home department. The request is always sent to

20   that department's HR contact.  Ellen Mathews was the contact in the

21   Department of Neurosciences." Spire had previously conspired with Leedy to

22   deny the plaintiff workers' compensation benefits, then later he conspired with

23   Mathews to deprive the plaintiff the contracted wages he was owed by the

24   Department of Recreation. The plaintiff again pressed Spire to answer if there

25   was some "standard policy" he was aware of and when, if at all the plaintiff

26   would received the pay he had earned but Spire refused to answer the questions.

45

In his final email correspondence states "There is nothing that I can do on Recreation's end for you."

112.   UCSD not only deprived and devalued the plaintiff's employee and disability rights, and prevented him from getting the appropriate medical attention, they also took away his position at as a yoga and kung fu instructor, which was very important to him and for which he had worked for over a decade. UCSD is where he met most of his close friends and also through which he met his wife, he used to love his alma mater. Furthering his social isolation and feelings of ostracization.

113.   The collusion between Morgan and Bogart not only served to deny the plaintiff's disability rights, but their discriminatory behavior also seriously jeopardized his life and limb by essentially denying him the medical care that he required for his potentially life threatening condition. There is a clear change in Bogart's attitude toward the plaintiff from his notes and communications with him, on June 3, 2013 (Exhibit 49), he was still willing to investigate his condition and said "I will be glad to support you with appropriate documentation however needed for your disability situation, or speak with Ms Morgan about your concerns when she contacts us." However, even after three weeks, he had still had not sent the Attending Physician's Statement to Liberty Mutual in support of his temporary disability. His wife went to his clinic on June 24, 2013 to get the filled out form for us to send ourselves since the doctor's office had not been able to send it. On that form, which he filled out following his conversation with Morgan, he states "Mr. Ahmed has had some mild allergic sinusitis based on symptoms. It is his theory that he has job-based environmental sensitivities, this has not been confirmed, I personally do not think this is so" (Exhibit 52). This was contrary to what he kept stating to the plaintiff, even in his mocking reply in a message dated June, 16, 2013 to his

pleas for assistance the severe nerve pain he was experiencing he says, "So the pain from the inflammation prevents you from doing any work at all. ? It must be quite bad I will pass this along to your employer when I write the letter..." (Exhibit 50)

114.   Because he never followed through with his promised support, despite repeated requests for the necessary documentation, Liberty Mutual denied his short-term disability claim on August 1, 2013 (Exhibit 51). Morgan not only failed to protect UCSD Medical Center from engaging in the practices to limit their liability for violations of statutes under the ADA but she engaged in fraudulent documentation practices by copying his signature from some document and pasting on an Interactive Process Meeting summary (Exhibit 52). As he indicated in his email to Morgan on December 10, 2013 (Exhibit 53), he had signed a previous version of the interactive process summary, but he did not sign the version she sent to him with his signature pasted on it. She essentially forged his signature to imply a properly completed interactive process, when there was actually a dispute regarding the department's refusal to accommodate his return to work when his physician released him to do so. As a result that interactive process was never properly concluded and he never signed a summary for it. Furthermore, instead of being his advocate or even a neutral party in the accommodations process, her communications with his doctor served to poison his mind and his subsequent medical opinion, which through his notes in the EPIC system (UCSD Medical Center's electronic records management system) he spread his bias throughout the UCSD Healthcare System and sabotaged not only his job but his entire medical care at UCSD Medical Center. Essentially they used this ploy to turn a private medical condition of the plaintiff at UCSD Medical Center with a doctor paid for through private insurance into a worker's compensation claim, where they can

1   exert their undue influence and exert control the medical care of their disabled

2   employees such as the plaintiff and even deny their disability rights altogether.

3   115.   The plaintiff was told by Thompson four times in the span of five days to go

4   to UCSD Occupational Medicine physician, even after he explained that he had

5   a preexisting condition and was already under the care of another provider.

6   Mathews and Morgan urged the plaintiff to file Workers' Compensation, despite

7   repeatedly declining because he already had providers he preferred, his medical

8   problems were complex and required very specialized care. In addition he did

9   not want his privacy to be jeopardized, since he knew and worked with many

10   UCSD physicians and nurses.

11   116.   Bogart's comments on the Liberty Mutual Insurance form that he never sent

12   to them seems to indicate that he was much more concerned about the burden

13   being placed on his employer, who just happens to be the same as his, UCSD

14   Medical Center, than he was concerned for his patient. Once Morgan made

15   contact with him he essentially stopped acting in his best interest as his

16   physician but instead acted in collusion with our mutual employer, UCSD

17   Medical Center.

18   117.   In *Brown v. Cassens Transport Co.*, 6th Cir., No. 10-2334, 4/6/12, where

19   five employees sued their employer, a claims adjuster and a doctor alleging

20   conspiracy to deny them workers' compensation benefits, the Sixth Circuit

21   Court of Appeals ruled that the lawsuit stated a claim under RICO, the

22   Racketeer Influenced and Corrupt Organizations Act. In *Brown v. Cassens*

23   *Transport Co. (Brown II)* and *Jackson v. Sedgwick Claims Management*

24   *Services, Inc.* the Sixth Circuit upheld Michigan workers' compensation

25   claimants' rights to file federal RICO claims against their employers, their

26   employers' third party administrators and physicians who had conducted

27   independent medical examinations on the theory that the defendants had

1  conspired to unlawfully deny or terminate their workers' compensation

2  benefits.

3  118.  The Court noted that an employee's "expectancy" of workers' compensation

4  benefits, as statutorily provided, creates a "property" right that when denied,

5  created the necessary property injury to support a RICO claim. RICO provides

6  for recovery of treble damages and attorney's fees. The precedence set by the

7  Court mentioned above also reasonably applies to the ADA statutes and

8  regulations, and the standard of a "reasonable accommodation" that serves to

9  create a safe and hazard free working environment, which allows for the

10  generation of a "property" right that, when denied, supports a RICO claim.

11  119.  As can be seen in the evidence supplied in this complaint, the plaintiff's

12  physician, Bogart, completely neglected his care and, therefore, was not acting

13  as his physician in his best interest but was strictly acting in the best interests of

14  his employer, which also happens to be the same institution as the plaintiff's

15  employer, UCSD. Thus, his physician, Bogart, and UCSD HR were acting in

16  concert as one entity. The conflict of interest is not a separate legal issue but

17  naturally arises when the employer is a hospital, an institution which employees

18  physicians and insists that a Workers' Compensation benefit for a workplace

19  injury can only be provided by physicians employed by it . There is an obvious

20  conflict of interest between the doctor patient relationship and the interests of

21  the doctor's employer in reducing the financial costs of Workers' Compensation.

22  Conspiracy to use UCSD Medical Center Doctor's as Worker's Comp doctors.

23  120.  UCSD attempted to dismiss the plaintiff while he was still on medical leave

24  by demanding an updated note from his physician, and simultaneously his

25  doctor, who happens to work for the same institution as the plaintiff, colluded

26  with their mutual employer to keep the plaintiff waiting for the note by saying

1    that he would write a letter supporting his need for accommodations and also

2    one in support of his disability leave, but he never followed through on either.

3    121.   On one hand, he had a doctor who was not willing to support him with

4    documentation nor diagnose his condition even though he kept telling the

5    plaintiff that he would do both, while at the same time his employer was

6    demanding the documentation or lose his job.

7    122.   In Bogart's notes from his final visit with the plaintiff on July 2, 2013, he

8    expresses their combined perceptions of the nature of his illness and his

9    intentions as if they were the plaintiff's instead (Exhibit 54):

10       Mr Ahmed has asserted that it is his belief, based on patterns he has noted,
11       that his office environment (at UCSD Neurosciences) is the cause of
12       "allergies and environmental sensitivities". I have been contacted by Ms
13       Morgan... He appears to have mild environmental allergies, probably with
14       sensitivity to allergens in the office environment that can be treated with
15       appropriate medical treatment. I do not think his office has to be modified to
16       accommodate him until that is done...He ....wants just to be in a room the
17       the window...

18   123.   It is clearly evident that Morgan had already contacted Bogart by 6/4/2013,

19   as he subsequently filled out and signed but withheld sending a Liberty Mutual

20   form (Exhibit 55) that he received from Morgan in a fax sent on 6/4/2013 at

21   6:26:58 PM. And he filled it out with the last visit being 5/21/2013. However,

22   in the doctor's visit note on 6/11/2013 (Exhibit 56), Bogart denies having been

23   even knowing who Morgan was, but instead referring to her as "Linda Mason"

24   in his 6/11/2013 progress notes but by his final notes dated 7/2/2013 (Exhibit

25   43), he accurately refers to the plaintiff's department of employment as

26   neurosciences and clearly know who Morgan is. Furthermore, he states, that the

27   plaintiff only wants "...just to be in a room the the window can be opened..."

28   and goes on to state that

> He had requested a CT for fear of retroorbital mass and was told pointedly that his fears were not founded nor based on any symptoms or findings apart from his apprehension; he was told that I did not think it was an study based on the entirely of his case.. Apparently he was seen by ophthalmology who acquiesced and order that study…

124.   It should also be noted that following the plaintiff's May 21, 2013 visit, he did not sign the note for 2 weeks, while the longest duration between the date of encounter and the date the note was signed was only 5 days. This period also coincides with the period that he was experiencing some extremely severe symptoms and also overlaps the time period that Morgan, having convinced him to sign a release of information, first directly contacted Bogart. It is also important to note that is completely and utterly incorrect in his medical opinion. Bogart's actions show purposeful sabotage of the plaintiff's rightful disability claim because he was more concerned about the burden being placed on his and the plaintiff's employer and his than he is with the plaintiff's need for an accommodation or treatment.

125.   The negative perceptions pertain to the discrimination suffered by the plaintiff at the hands of supervisors and UCSD Human Resources is evidenced by Morgan's hastily written email dated November 25, 2013 (Exhibit 29), she states:

> We understand your intentions are to return to work as soon as you are able however your leave has been extended numerous times over the past six months leaving the department no clear expectation that 12/9/13 will be the actual date you will be able to return… In his 11/18/13 letter Dr. Wolf indicates "Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face. Facial pain as a result of this sensitivity to cold air blowing directly on these areas , as well as visual impairment from the injury near his eye during April and May of 2013, exacerbated his symptoms.
> From this note we are given to understand the issue is with the temperature and force of the air rather than the air quality itself? And has the situation changed from a respiratory problem to facial pain and eye strain such that an

adjustment to the air flow and temperature in your office would be sufficient to address the issues? Now that the weather is cooler we expect the air conditioner to provide warm, rather than cool air. Will that make a difference? Or, are you requesting a window, a change in the air vent and an air purification system before you could return to work?

126.   Morgan even claimed that the plaintiff's doctor was implying

... quite strongly that your current difficulties were caused by either the air quality in your office and/or the air temperature and directional flow from the air conditioning vent in your office and yet multiple attempts to encourage to file for workers' compensation have been ignored. I'm confused about why you would not want to pursue a remedy that could potentially provide you with medical care, as well as an income benefit if you cannot work since you have repeatedly indicated your work environment caused your current medical issues...

even though neither his physician or himself ever stated that the environment "caused" his symptoms, only that his symptoms wore worsened by the environment at work.

127.   The plaintiff was forced to answer these questions into the details of his medical condition, which had no legitimate businesses reasons, but simply a ploy to unnecessarily prolong the interactive process and pry into his medical information because of their misgivings about the legitimacy of his serious medical condition. In reply to her, he was forced to write in an email dated December 2, 2013 (Exhibit 31):

No. I had an infection, and a rash that became a wound, and it is that wound that I have been healing from for the past 6 months. Although the exact source of the infection is uncertain, it is clear that my symptoms were exacerbated by my work environment, and that ultimately resulted in wounding me. The wound caused by an infection is the source of pain and it is that Dr. Wolf refers to in his 11/18/13 letter when he discusses my sensitivity to cold air....No. I need to avoid air blowing directly on my face. Any air causes pain, although cold air causes more pain...Along with the air purifier I already purchased, these accommodations should already be in place (per your email from 8/5/2013)...

52

128.   The fact of the matter is that he was experiencing an acute Leprosy related reaction, which could have permanently damaged his eye, and even caused his death.

129.   Despite Bogart's comment that 'He appears to have mild environmental allergies...' he was having a medical emergency, similar to cases reported in the literature of periorbital leprosy. His wife, who is also a neuroanatomist and he spent the better part of an hour debating whether there was a possible link between the sinusitis symptoms he had experienced and the cutaneous symptoms that he was experiencing. The type of leprosy reaction he was experiencing constitutes a medical emergency. In the article entitled "Prevention of blindness in leprosy" (Exhibit 57) the authors state:

> Integrated health workers (IHWs) will be expected to recognise major signs of ocular leprosy (listed on the next page), to provide primary (emergency) care, to refer patients in need of further examination or treatment and follow-up cases on ophthalmological treatment. A strong supervision and referral network are vital in the implementation of this programme. IHWs should:
> • recognise leprosy as a health problem
> • recognise that leprosy causes blindness

Bogart was guilty of at least under treatment if not outright gross negligence. He failed to recognize and diagnose a bacterial skin infection that has since been diagnosed and recognized by at least three doctors.... When asked by the plaintiff if the symptoms were likely to be periorbital cellulitis he said "No" and made a diagnosis of "allergy" and prescribed antihistamines and Prednisone, a corticosteroid which should not be used without checking and treating if needed an underlying infection . Bogart stated that it was "impossible" for a sinus infection to spread to the orbit because of "anatomy, immunology, and epidemiology", which Bogart implied the plaintiff lacked knowledge in. However, according to Dhaliwal, et al, (Exhibit 58) " In the patient reported here, there was involvement of the left maxillary and ethmoidal sinuses, with destruction of the medial orbit wall. The

1   disease probably started in the ethmoidal sinus and spread to the orbit." and they go

2   on to state " To prevent disabilities due to reactions in leprosy, it is critical to

3   diagnose the reaction early and provide prompt and adequate treatment."

4   Furthermore, Massone, et al. (Exhibit 59) reported about their patient:

5   　　　Physical examination disclosed an annular plaque of almost 10 x 8 cm in
6   　　　diameter (Figure 1). The margins were raised and slightly edematous, while
7   　　　the skin in the center was not infiltrated but dry and anaesthetic. Edema was
8   　　　observed around the right orbit. The supraorbital nerve was thickened and
9   　　　palpable (Figure 1, white arrow).

10   No culture was performed to rule out a bacterial infection.  As can be seen from the

11   attached case reports mentioned above of similar cases, in an acute reactive state,

12   leprosy is can precipitate into a medical emergency, that if not caught early and

13   managed with the proper treatment. The fact of the matter is that the plaintiff was

14   experiencing an acute Leprosy related reaction, which could have permanently

15   damaged his eye, and even caused his death.

16   130.   The plaintiff was treated by Dr. Steven Emmet on 5/28/2013, a week later,

17   　　who stated there "was no way this was an allergic reaction"—prescribed

18   　　Doxycycline. Because of the initial failure to treat, the infection/cellulitis

19   　　continued. At no point did Bogart recognize or correctly diagnose the condition

20   　　as an infection or cellulitis. He also failed to address the reports of severe pain

21   　　resulting from the infection. The plaintiff had recently been diagnosed as

22   　　having cellulitis by two doctors (Wolf and Jacob Husseman, MD).

23   131.   Bogart conspired with Morgan, to deny the plaintiff's disability rights. In her

24   　　most egregious act misconduct, she essentially forged his signature on an IP

25   　　summary document that the plaintiff had not signed by copying and pasting it

26   　　from another document and was therefore to engaged in fraudulent

27   　　documentation practices by falsifying his signature on the interactive process

28   　　summary.

132.   Morgan befriended the plaintiff first, as if she were going to be an advocate for him the same as his previous accommodations advocate had been in dealing with UCSD Medical Center. In addition, Morgan beguiled the plaintiff into signing an authorization for medical release without fully disclosing the conflict of interest between UCSD Medical Center, his employer, and his physician who also works for UCSD Medical Center. Since his experience with Sandvik had been very positive, he felt that she had both his privacy and his interest, so it seemed that Morgan would do the same but she did neither. He was coerced into signing a release for medical information by being forced to attend an IP meeting in the same building that was exacerbating his symptoms and Morgan beguiled him into signing the release by saying "we do it all the time when they are UCSD doctors". Morgan pretended to be his advocate and obtained a [Medical Release] which she used to relay their perceptions to his physician at the time, Bogart. Morgan was supposed to be his advocate but she repeatedly leaked his confidential correspondence to his UCSD Medical Center supervisors and even released his medical record number in unsecured emails (Exhibit 18). Matthews and Morgan had a very obvious close working relationship which they used to corner UCSD Medical Center Employees, especially if they also had doctors who were also UCSD employees. First they had employees sign an "Authorization To Release Medical Information", which they in turn used against them to deny their disability claims and protect the financial interests of the UCSD Medical Center.

133.   Therefore, when she asked for his release for an "Authorization To Release Medical Information" on May 29, 2013 without fully relating to him the potential conflict of interest by direct communication between employer UCSD Medical Center and his doctor who was also employed by UCSD Medical Center, the plaintiff did not question her. She said "we do it all the time when

1    there is a UCSD doctor involved". In hindsight, it was obviously a mistake, but
2    due to the severity of his symptoms at that time, and the fact that he was forced
3    to have the interactive process meeting in the same exact building that had been
4    exacerbating his symptoms to such a severe degree, they were able to coerce
5    him to sign anything they put in front of him at the time, just so he could leave
6    that building. It was shortly after this discovery that he found himself in a very
7    difficult situation. On one hand, he had a doctor who was not willing to support
8    him with documentation nor diagnose his condition even though he kept telling
9    the plaintiff that he would do both, while at the same time his employer was
10   demanding the documentation or lose his job.

11   134.   On July 8, 2013 the plaintiff was forced to make a choice between returning
12   to work in the same environment which had previously exacerbated his illness
13   or risk losing his job. Since he could not afford to lose his job or his health
14   insurance, he had no choice but to return to work in the same environment
15   while finding a physician who could help him with his serious medical problem.
16   During this time he was forced to wear a respiratory mask for more than 8 hours
17   a day while at work, which was very uncomfortable and hindered his ability to
18   do his job.

19   135.   He was ostracized by his peers because in addition to the mask, he had
20   numerous rashes on his face, which he tried to keep bandaged up. He also had
21   to purchase an air purifier at his own expense to use at work in an attempt to
22   reduce the risks of his exposure to the harmful environment. Despite these
23   measures and medication prescribed by his physicians at the time, his illness
24   continued to worsen each day he was at work.

25   136.   Morgan was no longer professional in her dialogue about the IP and
26   accommodations after he had letters from a private doctor. On numerous
27   occasions she violated his right to confidentiality. Furthermore, Morgan also

56

had a close working relationship with her counterparts, such as Tina Weeks, Disability Case Manager II, with Liberty Mutual Insurance that were assigned the UCSD Medical Center account on their behalf. Weeks, states in the Denial Notice from Liberty Mutual Insurance dated August 1, 2013 (Exhibit 51):

> On June 4, 2013 a fax was sent to Dr. Gary Bogart requesting the completion of the Attending Physician Statement and medical records from May 1, 2013 to the present. Additional request were faxed on June 19, 2013 and July 5, 2013 to Dr. Bogart. We wrote to you on June 19, 2013 requesting that you provide the Attending Physician Statement and medical records from May 1, 2013 through the present. On July 11, 2013 we received three letters from Dr. Gary Bogart. The letters indicate you are excused from work for chronic allergic sinusitis. Letters are dated May 20, 2013, June 27, 2013, and July 2, 2013. The letter from Dr. Bogart dated July 2, 2013 is releasing you to return to work on July 8, 2013.To date we have not received a response from Dr. Bogart for the Attending Physician Statement and your medical records from May 1, 2013 through July 8, 2013 to that provide a more in depth outline of your condition and any resulting restrictions and limitations that would support a disabling medical condition. Since we have not been provided with the documentation necessary to process this claim, we must deny your claim for benefits.

137.   When a UCSD Medical Center Employee begins to experience the onset of disability and as a result begins to find it challenging to keep working without an accommodation, UCSD Medical Center supervisors, in consultation with Human Resources, institute a policy of discrimination by complaining about that employee's performance instead of providing them reasonable accommodations, thereby creating ambiguity surrounding whether a decline in performance is related to a lack of accommodation or whether the deficit is something that existed prior to the need to provide a reasonable accommodation.

138.   The pressures placed on disabled employees who are forced to work longer hours to meet the demands of their supervisors inevitably result in additional health problems for the disabled employees who are already suffering. This

abuse occurs due to the fact that they are expected to perform their job functions without any accommodation being made in spite of their disability; instead they are only provided "performance evaluations". When employees do finally assert their disability rights, UCSD Medical Center Human Resources puts undue pressure on their employees to file workers' compensation claims so they, the employer can exert an undue influence over the medical care and disability benefits of their disabled employees. Human Resources for the Department of Medicine trains their personnel to routinely use the same exact tactics and phrases, in a clear pattern of systematic discrimination which includes the excessive documentation to be submitted to authenticate the disabled employee's' disability. The extent of these discriminatory practices in the University of California (UC) system and other state funded county hospitals in the state of California is unclear.

139.   The excessive documentation is a standard tactic in employment discrimination. When supervisors contact UCSD HR regarding a subordinate they have concerns about, they are advised to start document everything negative and initiate a "Performance Process", and employees are place under much greater scrutiny. The was undoubtedly what Kim was advised to do by Leedy. In addition, employees are pushed into the UCSD Workers' Compensation Program instead of going to physician's of their choice they have to use UCSD Occupational Medicine Clinics. After the plaintiff filed an Employee Occupational Incident Report (Exhibit 6) for his injury on February 27, 2012, he was instructed by Thompson to file for Workers' Compensation and go to UCSD Occupational Medicine Clinics listed below to set up an appointment even though he had submitted a completed and signed by himself and Dr. Tyler Forbes on the UCSD Doctor's Designation Form for Workers'

Compensation dated November 26, 2008 (Exhibit 60). In an email dated March

2, 2012 (Exhibit 61), Thompson states:

> I s/w Debby in your dept and also with Greg in your other dept...recreation.
> Debby could not locate a completed dr designation in your file. Greg did
> find a dr designation from 2004 that you signed, but you did not indicate a dr
> name. Therefore, without a designation in you personnel file, you will need
> to treat with UCSD Occupational Medicine for this injury. Please contact the
> La Jolla Clinic @ 8586571600 to schedule an appointment ASAP.
> Treatment with your personal physician will not be accepted to substantiate
> your WC claim.

140. This blatant falsification of the fact that a completed UCSD Doctor's

Designation Form for Workers' Compensation demonstrates the pattern of

conduct that UCSD supervisors and HR managers routinely engage in to deny

employees their disability rights.

141. The pattern of use of these common tactics of discrimination by UCSD is

evidenced by an email from Morgan dated December 3, 2013 (Exhibit 24) that

was mistakenly forwarded to the plaintiff, where she states, " Hopefully we can

get him back to work on 1/7 with the accommodations and the performance

process can continue." indicates that UCSD never engaged in the Interactive

Process in good faith but instead pursued their "performance process" as a

device to wrongfully terminate employees whom they discriminate.

142. Although the plaintiff can only attest to his own experience, and that of his

family and friends, that UC appears to be engaging in a pattern of

discrimination against naturalized U.S. citizens such as himself, his mother, and

other members of his family and friends who are immigrants. They routinely

fail to recognize the severity of their pain and suffering, and fail to diagnosis

this most common nerve disease in the world. They seem to be engaged in a

pattern of discrimination against immigrants who need proper medical

1   diagnosis of their disease in order to receive the disability benefits to which

2   they are entitled.

3   143.   For instance, despite multiple attempts by his rheumatologist to contact his

4   mother's physician at the University of California, Los Angeles, his mother's

5   doctor keeps denying even having received any messages. This is exactly the

6   same pattern of behavior that his UCSD physician, Dr. Bogart, engaged in. Due

7   to his condition, and the initial mishandling of his medical situation in addition

8   to the discrimination at work he lost both his health and his job.

9   144.   In addition, an alleged victim must allege that he was injured in his business

10   or property "by reason of" a violation of RICO's substantive provisions. This

11   complaint constitutes such an allegation as further detailed as follows:

12   A. The Flexible Spending Account (FSA) in which the plaintiff enrolled as

13   part of my benefits package was cancelled at the beginning of January.

14   He has had a FSA every year since 2008 and was supposed to have funds

15   to use throughout 2014 for his considerable medical expenses. However,

16   despite being told by UCSD that his FSA was activated, after being

17   dismissed he discovered that the account had been cancelled two months

18   prior to the date of his dismissal. This makes clearly evident that the

19   University intended to dismiss him while he was out on disability and

20   had had no intention of allowing him to return to work. They only

21   reluctantly allowed him to return to work because they thought

22   dismissing him while he was still on leave would be too blatantly

23   discriminatory, especially since he had made them aware that he had felt

24   the need to retain an ADA attorney. The department suddenly altered

25   course during the Interactive Process (IP) preceding my return to work.

26   Clearly they were not acting in good faith during the IP and never

60

1    intended to actually allow him to return to work and did not give me a

2    fair chance when they felt compelled to do so.

3    B. The disability insurance benefits he had been receiving while on medical

4    leave ended on January 13, 2014. Due to the university's negligence and

5    failure to provide proper accommodations, he was not allowed to return

6    to work when my physician released me back to work in December 2013.

7    As a result, he was charged the enormous sum of $1,662.92 for benefits

8    premiums that he otherwise should not have had to pay. This amount was

9    deducted from his earnings to pay for medical benefits for December

10   2013. Since he was only able to work for half of January, despite his

11   physician releasing him to work much earlier, that amount was nearly

12   him entire earnings for the time period. Additionally, in his January 31st

13   paycheck, not only was he charged for the full insurance premiums for

14   medical, dental, and vision coverage without any contribution from the

15   University, he was also double-charged for benefits premiums he had

16   already paid. It caused him great financial difficulty, particularly due to

17   the numerous medical bills he incurred due to the severity of symptoms

18   he suffered. This was only one of many repeated errors in calculating his

19   pay the University made beginning with his first paycheck, since he

20   started working for the Department of  Neurosciences at UCSD in March

21   2013. Please see attached "UCSD Payroll Errors" for details.

22                      FOURTH CAUSE OF ACTION

23        **Violations of Title VII of the Civil Rights Act of 1964**

24              **(Against Gessert, Mathews, Bogart)**

25   145.   UCSD violated Title VII of the Civil Rights Act of 1964 Title VII of 1964

26   42 U.S.C. § 2000e et seq prohibits workplace discrimination based on religion,

ethnicity, country of origin, race and color. Such discrimination is prohibited in any aspect of employment, including recruitment, hiring, promotion, benefits, training, job duties, and termination. Workplace harassment is also prohibited by Title VII of 1964 42 U.S.C. § 2000e et seq.

146.   The plaintiff stopped being a patient at UCSD Medical Center for many years before his first appointment with Bogart because his impression of doctors at UCSD is that they did not give their patients very good service. He primary used Scripps Hospital or Clinic for his medical needs but after numerous visits with dermatologists at Scripps and in private practice, who were not being able to diagnose and treat his condition, he made the appointment with Bogart on his wife's recommendation.  His wife, Natalie M. Schenker-Ahmed, had a similar medical problem with an abscess on her face. She had a visit with Bogart on April 17, 2012, during which he treated her well. He diagnosed and prescribed her two types of antibiotics and pain medication, as well as referring her a Ear, Nose, and Throat (ENT) specialist. She thought he was a good doctor and thought that he would be willing and able to help the plaintiff more than the dermatologist he had seen. Though Their medical problems were similar, they are both about the same age, and they both worked for UCSD, they received very different treatment from Bogart. The differences between the plaintiff and his wife are obviously gender, race, country of origin, and religion (even though neither the plaintiff or his wife are religious, they are both inclined to believe in science). Therefore, the basing their differential treatment by Bogart on any of those criteria would be a violation of by Title VII of 1964 42 U.S.C. § 2000e et seq, and since they are similar in most other respects, there is no other good explanation for why they were treated so differently by the same physician for very similar medical problems. In the plaintiff's case, Bogart refused to prescribe any antibiotics, or pain medication,

do any further testing, or even refer him to a specialist. He was told simply to take an over the counter antihistamine, and that his condition was nothing more than a "mild allergy". Unfortunately this type of discrimination in the UCSD Healthcare System by providers is quiet common, and for many the plaintiff listened to his colleague, Sandra Lombardi ("Lombardi"), RN, with UCSD Medical Center, complain about how "immigrants are clogging up the healthcare system". Even naturalized citizens, such as the plaintiff face more discrimination than native born citizens.

147.   According to the EEOC's webpage found in the following link: https://www.eeoc.gov/facts/backlash-employee.html. It is entitled "WORKPLACE RIGHTS OF MUSLIMS, ARABS, SOUTH ASIANS, AND SIKHS UNDER THE EQUAL EMPLOYMENT OPPORTUNITY LAWS" and states:

> Since the attacks of September 11, 2001, the Equal Employment Opportunity Commission (EEOC) and state and local fair employment practices agencies have documented a significant increase in the number of charges alleging workplace discrimination based on religion and/or national origin. Many of the charges have been filed by individuals who are or are perceived to be Muslim, Arab, South Asian, or Sikh. These charges most commonly allege harassment and discharge...

148.   It is also important to note that the DOJ sued UCSD for discriminating against South Asian Muslim American immigrants, such as the plaintiff in this complaint (SETTLEMENT AGREEMENT between the University of California San Diego Medical Center ("Respondent"), and the United States Department of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices ("Office of Special Counsel"); Exhibit 62). UCSD Medical Center agreed to pay $115,000 in penalties and change its system for verifying employment eligibility, in a settlement that resolved a lawsuit filed by the U.S. Justice Department. The

settlement had been reached in a lawsuit the department filed December 6, 2011 that accused the medical center of violating federal law by treating citizens and noncitizens differently when determining whether they could work in the United States. The United States is represented in this matter by Luz V. Lopez-Ortiz and Ronald Lee, OSC Trial Attorneys.

149.   Federal law requires employers to use the same system for all employees, establishing employment eligibility through documents that provide the worker's identity and authorization to work. The suit also claimed UCSD violated a law that allows the employee to choose which federally approved documents to use. . The lawsuit alleged that from 2006 to 2011 UCSD required more than 500 newly hired noncitizens and permanent legal residents to show green cards otherwise known as permanent residency cards, rather than documents of their preference in order to obtain employment with the university. "Under the terms of the settlement agreement, the medical center agrees to implement new employment eligibility verification policies and procedures that treat all employees equally regardless of citizenship status," a Justice Department news release stated. UCSD Medical Center also issued a statement saying "The investigation into this matter has not identified anyone who was denied or lost a job at UC San Diego Medical Center due to our hiring practices..."

150.   This statement is obviously false if considering the facts of this complaint. The evidence presented herein makes it clear that the plaintiff did indeed lose his job at UCSD for the same pattern of discrimination. The doctor working for UCSD thought that he was having a "mild allergic" reaction, and falsely claiming his need for an accommodation simply because he wanted "just to be in a room" with a window. These perceptions demonstrate the discriminatory nature of their practice because if they believed that he was in the severe pain

1    he was describing, then they would have investigated the possible involvement

2    of nerves because only nerve involvement could cause that kind of sharp,

3    shooting, stabbing pain.  These highly biased and discriminatory perceptions

4    spread from Morgan to Bogart, and by way of his notes in his medical records

5    at the UCSD Medical Center they comprised all of the care he received through

6    UCSD subsequently.

7    151.   In a study by Lauderdale, et al. (Exhibit 63) they used data from a large,

8    population based sample of California residents to investigate whether foreign-

9    born persons are more likely to report racial/ethnic discrimination in healthcare

10   than U.S.-born persons of the same race/ethnicity, whether foreign birth has the

11   same impact on discrimination perceptions for persons in different racial and

12   ethnic groups, and whether the immigration effect is "explained" by language

13   use, insurance, source of care, or socioeconomic factors. In their conclusion,

14   they state, "Immigration status should be included in studies of healthcare

15   disparities because nativity is a key determinant of discrimination experiences

16   for Asians and Latinos." Immigrants are among the most vulnerable groups

17   being subjected to discrimination in healthcare. As stated by Derose et al.

18   (Exhibit 64; emphasis added):

19   Immigrants have been identified as a vulnerable population, but there is
20   heterogeneity in the degree to which they are vulnerable to inadequate health
21   care. Here we examine the factors that affect immigrants' vulnerability,
22   including socioeconomic background; immigration status; limited English
23   proficiency; **federal, state, and local policies on access to publicly funded**
24   **health care;** residential location; and stigma and marginalization. We find
25   that, overall, immigrants have lower rates of health insurance, use less health
26   care, and receive lower quality of care than U.S.-born populations; however,
27   there are differences among subgroups. We conclude with policy options for
28   addressing immigrants' vulnerabilities.

152.   As further evidence please consider the following statement from the Racial and Ethnic Disparities in U.S. Health Care: A Chartbook, "These disparities may be explained by the fear and insecurity associated with immigrant status."

153.   There are many such well known instances in the recent past that show a pattern of discriminatory behavior by UCSD and this federally subsidized state institution's issues with diversity, including numerous incidents of racial intolerance on campus as well as discriminatory practices it engages in against immigrant employees mentioned above.

154.   In addition on July 24, 2013 (Exhibit 10), Gessert sent the plaintiff an email requiring more documentation for past absences after he sent an email with a photograph (Exhibit 65) of the condition of his face with a doctor's note advising a change in rooms. Even though he had informed Walter of the doctor's appointments prior to the appointments and she did not ask for documentation, on July 24, 2013 (Exhibit 10), he received an email from Gessert, who was acting as his supervisor at the time because Walter was on vacation, demanding doctor's notes for all his previous appointments retroactively.

155.   This requirement was substantially different from the Timekeeping Policy (Exhibit 66) for the ADCS that the plaintiff was given when he was hired, which states: "if an illness is 3 days or longer, a doctor's note should be given to your Department Human Resources contact and a copy to your supervisor." That day he was forced to take another leave of absence because he had again become seriously ill. he provided all but one of the doctor's notes that were required of him at that time and the remaining one subsequently after a great deal of effort.  Such deferential treatment can only be explained as continuation of the UCSD discriminating, by racially profiling immigrant employees for committing Workers' Compensation or Disability Benefit fraud.

156.   From spending half a dozen years working directly with healthcare providers, the plaintiff can personally attest the sentiment by some providers, such as Lombardi mentioned above, that immigrants, who have not contributed their share into the system are overburdening and clogging up the healthcare system. These healthcare providers do not believe that immigrants, regardless of citizenship status, are entitled to the same resources. According to the article by Pollack *et al* (Exhibit 67):

157.   On average, immigrants experience rapidly declining health status after arrival in Canada and other countries such as the United States and Australia (De Maio & Kemp, 2010; McDonald & Kennedy, 2004). Known as the "healthy immigrant effect," the health advantage enjoyed by newcomers at the time of arrival is quickly eroded due to a number of effects, including the stress of acculturation and difficulty navigating the host country's health care system (Newbold & Danforth, 2003). Barriers to health care, including language, economic, geographic, socio-cultural, knowledge, and transportation barriers, have been widely identified within the literature as inhibiting use of the health care system by immigrants despite increased need for care (Ahmed, Stewart, Teng, Wahoush, & Gagnon, 2008; Asanin &Wilson, 2008; Dunn & Dyck, 2000; Gagnon, 2002; Lawrence & Kearns, 2005; McKeary & Newbold, 2010). Missing from many of these analyses is the potential role of discrimination on the part of health and social service providers and their staff.

**III.    RELIEF YOU REQUEST** *(State exactly what you want the court to do for you. Do not use this space to state the facts of your claim.)*

WHEREFORE, plaintiff prays for judgment as follows:

1.  On the First and Second causes of action, that the plaintiff is awarded damages measured by the amount of lost income plus interest as provided by law totaling less than $300,000.

2.  On the Third cause of action, damages measured by the amount of lost income, plus interest as provided by law, all tripled in accordance with RICO no less than $ 593,025.

3.  On the Fourth cause of action, compensatory and punitive damages totaling no less than $300,000.

4.  On all causes of action, for plaintiff's costs of suit and other costs as provided by law.

5.  On all causes of action, for attorney fees as provided by law.

6.  On all causes of action, for such other and further relief as the Court may deem just and proper.

**IV.   DEMAND FOR JURY TRIAL** *(Would you like a trial by jury on all claims pursuant to FRCP, Rule 38?)*

No

I declare under penalty of perjury that the foregoing is true and correct.

April 3, 2017

Date                                                Signature


                                              Faisal Ahmed

                                              Printed Name



# UC San Diego
## SCHOOL OF MEDICINE

February 13, 2014

Faisal Ahmed
4055 Porte La Paz #149
San Diego, CA 92122

Re: Adjusted Probationary Period End Date

Dear Faisal,

In accordance with Article 32 Probationary Period of the agreement between the University of California and the University Professional and Technical Employees for Research Support Professionals Unit (RX), you are hereby advised your 6 months probationary period end dated has been adjusted to account for time you were on leave which is not qualifying service for the completion of the probationary period.

Your revised probationary period end date is now April 12, 2014.

As per Article 32. D-Release During Probationary Period, prior to completion of the probationary period, an employee may be released at the sole discretion of the University. The employee shall be informed of the general reason(s) for her/his release. Here is the link to Article 32 for reference: http://ucnet.universityofcalifornia.edu/labor/bargaining-units/rx/docs/rx_2013-2017_32_probationary-period.pdf

If you have any questions regarding the above, you may contact me at the number provided below or UCSD Employee/Labor Relations at 619-543-6147.

Sincerely,

*Ellen Mathews*

Ellen Mathews
Neurosciences HR Operations Manager

Enclosure: Proof of Service

cc: Patty Camacho, DBO Neurosciences
Sarah Walter, ADCS Neurosciences Supervisor
Linda Morgan, UCSD Disability & Accommodation Services
UCSD Employee/Labor Relations
Employee Personnel File





**U.S. Department of Justice**

Civil Rights Division

_____

DJ# 205-12-0

Disability Rights Section - NYA
950 Pennsylvania Avenue N.W.
Washington, DC  20530

Mr. Michael Dougherty, Director
Field Management Programs
U.S. Equal Employment Opportunity
 Commission
131 M Street, N.E.
Washington, D.C.  20507

**MAR 2 8 2014**

Re:    Correspondence of Faisal Ahmed
Date Received by DOJ: January 24, 2014
DJ Number: 205-12-0

Dear Mr. Dougherty:

I am referring the enclosed correspondence concerning the employment provisions of the Americans with Disabilities Act of 1990 to you for review and disposition as appropriate. The complainant alleges actions that may constitute discrimination on the basis of disability by the University of California, San Diego. We are sending the complainant a copy of this letter so that the complainant will know how to contact you. By copying the complainant, we are advising him/her that future inquiries about this complaint should be made to your office at 202-663-4935 (voice), 202-663-7063 (TTY).

Sincerely,

Linda A. Garrett
Civil Rights Program Specialist
Disability Rights Section

Enclosures

443345

cc:

Faisal Ahmed
4055 Porte La Paz, Unit #149
San Diego, CA  92122

Exhibit 1
1

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: Faisal Ahmed<br>4055 Porte La Paz, Unit 149<br>San Diego, CA 92122 | From: San Diego Local Office<br>555 W. Beech Street<br>Suite 504<br>San Diego, CA 92101 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 488-2014-00496 | Douglas D. Seamans,<br>Federal Investigator | (619) 557-7290 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Enclosures(s)

Christopher S. Green,
Local Office Director

1/3/17
(Date Mailed)

cc: Ms. Angela Fontanini
Labor Relations Specialist
UC San Diego Health Sciences
9500 Gilman Drive, Dept 0012
La Jolla, CA 92093-0012

Exhibit 2

2

*Lepr Rev* (1993) **64**, 255–258

# Trigeminal neuralgia—a presenting feature of facial leprosy

BRAJENDRA MISHRA,* G. N. MALAVIYA,†‡
A. GIRDHAR,† S. HUSAIN† & B. K. GIRDHAR†
*Bhopal Gas Disaster Research Centre, Gandhi Medical College campus, Bhopal-462 001; and †Central JALMA Institute for Leprosy, PB-31, Tajganj, Agra-282 001, India*

Accepted for publication 14 December 1992

*Summary* Trigeminal neuralgia is a well recognized clinical entity. However, it has not been reported to mimic leprosy or vice versa. Of the 3 cases reported here, 2 initially presented with neuralgic symptoms similar to that seen in trigeminal neuralgia and later developed borderline lesions on the face. The 3rd case demonstrated a tingling sensation along with firm and palpable supraorbital nerve (a branch of trigeminal nerve), and a very early skin lesion on the face pointed to the need to consider neuritic type leprosy before concluding the final diagnosis of a disease like trigeminal neuralgia which calls for a different therapeutic approach.

### Introduction

Many workers support the theory that leprosy starts with the appearance of an indeterminate patch on the skin and then progresses to the other serious forms or types.[1] Neuritic leprosy is the only type which appears without passing through this stage. However, some recent reports say that even neuritic cases have been seen to develop borderline skin lesions in the course of the disease.[6]

Various syndromes associated with nerve lesions have been considered or compared with leprosy, either at the time of making a differential diagnosis, or they have been known to occur during the course of leprosy.

In the first group, scalenus anterior syndrome, cervical rib syndrome and meralgia paraesthetica are the commonest.

In the second group the most frequently occurring clinical entity is lagophthalmos due to the involvement of the facial nerve trunk or its branches supplying the orbicularis oculi.[7] Less frequently occurring cranial nerve involvements are bulbar palsy type syndrome[8] and the loss of taste sensation due to the combined effects of facial, trigeminal and glossopharyngeal nerves.[9] Melkersson syndrome, a rarely seen clinical entity which is manifested by a recurrent facial paralysis, recurrent and eventually permanent facial

‡ Correspondence: P.O. Box 25, GPO, *Agra* Pin-282 001, India.

0305-7518/93/064255 + 04 $01.00  © Lepra

255

Exhibit 3
3

256    *Brajendra Mishra* et al.



**Figure 1.** Location of facial lesions in different patients.

(especially confined to lips) oedema and less constantly, plication of the tongue, has also been described, and this could be due to leprosy, at least in the Far East.[10]

Trigeminal neuralgia occurs in the elderly and middle aged, and consists of an excruciating paroxysm of pain in the gums, lips, cheek and chin, and, very rarely, in the distribution of the ophthalmic division of the 5th nerve. The pain seldom lasts more than a few seconds but may be so intense that the patient winces. The paroxysms frequently occur day and night for several weeks at a time. The cause of this clinical entity is unknown, although occasionally it is a manifestation of multiple sclerosis or herpes zoster. Very rarely a tumour or vascular anomaly in posterior fossa causes irritative lesion in the nerves, which is symptomatically indistinguishable from that of trigeminal neuralgia.

The text-book picture of trigeminal neuralgia does not include paralysis of muscles supplied by the 5th nerve.

**Case reports (Figure 1)**

1.   S.H., a 25-year-old Muslim male, complained of tingling in a small area of his left cheek, intermittently for 3 months. In the area of irritative symptoms no visible patch or nerve thickening was noticed. Slit skin smear for *M. leprae* and lepromin reaction was negative. A provisional diagnosis of Trigeminal neuralgia was made. At the time of the 2nd examination (12 months later), a raised infiltrated patch with anaesthesia along with thickened infraorbital branches on the same side was noticed. A clinical diagnosis of BT leprosy was made and later confirmed by histology of the lesion.

2.   R.J., a 27-year-old Hindu male, under treatment for neuritic leprosy, had developed a cutaneous lesion 12 months before and had paraesthetic symptoms (tingling) on pressing the left side of the forehead. On examination the supraorbital branch of the left trigeminal nerve was found palpable and firm. On pressing this the patient complained about the tingling. There was a faint hypopigmented patch on the left side of the forehead which gradually became more demarcated. The patient responded to a course of multidrug therapy supplemented with oral steroids. Histology of the lesion confirmed BT leprosy.

3.   P.K.M., a 30-year-old Hindu male, presented with a sudden onset of an erythematous

Exhibit 3
4

patch on the left side of the forehead, which covered the area demarcated by hairline above and nasolabial fold below, midline of the face, medially and laterally, and most part of the left eyebrow laterally. On the same side the zygomatic branch of facial nerve was thick. This patient gave a history of having suffered with trigeminal neuralgia 8 years ago which had recovered partially without treatment. He had paralysis of the muscles which are supplied by the motor division of the trigeminal nerve.

He was treated as a case of cerebro-vascular abnormality. After 2 months the lesion was found to be erythematous, firm, smooth and oedematous. Its margins sloped. The left ear was red, slightly itchy and edematous. The cornea was dry and corneal sensations were decreased. There was lacrimation, sialorrhoea and rhinorrhoea, but the patient was unable to feel the discharge due to anaesthesia, indicating sensory loss on the left side. Sensation for modalities like temperature and touch were reduced and impaired in the area innervated by ophthalmic and maxillary divisions of the trigeminal nerve. However, impairment of these modalities in mandibular division was doubtful. Taste sensations were partially affected though the left side of the oral cavity was anaesthetic.

The muscles supplied by the left trigeminal nerve were wasted. Muscle power in massater, pterygoid and temporalis were graded 3, 2 and 1, respectively. There was no weakness in the muscles supplied by the facial nerve.

In slit skin smears from facial lesions and ear lobules, *Mycobacterium leprae* were absent. Blood, urine analysis, skull X-ray and CAT scan were within normal limits. Tests for VDRL and LE cells were negative.

The patient was diagnosed as suffering with borderline tuberculoid leprosy.

**Discussion**

In the 1st case a provisional diagnosis of trigeminal neuralgia was made. Even in the 2nd, paraesthetic symptoms suggested the same diagnosis but there were enough signs to diagnose leprosy. In the 3rd case, even though the first diagnosis of trigeminal neuralgia had been made 8 years before, there is enough information to support the belief that those manifestations could have been an early presentation of leprosy.

Trigeminal neuralgia is a sensory affliction and impairment of motor functions is not documented. In leprous neuritis it is common to find damage to the motor functions resulting in paresis or complete paralysis of the muscles supplied by the affected nerve.

Neurological manifestations of preclinical leprosy deserve more attention. As early as 1964, Cochrane had observed that the early lesion may be preceded by vague paraesthetic or neurological symptoms.[11] To quote him, 'I am convinced that the first definite evidence of disease is seen in the appearance of an area of anaesthesia. This definite sign may be preceded by vague subjective symptoms such as tingling.' He further observed that the time gap between the onset of the 1st sign and diagnosis of leprosy can vary from 2 to 20 years. A recent study by us (under communication) also supports the above views.[12]

The cases reviewed here give enough information to support the view that trigeminal neuralgia-like symptoms may be due to leprosy, and before diagnosing a patient as suffering from trigeminal neuralgia, leprosy should also be considered, particularly if the patient has a family history of leprosy or he or she lives in a leprosy endemic area.

Exhibit 3

5

258     *Brajendra Mishra* et al.

**References**

[1] Dharmendra. Indeterminate group. Vol. 1. Bombay: Medical Publishing House, 1978; 44–7.
   Noordeen SK. Epidemiology of (Poly)neuritic type of leprosy. *Lepr India*, 1972; **Vol. XLIV(2):** 90–6.
   Chacko GJG. *Evolution of pathological lesions in leprosy patients and their immunological significance.* Proceedings of Indo U.K. symposium on leprosy. April 1986, 82–9. Central JALMA Institute publication, Agra, India.
[4] Shenoi SD, Padhee A. Polyneuritic leprosy changing in borderline tuberculoid (BT). *Ind J Lepr*, 1990; **62:** 363–4.
[5] Talwar S, Jha PK, Tiwari VD. (1992) *Neuritic leprosy epidemiology and therapeutic responsiveness* (abstract). XVII Biennial Conference and the workshop of Indian association of leprologists; abstracts of scientific papers FC 38.
[6] Brajendra Mishra, Mukherjee Ashok, Girdhar A, Husain S, Malaviya GN, Girdhar BK. Neuritic leprosy: further progression (under communication).
   Diwan VS. A survey of deformities in leprosy (with special reference to face). *Lepr Rev*, 1962; **33:** 225–64.
   Ishihara S. Bulbar palsy appearing in leprosy patients. *La Lepro*, 1967; **36:** 199 (Japanese: adapted from English summary).
[9] Malaviya GN, Ramu G. Loss of taste sensation over the tongue in leprous facial palsy—a case report 1981; **53(4):** 656–9.
[10] Maurice Victor, Adams RD. Diseases of cranial nerves. In: *Harrison's Principles of Internal Medicine.* Eighth edn, p. 121. Tokyo: Blakiston Publication; McGraw Hill; Kogakusha Ltd, 1977.
[11] Cochrane RAG. *Leprosy in Theory and Practice.* London: John Bristol & Co, 1964; 251.
[12] Brajendra Mishra, Mukherjee A, Girdhar Anita, Husain Sajid, Malaviya GN, Girdhar BK. Evolution of early lesions in leprosy *Lepr. Rev*, 1993; **64:** 259–66.

*Lepr Rev* (1993) **64,** 255–258

**Névralgie du trijumeau—un élément caractéristique de la lèpre de la face**

Brajendra Mishra, G. N. Malaviya, A. Girdhar, S. Husain et B. K. Girdhar

*Résumé*   La névralgie du trijumeau est une entité clinique bien connue. Cependant, on n'a pas rapporté d'observation où elle imite la lèpre ou vice-versa. Des trois cas rapportés ici, deux présentaient au début des symptômes névralgiques similaires à ceux que l'on observe dans la névralgie du trijumeau, et ont développé par la suite des lésions borderline de la face. Dans le troisième cas, une sensation de picotement accompagnée d'un nerf sus-orbital ferme et palpable—une branche du nerf trijumeau—et un début de lésion cutanée de la face évoquent une lèpre de type névritique qu'il faut envisager avant de porter un diagnostic de maladie du genre névralgie du trijumeau qui demande un traitement différent.

**La neuralgia trigeminal—una característica diagnóstica de la lepra facial**

Brajendra Mishra, G. N. Malaviya, A. Girdhar, S. Husain y B. K. Girdhar

*Resumen*   La neuralgia trigeminal es una entidad clínica bien reconocida. Sin embargo, no se ha informado que imita la lepra, ni viceversa. De los tres casos informados aquí, dos inicialmente presentaron síntomas neurálgicos similares a las que se observan en la neuralgia trigeminal, y posteriormente desarrollaron lesiones dudosas en la cara. En el tercer caso, una sensación de hormigueo y una zona firme y sensible entre la supraorbital, es decir una rama del nervio trigeminal, y una lesión muy temprana de la cara, indica la necesidad de pensar en lepra de un tipo neurítico, antes de decidir en un diagnóstico de una enfermedad como neuralgia trigeminal, que requiere un tratamiento terapéutico diferente.

Exhibit 3
6

# UNIVERSITY OF CALIFORNIA, SAN DIEGO
## EMPLOYEE PHYSICAL FUNCTIONAL CAPABILITIES & RESTRICTIONS

**(Please Type or Print)**

EMPLOYEE'S NAME: Faisal Ahmed _____ PHONE: 858-657-7122 _____

JOB CLASSIFICATION: SRA II _____

SUPERVISOR'S NAME: Hyong S. Kim, MD _____ PHONE: 858-657-7150 _____

Please contact Employee Rehabilitation Counselor at (858) 534-6744 if more detailed information is needed.
The attached job description contains the job's functional requirements.

Treating physician's name  Jan Fronek _____ Phone: 858-764-3331 _____

## PHYSICIAN'S EVALUATION
### EMPLOYEE'S CURRENT PHYSICAL FUNCTIONAL RESTRICTIONS & CAPABILITIES

Maximum weight to be lifted: 5-10 lbs _____   Carried: 5 lbs _____

Please describe any restrictions pertinent to: bilateral ACL injuries _____

Total number of work hours/day  7 hr/day  Working at heights  No   Equipment/vehicle operation  Ok

Sitting  Ok _____ Bending/Stooping  No _____ Keyboarding  Ok _____

Climbing  No _____ Walking  <20 min/day   Reaching  No _____

Pushing/Pulling  No _____ Standing  <30 min/day   Other Activities  No pivoting motions

Please list any cognitive functional limitations and other work environment considerations: Faisal should avoid
uneven terrain and confined tight spaces that would require pivoting to move.

Comments: After two months of recovery from his injury, Faisal will need two
surgeries. Each will require at least 4 months of recovery time, during which
his activity will be restricted.

Date employee able to return to modified duty: Mar. 1 _____

Recommended type of job modification(s): limited to desk work. _____

Date of projected return to regular duties: Initial recovery, May 30, prior to reconstructive
surgery

Please describe any anticipated permanent restrictions:  None anticipated

| (Treatment Professional's Signature) | Jan Fronek (Printed Name) | MD (Degree) | 3/23/12 (Date) |
|---|---|---|---|

Reviewed by: _____

| (Supervisor's Signature) | (Printed Name) | (Telephone #) | (Date) |
|---|---|---|---|

Upon completion, please e-mail copy to: cbenrimoj@ucsd.edu or send copy to:
Employee Rehabilitation Counselor, UCSD, 9500 Gilman Dr., La Jolla, CA  92093-0944   Fax: (858) 534-0190

FAX - 534-6046

TOTAL P.02

Exhibit 4

7

 Gmail

**Faisal Ahmed <faisahmed1@gmail.com>**

---

## FW: Departure

**Faisal Ahmed** <faisahmed1@gmail.com>                    Mon, Mar 19, 2012 at 11:22 AM
To: nmschenker@gmail.com

This is all he could respond with.  He canceled our evaluation meetings a couple times more than 6 months ago and didn't say anything again until our 1 on 1 meeting after I got hurt.  He's not even going to read the email or understand what I'm pleading for.

---

**From:** Kim, Hyong
**Sent:** Monday, March 19, 2012 9:58 AM
**To:** Ahmed, Faisal
**Cc:** Kaplan, Linda; Leedy, Deborah
**Subject:** RE: Departure

Faisal,

My concerns pre-date your recent  injury. I am reminding you now for the 4th time to schedule a performance review with me. Please feel free to note all your concerns below in the self-evaluations. And for the record, I respect your current medical restrictions.

Debby/Linda – I will need to speak to you about due process and the contents of Faisal's statement below.

Thanks,

Nick

---

**From:** Ahmed, Faisal
**Sent:** Monday, March 19, 2012 9:03 AM
**To:** Kim, Hyong
**Cc:** Santana, Luis; Kaplan, Linda; Leedy, Deborah; Doss, Paula
**Subject:** RE: Departure

Dr. Kim,

It is not my custom to point fingers, but in the current circumstances, I have no other choice.  The ECG tracing you're referring to from December was for a randomization visit which was not performed by me.  The ECG was buried in the chart and there was no mention of it needing review and a signature until the GRIPHON monitor finally sent us a

Exhibit 5

8

follow-up letter for a monitoring vi..... hat she did in December (please see the ....ched email). She even apologizes for the delay in getting the report to us.

To address the inferences you've made regarding my productivity being the cause for delays in scheduling "timely" monitoring visits, I must respectfully disagree with your conclusions. It seems that you are not taking into consideration my current disability, and that lack of consideration while I am handicapped is what led to me being ordered to come to clinic in a hurry during a heavy downpour on Monday, February 27, 2012.

As you may recall, I was supposed to have a doctor's appointment on that day at that time, but unfortunately for me the doctor's office rescheduled due to an emergency surgery for another patient. Otherwise, I would probably have had the Work Restrictions, which I now have, in place to protect me from being placed in such a precarious position. It is also unfortunate that I did not manage to have a MRI done prior to that day to be able to determine to what extent events on that day further injured me.

There is a direct relationship between the days of work I lost due to making my injury worse on that day and the need to postpone these upcoming monitoring visits. I will not deny I'm currently working at a sub optimal level of efficiency, but the fact is that this is due directly to the instability of my knees and decreased mobility from having to use crutches to get around. I'm not sure you understand the nature of my injury. Your comment that "You're too young to be having these problems" would seem to indicate that you do not. I don't have arthritis; I suffer from torn anterior cruciate ligaments in both knees, which is a common athletic injury. Indeed for some professional athletes this injury is a career ending event. Due to this injury my knees are unstable, therefore there is slippage of the knee joint where bones are moving out of place and running into other bones and/or causing meniscal damage. Though arguably not as critical as pulmonary diseases, the injuries are nonetheless very painful and extremely debilitating.

I've done my best to play through the pain, and work through injury putting my health and recovery at risk only to be told that I am not performing well enough. The last time I was injured, I still came to work and archived boxes because I felt it was my duty to finish the job, and I felt responsible since there was nobody else to take care of it. Even though I was in severe pain, I still came to work the day after my recent injury. I know now that I should have tended to my wounds better rather than tough it out and show up to work.

I realize now that my stoicism in the face of pain, sickness and injury doesn't serve me well because it makes people think that I'm fine when I'm not. I have tried to put on a brave face and continue with my work the best I can, but when there is no appreciation for my efforts but rather a constant questioning of my time, effort and productivity, it is almost impossible to continue under these circumstances. At times it seems like there is a refusal on the part of some to believe that my injuries and disability are real. I still have to do all of the tasks I normally have to do to perform my job, from moving binders, having to negotiate the cramped space of the clinical trials supplies/chart room, to getting laboratory samples for patient visits, and using my crutches to hobble over the hospital.

Many of these activities violate the work restrictions placed on me by my doctor. To date, there has been no consultation of any type as to how to help accommodate my limited ability to work. I am expected to carry on as usual and if I can't perform as well, then my time, effort and productivity are called into question.

You yourself said that the research program was "... doing better" than we were when you first took over as PI during a 1 on 1 meeting a couple of months ago. We had made it through some very difficult times and although there was

Exhibit 5
, 9 >

still room for improvement we had come a long way together. The extreme scrutiny and dismay of my work performance only started after my recent injury and particularly after Monday, February 27, 2012. Clearly there is a correlation between my injury and my ability to do my job efficiently and your evaluation of my performance. It is also clear that you need study coordinators who are able to get to the clinic, which as you know is a quite a long distance from our office building, in a hurry and work efficiently in an ever competitive and demanding research environment. My physical health requires me to restrict my activities and movement so that I can heal and recover from my injury. Therefore our needs are not compatible.

The last time I got hurt and had to take some time to recover caused many problems for the research team, and I believe we all would prefer not to go through that again. The current situation is untenable and not beneficial to the research team or to me. The team is not getting the productivity from me that it needs and demands, and I'm not being able to heal from my injuries because the demands of work are constantly aggravating my knee. Last week I worked 4 days, and a couple of days were very long, making my knee very swollen and painful by Friday so I was not able to go to work. This cycle will only continue if I can't take some time off to heal.

As I informed you last week on Wednesday, the doctor confirmed that my right ACL is torn as well as the left. He told me that it would take at least another 2 months to heal just to a point where I can have surgery. Since both my ACLs are torn at this point I will need 2 surgeries this year with maybe 3 to 4 months between them, but as you may recall from my previous surgery, ACL reconstruction requires extensive rehab and physical therapy, for up to a year post surgery. That means that I won't be 100% back to work for most of this year. This predicament I find myself in and the needs of the research team are not compatible.

It's unfair to the team to have to accept less than 100% from me for such a long time and at such a critical juncture. It's unfair to me, because I need time to heal and recover from these injuries and I'm not able to take the time I need without letting the work, and therefore the stress also, pile up in my absence. We have a mutual problem here and I need your help to find a mutually acceptable solution that gives everybody what they need rather than following the current course of action where I find myself under more and more pressure that I'm no longer able to cope with in my current condition. The doctor wrote me a prescription for physical therapy, which he wanted me to start several weeks ago, but due to the demands of work I've not been able to do that. I have an evaluation appointment today at 4:20 PM and a follow-up scheduled for 4:30 PM tomorrow. I will be leaving work earlier than usual due to these appointments but as you know the work still needs to get done. As you can see the demands of work and the demands placed on me by my injury are in conflict.

Perhaps we can initiate the interactive process again before this situation gets worse and together figure out if there is a way for us to reach an accommodation, and if we cannot reach an accommodation, you can put in a request for a medical separation evaluation. As it stands now neither of us is getting what we need, and despite my working at full capacity under my current circumstances to the point of jeopardizing my recovery, you are not satisfied with my performance. Please consider this as a plea for help to manage this very difficult situation that I find myself in.

Sincerely,

Faisal

Exhibit 5
10

Faisal Ahmed

Clinical Research Coordinator

Pulmonary Vascular Division

UCSD Medical Center

9300 Campus Point Drive # 7381

Mail Code:  7381

La Jolla, CA 92037 - 7381

Phone:  858-657-7122

Fax:  858-657-7107

e-mail:  f-ahmed@ucsd.edu

---

**From:** Kim, Hyong
**Sent:** Thursday, March 15, 2012 7:21 AM
**To:** Ahmed, Faisal
**Subject:** Re: Departure


Faisal,

Thanks for the daily updates. As you know, the time spent at work is not the only concern -- it's your productivity I am also (more) concerned with. Asking me to sign off on trials data from December in mid-March gives me information and makes me draw conclusions such as why some timely monitor visits get postponed from your end.

Best,



Nick Kim, M.D.

Associate Clinical Professor of Medicine

Fellowship Program Director

Clinical Service Chief, Thornton

Pulmonary and Critical Care Medicine

University of California, San Diego




On Mar 15, 2012, at 12:00 AM, Ahmed, Faisal wrote:

Exhibit 5

Dear Dr. Kim,

I am departing from work.

Best regards,

Faisal Ahmed

Clinical Research Coordinator

Pulmonary Vascular Division

UCSD Medical Center

9300 Campus Point Drive # 7381

Mail Code:  7381

La Jolla, CA 92037 - 7381

Phone:  858-657-7122

Fax:  858-657-7107

e-mail:  f-ahmed@ucsd.edu

THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL.  ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED.  IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.

Exhibit 5

12

**Faisal Ahmed**

**From:** Ahmed, Faisal
**Sent:** Saturday, April 27, 2013 10:26 AM
**To:** Walter, Sarah
**Subject:** RE: Weekly touch base - Faisal - 4/26/2013

Hi Sarah,

I apologize for the miscommunication. As we discussed yesterday, I have been having difficulty communicating clearly while feeling fatigued and nauseous from illness.   Yesterday I came home with the intention of grabbing a warmer coat and a bite to eat.  After eating, I felt nauseous and unable to drive, that is when I sent you the message and rested for awhile.  I did not mean to be presume that it would be okay for me to work from home without your approval.

Perhaps another workspace, possibly one with a window that allows for fresh air to come in, would be better suited for me.


Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Friday, April 26, 2013 9:53 PM
**To:** Ahmed, Faisal
**Subject:** Re: Weekly touch base - Faisal - 4/26/2013

Hi Faisal,

In the future please speak to me in person about something like this before taking action.  We do not currently have a flexible/telecommuting agreement in place for your position, and I cannot approve working from home without this in place.

I will find out from facility services if something can be done about the vents.  If your office is not satisfactory there may be other work spaces available that you can use.

Let's discuss further.

Thanks!
Sarah

Exhibit 8
20

On Apr 26, 2013, at 3:20 PM, Ahmed, Faisal wrote:

Hi Sarah,

Thank you for following up with Linda and Jenkis. I decided to come home for lunch because it seems like the my office room was very cold, and I also sneeze a lot more when I'm in there. May the vent filters need to be cleaned out or replaced? It is okay with you, I would prefer to finish the ECS assignment using my desktop at home, although I will have to return to the office since I left some things there. I do have full access to my workstation from here via VNC.


Warm regards,

Faisal


On 4/26/13 2:19 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:


Hi Faisal,

Here are my notes from our conversation today. It's important that we wrap up these loose threads for the Perl course and practicum before your HBA assignments begin in earnest. Keep me posted on what your docs say.

**Task Priorities**
Today: HBA ECS
Monday: Perl Course - 2-3 hrs left to complete final assignment
By Tuesday lunch: Practicum - 4 hrs - then send me what you've got
Database Schema - first draft next friday
Also to be assigned next week - experimental forms. Documenting diffs in administration for end users and to inform offline qc.

**Training Priorities**
1. GCP and HIPAA (Faisal following up with Jenkis on whether current trainings are ok)
2. Database training, practice session
3. Read ADCS Grant - review with Sarah (attached)
4. Review primary/secondary outcomes used by ADCS
ADAS-Cog (include Maze, Number Cancellation, Delayed word recall)
CDR
CGIC
ADCS-ADL

I also am following up with Linda Mellor for the ergo assessment and Jenkis on what UC policy is for health leave during probationary period.

Thanks,
Sarah

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel: 858-246-1347

Exhibit 8
21

Cell: 858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel: 858-246-1347
Cell: 858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Exhibit 8
22



# JAN
## Job Accommodation Network
### Practical Solutions • Workplace Success

# Accommodation and Compliance Series

# Employees with Respiratory Impairments

**Job Accommodation Network**
**PO Box 6080**
**Morgantown, WV 26506-6080**
**(800)526-7234 (V)**
**(877)781-9403 (TTY)**
**jan@askjan.org**
**askjan.org**



Exhibit 22
88



**ODEP**
Office of Disability
Employment Policy

**A service of the U.S. Department of Labor's Office of Disability Employment Policy**

# Preface

The Job Accommodation Network (JAN) is a service of the Office of Disability Employment Policy of the U.S. Department of Labor. JAN makes documents available with the understanding that the information be used solely for educational purposes. The information is not intended to be legal or medical advice. If legal or medical advice is needed, appropriate legal or medical services should be contacted.

JAN does not endorse or recommend any products or services mentioned in this publication. Although every effort is made to update resources, JAN encourages contacting product manufacturers/vendors and service providers directly to ensure that they meet the intended purposes. This guarantees that the most up-to-date information is obtained.

The following document is not copyrighted and reproduction is encouraged. Section 105 of the Copyright Law provides that no copyright protection is available for works created by the U.S. Government. Therefore, all works created by JAN fall under this provision. While individuals may use such work with impunity, individuals may not claim copyright in the original government work, only in the original material added. Individuals may access the full text of the law from the U.S. Copyright Office http://www.loc.gov/copyright. Please note that specific information cited by JAN may be copyrighted from other sources. Citing secondary sources from a JAN publication may violate another organization's or individual's copyright. Permission must be obtained from these sources on a case-by-case basis. When using JAN materials, JAN asks that the materials not be reproduced for profit, that the tone and substance of the information are not altered, and that proper credit is given to JAN as the source of the information. For further information regarding this or any other document provided by JAN, please contact JAN.

Updated 02/27/13.

Exhibit 2
89

## JAN'S ACCOMMODATION AND COMPLIANCE SERIES

### Introduction

JAN's Accommodation and Compliance Series is designed to help employers determine effective accommodations and comply with Title I of the Americans with Disabilities Act (ADA). Each publication in the series addresses a specific medical condition and provides information about the condition, ADA information, accommodation ideas, and resources for additional information.

The Accommodation and Compliance Series is a starting point in the accommodation process and may not address every situation. Accommodations should be made on a case by case basis, considering each employee's individual limitations and accommodation needs. Employers are encouraged to contact JAN to discuss specific situations in more detail.

For information on assistive technology and other accommodation ideas, visit JAN's Searchable Online Accommodation Resource (SOAR) at http://AskJAN.org/soar.

### Information about Respiratory Impairments

**What is a respiratory impairment?**

Respiratory impairment is a generic term that refers to a number of medical conditions that can affect the respiratory system and may result in limitations such as labored breathing or asthma attacks, fatigue and difficulty with mobility, heightened sensitivity to ordinary substances and chemicals, and compromised immunity to infection.

**What causes respiratory impairments?**

The following is a non-comprehensive list of many of the medical conditions that may result in respiratory impairments: Allergies, Asthma, Chemical Sensitivity (MCS), Chronic Obstructive Pulmonary Disease, Cystic Fibrosis, Environmental Illness (EI), Fragrance Sensitivity, Lung Cancer, Pulmonary Sarcoidosis, Tuberculosis, Emphysema, Pulmonary Hypertension, Latex Allergy, and AIDS Related Lung Disease.

For more detailed information, see Appendix A at the end of this document.

**How are respiratory impairments treated?**

Treatment of respiratory impairments depends on many factors, such as the type and stage of impairment; family history; and the individual's medical history, health, and age. Any of the following may be used for treating respiratory impairments: Inhalers or nebulizers containing bronchodilators or corticosteroids, expectorants, antibiotics, oxygen therapy, chemotherapy, lung transplantation, lung reduction surgery, natural treatments such as N-Acetyl Cysteine and Carnitine, and complementary/integrative therapies and treatments (About.com, 2006).

# Respiratory Impairments and the Americans with Disabilities Act

### Are respiratory impairments disabilities under the ADA?

The ADA does not contain a list of medical conditions that constitute disabilities. Instead, the ADA has a general definition of disability that each person must meet (EEOC Regulations . . ., 2011). Therefore, some people with respiratory impairments will have a disability under the ADA and some will not.

A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or is regarded as having an impairment (EEOC Regulations . . . , 2011). For more information about how to determine whether a person has a disability under the ADA, visit http://AskJAN.org/corner/vol05iss04.htm.

Ex. 22

91

# Accommodating Employees with Respiratory Impairments

(Note: People with respiratory impairments may develop some of the limitations discussed below, but seldom develop all of them. Also, the degree of limitation will vary among individuals. Be aware that not all people with respiratory impairments will need accommodations to perform their jobs and many others may only need a few accommodations. The following is only a sample of the possibilities available. Numerous other accommodation solutions may exist.)

**Questions to Consider:**

1. What limitations is the employee with respiratory impairment experiencing?

2. How do these limitations affect the employee and the employee's job performance?

3. What specific job tasks are problematic as a result of these limitations?

4. What accommodations are available to reduce or eliminate these problems? Are all possible resources being used to determine possible accommodations?

5. Has the employee with respiratory impairment been consulted regarding possible accommodations?

6. Once accommodations are in place, would it be useful to meet with the employee with respiratory impairment to evaluate the effectiveness of the accommodations and to determine whether additional accommodations are needed?

7. Do supervisory personnel and employees need training regarding respiratory impairments?

**Accommodation Ideas:**

Avoiding Environmental Triggers:

Some respiratory impairments are aggravated by environmental triggers. It may be helpful to:

- Maintain a clean and healthy work environment
- Provide air purification
- Condition, heat, dehumidify, or add moisture to the air as appropriate
- Provide additional rest breaks for the individual to get fresh air or take medication
- Create a smoke and fragrance-free work environment
- Consider an alternative work arrangement such as work from home
- Allow for alternative work arrangements when construction is taking place
- Use alternative pest management practices
- Implement a flexible leave policy

Ex. 22

92

- Allow for alternative means of communication such as telephone, e-mail, instant messaging, fax, or memos

Accessibility Accommodations:

An individual who experiences respiratory limitations may have difficulty performing activities that require gross motor movement, such as walking long distances, or performing activities that require excessive physical activity. It may be necessary to address access concerns for an individual who has difficulty approaching the work facility, moving around the facility, getting to work, or traveling as an essential job function.

- Modify the work-site to make it accessible
- Provide an accessible parking space with an unobstructed and easily traveled path into the workplace
- Provide an entrance free of steps with doors that open automatically or that have a maximum opening force of five pounds
- Provide an accessible route of travel to and from work areas used by the individual throughout the work environment
- Consider providing a scooter or motorized cart for the employee to use for long distances if the employee does not already use a mobility aid
- Move the individual's workstation closer to equipment, materials, and rooms the individual uses frequently
- Modify the workstation to accommodate a wheelchair, scooter, or the use of oxygen therapy equipment
- Arrange the workstation so materials and equipment are within reach range
- Provide restrooms that are easily accessed from the individual's workstation
- Review emergency evacuation procedures

Modify Policies:

Due to the unpredictable nature of the onset of respiratory limitations, an individual may have difficulty maintaining regular attendance or a regular schedule. It may be necessary to:

- Modify the location where work is performed
- Modify the attendance policy
- Provide leave as an accommodation
- Provide a modified or part-time work schedule
- Provide breaks

Maintain Air Quality:

The U.S. Environmental Protection Agency (EPA) provides suggestions for improving indoor air quality in its article, An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html. Employers should keep indoor air

Ex. 22

93

quality concerns in mind for employees with and without respiratory impairments. Good IAQ can improve worker productivity for everyone. To maintain air quality, it may be necessary to:

- Provide an office or workspace that has working windows
- Maintain the heating, ventilation, and air conditioning (HVAC) system
- Test indoor air quality
- Use air purification systems throughout the building or in personal workstations
- Reduce workplace pollutants
- Provide a mask
- Adjust indoor temperature to meet the individual's needs
- Institute a fragrance-free workplace
- Provide pre-notification of construction and cleaning in the workplace
- Use non-toxic building materials, furnishings, supplies, and flooring
- Use non-toxic solvents, primers, stains, paints, etc.

**Situations and Solutions:**

A teacher diagnosed with sick building syndrome was required to attend weekly faculty meetings in the school building. She usually taught class from a portable classroom outside of the building and could not be in the school building for extended time. JAN suggested that she use either a speakerphone or PA system from her classroom to listen in and participate in the meetings, be provided with meeting minutes, or attend the meetings and wear a respirator mask if she felt comfortable doing so.

An office worker with fragrance sensitivity was having difficulty because of the cleaning products used in the employee restroom. JAN provided information about non-toxic cleaning products.

An employee with bronchial asthma could not work in hot environments. JAN discussed air-conditioning, including a window unit for the employee's office if the employer could not install central air.

A hospital worker with COPD had difficulty walking from the employee lot to the work-site. The parking lot was very large and employees parked on a first-come, first-serve basis. JAN suggested providing a reserved parking space close to the work-site.

**Products:**

There are numerous products that can be used to accommodate people with limitations. JAN's Searchable Online Accommodation Resource at http://AskJAN.org/soar is designed to let users explore various accommodation options. Many product vendor lists are accessible through this system; however, JAN provides these lists and many more that are not available on the Web site upon request. Contact JAN directly if you have specific accommodation situations, are looking for products, need vendor information, or are seeking a referral.

Ex 22

94

# Resources

**Job Accommodation Network**
West Virginia University
PO Box 6080
Morgantown, WV 26506-6080
Toll Free: (800)526-7234
TTY: (877)781-9403
Fax: (304)293-5407
jan@AskJAN.org
http://AskJAN.org

The Job Accommodation Network (JAN) is a free consulting service that provides information about job accommodations, the Americans with Disabilities Act (ADA), and the employability of people with disabilities.

**Office of Disability Employment Policy**
200 Constitution Avenue, NW, Room S-1303
Washington, DC 20210
Toll Free: (866)633-7365
TTY: (877)889-5627
Fax: (202)693-7888
http://www.dol.gov/odep/

The Office of Disability Employment Policy (ODEP) is an agency within the U.S. Department of Labor. ODEP provides national leadership to increase employment opportunities for adults and youth with disabilities while striving to eliminate barriers to employment.

**American Cancer Society**
Toll Free: (800)227-2345
http://www.cancer.org

The American Cancer Society is the nationwide community-based voluntary health organization dedicated to eliminating cancer as a major health problem by preventing cancer, saving lives, and diminishing suffering from cancer, through research, education, advocacy, and service.

Ex 22
95

**American Lung Association**
1301 Pennsylvania Avenue NW
Suite 800
Washington, DC  20004
Direct: (202)785-3355
Fax:  (202)452-1805
info@lungusa.org
http://www.lungusa.org/

Conducts educational programs, sponsors conferences, publications, fellowships and research grants.

**Asthma and Allergy Foundation of America**
8201 Corporate Drive, Suite 1000
Landover, MD  20785
Toll Free:  (800)727-8462
Fax: (202)466-8940
http://www.aafa.org/

The Asthma and Allergy Foundation of America (AAFA) is the premier patient organization dedicated to improving the quality of life for people with asthma and allergies and their caregivers, through education, advocacy and research. AAFA, a not-for-profit organization founded in 1953, provides practical information, community based services, support and referrals through a national network of chapters and educational support groups. AAFA also sponsors research toward better treatments and a cure for asthma and allergic diseases.

Ex 22
96

# References

About.com. (2006). *What is lung disease?* (2006). Retrieved September 5, 2008, from

    http://lungdiseases.about.com/od/basicinformation/a/basicinfo.htm (no longer

    available)

EEOC Regulations To Implement the Equal Employment Provisions of the Americans

    With Disabilities Act, as Amended, 29 C.F.R. § 1630 (2011).

**Appendix A**

The following is a non-comprehensive summary of many of the medical conditions that may result in respiratory limitations. For more detailed information, contact an appropriate medical professional or the resources listed at the end of this document.

Allergies: According to the Asthma and Allergy Foundation of America (AAFA), an estimated 50 to 60 million Americans are affected by allergies. In fact, allergies are the sixth leading cause of chronic disease in the United States (AAFA, n.d.). It is common for an individual to be sensitive to more than one particular irritant. A substance that may normally not affect the average person may produce nasal congestion, itchy, watery eye, or an asthma attack for someone who is allergic. Allergic symptoms may occur due to dust, mold, mildew, pollen, foods, and insects among any number of other substances.

Asthma: According to the American Lung Association (ALA), asthma is a chronic lung disease that can be life threatening (ALA, 2008d). Asthma causes breathing problems known as asthma attacks or episodes of asthma. A person with asthma might get an asthma attack when they have a cold or some other kind of respiratory infection or when they breathe something that bothers the lungs such as cigarette smoke or dust. Asthma symptoms are often triggered by changes in weather (cold or hot), emotional distress and exercise. Asthma attacks may start suddenly or may take an extended period of time, even days, to develop. Attacks can be severe, moderate or mild and can require a period of recuperation.

Chemical Sensitivity (MCS), Environmental Illness (EI), and Fragrance Sensitivity: Chemical sensitivity, or MCS, is characterized by such symptoms as headaches, dizziness, nausea, breathing difficulties, tightening of the throat, chronic laryngitis, difficulty concentrating, memory loss, learning disorders, eczema, arthritis-like sensations, and muscle pain (About.com, 2006). A person who experiences limitations due to MCS or EI *may* have any of the above mentioned symptoms when exposed to such irritants as fragrances, cleaning agents, smoke, pesticides, molds, fumes from office machines, car exhaust, paint, new carpeting, solvents and other irritants.

For more specific information regarding MCS/EI, see JAN's Accommodation and Compliance Series: Employees with Chemical Sensitivity or Environmental Illness at http://AskJAN.org/media/MCS.html.

For more specific information regarding fragrance sensitivity, see JAN's Accommodation and Compliance Series: Employees with Fragrance Sensitivity at http://AskJAN.org/media/fragrance.html.

Chronic Obstructive Pulmonary Disease (COPD): The American Lung Association indicates that COPD is the fourth leading cause of death in America. Approximately 16.4 million Americans are diagnosed with COPD. COPD includes diseases that are characterized by obstruction to airflow such as emphysema or chronic bronchitis. It does not include other obstructive diseases such as asthma. Chronic bronchitis is an

Ex 22

98

inflammation and eventual scarring of the lining of the bronchial tubes and is evidenced by a chronic cough, increased mucus, frequent clearing of the throat and shortness of breath. Emphysema causes irreversible lung damage and is evidenced by cough, shortness of breath and limited exercise tolerance (ALA, 2002a).

Lung Cancer: According to the American Cancer Society's Lung Cancer Resource Center, it is estimated that there will be 169,400 new cases of lung cancer in the United States in 2002. Statistics show that lung cancer is the leading cause of cancer death among both men and women. More people die of lung cancer than of colon, breast, and prostate cancers combined (ACS, n.d.a).

Lung cancer generally develops over a period of years and typically affects people over the age of 50. The American Lung Association's, *Facts About Lung Cancer*, describes cancers that begin in the lungs. Lung related cancers are divided into two major types, non-small cell lung cancer and small cell lung cancer. Non-small cell lung cancer generally spreads to distant organs more slowly than small cell lung cancer. Squamous cell carcinoma, adenocarcinoma, and large cell carcinoma are three types of non-small cell lung cancer (ACS, n.d.a).

Pulmonary Sarcoidosis: Pulmonary sarcoidosis affects lung volume decreasing the amount of air the lungs can hold. The American Lung Association describes the disease as being characterized by the presence of granulomas, small areas of inflamed cells. They can appear on the walls of the alveoli (small air sacs in the lungs), or on the walls of the bronchioles (breathing tubes in the lungs), or in the lymph nodes surrounding the lungs. Symptoms include a dry cough, shortness of breath, or mild chest pain. Additionally, the person may experience fatigue, weakness, and weight loss. In cases where symptoms do appear outside the lung, they can include a scaly rash, red bumps on the legs, fever, soreness of the eyes, and pain and swelling of the ankles (ALA, 2008b).

Tuberculosis (TB): TB is an infection that primarily affects the lungs but can also affect other organs and tissues in the body. The infection is spread by airborne TB bacteria. A person may have *TB infection* or *TB disease*. If a person has TB infection they are essentially a carrier of the bacteria but are not affected by the bacteria. A person infected with TB disease, however, is ill and requires treatment. A person with TB disease can spread the disease. Symptoms of TB disease include excessive coughing (including coughing blood), repeated night sweats, unexplained weight loss, loss of appetite, fever, chills, and general lethargy. According to the American Lung Association, the rate of reported tuberculosis dropped 45 percent between 1992 and 2000. The decrease in reported TB has been attributed to improved TB control programs (ALA, 2008f).

Emphysema: According to the American Lung Association, emphysema ranks 15th among chronic conditions that contribute to activity limitations. An estimated 44 percent of individuals with emphysema report that daily activities have been limited by the disease. Emphysema develops gradually, usually from exposure to cigarette smoke. Some individuals are born with a deficiency of a protein known as alpha 1-antitrypsin

(AAT) which can lead to an inherited form of emphysema called alpha 1-antitrypsin (AAT) deficiency-related emphysema. For individuals with emphysema, the air sacs in the lungs become damaged and less able to transfer oxygen to the bloodstream. The individual then becomes short of breath and has difficulty exhaling because the lungs also lose their elasticity (ALA, 2008a).

Pulmonary Hypertension (PH): There are two forms of pulmonary hypertension, primary (PPH) and secondary (SPH). According to the American Lung Association, it is estimated that there are 300 new cases of PPH per year. PPH is defined as a rare disease of unknown cause that results in the progressive narrowing of the blood vessels of the lungs, causing high blood pressure in these blood vessels which eventually leads to heart failure. Secondary pulmonary hypertension (SPH) results from other types of lung disease, abnormal breathing processes, or heart disease (ALA, 2002h). According to the Mayo Clinic, symptoms and limitations of PPH include shortness of breath with exertion and general fatigue, passing-out spells, dizziness, ankle or leg swelling, and chest pain or pressure (ALA, 2008a).

Latex Allergy: The Occupational Safety and Health Administration (OSHA) states the following about latex allergy, "Allergy to latex was first recognized in the late 1970s. Since then, it has become a major health concern as an increasing number of people in the work place have been affected. Health care workers exposed to latex gloves or medical products containing latex are especially at risk. It is estimated that 8-12% of health care workers are latex sensitive. Between 1988 and 1992, the Federal Drug Administration (FDA) received more than 1,000 reports of adverse health effects from exposure to latex, including 15 deaths due to such exposure" (OSHA, n.d).

Latex allergy reactions can range from mild to very severe. Typically, the allergy begins with an irritant contact dermatitis and can develop into an immediate allergic reaction with respiratory symptoms. An individual with a latex allergy can be affected after coming into physical contact with products like latex gloves, elastic from waist bands, rubber bands, or medical equipment, by inhaling proteins from powdered latex gloves or balloons or by ingesting food products that have been prepared by workers using latex products.

For more specific information regarding latex allergy, see JAN's Accommodation and Compliance Series: Employees who are Allergic to Natural Rubber Latex at http://AskJAN.org/media/LATEX.html.

AIDS Related Lung Disease: A person with AIDS may experience any number of lung infections. Most common are pneumocystis carinii pneumonia (PCP), which is caused by a fungus, and tuberculosis and mycobacterium avium complex (MAC) which are caused by bacterium. AIDS also predisposes an individual to a variety of other lung infections from bacteria and molds (ACS, n.d.b). It is important for an individual with a compromised immune system to make an effort to avoid exposure to viruses and bacteria to stay healthy.

Ex 20

100

### References for Appendix A

About.com. (2006). *Multiple chemical sensitivity (MCS) the controversy?* (2006).

> Retrieved September 5, 2008, from

> http://allergies.about.com/library/weekly/aa011899.htm?terms=Multiple+Chemic

> al+Sensitivity

American Cancer Society (n.d.a). *All about lung cancer.* Retrieved September 5, 2008,

> from http://www.cancer.org/docroot/CRI/CRI_2x.asp?sitearea=&dt=15

American Cancer Society (n.d.b). *AIDS-related lung cancers.* Retrieved September 5,

> 2008, http://www.cancer.org/docroot/CRI/content/CRI_2_4_4x_AIDS-

> Related_Cancers_78.asp

American Lung Association (2008a). *Chronic obstructive pulmonary disease (COPD).*

> Retrieved September 5, 2008, from

> http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=205882

> 9&content_id={12C9AADB-157F-4ABB-A4C4-FC694FBE0323}&notoc=1

American Lung Association (2008b). *Sarcoidosis.* Retrieved September 5, 2008, from

> http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=206072

> 7&content_id={96FE4972-D321-4E95-B03F-042FEFB92682}&notoc=1

American Lung Association (2008c). *Tuberculosis fact sheet.* Retrieved September 5,

> 2008, from

> http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=206073

> 1&content_id={1ED78388-82B6-4D6B-A242-C6794FB77034}&notoc=1

American Lung Association (2008d). *Asthma in adults fact sheet.* Retrieved September

> 5, 2008, from

Ex 22
102

http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=205881

7&content_id={39966A20-AE3C-4F85-B285-68E23EDC6CA8}&notoc=1

American Lung Association (2008e). *Lung cancer fact sheet.* Retrieved September 5,

2008, from

http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=206024

5&content_id={BD3F3387-3AA3-4660-9EF7-3F5BD8B6D251}&notoc=1

American Lung Association (2008f). *Tuberculosis fact sheet.* Retrieved September 5,

2008, from

http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=206073

1&content_id={1ED78388-82B6-4D6B-A242-C6794FB77034}&notoc=1

American Lung Association (2003). *Primary pulmonary hypertension (PPH) fact sheet.*

Retrieved September 5, 2008, from

http://www.lungusa.org/site/apps/nlnet/content3.aspx?c=dvLUK9O0E&b=206032

1&content_id={FA692DC0-B9A9-4BDC-88F4-2609BD6E0EDD}&notoc=1

American Lung Association (2008f). *Tuberculosis fact sheet.* Retrieved January 26,

2006, from http://www.lungusa.org/site/pp.asp?c=dvLUK9O0E&b=35804

Asthma and Allergy Foundation of America (n.d.). *Allergy facts and figures.* Retrieved

January 26, 2006, from http://www.aafa.org/display.cfm?id=9&sub=30

Occupational Safety and Health Administration (n.d.). Safety and health topics latex

allergy. Retrieved September 5, 2008, from

http://www.osha.gov/SLTC/latexallergy/index.html

Ex 22
103

This document was developed by the Job Accommodation Network (JAN). Preparation of this item was funded by the Office of Disability Employment Policy, U.S. Department of Labor, Grant Number OD-23442-12-75-4-54. This document does not necessarily reflect the views or policies of the Office of Disability Employment Policy, U.S. Department of Labor, nor does the mention of trade names, commercial products, or organizations imply endorsement by the U.S. Government.

Practical Solutions  •  Workplace Success

16

$Ex$ 22

164

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Monday, June 03, 2013 3:54 PM |
| **To:** | Bogart, Gary |
| **Cc:** | Ahmed, Faisal |
| **Subject:** | Request for Clarification of Work Restrictions |
| **Attachments:** | Authorization to Release Medical Information Morgan 29-May-13.pdf; Ahmed, F. Job Description.mht |

Dear Dr. Bogart,

Thank you for your note of 5/20/13 regarding your patient **Faisal Ahmed**, (MRN: 1713851-2) advising Mr. Ahmed's department of his need for job accommodations. This is a request for clarification of that request to ensure appropriate accommodations are made for him. You indicated ". . . It is the case that his symptoms are exacerbated by air conditioning. I am apprised, his current work condition is such that he is in an room that places him at risk, and as such he needs to be changed to a room more conducive to his long term health. . . ."

Mr. Ahmed is indeed in a building with heating and cooling. This is a building leased by the University and, as such, the building maintenance including the HVAC system is managed by the building maintenance company. The entire building is serviced by the same HVAC system. The University is subject to the contract with the building owner as far as changes that can be made to the building. Mr. Ahmed currently is an office without a window. There are some offices with a window to the outside however these windows, as specified in the tenant handbook, may be opened a maximum of 6 inches. The horizontal blinds must be kept lowered at all times and must be kept at a 15 degree angle over the window. So, the window may provide access to some "fresh air" however it will be limited by the window itself and the lowered blinds. The air conditioning vents cannot be entirely closed. Because the building HVAC system is divided into segments whereby one part of the system services several offices, if one of the vents is closed off the air flow into the remaining offices becomes stronger. Further, the thermostat is affected by the temperature in all of the offices so that if one vent is closed off the temperature may be artificially lowered in the surroundings offices because that office will be warmer. So, it is not clear there is an office that would be any more conducive to Mr. Ahmed's health because all the offices are on the same system.

You mentioned the air conditioning system is exacerbating Mr. Ahmed's medical condition. Is it the temperature of the air that is a problem or is it the strength of flow of air into the room or something else entirely? We may be able to reduce the air flow into the room by redirecting the vents and closing some of them so that there is less air being blown into the office. Or, is it possible there is something in the HVAC system itself that is being introduced into the office via the forced air? If that's the case there is not a reasonable expectation it would not be in all of the offices. The department does not want to have the special sit/stand work station, computers and phone moved only to realize the problem has not been solve.

I contacted the EH&S department about this situation to see if they might be able to test for particles or substances in the office that might be causing a reaction. I was told that unless we have a specific substance to test for it is not possible just to do general air qualify testing since there are so many potential irritants. Further, the air can easily be within OSHA guidelines and still cause a problem for someone with a specific allergy or sensitivity to that substance. Since none of the other employees are having a reaction it is unlikely the level of irritant in the building is beyond the building standard. So, without knowing specifically what is causing the reaction, it is not possible to make sure it is eliminated.

The department wants to assist Mr. Ahmed by providing a work environment which will be safe and comfortable for him. They don't, of course, want him to return to work and have another reaction similar to the

Exhibit 9
2.3

one from which he is currently recovering. **We are requesting your help in being more specific as to what circumstances will allow Mr. Ahmed to work comfortably.** If you can advise what specific circumstances will allow Mr. Ahmed to return to work without experiencing further medical problems we will do our best to provide this.

I have been advised to include this language in any request for job accommodation information:

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information,' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

You will find attached an Authorization to Release Information signed by Mr. Ahmed so that I might communicated with you about this accommodation request. I'm also attaching a copy of his job description for your reference. We appreciate any help you can give us Dr. Bogart in specifying a compatible work situation for Mr. Ahmed. Please let me know if you need additional information or wish to discuss this request. Thank you. Linda

Linda Morgan
UC San Diego Health Sciences
Disability & Accommodation Services
619-543-7709
619-471-9332 fax
lcmorgan@ucsd.edu
· Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

Exhibit 9
24

# Clinical Operations Real Time Edit Check Specification (ECS) Work Instruction
Author: Iris Sim and Sarah Walter
Version 2

## Purpose
The purpose of this document is to outline the process of writing Real Time Edit Check Specifications (ECS) document.

## Relevant SOPs
Prior to being assigned any of these tasks Clinical Operations team members must be trained on the following SOPs:
1. ADCS SOP CO-003 EDC Portal Setup and Deployment

## Related Documents
EDC training
Data dictionary training
Process flow for Database Development
Process flow for UAT
Clinops Test Case Development_WID
Edit Check Specifications Template

## Training Interval
Annual

## Roles/Titles
* Data Analysts
* Data Manager

## Procedures Overview and Rules
Edit Check Definition: According to the CDISC clinical research glossary from Applied Clinical Trials: *An auditable process, usually automated, of assessing the content of a data field against its expected logical, format, range, or other properties that is intended to reduce error. NOTE: Time-of-entry edit checks are a type of edit check that is run (executed) at the time data are first captured or transcribed to an electronic device at the time entry is completed of each field or group of fields on a form. Back-end edit checks are a type that is run against data that has been entered or captured electronically and has also been received by a centralized data store.*

The following are overall principles being applied:
1. Real Time Edit Checks Specifications (ECS) are positive statements in English of rules for data at the point of entry into the system, and before being accepted as saved data. The ADCS standard is to phrase the rule based on what is allowed to be entered, rather than listing all cases of data that are not allowed.

Exhibit 10
25

2. ECS should stand-alone and fully describe how the data is being evaluated.
3. The datadic google doc (e.g. ini_datadic) includes the root data dictionary required by the system, plus standard columns for the following:
    a. ECS
    b. other form actions
    c. UAT test cases
    d. UAT results.
4. Other form actions are included along with ECS and UAT documentation test cases need to be written and employed for both real-time edit checks and these other form actions. The descriptions of other form actions are included for the field in which the action is based, and will reference other field(s) involved with triggering the action as needed.
5. Test cases must include everything that needs to be tested, including logic (ECS) and Perl coding.
6. At launch of database, the data dictionary including ECS and test cases is archived as Version 1. Data Dictionary and ECS may be updated throughout the trial following ADCS SOP on Clinical Database Change Control.

Assumption for specific ECS/Test Case scenarios:
1. For partial dates, the missing portion(s) of the date is required to be "--", for example "--/--/2012".

### Section 11: Step by Step Procedures
1. After system google docs are set up (reference separate WID), the Data Analyst or Data Manager adds tables to the data dictionary, as forms are being drafted and/modified. The ECS are written at the same time as tables and fields are drafted, and immediately implemented.
2. Table label is used to identify the type of table, based on origin of data. It is entered under ID field for each table. Labels are:
    ▪ eCRF
    ▪ uploaded external data
    ▪ eCRF scored data
    ▪ System Administration table
    ▪ Experimental eCRF (HBA only)
    ▪ Nonexperimental eCRF (HBA only)
3. The ECS Statement is structured as follows: **Field Label:  Rule for data type. Dependency/Relationship rule. Range. Additional rules. Missing data rule.** The minimum an ECS statement must include is the rule for data type. All other rules are only stated where applicable.



Exhibit 10
26

a. The "Field Label" is used to identify special types of fields. Field Label is always followed with a colon. Labels are:
    i. Dependent field: used to identify fields with basic dependency relationships, as well as other relationships.
    ii. Hidden field:
    iii. Hidden Calculation Field:
    iv. Completion question:
    v. Binary Checkbox:
    vi. Score field:
    vii. Hidden score field:

b. The "Rule for data type" is defined for most fields in the data dictionary. Rules are:
    i. Must select one option.
    ii. Must enter text.
    iii. Must enter a number.
    iv. Must enter a date.
    v. Must select a complete valid date (mm/dd/yyyy) on or before system date plus one day (Pacific). Note: this is only used where a full valid (system-verified) date is required.
    vi. Must enter a time.
    vii. Must select one or more options.
    viii. Must select one or more options from the group of fields (FLD1; FLD2; FLD3).
    ix. Optional Field. (Note: this rule is rarely used.)

    ▪ Example for Yes/No questions:
    *Must select one option.*
    ▪ Example of Binary Checkbox where check is anchored.
    *Binary Checkbox:  Must select one or more options from group of fields (BIBLOOD; BIURINE; BICSF; BINONE).*
    ▪ Example of Binary Checkbox where check is NOT anchored.
    *Binary Checkbox:  Optional field.*

c. The "Dependency/Relationship rule" defines the relationship between two fields. The related and dependent fields are listed a single time within the statement for the field(s) in which the dependency relationship is enforced.
    i. Relationship statement defines fields and rules
    ii. The dependency statement follows this format:
    *... if parent field (FIELDNAME: Question Text) is [answer option or range], otherwise must be blank.*
    ▪ Dependency Statement example with parent field option:
    *Dependent field: Must enter text if parent field (PTLANG: 9. Participant's Primary Language) = Other (specify), otherwise must be blank.*
    ▪ Dependency Statement example with parent field range:
    *Dependent field: Must select one option if parent field*



Exhibit 10
27

*(PTEDUCAT: 5. Participant Education) is 0-5, otherwise must be blank.*

    iii. Relationship statement example:
*Must enter number. If related field (VSWTUNIT: 1b. Weight Units) is entered as kilograms range is 34-160. If related field is entered as pounds, range is 75-350. Allow one decimal. Allow nd/unk.*

d. The "Range" should be specified when the field allows free entry (rather than selection from a list) and a specific range of values or character/digit length is required. The following additional rules should be followed for ranges:

    i. When a specific character/digit length is required, ECS states the minimum and maximum value allowed.

    ii. Character/digit length is not required, when a range of values is specified for a numeric field, e.g. 0-100..

    iii. Date fields only need to specify the range of allowable years.

    iv. Do not rely solely on range specifications for fields that allow non-numeric characters.

- Range example where specific value range is required:
*Must enter a number. Range 6-40. Allow nd/unk.*
- Range example where a specific character/digit length is required:
*Must enter text. Required character length 3.*
- Range example with Dates:
*Dependent field: Must enter a date if parent field (PTNOTRT: 7. Participant Retired?) = Yes, otherwise must be blank. Year range 1970- 2013. Allow Missing Day or Month/Day. Allow Nd/Unk.*

e. "Additional rules" should be specified if edit check requirements do not fit within the above categories. Some examples include:

    *i.* For checkboxes with a 'None of the above' option, statement structure for additional rule is: If option is checked, must be only item selected.

- Example: *Must select one or more options. If option (0= None of the above) is checked, must be only item selected.*

    ii. Where partial dates are allowed, ECS defines the portions allowed to be missing.

- Example where Year and Month are required: *Must enter valid date between 1910- 1970. Allow missing day.*
- Example where Year is required: *Must enter valid date between 1910-1970. Allow missing day or month/day.*

    iii. If a numeric field should allow decimals, that must be specified: Allow (one or two) decimal.

- Example with one decimal allowed:
*If related field (VSWTUNIT 1b. Weight Units) is entered as kilograms range is 34-160. If related field is entered as pounds, range is 75-350. Allow one decimal. Allow nd/unk.*

Exhibit 10
28

     f.   The "Missing data Rule" is the final rule in each ECS statement: Allow nd/unk.
         i.   For dependent fields where the parent field is allowed to be nd/unk, include rule for dependent field.
            ■  Example: *Dependent field: Must select one option if parent field (VSWEIGHT: 1a Weight) is completed. Allow nd/unk.*

4.  For studies that were launched without ECS being developed, the following process should be followed:
     a.  Create a separate google doc – a copy of the data dictionary and add additional templated columns for ECS and UAT, including the following 3 columns in place of the standard "ECS" column:
         i.   Expected Edit Check Specifications (ECS): What should the check be?
         ii.  Does the Existing ECS match the Expected ECS? (yes/no)
         iii.  If No, record Existing ECS:
     b.  Log ECS as if doing so prior to the launch of a study – stating what the rules should be.
     c.  Review existing edit checks and log whether the existing edit checks conform to the draft ECS.
     d.  If the existing edit check does not conform to the draft ECS, also log ECS matching the edit checks currently in place.
     e.  The protocol team should review any cases for which the newly drafted ECS does not match the existing edit checks to decide whether updates should be made to any realtime edit checks. If so, updates should be made in accordance with SOP CO-001 – Clinical Database Change Control..
     f.  After ECS is reviewed for the entire set of data tables, and decisions on whether to update the database are made, the current active ECS will be added to the datadic google doc.

| Version History | | | | |
|---|---|---|---|---|
| Version Number | Summary of Changes | Author | Approval Signature | Date |
| 1 | n/a | Sarah Walter, Iris Sim | | |
| 2 | Added Binary checkbox, additional instructions for ECS for studies already launched, assumptions for partial dates | Sarah Walter | *[signature]* | 4/24/2013 |
| | | | | |

Exhibit 10
29

## Faisal Ahmed

| | |
|---|---|
| **From:** | Sarah Walter [swalter@ucsd.edu] |
| **Sent:** | Thursday, May 16, 2013 1:40 PM |
| **To:** | Ahmed, Faisal |
| **Subject:** | Re: Practicum |

**Categories:**    ADCS

Faisal,

I'm a little confused about what you reviewed here - please stop by so we can discuss when you are back this afternoon.

I provided you feedback based on your performance on this file (4/29/2013) because while you were out of the office, Earlita was updating the real HBA ECS file. What I asked you to review is the current HBA ECS file, to ensure that the errors I've pointed out from the 4/29 file have indeed been addressed by Earlita, and if not, to correct them. The other purpose of reviewing the current ECS is I want to ensure that you have the opportunity to ask for more training on anything that isn't clear to you at this point.

Whenever you are assigned a task, it's critical that you reiterate back what your plan is, and if anything is not clear, please IM me or come to my office to ensure you understand the assignment.

Thanks,
Sarah


On May 14, 2013, at 5:34 PM, Ahmed, Faisal wrote:


Hi Sarah,

I began the re-reviewed of the HBA ECS today following the HBA call this morning. I began the task by rereading the WID v2, then began with the tables that were not correctly completed by me. I highlighted in green those that I corrected, but there were a few that I didn't understand where the error was so I consulted with Earlita on those, and she couldn't detect the errors either. I highlighted those in tan, and continued to review the HBA ECS since your your email states "review of the entire ECS for hba". Please find my corrections document attached and provide some guidance if possible for those rows which are highlighted in tan.


Thank you,

Faisal


On 5/13/13 7:02 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:


That's great- no need to continue working on this. Please turn your attention to the review of the entire ECS for hba, with my edits. I believe your email said you would be looking only at highlighted cells- but please re-review all of the non experimental forms, each field tomorrow, and send me an update when completed.

Exhibit 11
30

Thanks!
Sarah

Sent from my iPhone

On May 13, 2013, at 6:25 PM, "Ahmed, Faisal" <faahmed@ucsd.edu> wrote:


Re: Practicum
Hi Sarah,

I've made a lot of progress today and have a working program.  Still figuring out how to sort the data by Month/Year but the numbers are all correct.  Please find the source code and output data files attached.


Thank you,

Faisal


On 5/10/13 6:13 PM, "Faisal Ahmed" <faahmed@ucsd.edu> wrote:
Hi Sarah,

Please find the source code and output file attached of work from today.  I commented some lines out to isolate the hash process.  There too many iterations of one the loops in my code, thus the many lines of output.


Warm regards,

Faisal


On 5/9/13 6:17 PM, "Faisal Ahmed" <faahmed@ucsd.edu> wrote:
Hello Sarah,

As we discussed briefly, today I was finally able to get the CSV module to parse the data from the file by telling it to use "return" instead of "newline" as the end of lines.  That allowed me to work on the rest of the coding, it hasn't been very straight forward and I still revert to using C++ routines sometimes, like building 2 dimensional arrays, as you might notice in the attached Perl source code file.  Tomorrow I am going to change that part of the code to use a hash, which is Perl way of doing it.


Warm regards,

Faisal


On 5/9/13 10:34 AM, "Faisal Ahmed" <faahmed@ucsd.edu> wrote:
Good morning Sarah,

Finally getting to the bottom of the problems I've been running into with this task.  The CSV file has some unusual characteristics, I'm not sure if that was part of the intended test of my Perl skills.  Could you tell me how the files were

Exhibit 11

31

generated? What programs? What operating systems? These can determine how newlines and carriage returns are encoded, and without normalizing those data the CSV module in Perl gets confused and doesn't know how to parse the data. Please let me know if possible how the files were created. I am attempting to fix the data files but it would be very helpful to know the source of the data.

Thank you,

Faisal


On 5/9/13 9:44 AM, "Sarah Walter" <swalter@ucsd.edu> wrote:
Thank you.
On May 9, 2013, at 9:36 AM, Ahmed, Faisal wrote:
Re: Practicum
Hi Sarah,

This email didn't get sent yesterday, sorry I hit send but because of the Perl files it didn't process without another confirmation.

Tried a few different paths today and figured out where the parse was breaking. Please find a couple of the scripts I wrote along with their output data. I'm hoping to be able to get it working tomorrow.


Warm regards,

Faisal


On 5/7/13 5:43 PM, "Faisal Ahmed" <faahmed@ucsd.edu <x-msg://170/faahmed@ucsd.edu> > wrote:
Hi Sarah,

To make sense of the CSV module, I am breaking down the steps required to complete the task. The 2nd step after loading the csv file into Perl is to parse the data. The attached code is just to do those 2 things, and as the attached output shows, it is failing to parse the data. Now I have to figure out why it's failing, most likely because something in the data is breaking the parse process.


Warm regards,

Faisal


On 5/6/13 5:49 PM, "Faisal Ahmed" <faahmed@ucsd.edu <x-msg://170/faahmed@ucsd.edu> > wrote:
Hi Sarah,

Please find attached the Perl script I've written so far for the practicum.


Warm regards,

Faisal



Exhibit 11
32

On 5/6/13 4:05 PM, "Faisal Ahmed" <faahmed@ucsd.edu <x-msg://170/faahmed@ucsd.edu> > wrote:
Hi Sarah,

Managed to install the module into Perl.  Learning how to use it now.  The CSV module was not covered in the Perl course.


Thank you,

Faisal


On 5/6/13 1:45 PM, "Sarah Walter" <swalter@ucsd.edu <x-msg://170/swalter@ucsd.edu> > wrote:
Please email adcs-it for assistance.
Thanks,
Sarah

On May 6, 2013, at 1:37 PM, Ahmed, Faisal wrote:
Practicum
Hi Sarah,

I've been working on the practicum for almost 4 hours today, and have hit a road block.  I hadn't realized that Perl needs a special module Text::CSV_XS to work with CSV files.  I've tried to install the module through CPAN but there are errors.  The "make" test is successful but it fails install.  I need some help from local experts to figure this out, I asked Earlita for help but she wasn't sure why it fails to install on my system.  Who else might I ask for help with installing this module?


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355
Email: f1ahmed@ucsd.edu <x-msg://170/f1ahmed@ucsd.edu>  <x-msg://3099/f1ahmed@ucsd.edu <x-msg://3099/f1ahmed@ucsd.edu> >
http://www.adcs.org <http://www.adcs.org/>  <http://www.adcs.org/>

Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please cont

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu <x-msg://170/swalter@ucsd.edu>
Tel: 858-246-1347



Exhibit 11
33

Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

<parsing_csv_string_de
bug.docx><parsing_csv
_strings.docx><parsing_
csv_strings_debug.pl><
parsing_csv_strings.pl>

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail
message from the Alzheimer's
Disease Cooperative Study (including
all attachments) is for the sole use of
the intended recipient(s) and may
contain confidential and privileged
information.  Any unauthorized
review, use, disclosure, copying or
distribution is strictly prohibited.  If
you are not the intended recipient,
please contact me by reply e-mail
and destroy all copies of the original
message.*

<test.doc>
<test.pl>

<hba ccs working doc - 20130429_FA performance(1).xlsb>

Exhibit 11
34

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Exhibit 11
35

## Faisal Ahmed

**From:** Ahmed, Faisal
**Sent:** Monday, May 13, 2013 9:28 AM
**To:** Walter, Sarah
**Subject:** Re: Checks on Scoring – due Thursday EOD

**Categories:** ADCS

Hi Sarah,

Thank you for the feedback on this assignment. I understand that if I am ever unsure how to perform a task I should come ask you immediately, rather than risk wasting time. In this case I did as you suggest as an acceptable alternative and asked a member of the group how to perform the task. You also made it clear to me that it essential for you to know how I approached the task so that you might redirect me as necessary. In the future I shall also better explain how I approached the assigned task when sending the assignment to you for review.

Thank you,

Faisal

On 5/10/13 4:47 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:

Faisal,

Here is a summary of the scoring assignment with my feedback:

As we discussed today:

I do not want to receive work back with a disclaimer – 'I wasn't sure how to perform'. If you are not sure how to perform come and talk to me immediately. Otherwise time is wasted. Alternatively, you can ask others in the group how to approach the task, and reiterate back to me how you are going to approach the task. This is critical so that we understand each other, and I can re-direct you if necessary, without losing time. You mentioned today that you weren't sure what I meant by a 'score field'. This is a perfect example of something I would like to discuss with you right away so that you are clear on the expectations of the task.

When you send work, include how you approached task, to help inform my review. In this example, Earlita had already highlighted all of the score fields for HBA for discussion, and had labeled those with no scoring being checked. Did you double check any of this?

It's understandable that you weren't able to label the scores as ADCS standard or not. I would have liked you to have labeled them as experimental or non experimental (which is what is already on the ECS).

Outcome of task: You correctly identified 30 fields, 3 were incorrectly labeled as 'score fields' and one total score field was missed from your list.

Please update the scoring google doc with this updated information –

Thank you!
Sarah

Exhibit 12
36

On May 8, 2013, at 5:49 PM, Ahmed, Faisal wrote:

Hi Sarah,

I wasn't sure about how to perform this task. Please take a glance at the attached document and let me know if I need to make any corrections. Thank you.

Warm regards,

Faisal

On 5/8/13 12:01 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:

Hi Faisal,
If you are not sure, put UNK. We don't really have this documented at all...
Sarah

On May 8, 2013, at 11:57 AM, Ahmed, Faisal wrote:

Re: Checks on Scoring - due Thursday EOD
Hi Sarah,

Where can I find the Standard ADCS Scoring Rules?

Thank you,

Faisal

On 5/8/13 10:25 AM, "Sarah Walter" <swalter@ucsd.edu <x-msg://11/swalter@ucsd.edu> > wrote:

Hi all,

During recent Informatics meetings the issue of scoring has come up - we will need to make a decision on how scoring should be cleaned for all studies. In order to inform this decision we need a list of all scores collected for each study.

I've set up a google doc to capture this information. Please review today and let me know if you have suggestions for what other information would be needed to inform the decision of whether to change to a webservice or stick with current method. I've put in one example from NGF for your reference.

By Thursday afternoon, please list all of the scores for the following studies:

Edgar: ADNIGO and ADNI 2
Iris: DIAN
Earlita: RES
Faisal: HBA
Louiza: NGF

Exhibit 12
37

KB Page for all-protocol docs:
https://sites.google.com/a/iadcs.org/clinops-knowledgebase/protocol-related-documents-2/all-project-docs

Thank you,
Sarah
Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu <x-msg://11/swalter@ucsd.edu>
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

<scoring.xlsx>

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Exhibit 12
38

Thursday, May 9, 2013 10:39 AM

**Subject: database training**
**Date:** Wednesday, May 1, 2013 2:11 PM
**From:** Melissa Davis <mvdavis@ucsd.edu>
**To:** Edgar Alminar <eaalminar@ucsd.edu>, Faisal Ahmed <faahmed@ucsd.edu>, Sarah Walter <swalter@ucsd.edu>

Hi Edgar, Faisal, and Sarah,

I'd like to resume database training next week. Prior to that, please practice the basics covered thus far:

dependencies using indent + subquestion_trigger keywords
field type: decimals
display type: binary checkbox
time keywords (w/ & w/o _strict)
date keywords (w/ & w/o _strict)
letpass keyword
compare radio/combo/check display type behavior when 1 option is defined in code
define code - numeric ranges - with steps (e.g., 0..100:5) and gaps (e.g., 0..10,20..30), value/label pairs
compare display type= text when field type=N vs. type=T
try defining display type=check incorrectly (e.g. numeric of length 1) and see what happens in sync tool/eCRF
try this: add rangeperl keyword to existing radio button. sync datadic. add new code option. sync datadic. test eCRF - try entering newly added code option.

Please feel free to find me if you have any questions as you're practicing. I'll be in touch with possible times for next week's training sessions.

Thanks! .

Melissa

--

Melissa Davis
Data Manager
Clinical Operations Core
Alzheimer's Disease Cooperative Study
University of California, San Diego
mvdavis@ucsd.edu

**Page 1 of 2**

Exhibit 13

39



Alzheimer's Disease Cooperative Study
Clinical Operations Group
Organizational Chart  rev 03/01/2013

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Sarah Walter [swalter@ucsd.edu] |
| **Sent:** | Friday, February 21, 2014 6:52 PM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Tobias, Deborah |
| **Subject:** | Re: Performance Feedback 2/14/2014 |

| | |
|---|---|
| **Categories:** | ADCS |

Hi Faisal,
Thank you for your input.  We will set up weekly meetings when I return from vacation.
Thank you,
Sarah

On Feb 21, 2014, at 8:56 AM, Ahmed, Faisal wrote:

Good morning Sarah,

I would like to extend my thanks to both you and Deborah for taking the time to go over my performance update. The feedback will better enable me to meet the expectations for my position. With the regular communication of the expectations for me, I am positive that I will be able to meet them. I understand that it is critical for a person in my role in data management to have the analytical skills necessary to write out the logic of a field efficiently and accurately. I also understand that a person in my position is responsible for making up for any deficits in my knowledge or training due to my absences and disruptions caused by my illness. Please take into consideration that though I desired to be able to work the additional hours necessary to address any deficits in my training and job knowledge, until recently my work hours were restricted by my physician. Please also allow me to express a different perspective on a few things:

Regarding productivity, please do not take offense for me asking, but are the calculations for how long it took to complete the ECS tables based on the period "1/12/14 to 2/13/13", as indicated on the evaluation form?  If so, there might be a miscalculation, as I did not actually return to work until 1/16/14. Moreover, please consider the additional time for training/reorientation that I have had to do on my own, because I have received only about an hour of training following my return to work.

Examples of inadequate retraining:
-Inappropriate questions that resulted from a lack of understanding of the EDC system.
-Database training slides that Melissa created contained 12 sessions over 2 days. I was only provided with 3 sessions over nine months ago.

ACTION:
I will thoroughly review all the materials that were provided and ensure that there are no other critical gaps in my knowledge or training. I have learned from my mistakes and will not repeat these same errors again. I am committed to improving my productivity and accuracy to meet the expectations set for my position.

   1. Edit Check Specifications:
      The database training that I was provided on the ADCS' unique system was not sufficient to enable me to meet the expectations for my position. In an email I sent on January 17, 2014 (the day after my first day back at work) I indicated that this critical aspect of training was not adequate for the task I was assigned and that I required review of the training that had taken place over nine months earlier. I requested additional training on the database in person as well, identifying it as a deficit in my training. It is the only training that I have specifically requested, but that training opportunity was denied to me. Being deprived of this opportunity reduced my ability to assimilate the information contained in the written resources that were provided. Without adequate training on the database systems, it is difficult for me to know which differences between the studies are superficial due to study design versus significant differences in logic.

Exhibit 15
41

It should be noted that the training I had previously received took place in April of 2013, which was a time when my health was failing at least partly due to the environment I was working in, as stated in the note from my doctor dated November 18, 2013. Please also note that during June of 2013 I was out of the office on disability leave and could not have worked on these tasks as stated in the evaluation. I was only able to return to work for a couple of weeks in July before having to go out again due to my serious medical condition. Kindly consider that I was still suffering because I was working in an environment that was having a detrimental effect on my health and I was struggling with my disability in July of 2013 as indicated in the note from my doctor dated December 20, 2013. In addition to being sick, I remember feeling ill equipped to perform this task even then, which is the reason I requested additional hands-on training on the database system when I returned to work and was immediately assigned this task again.

Regarding the Boston Naming Test and NPI tables, I had made the corrections on the Excel spreadsheet that contained the corrections, and I copied over only those fields where I understood and agreed with the logic. I had not yet copied those rows where I did not understand or did not agree with the corrections. However, I felt apprehensive about putting my edit checks in the Google doc without being absolutely certain that they were without error.

Although there is an assertion that knowledge and understanding of how the database system functions is not necessary to write the edit checks, I respectfully disagree. Writing logical checks for an unfamiliar system is similar to trying to check grammar in an unknown language. For example, the rules for the field labels are dependent on the data types, which are defined by the keywords. Innovation is not possible for a system when one does not have good understanding of how the system functions and what constraints it has. Assigning tasks for me to perform for which I am not properly trained and denying my requests for training is priming me for failure.

2.    Testing for TCAD UAT:
I agree that I should not have had the question I did regarding the functioning of the database system. I did communicate the training deficit on the database system and requested further training on how the EDC system functions directly from supervision. However the resources I was directed to did not compensate for the deficit of a demonstration of database functions and some time to do hands-on training on the system. Although I had been using the system to write the edit checks by looking at each eCRF and at times submitting forms, I did not submit any blank forms with blank fields because the work instructions (ECS WID V3) I received did not say to do so. I realize that there is a statement in the EDC training mentioning this function, but I had misunderstood the meaning. Due to the length of time I was away from the job and the interruptions to my training due to my illness, I had understandably forgotten some of the information that I learned so many months ago. It is unrealistic to expect me to perform at an optimal rate immediately upon returning to work following a serious illness and having been unable to work for an extended period with very little retraining. As a result, there were some gaps in my knowledge. I understand that it is my responsibility to identify and fill in these gaps, and not to ask inappropriate questions. This task did allow me to get some hands-on experience with the EDC 3 system, and as a result there are fewer gaps in my knowledge.

3.    Work instruction update – Real Time ECS:
There were only two edits to the WID that I felt confident enough to send, because I feared that I would be reprimanded if I suggested something "inappropriate". This fear is based on my experiences working in Clinops for the ADCS including this evaluation. Being afraid to express ideas freely makes it very difficult to suggest innovations.

As I stated above, and as you may recall, we had a slight difference of opinion regarding the logic for the NPI fields that are referred to in the evaluation. However, due to apprehension from fear of making suggestions that could be construed as being inappropriate, I hesitated to include them with my edits for the WID. I intended to speak with you about the NPI fields but was reluctant to send an email because, from experience, my questions and comments are less likely to be misinterpreted or misconstrued when they are communicated in person. Iris did not have any edits for me to incorporate when I checked with her prior to submitting the draft.

I did not intend to be accusatory, or to tell anyone that they are not performing appropriately, nor to instruct my peers. It is very unfortunate for me that my questions and suggestions have been misinterpreted and misconstrued in this manner. I have reviewed the UCSD Principles of Community and shall endeavor to always frame my communications so that they are in keeping with those principles. However, I am having some difficulty in understanding exactly how my correspondences to you and my peers deviated from those principles. Perhaps you can help me understand what in particular about my questions and suggestions violated these principles and could be construed as "accusatory" or

Exhibit 15

42

"Inappropriate". It was not my intention to be disrespectful, my intention was to give the respect that is due and have proper accord.

I understand that I should not ask questions that could be interpreted as inappropriate or make any suggestions to my peers that could be misconstrued as instructing or critical of their performance. I will exercise even more restraint in my communications so that the tone cannot be misconstrued. However, I did not refer to myself trainee, I am sorry that was not more clear in my statements. Please provide me with more guidance on how to make suggestions without appearing to instruct my peers. Or am I allowed to offer any suggestions solely to you?

Please let me know when you'd like to set up weekly meetings. I look forward to working together on an action plan to get my performance up to expectations. It would be appreciated if we could avoid "impromptu" meetings like last week's when I was meeting my wife for lunch.


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Friday, February 14, 2014 4:04 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah
**Subject:** Performance Feedback 2/14/2014

Hi Faisal,
Here is the feedback we just reviewed in person with Debbie present. As I said in the meeting, I'd like to set up weekly meetings with you so we can work together on an action plan to work to get your performance up to where it needs to be.
Thank you,
Sarah

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701


*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the*

Exhibit 15
43

*intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

 **Gmail**

Faisal Ahmed <faisahmed1@gmail.com>

---

## Interview Practicum

---

**Faisal Ahmed** <faisal@ucsd.edu>                                                 Fri, Dec 14, 2012 at 9:19 AM
To: Auntre Hamp <ahamp@ucsd.edu>
Cc: Sarah Walter <swalter@ucsd.edu>

Greetings Auntré,

I hope that you are doing well and the week has been good to you. It was a pleasure to meet with you last week. Please find attached the completed outputs and documentation of the practicum you provided for me. Also, please let me know when would be a good time for us to review the results. I am available anytime this afternoon to connect with you via phone.


Warm regards,

Faisal


On Wed, Dec 12, 2012 at 4:18 PM, Auntre Hamp <ahamp@ucsd.edu> wrote:
> Hello Faisal,
>
> I hope this email finds you well. I really enjoyed meeting with you last week. As one of our final steps we
> would like to ask you to do a practicum utilizing ACCESS and SQL to create some tables for us. Following
> your returning the output, we would like to schedule a brief 10-15 minute session. It is our hope that we could
> connect with you via phone to review this with you prior to the end of the week.
>
> Attached is the document along with the instructions and the files that are going to be utilized for the
> practicum. Please email your completed outputs and documentation outlined in the instructions as soon as
> you are finished.
>
> If you have any questions please feel free to contact me.
>
> Look forward to connecting with you soon.
>
>
>
>
> Auntré Hamp, MEd, MPH
> Data Manager
> Clinical Operations
> Alzheimer's Disease Cooperative Study
> University of California, San Diego
> 9500 Gilman Drive, MC-0949
> La Jolla, CA 92093-0949
> Phone: (858) 534-0929
> Fax: (858) 246-1415
> Email: ahamp@ucsd.edu
>
> Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all
> attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged
> information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are
> not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.

Exhibit 16
45

**Practicum.pdf**
458K

Ev. 16
46

# Interview Practicum Results

1. The desired columns are RID (Primary Key) from the prac_rand table, PTGENDER from the prac_ptdemog table and SITENAME from the prac_sites table. The names of tables are shortened by using r for the prac_rand table, d for the prac_dtdemog table and s for the prac_sites table. The results must match the following conditions: The participant must be randomized into the study, thus RID must appear in both the prac_rand and prac_ptdemog tables, and the participant must be between 60 and 65. Site names must also be displayed by matching the SITEID (Primary Key) in the prac_rand table with SITEID in the prac_sites table.

CODE:

    **SELECT r.RID, d.PTGENDER, s.SITENAME**

    **FROM prac_rand r, prac_ptdemog d, prac_sites_vwx s**

    **WHERE r.RID=d.RID AND d.PTAGE Between 60 And 65 AND r.SITEID=s.SITEID**

    **ORDER BY r.RID;**

OUTPUT

| YOUNG PARTICIPANTS | | |
|---|---|---|
| RID | PTGENDER | SITENAME |
| 20 | 1 | Medical University of South Carolina |
| 36 | 2 | University of Michigan, Ann Arbor |
| 40 | 1 | Medical University of South Carolina |
| 47 | 1 | Mayo Clinic, Rochester |
| 72 | 2 | Yale University School of Medicine |
| 74 | 1 | UC San Diego |
| 106 | 2 | Georgetown University Medical Center |

Shows 3 columns, the RID (Primary Key) of all randomized participants in the study who are between 60 and 65 years old along with their gender and the associated site name. The resulting table is sorted by the RID column.

Ex. 16
47

2. The desired columns are RID (Primary Key) from the prac_adverse table, SITEID (Site ID) from the prac_adverse table, SITENAME (Site Name) from the prac_sites_vwx table, and VISCODE (Visit Code) from the prac_adverse table. The table names are shortened; prac_adverse is shortened to a, and prac_sites_vwx is shortened to s. All the Adverse Events from Yale University have the SITEID of 19 in the prac_sites_vwx and that must match the SITEID in the prac_adverse table. The results are sorted by RID column from the prac_adverse table.

For the Mayo Clinic Jacksonville the same as above except using a SITEID value of 18 instead of 19 in the prac_sites_vwx table that must match the SITEID in the prac_adverse table.

CODE:

```
SELECT a.RID, a.SITEID, s.SITENAME, a.VISCODE

FROM prac_adverse AS a, prac_sites_vwx AS s

WHERE a.SITEID=s.SITEID And s.SITEID=19

ORDER BY a.RID;
```

and

```
SELECT a.RID, a.SITEID, s.SITENAME, a.VISCODE

FROM prac_adverse AS a, prac_sites_vwx AS s

WHERE a.SITEID=s.SITEID And s.SITEID=18

ORDER BY a.RID;
```

OUTPUT:

| YALE_AE | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 6 | 19 | Yale University School of Medicine | scm |
| 6 | 19 | Yale University School of Medicine | bl |
| 6 | 19 | Yale University School of Medicine | w06 |
| 6 | 19 | Yale University School of Medicine | w13 |
| 6 | 19 | Yale University School of Medicine | w06 |
| 6 | 19 | Yale University School of Medicine | w19 |
| 12 | 19 | Yale University School of Medicine | scm |
| 12 | 19 | Yale University School of Medicine | bl |
| 12 | 19 | Yale University School of Medicine | w06 |
| 12 | 19 | Yale University School of Medicine | w13 |
| 12 | 19 | Yale University School of Medicine | w19 |

Ex 16
48

| YALE_AE | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 12 | 19 | Yale University School of Medicine | w19 |
| 17 | 19 | Yale University School of Medicine | w13 |
| 17 | 19 | Yale University School of Medicine | w06 |
| 17 | 19 | Yale University School of Medicine | w13 |
| 17 | 19 | Yale University School of Medicine | w19 |
| 17 | 19 | Yale University School of Medicine | bl |
| 17 | 19 | Yale University School of Medicine | scm |
| 25 | 19 | Yale University School of Medicine | w06 |
| 25 | 19 | Yale University School of Medicine | w13 |
| 25 | 19 | Yale University School of Medicine | scm |
| 25 | 19 | Yale University School of Medicine | bl |
| 32 | 19 | Yale University School of Medicine | scm |
| 54 | 19 | Yale University School of Medicine | scm |
| 54 | 19 | Yale University School of Medicine | w06 |
| 54 | 19 | Yale University School of Medicine | bl |
| 54 | 19 | Yale University School of Medicine | bl |
| 64 | 19 | Yale University School of Medicine | bl |
| 64 | 19 | Yale University School of Medicine | scm |
| 72 | 19 | Yale University School of Medicine | bl |
| 72 | 19 | Yale University School of Medicine | w06 |
| 72 | 19 | Yale University School of Medicine | w13 |
| 72 | 19 | Yale University School of Medicine | scm |
| 86 | 19 | Yale University School of Medicine | bl |
| 86 | 19 | Yale University School of Medicine | w06 |
| 86 | 19 | Yale University School of Medicine | scm |
| 94 | 19 | Yale University School of Medicine | bl |
| 94 | 19 | Yale University School of Medicine | scm |
| 94 | 19 | Yale University School of Medicine | w06 |
| 95 | 19 | Yale University School of Medicine | bl |
| 95 | 19 | Yale University School of Medicine | scm |
| 96 | 19 | Yale University School of Medicine | bl |
| 96 | 19 | Yale University School of Medicine | scm |
| 102 | 19 | Yale University School of Medicine | bl |
| 102 | 19 | Yale University School of Medicine | scm |
| 102 | 19 | Yale University School of Medicine | w06 |
| 132 | 19 | Yale University School of Medicine | bl |
| 132 | 19 | Yale University School of Medicine | scm |

Ex 16
119

| YALE_AE | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 133 | 19 | Yale University School of Medicine | bl |
| 133 | 19 | Yale University School of Medicine | sc |
| 133 | 19 | Yale University School of Medicine | scm |
| 134 | 19 | Yale University School of Medicine | scm |
| 134 | 19 | Yale University School of Medicine | bl |
| 141 | 19 | Yale University School of Medicine | scm |
| 141 | 19 | Yale University School of Medicine | bl |
| 144 | 19 | Yale University School of Medicine | bl |
| 144 | 19 | Yale University School of Medicine | scm |
| 144 | 19 | Yale University School of Medicine | bl |
| 152 | 19 | Yale University School of Medicine | scm |

and

| MAYO_AE | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 44 | 18 | Mayo Clinic, Jacksonville | w06 |
| 44 | 18 | Mayo Clinic, Jacksonville | bl |
| 44 | 18 | Mayo Clinic, Jacksonville | w13 |
| 44 | 18 | Mayo Clinic, Jacksonville | scm |
| 50 | 18 | Mayo Clinic, Jacksonville | scm |
| 50 | 18 | Mayo Clinic, Jacksonville | bl |
| 50 | 18 | Mayo Clinic, Jacksonville | w06 |
| 50 | 18 | Mayo Clinic, Jacksonville | w13 |
| 52 | 18 | Mayo Clinic, Jacksonville | w06 |
| 52 | 18 | Mayo Clinic, Jacksonville | bl |
| 52 | 18 | Mayo Clinic, Jacksonville | scm |
| 55 | 18 | Mayo Clinic, Jacksonville | w06 |
| 55 | 18 | Mayo Clinic, Jacksonville | w13 |
| 55 | 18 | Mayo Clinic, Jacksonville | bl |
| 55 | 18 | Mayo Clinic, Jacksonville | scm |
| 59 | 18 | Mayo Clinic, Jacksonville | w06 |
| 59 | 18 | Mayo Clinic, Jacksonville | scm |
| 59 | 18 | Mayo Clinic, Jacksonville | w13 |
| 59 | 18 | Mayo Clinic, Jacksonville | bl |
| 114 | 18 | Mayo Clinic, Jacksonville | scm |
| 114 | 18 | Mayo Clinic, Jacksonville | bl |

Ex 16
50

| MAYO_AE | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 140 | 18 | Mayo Clinic, Jacksonville | scm |

4 columns displaying RID (Primary Key), the SITEID (Site ID) , the SITENAME (Site Name) for and VISCODE (Visit Code).  The table is sorted by RID column.

Ex 16
51

The desired columns are RID (Primary Key) from the prac_rand table, SITEID (Site ID) from the prac_adverse table, SITENAME (Site Name) from the prac_sites_vwx table, and VISCODE (Visit Code) from the prac_adverse table. The names are not shortened for the sake of clarity. The conditions to meet are that VISITDT from the prac_rand table be prior to 10/1/2012, SITEID must be equal to 19 for Yale University and 18 for the Mayo Clinic, Jacksonville. The RID from the prac_adverse table must match the prac-rand table to ensure a randomized study participant and the SITEID from the prac_rand table must match the SITEID from the prac_sites_vwx table to display the correct SITENAME.

CODE:

```
SELECT prac_rand.RID, prac_adverse.SITEID, prac_sites_vwx.SITENAME,
prac_adverse.VISCODE

FROM prac_rand, prac_adverse, prac_sites_vwx

WHERE prac_rand.VISITDT<#10/1/2012#

AND prac_rand.SITEID=19

AND  prac_rand.RID=prac_adverse.RID

AND prac_rand.SITEID=prac_sites_vwx.SITEID

ORDER BY prac_adverse.RID;
```

and

```
SELECT prac_rand.RID, prac_adverse.SITEID, prac_sites_vwx.SITENAME,
prac_adverse.VISCODE

FROM prac_rand, prac_adverse, prac_sites_vwx

WHERE prac_rand.VISITDT<#10/1/2012#

AND prac_rand.SITEID=18

AND  prac_rand.RID=prac_adverse.RID

AND prac_rand.SITEID=prac_sites_vwx.SITEID

ORDER BY prac_adverse.RID;
```

Ex 16
52

OUTPUT:

| | | YALE PRIOR | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 6 | 19 | Yale University School of Medicine | bl |
| 6 | 19 | Yale University School of Medicine | scm |
| 6 | 19 | Yale University School of Medicine | w19 |
| 6 | 19 | Yale University School of Medicine | w13 |
| 6 | 19 | Yale University School of Medicine | w06 |
| 6 | 19 | Yale University School of Medicine | w06 |
| 12 | 19 | Yale University School of Medicine | w19 |
| 12 | 19 | Yale University School of Medicine | w13 |
| 12 | 19 | Yale University School of Medicine | w19 |
| 12 | 19 | Yale University School of Medicine | scm |
| 12 | 19 | Yale University School of Medicine | bl |
| 12 | 19 | Yale University School of Medicine | w06 |
| 17 | 19 | Yale University School of Medicine | w13 |
| 17 | 19 | Yale University School of Medicine | w06 |
| 17 | 19 | Yale University School of Medicine | bl |
| 17 | 19 | Yale University School of Medicine | scm |
| 17 | 19 | Yale University School of Medicine | w19 |
| 17 | 19 | Yale University School of Medicine | w13 |
| 25 | 19 | Yale University School of Medicine | scm |
| 25 | 19 | Yale University School of Medicine | w06 |
| 25 | 19 | Yale University School of Medicine | bl |
| 25 | 19 | Yale University School of Medicine | w13 |
| 54 | 19 | Yale University School of Medicine | bl |
| 54 | 19 | Yale University School of Medicine | bl |
| 54 | 19 | Yale University School of Medicine | w06 |
| 54 | 19 | Yale University School of Medicine | scm |
| 64 | 19 | Yale University School of Medicine | scm |
| 64 | 19 | Yale University School of Medicine | bl |
| 72 | 19 | Yale University School of Medicine | scm |
| 72 | 19 | Yale University School of Medicine | bl |
| 72 | 19 | Yale University School of Medicine | w06 |
| 72 | 19 | Yale University School of Medicine | w13 |

Ex 16
53

and

| MAYO_PRIOR | | | |
|---|---|---|---|
| RID | SITEID | SITENAME | VISCODE |
| 44 | 18 | Mayo Clinic, Jacksonville | bl |
| 44 | 18 | Mayo Clinic, Jacksonville | w06 |
| 44 | 18 | Mayo Clinic, Jacksonville | w13 |
| 44 | 18 | Mayo Clinic, Jacksonville | scm |
| 50 | 18 | Mayo Clinic, Jacksonville | scm |
| 50 | 18 | Mayo Clinic, Jacksonville | bl |
| 50 | 18 | Mayo Clinic, Jacksonville | w06 |
| 50 | 18 | Mayo Clinic, Jacksonville | w13 |
| 52 | 18 | Mayo Clinic, Jacksonville | bl |
| 52 | 18 | Mayo Clinic, Jacksonville | scm |
| 52 | 18 | Mayo Clinic, Jacksonville | w06 |
| 55 | 18 | Mayo Clinic, Jacksonville | w06 |
| 55 | 18 | Mayo Clinic, Jacksonville | bl |
| 55 | 18 | Mayo Clinic, Jacksonville | w13 |
| 55 | 18 | Mayo Clinic, Jacksonville | scm |
| 59 | 18 | Mayo Clinic, Jacksonville | scm |
| 59 | 18 | Mayo Clinic, Jacksonville | bl |
| 59 | 18 | Mayo Clinic, Jacksonville | w06 |
| 59 | 18 | Mayo Clinic, Jacksonville | w13 |

4 columns displaying the RID (Primary Key), SITEID (Site ID), SITENAME (Site Name), and VISCODE (Visit Code) for all participants who were randomized and with a visit date prior to 10/01/2012 at Yale University and the Mayo Clinic, Jacksonville respectively.   Both the tables are sorted using the RID column.

Ex 16
54

# UNIVERSITY OF ILLINOIS
## AT URBANA-CHAMPAIGN



Online & Continuing Education
901 West University Avenue
Suite 201, MC-260
Urbana, IL 61801-2777

June 13, 2013

Faisal Ahmed
4055 Porte La Paz
#149
San Diego, CA 92122

TO WHOM IT MAY CONCERN:

This letter is written to certify that the above named student was enrolled in and successfully completed the following course through the O'Reilly School of Technology:

|  |  |
|---|---|
| Course: | Perl 1: Introduction to Perl |
| Course #: | 128 |
| Instructor: | Ben Hengst |
| Date Enrolled: | March 12, 2013 |
| Date Completed: | June 11, 2013 |
| Grade: | A |

For his/her work in this module, this student has earned 4 CEUs (Continuing Education Units).

Shari Grindley
University of Illinois Online & Continuing Education

Exhibit 17

55

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Mathews, Ellen |
| **Sent:** | Sunday, July 07, 2013 3:32 PM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Walter, Sarah; Morgan, Linda; Tobias, Deborah; Ng, Chung (Jenkis) |
| **Subject:** | RE: Updated Dr's Note REQUIRED as of 07/03/13 - AHMED, FAISAL |

Thank you Faisal. It also appears there are no new work restrictions and we will expect to see you return to full duty on Monday July 8th.

# Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Friday, July 05, 2013 1:38 PM
**To:** Mathews, Ellen
**Cc:** Walter, Sarah; Morgan, Linda; Tobias, Deborah; Ng, Chung (Jenkis)
**Subject:** RE: Updated Dr's Note REQUIRED as of 07/03/13 - AHMED, FAISAL

Hello Ellen,

Please find the release to return to work starting Monday, 07.08.2013 from my physician attached.


Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is*

Exhibit 18
56

*for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Thursday, July 04, 2013 1:30 PM
**To:** Ahmed, Faisal
**Cc:** Walter, Sarah; Morgan, Linda; Tobias, Deborah; Ng, Chung (Jenkis)
**Subject:** RE: Updated Dr's Note REQUIRED as of 07/03/13 - AHMED, FAISAL

Hello Faisal,

We did not hear back from you after your doctors' appointments thru Tuesday 07/02/13.

Did your doctor provide you with a release to return to work as we will need that before you return? Also, if the return to work was not for July 3rd, we will need a doctor's note to extend your leave from 07/02/13 to the day you are expected to return. We need **this update certification no later than Wednesday July 10th.** It may be faxed to me at 858-822-0411 or sent via email to me.

Please respond immediately so we know your current status.

Thank you and hope to hear soon that you are feeling better and can return to work.

## Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Friday, June 28, 2013 1:59 PM
**To:** Mathews, Ellen
**Cc:** Walter, Sarah; Morgan, Linda; Tobias, Deborah; Ng, Chung (Jenkis)
**Subject:** RE: Updated Dr's Note REQUIRED

Hello Ellen,

I appreciate your continued patience and well wishes through this difficult time. Please find attached an updated doctor's note to re-certify my medical condition. I apologize for the delay, we were waiting for the results of some recent exams. I have doctors' appointments on Monday and Tuesday next week, and I expect to be released to return to work starting the following week (07.08.2013). Please also find attach an updated Leave of Absence Request with the corresponding information.



Exhibit $^2$ 18
57

Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is
for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized
review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact
me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Tuesday, June 25, 2013 10:30 AM
**To:** Ahmed, Faisal; Ng, Chung (Jenkis)
**Cc:** Walter, Sarah; Morgan, Linda; Tobias, Deborah
**Subject:** Updated Dr's Note REQUIRED

Hello Faisal,

You requested a job accommodation as you felt your work office environment was causing you to experience medical
problems. You have been unable to work since May 21, 2013 due to a medical condition. When we met for an
interactive process meeting on May 29, 2013 to talk about your accommodation request, it was agreed you would obtain
additional information from your physician as to your specific work restrictions or limitations so we could provide you, if
possible, with a compatible work environment if necessary. We have not received any additional information as to your
specific accommodation requirements to date. We very much want to have you return to your job without jeopardizing
your health but are at a loss as to how to make that happen without information from your medical provider with specifics
as to the environment that would allow you to do so.

We understand you are pursuing treatment for medical issues and wish you every success in your treatment. However, the
Leave of Absence Request approved from 5/21/13 to 6/17/13 is now expired and we need a recertification of your medical
condition from your health care provider on which to base continued leave. Please provide us with an updated doctor's
note no later than Friday, 06/28/13. Your doctor may fax the note to my attention at 858-822-0411 if that is more
convenient. Otherwise, you may forward via email to esmathews@ucsd.edu or to UCSD, 9500 Gilman Drive MC 0662,
La Jolla, CA 92037.

Please refer to PPSM 2.210 that states, leaves for medical reasons may require written confirmation from a health
provider and the University may require recertification of the medical condition and/or periodic reports regarding the
status and intent to return to work.

Thank you for your e-mail, below indicating you are working on obtaining additional information. However we hope you
understand we require documentation from your medical provider to continue your medical leave at this time. Please
provide this by this Friday 06/28/13 or further personnel action may be taken.

We look forward to hearing from you very soon and receiving news that you are able to return to work or documentation
indicating the need for and duration of medical leave.

Sincerely,

Exhibit³ 18
58

# Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Monday, June 17, 2013 9:05 AM
**To:** Mathews, Ellen; Ng, Chung (Jenkis)
**Cc:** Walter, Sarah; Morgan, Linda
**Subject:** RE: Leave of absence paperworks

Dear Ellen and Jenkis,

My physicians are awaiting the results of recent tests, and have also scheduled further tests to determine the course of treatment needed before I am released to return to work. I am working with my physicians and Linda Morgan to obtain the documentation required for my continued absence from work. I will forward the documentation to you as soon I am able.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Ahmed, Faisal
**Sent:** Tuesday, June 11, 2013 10:46 AM
**To:** Walter, Sarah
**Cc:** Mathews, Ellen; Ng, Chung (Jenkis)
**Subject:** RE: Leave of absence paperworks

Thank you for keeping me in your thoughts, I hope that I will be well enough to return to work soon.

Faisal



Exhibit 18

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Monday, June 10, 2013 9:10 AM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen; Ng, Chung (Jenkis)
**Subject:** Re: Leave of absence paperworks

Faisal - I'm sorry to hear this. We are all thinking of you and hope you feel better soon.
Sarah

On Jun 10, 2013, at 9:07 AM, Ahmed, Faisal wrote:

Hello Ellen and Jenkis,

Due to some complications with my condition, my return to work has been delayed. My next appointment with Dr. Bogart is on Tuesday, and I also have consults scheduled with a couple of surgeons later this week to determine the course and duration of treatment necessary for my recovery. Please find attached an updated Leave of Absence Request form.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Ahmed, Faisal
**Sent:** Thursday, May 30, 2013 4:02 PM
**To:** Mathews, Ellen; Ng, Chung (Jenkis)
**Cc:** faisal@ucsd.edu
**Subject:** RE: Leave of absence paperworks

Hello Ellen and Jenkis,

Please find attached an updated form.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)

Exhibit 18
60

University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Mathews, Ellen
**Sent:** Thursday, May 30, 2013 12:01 PM
**To:** Ahmed, Faisal; Ng, Chung (Jenkis); faisal@ucsd.edu
**Subject:** RE: Leave of absence paperworks

Hello Faisal,

Under the reason for leave of absence, only one box should be checked.  If you will be filing a Worker's Comp claim then it would be appropriate to mark this as work-related injury (though provisional until determined as such by WC Administrator).

Thank you,

## Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Thursday, May 30, 2013 11:18 AM
**To:** Ng, Chung (Jenkis); faisal@ucsd.edu
**Cc:** Mathews, Ellen
**Subject:** RE: Leave of absence paperworks

Hi Jenkis,

Please find the completed form attached.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences


Exhibit 18
60

9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355
Email: fahmed1@ucsd.edu
http://www.adcs.org

**From:** Ng, Chung (Jenkis)
**Sent:** Wednesday, May 29, 2013 1:46 PM
**To:** faisal@ucsd.edu; Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** Leave of absence paperworks
**Importance:** High

*Hi Faisal,*

*Per our conversation, please find the attached leave of absence form. Please complete and send it back to me.*

*If you have any other questions, please feel free to let me know.*

*Thanks,*
*Jenkis*

*Jenkis Ng*
Payroll Contacts
Alzheimer's Disease Cooperative Study (ADCS)
Department of Neurosciences
Phone: 858-246-1331
Fax: 858-246-1416
ckng@ucsd.edu

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

<Leave of Absence Request 09-Jun-13-Signed.pdf>

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized*

Exhibit 18
62

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Monday, August 05, 2013 10:10 AM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Mathews, Ellen; Tobias, Deborah; Walter, Sarah |
| **Subject:** | Office Switch Completed |
| | |
| **Follow Up Flag:** | Follow Up |
| **Due By:** | Saturday, August 10, 2013 3:47 PM |
| **Flag Status:** | Flagged |

Good Morning Faisal,

I wanted to let you know that I spoke with Ellen on Friday and your office furniture/equipment has been moved, per your request, to an office with a window.  As you know, Dr. Wolf's note does not say definitively switching you to an office with a window will eliminate your risk of respiratory illness, but your department wants to support your recovery and so the change was made.  Once you are released and return to work, we can talk further about any additional accommodation requests.  I hope you are feeling much better!  Take care,  Linda

**Linda Morgan**
**619-543-7709**

• Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above.  If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

1

Exhibit 19

64

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Tuesday, December 10, 2013 10:57 AM |
| **To:** | Shonley, Lori |
| **Cc:** | Mathews, Ellen; Ahmed, Faisal |
| **Subject:** | RE: HR0017118- Extension of LOA for Faisal Ahmed 2ND REQUEST |
| **Attachments:** | Ahmed, F. 7-18-13.pdf; Ahmed F Return to Work Certification-Signed Updated 22_Nov_ 2013.pdf; Ahmed F Wolf_Letter_18-Nov-2013.pdf |

Hi Lori,

Here is the information Faisal provided to support his accommodation request and return to modified work. The department is still working on getting a 24" screen or possible a second standard size monitor as well as providing supervisory support for a part time return to work for Faisal. The issue is that the supervisor, as well as other departmental staff will be working reduced schedules during December and will not be able to provide the support and supervision necessary for Faisal's return since he is in the probationary period. Thanks, Linda

Linda Morgan
619-543-7709

• Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

---

**From:** Shonley, Lori
**Sent:** Monday, December 09, 2013 4:03 PM
**To:** Ahmed, Faisal; Ahmed, Faisal
**Cc:** Mathews, Ellen; Morgan, Linda
**Subject:** RE: HR0017118- Extension of LOA for Faisal Ahmed 2ND REQUEST

Dr. Ahmed,
Please send the updated LOA request and medical certification form indicating the restrictions that you have that the dept. cannot accommodate.
Thank you,

**Lori Shonley** | UC San Diego, Health Sciences Human Resources | T: 619.471.9556 | lshonley@ucsd.edu

---

**From:** Shonley, Lori
**Sent:** Tuesday, December 03, 2013 2:41 PM
**To:** Ahmed, Faisal
**Subject:** FW: HR0017118- Extension of LOA for Faisal Ahmed
**Importance:** High

Faisal,
Please complete the attached LOA request form to extend your leave. You can send it back to me at this email address, or fax it to 619-543-7369. Please include your updated medical certification.
Thank you,

**Lori Shonley** | UC San Diego, Health Sciences Human Resources | T: 619.471.9556 | lshonley@ucsd.edu

Exhibit 21
74

**From:** Mathews, Ellen
**Sent:** Tuesday, December 03, 2013 2:29 PM
**To:** Shonley, Lori; Goff, Jamila
**Cc:** Mccarthy, Talia; Tobias, Deborah; Walter, Sarah; Cuellar, Debbra; Camacho, Patty
**Subject:** HR0017118- Extension of LOA for Faisal Ahmed
**Importance:** High

Hello Lori & Mila,

As per Linda's email below, Faisal has a doctor's note (with restrictions requiring department accommodations) with a return to work date of 12/09/13. Due to restrictions including a graduated return to full time work schedule, the fact Faisal has been off work for more than 180 days, the high volume workload but limited staff at ADCS available to train Faisal (interruptions to training due to mandated holidays), the Department is unable to currently accommodate all requested work restrictions until 01/07/14 which is now his projected return to work date.

As indicated in the email below, Linda Morgan has confirmed with Liberty Mutual they are willing to extend his disability payments thru 01/06/14 and Linda advised Faisal of this. In addition, since he has been out more than 180 days on medical leave, Linda Morgan advised Faisal he needs to submit a leave request for personal leave. Lori can you please send him any appropriate documents to take action for personal leave?

Faisal will be providing us with an update Dr's note on his revised restrictions.
Please let me know if there are any questions.

Thank you,

# Ellen

Ellen Mathews
HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Morgan, Linda
**Sent:** Tuesday, December 03, 2013 8:23 AM
**To:** Mathews, Ellen
**Subject:** RE: Work Restrictions by Friday 11/22

Good Morning Ellen,

I sent them the letters from Dr. Wolf and the note releasing him on 12/9 with restrictions. So, I don't think anyone has to send in anything. It sounds to me like she was going to authorize payments to him through 1/6. Hopefully we can get him back to work on 1/7 with the accommodations and the performance process can continue. I believe they would let him know if he needed to provide anything else. Thank you for all your help! LM



Exhibit 21
75

Linda Morgan
619-543-7709

• Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Mathews, Ellen
**Sent:** Monday, December 02, 2013 4:10 PM
**To:** Morgan, Linda
**Subject:** RE: Work Restrictions by Friday 11/22

Great, that will be helpful for both Faisal and the Department. Does HS Shared Services need to do anything in regards to requesting the extension of his benefits from Liberty Mutual or does Faisal need to generate a request thru LM?

Ellen

**From:** Morgan, Linda
**Sent:** Monday, December 02, 2013 3:19 PM
**To:** Mathews, Ellen
**Subject:** RE: Work Restrictions by Friday 11/22

Thanks Ellen. I will do so. Also, I heard back from Liberty Mutual. They will extend his benefits until 1/6/14 so we are good with extending his leave. Thank you! LM

Linda Morgan
619-543-7709

• Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Mathews, Ellen
**Sent:** Monday, December 02, 2013 3:18 PM
**To:** Morgan, Linda
**Subject:** FW: Work Restrictions by Friday 11/22

Hi Linda,

I am not sure if you need to revise the dates on the summary. Faisal was on leave 05/21/thru 07/07/13 and returned to work 07/08/13 and then went out on leave again as of 07/23/13 until current.

Thanks,

Ellen

**From:** Morgan, Linda
**Sent:** Monday, December 02, 2013 2:07 PM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen; Gallagher, Aimee
**Subject:** RE: Work Restrictions by Friday 11/22

3

Exhibit 21
76

Hi Faisal,

Thank you for your response! Here is the interactive process (IP) summary I mentioned. Please review and, if you agree, please return to me with signature via e-mail or fax (my fax is 619-471-9932). Thank you.

I have a question from the department. Do you still need the sit/stand desk? Apparently this desk will require another piece in order to properly install the additional monitor and a standard desk can be substituted if you no longer need the sit/stand feature.

It was nice to speak with you today. I'm very glad you're feeling better and ready to return to work. I hope we can arrange a situation that works for you and the department. I sent an e-mail to Corie Gillham and will let you know as soon as I get a response. Take care, Linda

Linda Morgan
619-543-7709

· Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Monday, December 02, 2013 1:18 PM
**To:** Morgan, Linda
**Subject:** RE: Work Restrictions by Friday 11/22

Hi Linda,

Please find the email with my responses to your questions again below.


Thank you,

Faisal

**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org


**From:** Morgan, Linda
**Sent:** Monday, November 25, 2013 12:47 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Gallagher, Aimee; Quilter, Aimee; Mathews, Ellen; Cuellar, Debbra
**Subject:** RE: Work Restrictions by Friday 11/22

Exhibit 21
72

Hi Faisal,

I'm sorry to hear your recovery is not progressing as expected. As I'm sure you understand, your department is experiencing a severe hardship with regard to staffing and has an urgent need for the current staff to be available to work. It is unclear at this point whether or not your leave can be extended. We understand your intentions are to return to work as soon as you are able however your leave has been extended numerous times over the past six months leaving the department no clear expectation that 12/9/13 will be the actual date you will be able to return.

> *I have extended my leave month by month because I have been recovering from a wound and the progress has been inconsistent . Over the last month, progress has varied week to week, and therefore the initially estimated 2 weeks from 11/18/2013 turned into 3 weeks. I am certain that I can return to work on 12/9/2013.*

We're also confused with regard to the medical information you provided. Dr. Wolf indicated in his 7/18/13 letter that your condition may be due to "various environmental triggers that can exacerbate his respiratory condition." At that time Dr. Wolf recommended you be provided with a working window for access to fresh air and noted "an air purification system . . . would also be helpful." Dr. Wolf does note he has no idea whether or not these changes will help you but feels they may. So, is the air purification system an accommodation requirement before you will be able to return to work or is this optional? Based on his opinion discussed below, do you still need a window?

> *As stated in the letter dated 11/18/13, the recommendations made in the 7/18/13 letter are "necessary" for my work environment, and need to be in place for me to return to work. However, I purchased an air purifier already, and it should have been moved along with the rest of my office furniture. Linda's email from 8/5/2013 stated that my "office furniture/equipment has been moved, per [my] request, to an office with a window" and therefore these accommodations should already be in place and should not be changed.*

In his 11/18/13 letter Dr. Wolf indicates "Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face. Facial pain as a result of this sensitivity to cold air blowing directly on these areas , as well as visual impairment from the injury near his eye during April and May of 2013,

Exhibit 21

70

exacerbated his symptoms." From this note we are given to understand the issue is with the temperature and force of the air rather than the air quality itself?

> *No. I had an infection, and a rash that became a wound, and it is that wound that I have been healing from for the past 6 months. Although the exact source of the infection is uncertain, it is clear that my symptoms were exacerbated by my work environment, and that ultimately resulted in wounding me. The wound caused by an infection is the source of pain and it is that Dr. Wolf refers to in his 11/18/13 letter when he discusses my sensitivity to cold air.*

And has the situation changed from a respiratory problem to facial pain and eye strain such that an adjustment to the air flow and temperature in your office would be sufficient to address the issues?

> *No, there has been no change, and an adjustment to the airflow and temperature would not be adequate.*

Now that the weather is cooler we expect the air conditioner to provide warm, rather than cool air. Will that make a difference?

> *No. I need to avoid air blowing directly on my face. Any air causes pain, although cold air causes more pain.*

Or, are you requesting a window, a change in the air vent and an air purification system before you could return to work?

> *Along with the air purifier I already purchased, these accommodations should already be in place (per your email from 8/5/2013).*

Dr. Wolf advises you will need a larger computer monitor, at least 24 inches. In my experience visual difficulties are aided by an increase in the size of the font rather than the size of the monitor. We may need additional information on this requirement.

> *I work with spreadsheets and tables for my job. I need to be able to see multiple columns simultaneously. From my previous experience actually performing this job, increasing font size had a significantly negative impact on my productivity and accuracy.*



Exhibit 21
~~79~~

Dr. Wolf recommends you "begin at a 5 hour work day and gradually increase this to a full 8 hour work day in the first 2 weeks back." Does this mean you can work 5 hours the first week and then increase to 8 hours the second week? It is unclear what sort of graduated return to work is being requested.

> *4 days at 5 hours ------> 12:00pm- 5:30pm (including a couple of 15 minute breaks)*
>
> *3 days at 6 hours ------> 11:00am-5:30pm (including a 30 minute lunch)*
>
> *3 days at 7 hours ------> 10:00am-5:30pm (including a 30 minute lunch)*
>
> *3rd week back to full time ------> 9:00am-5:30pm*

Dr. Wolf seems to imply quite strongly that your current difficulties were caused by either the air quality in your office and/or the air temperature and directional flow from the air conditioning vent in your office and yet multiple attempts to encourage to file for workers' compensation have been ignored. I'm confused about why you would not want to pursue a remedy that could potentially provide you with medical care, as well as an income benefit if you cannot work since you have repeatedly indicated your work environment caused your current medical issues.

We are very concerned that Dr. Wolf is not confident changes to the work environment will provide a safe environment for you. We are also not clear on the specific accommodation(s) being requested. Finally, based on the urgent staffing needs, it is not certain your leave can be extended to 12/9/13. I would welcome a call to discuss these matters and get clarification on your specific request. I look forward to hearing from you. Linda (619-543-7709)

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

[T] Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Friday, November 22, 2013 9:23 PM
**To:** Mathews, Ellen; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: Work Restrictions by Friday 11/22

Hello Ellen,

Thank you, however I am not quite well yet and have not healed as much as expected during this week. As a result my physician felt that I would require an additional week to finish healing. Please find attached an updated Return to Work Certification, an updated Leave of Absence Request, and a note from the doctor.



Exhibit 21
80

Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Tuesday, November 19, 2013 6:23 PM
**To:** Ahmed, Faisal; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** Work Restrictions by Friday 11/22

Hello Faisal,

Thank you for the update and glad you are better.

Please be sure to get us a note from your health care provider by this Friday 11/22/13 regarding any work restrictions. We need to review these before your actual return to work date of 12/02/13.

If you have any other questions, please let us know.

Regards,

Ellen

Ellen Mathews
HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*



**From:** Ahmed, Faisal
**Sent:** Monday, November 18, 2013 8:42 PM
**To:** Mathews, Ellen; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen and Debbra,

Please attached a Return to Work Certification (a note to follow), and a Leave of Absence Request.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst – Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

**From:** Mathews, Ellen
**Sent:** Monday, October 21, 2013 10:03 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Thank you Faisal.

Ellen

**From:** Ahmed, Faisal
**Sent:** Friday, October 18, 2013 6:33 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen,

Please find attached an updated note from my doctor.

Thank you,

Faisal


Exhibit 21
80

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355
Email: fahmed1@ucsd.edu
http://www.adcs.org

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Tuesday, October 15, 2013 9:47 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Thank you for your reply.  The dr's note with updated status may be faxed to my attention at 858-822-0411 or sent to my email,

We will expect hear from you and/or you doctor this Friday 10/18.

Ellen

---

**From:** Ahmed, Faisal
**Sent:** Tuesday, October 15, 2013 9:38 AM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen,

Sorry, I did not see the email below before but I did receive your voicemail this morning. The next scheduled visit with my physician is on the afternoon of 10.18.2013.  That is when I will be able to provide you an update as to the status of my leave.


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst
Alzheimer's Disease Cooperative Study
University of California, San Diego
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355

10
Exhibit 21
89

Email: flahmed@ucsd.edu
http://www.adcs.org


-------- Original message --------
From: "Mathews, Ellen" <ESMATHEWS@mail.ucsd.edu>
Date: 10/12/2013 12:38 PM (GMT-08:00)
To: "Ahmed, Faisal" <faahmed@ucsd.edu>
Cc: "Tobias, Deborah" <dtobias@ucsd.edu>,"Walter, Sarah" <swalter@ucsd.edu>,"Gessert, Devon"
<dgessert@ucsd.edu>,"Cuellar, Debbra" <dlcuellar@ucsd.edu>,"Morgan, Linda"
<lcmorgan@ucsd.edu>,"Gallagher, Aimee" <agallagher@mail.ucsd.edu>,"Quilter, Aimee"
<aquilter@ucsd.edu>
Subject: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Faisal,

We have not heard from you since this last email below on your status.  Hopefully your health has been improving.

We are trying to stay current on open Leave of Absence files due to personnel changes in our HR unit.  It is important that you provide us with an updated status next week on your condition and estimated return to work or if your doctor will be extending your leave.

I also did not see a reply from you as to whether or not you applied for disability, and if so was the claim approved?

Please advise on your status as soon as possible.

Thank you,

## Ellen

Ellen Mathews
HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*


**From:** Mathews, Ellen
**Sent:** Monday, September 16, 2013 1:42 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Faisal,



Exhibit 21
87

Thank you for sending a leave status update and dr's note with an estimated return to work date of 10/28/13. Sorry to hear you are still not feeling well and are unable to return to your career position at the ADCS. For now, we will continue to report your status in payroll as no-pay.

Please plan on submitting your updated leave status no later than Friday 10/18/13 or if your doctor should release you to return to work earlier.

Did you by any chance complete disability paperwork with Lori Shonley in benefits?

# Ellen

Ellen Mathews
HR Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Friday, September 13, 2013 4:13 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** RE: Leave Status AHMED, FAISAL-Next Dr. Note due 09/16/13

Hello Ellen,

My most recent follow-up visit with my physician on was on Wednesday. From the visit he determined that I will need additional time to recover. Please find attached his note and a revised leave of absence request form.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**



*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Friday, August 23, 2013 11:11 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status AHMED, FAISAL-Next Dr. Note due 09/16/13

Good morning Faisal,

We are sorry to hear you are still in recovery and will update your leave status in Payroll to reflect the return to work date of 09/23/13.

Please keep us informed on the status of your leave by providing us with an updated dr's note no later than Monday 09/16/13 (or sooner if anything changes).

Thank you,

Ellen

---

**From:** Ahmed, Faisal
**Sent:** Thursday, August 22, 2013 9:00 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** RE: Leave Status & Return To Work Date - AHMED, FAISAL

Hello Ellen,

My recovery has been slower than expected and my physician has extended my leave. Please find attached certification from my doctor and a revised leave of absence request form. I have also received your email dated 08.13.2013, although I have not had an opportunity to review it in detail.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Mathews, Ellen
**Sent:** Thursday, August 22, 2013 12:31 PM



Exhibit 21
RA

**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status & Return To Work Date - AHMED, FAISAL
**Importance:** High

Hello Faisal,

We hope your recovery is going well and you will soon be released to return to work. This office has not heard from you since 08/02/13 and it is important we know your current status.

Based on the last dr's note received your leave is due to end soon with a return to work date of 08/26/13. Please confirm if you will be returning to work on this date and provide us with a dr's note indicating you have been released to return to work. If your doctor is extending your leave, we will need an updated note with this information, otherwise you will be on unexcused absence.

Linda Morgan will be contacting you regarding setting up an Interactive Process meeting with you once you return to work to discuss reasonable accommodations and any work restrictions provided by your doctor. Per Linda's prior email to you, the ADCS was agreeable and able to move your workstation to an office with a window. Any other changes/modifications can be discussed at the IAP meeting. Aimee Gallagher from Employee Relations may be joining us for this meeting in the event you have any other personnel questions to be addressed.

Again, please contact me by response to this email or by phone to confirm your status and if we may expect to see you on Monday 08/26/13.

Thank you Faisal.

# Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

Exhibit 21
87

Print This Page   |   Close This Window
Name: Faisal Ahmed | DOB: 7/4/1976 | MRN: 1713851-2 | PCP: Gary N. Bogart, DO

## Letter Details

# UC San Diego
## HEALTH SYSTEM

Faisal Ahmed | MRN: 1713851-2

May 20, 2013

5/20/2013

Re: Faisal Ahmed,

To Whom It Concerns,

Please be aware that I am Mr, Ahmed's treating physician and can attest that he has been evaluated for chronic allergic sinusitis. It is the case that his symptoms are exacerbated by air conditioning. I am apprised, his current work condition is such that he is in an room that places him at risk, and as such he needs to be changed to a room more conducive to his long term health. Please contact the office if you have any ongoing questions or concerns. Thank you.

Sincerely,

Gary N. Bogart, DO

UCSD LA JOLLA FAMILY AND SPORTS MEDICINE
9333 Genesee Ave, Ste. 200
San Diego CA 92121
TEL: 858-657-8600
FAX: 858-657-8625
Page 1 of 1

*This letter was initially viewed by Faisal Ahmed at 5/20/2013 3:44 PM.*

MyChart® licensed from Epic Systems Corporation, © 1999 - 2013.

Exhibit 6
13

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Mathews, Ellen |
| **Sent:** | Wednesday, May 22, 2013 2:54 PM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Walter, Sarah; Tobias, Deborah; Ng, Chung (Jenkis); Gessert, Devon; Morgan, Linda |
| **Subject:** | RE: Absence from Office - Faisal Ahmed/ADCS |
| **Attachments:** | Completed IAP 02-05-13 & Dr. Note-AHMED, F.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Flag for follow up |
| **Flag Status:** | Flagged |

Hello Faisal,

At this point, we will use the current note you provided and if anything further is needed we can discuss during the IAP meeting.

We are committed to exploring possible reasonable accommodations for you and plan meet to discuss this on Wednesday, May 29th at 8:30am in the ADCS Conference Room. Please plan on attending to discuss all your requests and ideas for accommodations to be considered,

Linda Morgan is now the Disability Manager that will be working with us on the interactive process. I have attached the IAP documentation from our last IAP meeting on 02/05/13 for reference.

Thank you,

Ellen

**From:** Ahmed, Faisal
**Sent:** Wednesday, May 22, 2013 1:26 PM
**To:** Mathews, Ellen
**Cc:** Walter, Sarah; Tobias, Deborah; Ng, Chung (Jenkis); Gessert, Devon; Morgan, Linda
**Subject:** RE: Absence from Office - Faisal Ahmed/ADCS

Hello Ellen,

Thank you for the information. I have a question regarding the following:

> "If you feel you are unable to work in your current work environment you should stay home. Please advise your supervisor each day or for the period you expect to be out. A doctor's note is required in order for this to be excused absence(s). Please note, if you do not have any accrued sick leave available, provisionally this will be be unpaid leave."

What does the doctor's note need to state for my absences to be excused if I am unable to work in my current work environment? I've already submitted a note regarding the work environment and its relationship to my condition. I am attaching it to this email for your reference.

Thank you,

Faisal

Exhibit 7
14

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Mathews, Ellen
**Sent:** Wednesday, May 22, 2013 10:08 AM
**To:** Ahmed, Faisal
**Cc:** Walter, Sarah; Tobias, Deborah; Ng, Chung (Jenkis); Gessert, Devon; Morgan, Linda
**Subject:** Absence from Office - Faisal Ahmed/ADCS

Hello Faisal,

Sarah forwarded me your messages below and I am sorry you are not feel well.

We have contacted UCSD's Disability Manager to set up a meeting for the interactive process (http://blink.ucsd.edu/HR/services/support/disabilities/accommodation / ) to be initiated and will let you know when the meeting is scheduled.

If you feel you are unable to work in your current work environment you should stay home.  Please advise your supervisor each day or for the period you expect to be out. A doctor's note is required in order for this to be excused absence(s).  Please note, if you do not have any accrued sick leave available, provisionally this will be be unpaid leave.

Also be advised that you are not currently eligible to apply for Family Medical Leave (FML) as you have not worked at least 1250 hours in the 12 months immediately prior to the beginning date of leave.  Here is a link to information on Leave Without Pay: http://atyourservice.ucop.edu/forms_pubs/checklists_factsheets/leave_wo_pay.pdf .

Here are additional links regarding Supplemental Disability and Workman's Compensation:

**Disability:**          http://atyourservice.ucop.edu/forms_pubs/checklists_factsheets/disabilityfact.pdf
http://atyourservice.ucop.edu/forms_pubs/misc/guide-to-filing-for-disability-4-16-2013.pdf
(Contact is Lori Shonley at lshonley@ucsd.edu )

**Worker's Compensation:**          http://blink.ucsd.edu/safety/occupational/workers-comp/
http://blink.ucsd.edu/safety/occupational/reporting.html#1.-Notify-your-supervisor.
(Contact is Pam Thompson at pmthompson@ucsd.edu )

Again, we will advise you of the Interactive Meeting date.

Thank you,

Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662

Exhibit 7
15

La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Wednesday, May 22, 2013 6:25 AM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Ng, Chung (Jenkis)
**Subject:** Fwd: Weekly touch base - Faisal - 4/26/2013

Begin forwarded message:


**From:** "Ahmed, Faisal" <faahmed@ucsd.edu>
**Date:** May 21, 2013 9:42:20 PM PDT
**To:** "Walter, Sarah" <swalter@ucsd.edu>
**Cc:** "Gessert, Devon" <dgessert@ucsd.edu>
**Subject: RE: Weekly touch base - Faisal - 4/26/2013**


Please find attached another note from my doctor for my absence today. I would once again like to request permission to use the room across the hall. Thank you.

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org


**From:** Ahmed, Faisal
**Sent:** Tuesday, May 21, 2013 12:37 PM
**To:** Walter, Sarah
**Cc:** 'Devon Gessert'
**Subject:** RE: Weekly touch base - Faisal - 4/26/2013

Hi Sarah,

As you may recall, last week during our meeting, after you were done giving me "informal feedback", I again requested that I be allowed to work in a different room, preferably one with a window so that I have access to fresh air and do not have to rely solely on the ventilation system. Even though you previously had offered other workspaces for me to use (see your email below), and the room directly across from my office is currently unoccupied, when I asked, you stated that you needed a doctor's note in order to consider my request. Please find the note attached along with pictures of my condition last night and this morning. Due to my condition I am waiting to see my physician again today, and I am unable to return to work. Furthermore, I do not think it would be wise for me to return to work in my current office, since exposure to that environment is potentially making my illness worsen. I trust that you will honor my reasonable request for accommodation and not continue to insist that I work in my current office that is potentially making me ill

Exhibit 7

16

and also insist that I continue to take unpaid leave for the days that I am unable to work due to my illness. I hope that we can quickly resolve this matter internally so that I can return to the office and resume work as soon as possible.


Sincerely,

Faisal


**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Friday, April 26, 2013 9:53 PM
**To:** Ahmed, Faisal
**Subject:** Re: Weekly touch base - Faisal - 4/26/2013

Hi Faisal,

In the future please speak to me in person about something like this before taking action. We do not currently have a flexible/telecommuting agreement in place for your position, and I cannot approve working from home without this in place.

I will find out from facility services if something can be done about the vents. If your office is not satisfactory there may be other work spaces available that you can use.

Let's discuss further.

Thanks!
Sarah

On Apr 26, 2013, at 3:20 PM, Ahmed, Faisal wrote:


Hi Sarah,

Thank you for following up with Linda and Jenkis. I decided to come home for lunch because it seems like the my office room was very cold, and I also sneeze a lot more when I'm in there. May the vent filters need to be cleaned out or replaced? It is okay with you, I would prefer to finish the ECS assignment using my desktop at home, although I will have to return to the office since I left some things there. I do have full access to my workstation from here via VNC.


Warm regards,

Faisal

Exhibit 7
17

On 4/26/13 2:19 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:

Hi Faisal,

Here are my notes from our conversation today. It's important that we wrap up these loose threads for the Perl course and practicum before your HBA assignments begin in earnest. Keep me posted on what your docs say.

**Task Priorities**
Today: HBA ECS
Monday: Perl Course - 2-3 hrs left to complete final assignment
By Tuesday lunch: Practicum - 4 hrs - then send me what you've got
Database Schema - first draft next friday
Also to be assigned next week - experimental forms. Documenting diffs in administration for end users and to inform offline qc.

**Training Priorities**
1. GCP and HIPAA (Faisal following up with Jenkis on whether current trainings are ok)
2. Database training, practice session
3. Read ADCS Grant - review with Sarah (attached)
4. Review primary/secondary outcomes used by ADCS
ADAS-Cog (include Maze, Number Cancellation, Delayed word recall)
CDR
CGIC
ADCS-ADL

I also am following up with Linda Mellor for the ergo assessment and Jenkis on what UC policy is for health leave during probationary period.

Thanks,
Sarah

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

Exhibit 7
18

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel: 858-246-1347
Cell: 858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Exhibit 7
19

## ADCS NEUROSCIENCES
## TIMEKEEPING POLICY
### Staff Employees
(Draft Updated January 2009)

### TAKING TIME-OFF

Please follow these University/Departmental policies and procedures to appropriately document time-off:

1. **VACATION LEAVE USAGE**: Vacation leave is normally scheduled in advance and shall be approved by the employee's immediate supervisor. For vacation periods that will exceed 'two weeks, DBO approval may be required to ensure workload coverage. If hours of time-off exceed hours of accrued vacation (and/or accrued comp), the employee may be placed in non-pay status for the excess hours. Sick leave may <u>not</u> be used in lieu of vacation leave. Note: *Vacation leave may not be used until the month after it is earned.*

   If you cannot schedule vacation within 60 working days of accruing the maximum due to operational considerations, you will have an additional 4 (four) months within which to take vacation to bring your vacation accruals below the maximum. Vacation will continue to accrue during the additional 4 months.

2. **SICK LEAVE USAGE**: Sick leave can only be used for specific circumstances, such as, illness (self or family), doctor's appointments, bereavement, etc. If you are uncertain of the appropriate use of sick leave, please see the timekeeper. If hours of time-off exceed hours of accrued sick leave, vacation may be used in lieu of sick leave or, employee will be placed in non":pay status for the excess hours . Note: *Sick leave may not be used until the month after it is' earned.*

3. **REPORTING ABSENCES**: Discuss expected absences (sick, vacation, late, etc.) in advance with your supervisor. *If an illness is 3 days or longer, a doctor's note should be given to your Department Human Resources contact and a copy to your supervisor.* It is an employee's responsibility to notify their supervisor before the beginning of their shift (when possible) concerning any unexpected absence~. It is also recommended an employee contact their supervisor and one other office staff (in the event the supervisor is not in the office). If necessary, a follow-up call is appropriate.

   Report to work in accordance with the established departmental work hours. The typical work schedule is weekdays from 8 a.m. to 4:30 p.m., unless you have completed an alternate schedule form (available from department HR contact) and your supervisor or department head informs you that an alternative work schedule is required or has been approved.

   Absences should be reported to the nearest quarter hour and in quarter hour increments for non-exempt employees (**whole day increments only (no partial days) for exempt employees).**

   Send an email to your supervisor for pre-approval when requesting vacation or expected sick leave. If you are unexpectedly out of the office, please notify your supervisor prior to the beginning of your return to work day.

4. **OVERTIME PROCEDURES (non-exempt staff only): All overtime MUST be approved by the employee's supervisor IN ADVANCE. When OT hours are estimated to exceed 10 hours in a normal work week, the employee's supervisor, AND the Director of Administration, Jackie Bochenek or Co-Director of Administration, Debbie Tobias, must pre-approve the OT.** Requests for overtime compensation not authorized in advance may be subject to non-payment or comp time disallowed upon review. It is Department policy that any OT earned for non-represented employees is to be credited as comp time (unless pay is approved by your supervisor).

Exhibit 24
106

Send an email to your supervisor for approval PRIOR to working any overtime. This may be done a day, week, or month at a time using an estimate of hours. AGAIN, any week where OT hours exceed 10 hours, the Administrative Director or Co-Director must also pre-approve the OT.

5. **COMP BALANCES & USAGE**
It is Department policy that accrued overtime comp balances not exceed a total of 40 hours (Comp & Comp+ combined). Furthermore, **comp accruals will be used before vacation accruals** when possible (if more than 1-2 months from reaching maximum vacation accrual balance).

If you cannot schedule vacation within 60 working days of accruing the maximum vacation due to operational considerations, you will have an additional four months within which to take vacation to bring your vacation accruals below the maximum limit. Vacation will continue to accrue during the additional four months.

6. **MONTHLY TIMESHEETS**
Staff employees are <u>REQUIRED</u> to submit a monthly summary (equivalent to paper timesheets). Supervisor's approval email is required to the timekeeper regardless if absences or overtime have occurred.

Please follow the attached ADCS Timekeeping procedure for submitting monthly summaries.


*PLEASE NOTE: All absences and overtime comp accruals are reported retroactively. Therefore, your monthly*
*Leave Activity Summary Report (LASR) may not reflect current month leave activity until the following month.*

Please make every effort to submit your time sheets on time. If you have any questions about completing your timesheet, please contact Jenkis Ng at 858-246-1331, LJVPC Suite C227, room 220B, or via email at: ckng@ucsd.edu OR Robia Sabat at 858-246-1323, LJVPC Suite C227 room 221 or via email at rsabat@ucsd.edu.

Thank you for your cooperation.

Exhibit 24
107



**UC San Diego**
SCHOOL OF MEDICINE

February 28, 2014

Faisal Ahmed
4055 Porte La Paz #149
San Diego, CA 92122

SUBJECT:  Probationary Release (RX)

In accordance with Article 32 of the Agreement for the Research Support Professionals Unit (RX) between the University of California and the Coalition of University Professional and Technical Employees (UPTE), you are hereby advised of the decision to release you from probation effective **Friday, February 28, 2014.**

The reason for this release is due to your limited knowledge and basic understanding of data logic and analysis required to perform the essential functions at the Staff Research Associate 3 level as discussed and provided to you on the Performance Update evaluation on February 14, 2014.

Your final paycheck will included any unused vacation hours.  If you have any questions regarding your paycheck or other benefit related matters you may contact Health Sciences Human Resources Shared Services at myhshr@ucsd.edu or 619-543-3200.

If you have any questions regarding this release, please contact Viviane Pourazary, Labor Relations Specialist with UCSD Health Sciences Employee Advocacy and Labor Relations at 619-543-6147 or via email at vpourazary@ucsd.edu.

Dr. Paul Aisen
ADCS Director
UCSD Department of Neurosciences

Attachment:  Proof of Service

cc:  Department Head
     Employee File
     UCSD Health Sciences Labor/Employee Relations

DEPARTMENT OF NEUROSCIENCES
9500 Gilman Drive, #0662    La Jolla, California 92093-0662    TEL: (858) 534-9546    FAX: (858) 822-0411

Exhibit 25
108

# PREVENTION OF BLINDNESS IN LEPROSY



Paul Courtright
Susan Lewallen

Exhibit 28
140

# PREVENTION OF BLINDNESS IN LEPROSY
## 2ND EDITION

**Edited by:**
**Paul Courtright**
**Susan Lewallen**

**Printed in South Africa**
**2006**

Exhibit 28
(4)

# Prevention of  Blindness in Leprosy

**2nd Edition**
Edited by:

**Paul Courtright  Susan Lewallen**

**Contents**

Glossary
Introduction
Overview
Chapter 1:   Ocular leprosy as a cause of blindness
Chapter 2:   The clinical disease
            Changes of the eyelid
            Medical management of lagophthalmos
            Surgical management of lagophthalmos
            Trichiasis
            Corneal changes
            Iris involvement
            Cataract
Chapter 3:   Programme development for prevention of blindness in leprosy
            Present action in eye health care
            Present action in leprosy control
            Programme coordination
            Recommended programme activities
            Disability grading
Chapter 4:   Training personnel in prevention and management of eye
                 disease in leprosy
            Integrated health workers
            Paramedical workers in leprosy
            Ophthalmologists
Chapter 5:   Research needs
            Epidemiologic research
            Operational research
            Basic research
Executive summary
Selected references
Annex 1: List of participants
Annex 2: Lagophthalmos surgery outcome assessment form
Annex 3: Modified lateral tarsal strip procedure
Annex 4: Standardized clinical examination

Exhibit 28
142

# GLOSSARY

**Aqueous flare**
The evidence of protein in the aqueous humour, a sign of breakdown of the blood-aqueous barrier, often due to inflammation of the iris and ciliary body.

**Dermatachalasis**
Loss of normal elasticity of the skin leading to excessive skin folds, particularly of the upper eyelids.

**Ectropion**
Outward turning of the eyelid margin, so that it is not in contact with the eyeball.

**Entropion**
Inward turning of eyelid margin, toward the eyeball.

**Erythema Nodosum Leprosum (ENL)**
An inflammatory condition of the skin chararterised by painful red nodules and often accompanied by fever and joint pains; a feature of the multibacillary form of leprosy. ENL is often referred to as Type 2 Reaction.

**Fluorescein**
A chemical solution used to demonstrate superficial corneal damage, which appears as a bright green area.

**Iridectomy**
Surgical excision of a piece of the iris.

**Iritis**
Inflammation of the iris; commonly associated with inflammation of the ciliary body. The combined condition is iridocyclitis. Iritis is often referred to as anterior uveitis.

**Keratitis**
Inflammation of the cornea. In avascular keratitis new blood vessels are not yet invading the cornea. Exposure keratitis refers to inflammation of the cornea due to exposure and drying of the surface.

**Lagophthalmos**
A condition in which the eyelids cannot be completely closed to protect the cornea.

Exhibit 28
143

**Meibomian glands**
Glands situated in the tarsal plates of the eyelids secreting an oily substance, which spreads over the surface of the tear film and prevents excessive evaporation.

**Miotic pupil**
Small contracted pupil.

**Multibacillary**
Leprosy which includes polar lepromatous (LL) borderline lepromatous (BL) and mid-borderline (BB) types in the Ridley-Jopling classification. For field use, multibacillary includes all patients with more than 5 skin lesions.

**Multi-Drug Therapy (MDT)**
The combined therapy which may include rifampicin, clofazimine and dapsone and others recommended by WHO for treatment of multibacillary and paucibacillary leprosy.

**Paucibacillary**
Leprosy which includes only smear-negative indeterminate (I), borderline tuberculoid (BT) and polar tuberculoid (TT) cases in the Ridley-Jopling classification. For field use, paucibacillary includes patients with up to 5 skin lesions.

**Reversal reaction**
This reaction, which can occur in both PB and MB leprosy (mainly in formerly borderline patients of Ridley-Jopling classification), is the result of a sudden change in cellular immunity and is characterised by acute exacerbation of skin lesions and often accompanied by acute neuritis. Reversal reaction in also referred to as Type I Reaction.

**Synechiae**
Adhesions between iris and anterior lens capsule.

**Trichiasis**
One or more eyelashes rubbing against the eyeball.

5

Exhibit 28
144

# INTRODUCTION

The problem of eye involvement as a cause of disability in leprosy is well recognised. The successful, widespread use of multidrug therapy has led to significant reductions in the prevalence of leprosy worldwide; subsequently, there has been increased attention to the problem of disabilities, including those relating to visual loss.

A workshop on ocular leprosy was held in Broxbourne, UK from 3-5 July 2001, organized by the British Columbia Centre for Epidemiologic & International Ophthalmology and LEPRA and sponsored by ILEP. The list of participants at the 2001 workshop is given in Annex 1. The 2001 workshop came almost 11 years after the first ocular leprosy workshop, in London, in September 1987. Significant changes in the management of leprosy as well as increased knowledge about the ocular manifestations of leprosy led to the need for major changes to the earlier "Prevention of blindness in Leprosy".

This booklet, resulting from the workshop, is intended for use by all health workers and programme managers involved in leprosy control and prevention of blindness. We are grateful to the workshop participants for all of their contributions.

Publication of this booklet was made possible by a grant from American Leprosy Missions.

Exhibit 28

145

# OVERVIEW

Visual impairment and blindness occur in patients with ocular leprosy; these individuals form a severely disadvantaged group because of other disabilities due to the disease, its social stigma and the difficulties and delay in receiving appropriate eye care.

Annually, 500,000 to 700,000 leprosy patients are being detected and put on anti-leprosy treatment. Since 1985 about 15 million leprosy patients have been diagnosed and been put on MDT treatment.

Data on blindness in leprosy is incomplete and often unreliable, because of the problems in obtaining representative population-based estimates. From existing surveys it is estimated that between one-quarter and one-half a million leprosy or ex-leprosy patients could be blind (vision less than 6/60). The visual disability in these patients is compounded by other disabilities, particularly sensory impairment and deformity of the extremities.

The incidence of blindness in ocular leprosy is influenced by many factors, especially anti-leprosy treatment, the type and duration of the disease, and eye treatment received. The three major pathways to blindness from leprosy are:

1. Corneal opacity arising from exposure associated with lagophthalmos and diminished corneal sensation
2. Iridocyclitis and its sequelae
3. Cataract arising as a complication of uveal and corneal disease.

In addition, many elderly leprosy patients are blind as a result of age related cataract. This may not be directly related to leprosy, but because of leprosy, these patients often have less access to surgery.

Whereas corneal involvement occurs in both types of leprosy (paucibacillary and multibacillary), iridocyclitis is characteristic of multibacillary disease. This, and differences in age at disease recognition, probably account for regional differences, i.e., corneal disease in Africa and the Indian subcontinent where paucibacillary disease predominates, and iris involvement in East Asia and South America where multibacillary disease predominates.

Ocular leprosy represents a considerable source of avoidable blindness, which can be greatly reduced by early detection of patients at risk, and appropriate management. This calls for intensified efforts in the training of health personnel and patient education and integrating leprosy and ex-leprosy patients into general eye care services.

7

Exhibit 28

146

# CHAPTER 1

# OCLUAR LEPROSY AS A GLOBAL CAUSE OF BLINDNESS

Multidrug therapy (MDT) has greatly reduced the incidence of eye disease in leprosy. Nevertheless, people who have leprosy or who have had leprosy in the past (referred to here as ex-leprosy patients), continue to have eye complications as a result of the disease or as a result of other causes, such as cataract.

The lack of reliable details on total numbers of people affected by leprosy, together with the great variation in the frequency of eye complications in different populations, continues to make estimation of the prevalence of blindness and ocular involvement in leprosy difficult. The prevalence of eye disease in ex-leprosy patients varies considerably, primarily as a result of variations in previous anti-leprosy treatment, the condition at leprosy diagnosis, and the age of the patient.

A review of the world literature shows wide variation in the methods, planning, setting up and reporting of ocular leprosy surveys. Many studies taken from leprosaria have a predictably high prevalence of eye disease. Even the definition of blindness and the evaluation of ocular manifestations in respect of visual impairment have not been sufficiently standardised to allow firm conclusions to be drawn from these studies.

Meaningful estimates of the prevalence of blindness among people affected by leprosy are further hindered by regional variability of case management procedures. Ocular disease is, not surprisingly, a function of disease duration. The duration of disease at diagnosis may vary according to health service coverage, the level of awareness of the disease, and the social stigma of leprosy.

At the time of diagnosis, ocular disease due to leprosy is not uncommon; approximately 11% of people with multibacillary (MB) leprosy (from the LOSOL study in Ethiopia, India, and the Philippines) have lagophthalmos, uveitis, or trichiasis related to their disease at diagnosis. These conditions will remain after MDT and put the person at risk for blindness in the future; this is of particular concern if the person is discharged from the health care system with no provision for follow up.  In these populations the primary predictors of leprosy related eye disease were older age, the presence of other disabilities and reactions involving the face.



# CHAPTER 2

# THE CLINICAL DISEASE

**Changes in the eyelids**

In order for the eyelids to protect the eye by spreading tears and clearing the cornea of debris, they must have the necessary rigidity, the correct curvature and the proper lid margin apposition. They must be able to open and close under voluntary control, perform spontaneous intermittent blinking, and respond with a defensive blink reflex.

In leprosy a considerable number of patients, whatever the clinical type of the disease, are at risk of developing lagophthalmos. For the patient who develops a reversal reaction, and who already has skin involvement of the face, in particular in the area overlaying the facial nerve, lagophthalmos may develop early in the disease and has a sudden onset. Unless intervention with systemic steroid treatment is prompt, much of the orbicularis oculi function may be lost.

Without anti-leprosy treatment, multibacillary patients develop paresis later in the disease and they often have corneal sensory loss by that time. These patients then have little or no urge to blink, nor can they do it adequately with voluntary effort. They are at high risk and require early surgical intervention to avoid corneal damage. In some longstanding MB cases corneal sensory loss (and exposure keratitis) can occur unrelated to lagophthalmos.

Lagophthalmos generally develops either before or within six months of the start of treatment and in relation to a reversal reaction. Development of lagophthalmos during the later course of anti-leprosy treatment is not common; the incidence of lagophthalmos is generally less than 1% per year. Most of the lagophthalmos in leprosy is the result of nerve damage affecting the zygomatic and temporal branches of the VIIth cranial nerve. In addition multibacillary patients may have destruction of the delicate marginal and pretarsal fibres of the orbicularis oculi muscle due to infiltration by *Mycobacterium leprae*.

Since the branches of the VIIth nerve are randomly involved, the extent of the resulting paresis is variable. Many observers note that the lower lid is commonly affected first, especially the marginal fibres. The characteristic effect is a slack, drooping lower lid, exposing the sclera inferior to the cornea (ectropion), a condition that interferes with adequate support of the precorneal tear film (Figure 1).

Exhibit 20
149

Paresis of the pretarsal muscle (in the upper lid) results in exposure of the cornea in sleep. Paresis of the peripheral, strong preorbital part of the orbicularis muscle may occur but is not common (Figures 2,3). By using this part of the muscle many patients are able to achieve closure by deliberate forced effort even though there are serious deficiencies in closure during sleep and lack of the protective defensive blink. The eye is undoubtedly at risk, but providing that sensation is adequate, the cornea may remain remarkably healthy.

Infiltration of the skin and other lid structures by *M. leprae* results in further significant changes, in addition to the nerve and muscle damage and resulting lagophthalmos:

1. Loss of elasticity of the skin with premature accentuated dermatochalasis and heavy, drooping, upper lids. The weight of skin may cause an in-turned eyelid margin (entropion) and trichiasis may result.

2. Atrophy and stretching of the canthal tendons contributes further to the condition of ectropion of the lower lid margin.

3. Atrophy of the tarsal plate, which results in thin floppy lids that are less efficient in spreading tears and cleaning the cornea.

4. Atrophy of tissues supporting the eyelash follicles may result in the loss of eyelashes, while the remaining lashes tend to hang against the cornea or bulbar conjunctiva. The remaining lashes are often short and atrophic. With severely impaired corneal sensation, the patient ignores the situation. In those patients whose sensation is less impaired the discomfort of the lashes may be interpreted as an 'itch'. The patient will be tempted to rub the eye with calloused, insensitive and often infected fingers. The cornea may be damaged and ulcerate.

5. Meibomian glands may become infiltrated and secondarily infected, with atrophy as the ultimate result. This may contribute to the poor quality of the tear film seen in many patients with long-standing disease.

**Medical management of lagophthalmos**

With early and effective anti-leprosy treatment, serious damage to the eyelids can be largely averted. However health workers should keep in mind the risk of reversal reaction, affecting the VIIth cranial nerve and causing extensive motor loss. Patients with pre-existing patches in the face are at particular risk (Figure 6).


Exhibit 28
150

Prompt intervention by means of systemic steroids can prevent permanent damage in those cases and so help to safeguard the cornea. Recent facial nerve damage, with a duration of less than 6 months should also be treated with systemic steroids, as should any recent nerve damage in leprosy. A recommended semi-standard regimen for systemic steroids is as follows:

A starting dose of 40 mg of prednisolone daily for 2 weeks would be followed by a decrease by 10 mg every two weeks until 20 mg is reached. Thereafter, decrease the dose by 5 mg every 2 weeks. The total duration of the course is 12 weeks. The starting dose may be increased if no improvement occurs within the first few days. In addition, exercises, 'Think blink' and corneal protection devices (such as sunglasses) may be necessary.

## Surgical management of lagophthalmos

Lagophthalmos surgery should be provided to patients who need it. Evaluation of the need for lagophthalmos surgery should be based on one or more of the following conditions: size of lid gap, corneal exposure, corneal hypoesthesia, visual acuity, and/or cosmetic difficulties. Permanent tarsorrhaphy has been used frequently, but the result may be cosmetically unacceptable to the patient. The loss of the temporal field of vision is a disabling side effect of a temporal or lateral tarsorrhaphy. There are a number of other comparatively simple surgical procedures being used for lagophthalmos surgery. An appropriate procedure in many situations is the modified lateral tarsal strip procedure (Annex 3), but there is little evidence to support the superiority of any one procedure. Regardless of the procedure, with time, surgical failure becomes more likely: patient education and follow up of surgical cases is strongly encouraged. Standardised routine monitoring of the outcome of lagophthalmos surgery is recommended. (Annex 2)

## Trichiasis

Trichiasis is not an uncommon finding in leprosy patients; it has been recognized in 1% of MB patients at the time of their disease diagnosis (Figure 5). Among ex-leprosy patients the incidence of trichiasis was approximately 1% per year. Trichiasis has been shown to be responsible (along with lagophthalmos) for incident corneal disease in leprosy patients. Trichiasis in leprosy may be due to loss of support of lash follicles, secondary to infiltration by M. leprae. Eyelid ptosis, associated with laxity in the pretarsal tissues, may also be the underlying cause of trichiasis in many leprosy patients. Surgical management (rather than epilation) of trichiasis is recommended in most cases, particularly those in which irritation is noted.

12

Exhibit 28
151

**Corneal changes**

The major corneal change in ocular leprosy is exposure keratitis due to lagophthalmos, in particular in combination with reduced or absent corneal sensation (Figure 2). To a lesser extent, corneal damage may be caused by trichiasis. The insensitive and unprotected cornea may be readily damaged by foreign bodies and drying. Exposure of the cornea to drying can result in destruction of the corneal epithelium. The early stages can be recognized by fine punctate superficial lesions on the cornea, usually in the lower outer part of the cornea. Secondary bacterial infection or a foreign body may subsequently cause a corneal ulcer. Chronic infection of the tear sac (dacryocystitis) is an aggravating factor, potentially leading to bacterial corneal ulcers.

Protection must be provided to those patients with lagophthalmos by any means effective in narrowing the aperture between the eyelids and keeping the cornea lubricated. Active exercises may be helpful in improving lid function. There should be frequent use of tear substitute drops if these are available, and ointment or oily drops at night. Sunglasses and other protective devices are also very helpful. Surgery for lagophthalmos should be provided when the surgeon judges that the cornea is in danger, as per the guidelines above. A corneal ulcer must be treated immediately with an antibiotic eye ointment. The patient may need to be referred for further specialist treatment and/or surgery.

Reduced corneal sensation can also contribute to corneal ulceration, although this has not been carefully studied. Although it is not completely reliable, corneal sensation can be determined by the use of a clean wisp of cotton-wool. This need not be done routinely: irregular or absent blinking in a patient without lagophthalmos also may indicate decreased corneal sensation. The cornea is touched with the cotton and the patient's absence of a blink response or denial of feeling the touch is recorded. Patients with reduced corneal sensation are at higher risk of corneal ulceration and erosion, as there may be no pain as a warning sign. A temporary central tarsorrhaphy may be necessary to get the cornea to heal. Once the cornea has healed a more cosmetically acceptable procedure can be done. Corneal scarring can be recognized with the aid of a torch, and its effect on vision is determined by its location.

Other less common corneal problems in untreated, multibacillary patients with high bacillary loads, include avascular punctate keratitis (Figure 8), pannus, corneal beading and limbal lepromas. Avascular (not to confused with 'fine punctate superficial lesions' mentioned previously) punctate keratitis first appears as faint, discrete superficial opacities in the upper, outer quadrant of the cornea.

Exhibit 28

152

Histologically they consist of clumps of bacilli-laden cells. They may become dense white tiny opacities resembling specks of chalk-dust. As the disease progresses, they may coalesce to form a diffuse haze. This keratitis is usually asymptomatic, the eye remaining white. Later, blood vessels may grow into the cornea, and fresh lesions develop alongside the vessels to form lepromatous pannus.

Beading of nerves in the periphery of the cornea appears as focal areas of thickening of the nerves with high magnification. This sign is pathognomonic of leprosy, but not necessarily correlated with reduced sensation. A limbal leproma is a nodule, usually arising from the ciliary body; the pupil is often drawn to the side of the leproma. It may grow to encroach on the cornea. These lesions have become rare since the earlier diagnosis of leprosy and the universal use of MDT.

**Iris Involvement**

The frequency of uveal involvement in leprosy varies considerably in published series and in different countries. The interpretation of reports is made difficult by the lack of standardisation of examination techniques and recording. However, recent research using standard recording has shown a similar frequency in multibacillary patients in Asia and Africa, once other demographic factors, age in particular, are controlled for. The iris may be involved in leprosy either in the acute form of iridocyclitis, which occurs as part of the ENL (Erythema Nodosum Leprosum) reaction, or as a chronic process. The acute form is not different from any other acute iridocyclitis, causing pain, photophobia and pericorneal redness (Figure 7). Often a severe uveitis may cause so much diffuse redness that it seems to also be a scleritis. The treatment is topical application of atropine and steroids, which should be administered immediately to avoid complications.

Episcleritis also commonly occurs as part of the ENL reaction in leprosy. Episcleritis is an inflammation of the elastic connective tissue beneath the conjunctiva and above the white sclera. There is a localized area of diffuse redness, which may be painful and locally tender (Figure 9).

A chronic insidious form of iridocyclitis may occur in multibacillary leprosy, especially in those who had a long period of inadequate treatment prior to starting MDT. The chronic iridocyclitis will tend to lead to iris atrophy and a small pupil (Figure 10), and these patients may become blind because of the combination of a small pupil and mild corneal changes or cataract in the visual axis.

14

Exhibit 28
153

Once iris atrophy and a small pupil are recognized, it has often been recommended that this be treated long term with topical atropine or phenylephrine in an attempt to stimulate pupillary dilation. It is not clear, however, how useful this is. When cataract accompanies the small pupil, it should be removed. Since these 'complicated cataracts' pose a surgical challenge, they should be operated by experienced ophthalmologists in centres with adequate facilities to deal with the challenge.

## Cataract

A cataract is an opacity or cloudiness of the lens, reducing vision and (when very advanced) causing the pupil to appear grey or white (Figure 4). Cataract is the leading cause of blindness in leprosy affected persons, probably responsible for over 75% of incident blindness. Cataract occurs with increasing age; the risk of cataract is 2.5 to 3 times more common in MB leprosy (or ex-leprosy) patients with evidence of chronic uveitis. In an individual patient, however, it is often not possible to determine whether or not the cataract is due to leprosy, or is simply age related.

Cataract is treated surgically by removing the cloudy lens and preferably replacing it with a synthetic intraocular lens (IOL). Although cataract surgery can be done without an IOL, the visual benefit is very much less.  Research shows that cataract surgery with IOL implantation, even in patients with evidence of chronic uveitis, can be done safely and will provide a good quality outcome. In cases with longstanding chronic uveitis, the surgery will  be more challenging; nonetheless, IOL implantation, where available, should be promoted among leprosy patients who need cataract surgery. In most cases timely removal of a visually disturbing cataract and implantation of an IOL will lead to a better outcome than waiting until the cataract is very mature. High quality surgery can only be ensured if people with leprosy are accepted into the general eye care services.   Routine assessment of the outcome of cataract surgery is strongly recommended. Education of health workers (including eye care staff) is required to ensure that leprosy patients gain access to eye care facilities.

Exhibit 28

154

# CHAPTER 3

# ACTIVITIES FOR PREVENTION OF BLINDNESS

# IN LEPROSY

People need not go blind from leprosy. For the primary prevention of blindness, early detection and systemic treatment of leprosy are of utmost importance. Leprosy Elimination Campaigns (LECs) have been successful in mobilizing community involvement and reducing the stigma associated with leprosy. Eye care for leprosy and ex-leprosy patients must be included in district/region based VISION 2020 plans. Integration of leprosy and eye care will reinforce and complement VISION 2020 initiatives and strengthen leprosy control activities. Integration of leprosy into VISION 2020 plans must be accompanied by education of district and regional eye care staff to reduce the stigma associated with the disease and to strengthen their ability to provide high quality eye care services.

Leprosy patients and ex-leprosy patients with disabilities form a distinctly disadvantaged group. Disability due to deformities of the extremities receives attention because it is obvious, but ocular morbidity may be overlooked. In many developing countries, leprosy patients also receive a low priority in obtaining eye care in the general ophthalmic service. This is because of their generally low socioeconomic level and the stigma of leprosy. Nonetheless, it is critical that leprosy patients (during their anti-leprosy treatment and after release from treatment) be integrated into general health and eye care programmes. Only in this way can they be assured of receiving acceptable quality eye care, particularly for treating cataract. Integration will require close collaboration between leprosy control and prevention of blindness programmes. At the national, regional, and local levels strong political commitment (including professional organisations) is needed to integrate leprosy patients into general health and eye care programmes.

Further steps that are needed include the creation of explicit guidelines and instructions on eye care in leprosy within national leprosy programme manuals. In planning for Prevention of Disability (POD), guidelines as well as budgets for implementing eye care activities are required. A chapter on prevention of blindness in leprosy should be included within manuals and guidelines for eye care staff in national prevention of blindness programmes.

16

Exhibit 28
155

**Present action in eye health care**

An integrated primary health care approach to blindness prevention has been developed in many countries with 'primary eye care' as one of its cornerstones.

This implies provision of simple eye care at the community level by trained health workers, together with basic health education for the promotion and protection of eye health. This approach is equally valid for cases of eye disease due to leprosy.

Primary eye care can be divided, from a management point of view, into several categories of action:

- Recognition and referral of visual impairment or blindness
- Recognition and treatment of common and simple disorders, such as conjunctivitis and superficial foreign bodies
- Recognition, initial treatment and referral of some conditions such as lagophthalmos and corneal ulcers
- Recognition and referral of remaining cases, such as painful red eyes and sudden loss of vision.

The primary eye care scheme needs continuous support from higher levels of the health services, in order to provide timely and appropriate care of referred cases. There is a need for refresher courses and supervision of the workers providing primary eye care, if deterioration of the work being performed is to be avoided.

The intermediate level of eye care is usually found in eye departments or in special clinics of district and provincial hospitals. At this level either trained ophthalmic assistants or medical officers (or possibly, ophthalmologists) are usually available.

The tertiary level of eye care is normally found in university clinics or major hospitals. Experience has shown that whereas a primary eye care scheme can be relatively easy to set up at the periphery, the problem is maintaining adequate support and supervision and ensuring that there is sufficient capacity to deal with all referred cases at the intermediate level.

**Present action in leprosy control**

Leprosy control is carried out at the country level in a variety of ways. Some programmes still function as vertical services, while others are completely integrated within the primary health care services. Most programmes conduct leprosy control through various combinations of the two approaches. Globally, the general trend is to integrate leprosy control into primary health care services.

Exhibit 28
17
156

The present activities related to ocular leprosy are generally unsatisfactory in control programmes, whether vertical or integrated. The training given on ocular leprosy, including its prevention and management, is rather limited even for personnel meant for specialised leprosy services. Further, leprosy institutions or hospitals, which act as referral points often do not have sufficient technical or material resources to deal with the problems of ocular leprosy effectively. While the referral services available at general ophthalmic centres are capable of dealing with many of the ocular leprosy problems, the services very often are not available or accessible for leprosy patients. This is part of the problem of the non-acceptance of leprosy patients in general health services. Another dimension of the problem is the low priority that leprosy and its ocular manifestations receive within the undergraduate medical curriculum.

### Co-ordination of activities

Ocular leprosy should be a component of integrated health care, leprosy control, and prevention of blindness programmes. In order to make the best possible use of available resources, it is important to co-ordinate carefully the management of patients with ocular leprosy. Ophthalmologists and other staff involved in the provision of eye care should be better trained in the diagnosis and treatment of ocular leprosy and motivated to care more for those patients. Opportunities should be provided for ophthalmologists to visit leprosy centres, and to assume responsibility for the care of patients with ocular leprosy. Training in the recognition and treatment of ocular complications from leprosy should be included in the undergraduate and postgraduate programmes. Such programmes should include clinical teaching with examination of patients with ocular leprosy in general eye clinics. Surgical intervention (primarily for cataract and lagophthalmos) should be an integral part of training and treatment programmes. Ultimately, the quality of eye care received by those affected by leprosy will not be better than the quality available to the general population; therefore it is to the benefit of leprosy patients that general eye care programmes be supported.

A training component that addresses the skills and activities of health workers in relation to care of eyes in leprosy should be introduced into national VISION 2020 and leprosy control plans. The plan should address the needs at different levels and should include the needs of existing health workers through supplementary courses, and of health workers currently in training through medical, nursing and paramedical curricula. In every setting with a leprosy control programme, a practical referral system needs to be clearly defined.

18

Exhibit 28
157

Workers at all referral points need to be educated regarding the eye care needs of leprosy patients. Integrated health workers or leprosy paramedical workers should be trained in the recognition of ocular leprosy and to perform regular screening of patients, to identify those in need of treatment or referral.

The diagram below illustrates the various possibilities for interaction at different levels between the health personnel concerned. It should be noted that all these categories of staff may not exist as separate individuals, e.g., an integrated health worker may well fulfill the functions of a leprosy paramedical worker in an integrated programme.



## Recommended activities

At the time of leprosy diagnosis all patients should be examined for lagophthalmos (any gap in mild closure), visual acuity, the red eye, and presence of a facial patch. All people with lagophthalmos, decreased vision, persistent red eye, and/or a facial patch in reaction should be referred by the basic health worker to a higher level for clinical evaluation, or as per guidelines in the national leprosy control and prevention of blindness programmes.

At the end of anti-leprosy treatment all patients must be educated regarding the risk of eye disease and informed that they should return for examination if they develop lagophthalmos, diminished vision, a red eye, or a facial patch in reaction.



Exhibit 28

158

19

Explicit instructions regarding referral must be given to each discharged patient. All patients with lagophthalmos should receive continued periodic follow up.

In settings where there are leprosy colonies/villages it is recommended that annual (as a minimum) screening eye examinations and treatment be conducted. Furthermore, patients in 'care after cure' programmes should have, as a minimum, annual eye care examinations and management.

There are many barriers that prevent patients from accepting lagophthalmos surgery or for accepting cataract surgery, which need to be identified. They can be broken down sequentially, as follows:

- **Awareness** (knowledge of the availability of surgery, the surgical location, the cost of surgery, and the anticipated outcome of surgery)

- **Accessibility** (affordability of surgery, distance to surgical facility, provider acceptance of leprosy patients, quality of surgical outcome)

- **Acceptance** (family willingness to support surgery, family willingness to provide assistance to seek surgery, fear of surgery, fear of a poor outcome)

Information on specific barriers is important to properly promote cataract and lagophthalmos surgery to patients and their families. The barriers will be different for lagophthalmos and cataract, and will be different for men and women. Promotion activities need to be gender-sensitive.


**Disability grading in leprosy**

There have been many revisions to the WHO leprosy disability grading scheme; the current WHO grading scheme for eye disabilities is impractical for most programmes and is rarely implemented. Accordingly, it is recommended that visual acuity (either visual impairment [visual acuity <6/18] or blindness [visual acuity <6/60], depending upon the setting) and lagophthalmos should become the primary indicators for monitoring disability (grade 2) and that corneal hypoesthesia, corneal opacities, and uveitis should be removed from the leprosy disability grading scheme. These latter conditions are more difficult for health workers to detect reliably, although an ophthalmologist may consider them in determining appropriate treatment for a given patient.

Exhibit 28

159

# CHAPTER 4

## TRAINING PERSONNEL IN PREVENTION & MANAGEMENT OF EYE DISEASE IN LEPROSY

Standard manuals for training integrated health workers and others in the adopted guidelines are being prepared. Resources need to be identified for training these workers in eye problems, and to educate patients and their families about blinding eye lesions. Much can be incorporated into present training schemes and existing education establishments can be used for health worker and patient education.

The target groups for education in relation to ocular leprosy are:

1. The 'decision makers', such as the Minister of Health, the leprosy policy-making committee, and programme managers
2. The 'opinion shapers', such as community and religious leaders, and educational establishments, including medical schools
3. Integrated health workers, leprosy health staff and ophthalmic workers at all levels
4. Patients, ex-leprosy patients and their families.

To all these groups the clear message should be given that:

- Leprosy can be a serious disease for the eye; people with leprosy should have equal access to general eye care services
- MDT is an effective treatment for leprosy and it will greatly reduce the risk of leprosy associated blindness
- When eye complications develop in spite of MDT, these can almost always be treated to prevent blindness
- Early recognition and management will lead to the best outcome.

### Integrated health workers

*a. Background*

Integrated health workers in leprosy endemic countries are often responsible for 5,000 to 25,000 people, amongst which there may be 5 or fewer leprosy or ex-leprosy patients. These workers have health related responsibilities for a local area, but limited knowledge of leprosy.

Most leprosy or ex-leprosy patients do not need to be seen by an ophthalmologist or specialized eye worker (ophthalmic assistant or ophthalmic nurse). Fortunately, many of the clinical signs of ocular leprosy are symptomatic.

21



Exhibit 28
160

Active screening, basic care and referral by integrated health workers or other trained non-ophthalmic health staff can significantly reduce the levels of ocular morbidity and blindness amongst leprosy patients.

For inclusion in a programme for integrated health workers, only those clinical signs that can be easily detected and that lead to blindness need to be identified.

*b. Tasks*

Integrated health workers (IHWs) will be expected to recognise major signs of ocular leprosy (listed on the next page), to provide primary (emergency) care, to refer patients in need of further examination or treatment and follow-up cases on ophthalmological treatment. A strong supervision and referral network are vital in the implementation of this programme. IHWs should:

• recognise leprosy as a health problem

• recognise that leprosy causes blindness

• educate patients and their families about leprosy and its blinding complications

• know who their referral persons are and refer all eye problems among leprosy patients to this level

• help reduce resistance by eye health staff to treat eye diseases of leprosy patients

• know patients under therapy and ex-leprosy patients

• know how to administer eye drops

• teach patients and family members how to instill eye drops and monitor their application

• know how to measure visual acuity, examine for lagophthalmos and the red eye, and recognize a facial patch

• know how to elicit symptoms and information on quality of life from the patient and family

• know how to promote surgical intervention

22

Exhibit 28
161

Exhibit 28
23



Figure 1. Ectropion of both lower eyelids (photo by M. Brand).

**Figure 1**

Figure 2. Lagophthalmos
On the right the patient is in normal
position. On the left he is in gentle
closure (photo by M. Brand).

**Figure 2**

Right →   Left ↑

**Figure 3**



Figure 5: Patient with Lagophthalmos. He has been asked to close forcefully, but still has a gap visible on both sides. Worse on the right than on the left (photo by P. Courtright).

**Figure 4**



Figure 4: Cataract in both eyes. Note the white pupils. (This is not a PAL) (photo by ICEH).

Figure 6: Large facial patch over left zygoma. This patient has a high risk for developing lagophthalmos in the left eye. (photo by M. Hogeweg).

**Figure 6**

**Figure 5**




Figure 5: Trichiasis (photo by Massae).

**Figure 7**



Figure 7: Acute iridocyclitis in Leprosy. The affected right eye shows a smaller pupil and cirumcorneal vascular dilation (photo by M. Brand)

25

Exhibit 28
164

Figure 8: Advanced punctate keratitis, which has characteristically started at the corneoscleral junction of the superior

**Figure 8**

temporal quadrant (photo by M. Brand)

**Figure 9**

Figure 9: Episcleritis in Leprosy (photo by M. Brand)

**Figure 10**

Figure 10: Chronic iridocyclitis (photo by M. Hogeweg)

Exhibit 28

**Major signs of ocular leprosy to be recognized by an Integrated Health Worker**

| Clinical sign | Diagnostic criteria | Therapeutic intervention |
|---|---|---|
| *Visual acuity* | | |
| Visual impairment | < 6/18 | Refer, if causing reduced visual function/quality of life |
| Severe visual impairment | < 6/60 | Refer |
| Blindness | < 3/60 | Refer |
| *Facial patch* | Red & raised patch on the face | Refer |
| *Lagophthalmos* | | If present for < 6 months: refer for steroid treatment |
| Gap on gentle closure, as in sleep | Lids drift open | Exercise, and eye ointment at night; refer |
| Gap on forced closure | Globe exposed | Protect cornea; use eye ointment; refer |
| *Trichiasis* | Lashes rubbing on globe, with irritation | Apply ointment and refer |
| *Red eye* | | |
| Discharge - clear cornea | | Clean; antibiotic eye ointment |
| Pain and photophobia | | Refer |

Additional cases to be referred to the secondary level of eye care are those with no response to topical antibiotic therapy.

Exhibit 28
27
166

*c. Training*

IHWs should be trained by their supervisors, leprosy paramedical workers, or ophthalmic assistants where possible. Training should be performed both at the health centre and in the field. Initial training would require one day at the health centre or district hospital. Periodic field supervision is essential, the IHWs accompanying their leprosy supervisors during their scheduled visits to the patients. The cost of this training should already be contained within the structure of integrated health worker training. Appropriate training aids may include learning boards and recognition cards, and the workers should examine normal eyes.

*d. Equipment and supplies*

Equipment and supplies for examination include:

• card or chart for visual acuity testing

• torch

• tetracycline (or other antibiotic)

• corneal protection devices (e.g.: tape and eye shades)

Exhibit 28
167

### Paramedical worker in leprosy

*a. Background*

In some settings, paramedical workers in leprosy (PMW) are responsible for over 100 leprosy patients. They have extensive training in leprosy while they usually have little training in eye care. The PMW is generally responsible to a medical officer. As full-time leprosy workers, the PMWs can assume responsibility for management of cases of ocular leprosy, provided they receive appropriate training.

*b. Tasks*

The PMW will educate the patient and family about the dangers of eye complications of leprosy and about preventive measures. Upon completion of training, the PMW should be able to perform the diagnostic and therapeutic tasks listed on the next page.

*c. Training*

The PMWs should be taught, as part of their general training in leprosy control, by a medical officer with extensive ophthalmic experience, an ophthalmic assistant, or by an ophthalmologist with experience in leprosy. In certain African and other countries the ophthalmic medical assistants or clinical officers may be responsible for this training. The training is best conducted in a setting where leprosy patients are treated. The initial training course, conducted over a 3-day period, should consist of lectures and practical clinical exposure. Yearly refresher sessions should then update this information. Both phases of training need to be integrated within existing leprosy training programmes. Training aids should include task-oriented manuals, posters, flip-charts and booklets and, where possible, videos, slides, and 'model' eyes. In addition, training teams should accompany the PMWs for supervision in the field.

*d. Equipment*

Equipment for examination and therapy include:

• card or chart for visual acuity testing
• pinhole (if trained in use)
• torch and loupe (magnifying lens)
• tetracycline (or other antibiotic)
• cotton-wool (for testing corneal sensation)
• short-acting mydriatic (phenylephrine 5%)
• corneal protection devices (e.g. sunglasses)

29

Exhibit 28

168

**Major signs of ocular leprosy to be recognized by an
Paramedical Worker in Leprosy**

| Clinical sign | Diagnostic criteria | Therapeutic intervention |
|---|---|---|
| *Visual acuity* | | |
| Visual impairment | < 6/18 | Refer, if causing reduced visual function/quality of life |
| Severe visual impairment | < 6/60 | Refer |
| Blindness | < 3/60 | Refer |
| *Facial patch* | Red & raised patch on the face | Refer |
| *Lagophthalmos* | | If present for < 6 months: refer for steroid treatment |
| Gap on gentle closure, as in sleep | Lids drift open | Exercise, and eye ointment at night; refer |
| Gap on forced closure | Globe exposed | Protect cornea; use eye ointment; refer |
| *Trichiasis* | Lashes rubbing on globe, with irritation | Apply ointment and refer |
| *Cornea* | | |
| Surface | Dull or rough | Ointment and refer |
| Sensation | Diminished | Ointment; blinking exercises Protective (sun)glasses Patient instruction Refer corneal damage |
| *Red eye* | | |
| Discharge - clear cornea | | Clean; antibiotic eye ointment |
| Pain and photophobia | | Refer |

Exhibit 28

30.
/69

## Ophthalmic assistant or ophthalmic nurse

*a. Background*

In many leprosy endemic countries ophthalmic assistants or ophthalmic nurses are the backbone of eye care services in rural areas. Their training often includes surgery for extra-ocular conditions  (e.g., bilamellar tarsal rotation procedure for trichiasis) but not for intra-ocular conditions (e.g., cataract). In most settings their training in management of eye conditions of leprosy is either insufficient or non-existent. Standard curriculums which include cosmetically acceptable management of lagophthalmos, referral procedures for other conditions, and training and supervision of IHWs are needed. Promotion of integration of leprosy patients within district/regional VISION 2020 programmes should also be included.

*b. Tasks*

The ophthalmic assistant may be the most appropriate person to train and supervise IHWs in diagnosis and basic primary eye care management. Ophthalmic assistants should also assist in encouraging the use of eye care facilities by leprosy patients and help to reduce the stigma associated with leprosy. Furthermore, the ophthalmic assistant should be prepared to do simple surgical correction of lagophthalmos and trichiasis. In both cases, it is important that the outcome of surgery should be monitored.

*c. Training*

Ophthalmic assistant training curriculums, although generally well-developed, have minimal information on managing eye disease in leprosy patients and no information on training and supervision of IHWs in their activities. It is critical that these curriculums be updated to include relevant sections on eye care in leprosy. Furthermore, ophthalmic assistants need training in procedures, other than the cosmetically unacceptable tarsorrhaphy, for correction of lagophthalmos and ectropion. Monitoring of the outcome of surgery, currently not part of ophthalmic assistant training programmes, needs to be included.

Exhibit 20
170

## Ophthalmologist

*a. Background*

The ratio of ophthalmologists to the population in most leprosy endemic countries is very low; in addition, most ophthalmologists are located in urban areas, far distant from most leprosy and ex-leprosy patients. It would be most helpful if regional or national referral ophthalmologists were identified for leprosy control programmes. There are standard recording forms (Annex 4) for clinical examination in leprosy, which may be helpful in monitoring ocular conditions in these patients. Some ophthalmologists may wish to add other ocular signs to the form.

*b. Tasks*

The primary role of the ophthalmologist in management of eye disease in leprosy is to be the tertiary referral for patients in need of more detailed examination and in need of surgical intervention. In some settings well-trained cataract surgeons can provide IOL implantation surgery to non-complicated cases. Ophthalmologists who conduct outreach eye care services should include leprosy settlements in their annual schedule.

*c. Training*

Ophthalmologists and other relevant surgeons need to be trained in good quality lagophthalmos and cataract surgery. Training should include monitoring of the outcome of surgery.

Exhibit 28

171

# CHAPTER 5

## RESEARCH NEEDS IN OCULAR LEPROSY

### Epidemiological research

Epidemiological research is important in elucidating risk factors for ocular morbidity and blindness from leprosy. Findings from the Longitudinal Study of Ocular Leprosy (LOSOL) and other studies are answering some of the questions related to demographic and clinical characteristics of leprosy that influence the development of ocular lesions during MDT.   Continued follow up of these study subjects after completion of MDT would help elucidate the progression of ocular disease and vision loss; this information is important to help determine which patients require long-term active ophthalmologic follow up. Additional research into the contribution of local production of antibodies, genetic variations and reactions (ENL and reversal reactions) to ocular pathology would also be useful.  Current research from the LOSOL study cohort provides information about patients who have undergone two years of MDT; there is no information on how a shortened duration of MDT affects the incidence of eye disease.

At a national or regional level in leprosy endemic countries it is important that epidemiologic methods be used to assess the eye care needs of the leprosy (and ex-leprosy) population. This information, if gathered in a standardized fashion, can be used for prioritizing eye care activities within and between areas. Prevalence information, when combined with information on utilisation of services, barriers to use, and socio-demographic data, can also be essential for identifying the specific activities required for reducing the risk of disabling and stigmatizing ocular conditions. While the LOSOL study set up standard criteria for data collection, there are still areas of difficulty, principally in the assessment of corneal sensation.

Different epidemiological methods (cross-sectional studies, longitudinal studies, case-control studies, and clinical trials) are needed for different questions. For example, there is still a need for conducting a clinical trial of different procedures for surgical correction of lagophthalmos (and co-existent conditions such as ectropion and reduced corneal sensation).

33

Exhibit 28
172

**Operational research**

Operational research is concerned with the application of scientific methods, techniques and tools to find solutions to problems that may arise in the operations of a system. It provides to those managing a health system alternative strategies to improve effectiveness. Prevention of blindness from leprosy, like the control of leprosy itself, involves a complexity of medical, social, and economic problems.

Considerable planning and analysis would need to be undertaken to achieve the stated objectives for control, having time and quality parameters, and being accomplished with optimum benefit in relation to costs. Operational research and systems analysis thus provide tools to optimise the strategies for prevention of blindness due to leprosy as well as the prevention of blindness due to other causes in leprosy and ex-leprosy patients. The three main activities in the management of eye conditions in leprosy are 1) case detection, 2) treatment, compliance, monitoring, and surveillance, and 3) health education.

The following operational research topics are of particular importance:

*Case detection*

> What are the critical signs that integrated health workers must recognize in order to ensure that most patients at risk of vision reducing eye disease are found in a timely fashion?

> What degree of lagophthalmos should signal to health workers the need to encourage patients to seek ophthalmologic assessment?

> Is there a gender bias in case detection in leprosy and does this influence prevalence or incidence of complications?

*Treatment, compliance, monitoring, and surveillance*

> Routine monitoring of lagophthalmos surgery is critical to decision making regarding surgical procedures, quality of surgery, and post- operative care. Systems for routine monitoring of lagophthalmos surgery are needed. Routine cataract outcome assessment programmes are needed wherever leprosy patients are receiving cataract surgery. In particular, data on the outcome of IOL implant surgery in complicated cataract cases is needed. There are considerable barriers preventing use of surgical services (lagophthalmos and cataract): these need to be assessed locally and nationally to develop practical programmes to promote acceptance of surgery.

34


Exhibit 28
173

Most research into surgical treatment includes only clinical outcomes. It is important to include patient assessment of outcome, particularly for conditions such as lagophthalmos and ectropion.

Research is needed into determining the best indicators for monitoring programme efficiency, effectiveness, and sustainability.

*Health education*

'Think-blink' is routinely recommended as an activity for individuals with mild lagophthalmos and impaired corneal sensation. While it seems intuitively useful, there is no evidence of its effectiveness. This activity should be evaluated both from the perspective of patient acceptance and efficacy. It is suggested that blinking exercises will reduce lid gaps by 1-2 mm, by strengthening the orbicularis, but efficacy has not been tested.

Study of the skills necessary within the health system (at all levels) is needed to help refine job descriptions and training activities.

## Basic research

There is evidence that *M. leprae* reaches the eye predominantly via the blood stream. The clinical ocular manifestations may be secondary to nerve involvement, either from direct infiltrative lesions or as a result of cellular immune response in the tissues. Basic histopathologic research has been hampered by:

The paucity of material that can be obtained from the human eye and the adnexal structures at any stage of the disease

The lack of centres and trained personnel whose special interest is research in ocular leprosy at places where the clinical material is available

The loss of valuable material, discarded from surgical procedures.

Anterior uveitis, both acute and chronic, is a clinical problem that is potentially sight threatening. There are, however, few immunopathological studies to substantiate the general view that the acute ocular reactions are mediated by immune reactions or that chronic uveitis is the end-result of multiple, low-grade episodes of acute uveitis.


Exhibit 28
179

**EXECUTIVE SUMMARY**

Guidelines for the management of eye care in leprosy:
Recommendations from an ILEP supported meeting

July 3-5. 2001
Broxbourne, UK

Multidrug therapy (MDT) has greatly reduced the incidence of eye disease in leprosy. Nevertheless, people who are affected by leprosy or who have previously had leprosy, continue to have eye complications as a result of the disease or as a result of other causes, such as cataract.

Recent research has shown that at the time of their leprosy diagnosis approximately 10% of people with multibacillary (MB) leprosy have lagophthalmos, uveitis, or trichiasis related to their disease. Cataract related vision loss is higher in leprosy patients than in the general (age-matched) population. During MDT, around 2% of MB patients develop lagophthalmos and 7% develop uveitis. Research on the incidence of ocular disease following completion of MDT suggests that uveitis may still develop. The prevalence of eye disease in patients released from treatment (cured patients) varies considerably, primarily as a result of previous anti-leprosy treatment.

In many settings there are significant barriers preventing the use of eye care services by leprosy patients, either during or after anti-leprosy treatment.

Globally, leprosy control programmes have become more integrated into general health care services. At the same time, our understanding of eye disease in leprosy has increased. These two developments have highlighted a need for revising global prevention of blindness guidelines. The quality of eye care received by those affected by leprosy should at least equal the quality available to other people; therefore it is to the benefit of leprosy patients that general eye care programmes are supported. Based on our current knowledge of eye disease in leprosy and upon the changing structure of leprosy control programmes, the following recommendations for eye care management in leprosy are proposed:

36

Exhibit 28
175

1. It is critical that leprosy patients (during their anti-leprosy treatment and after release from treatment) are accepted into general health and eye care programmes. Integration will require close collaboration between leprosy control and prevention of blindness programmes. At national, regional, and local levels, strong political commitment (including professional organisations) is needed to integrate leprosy patients into general health and eye care programmes.

2. Integration of leprosy and eye care will reinforce and complement VISION 2020 initiatives and strengthen leprosy control activities.

3. Cataract is the leading cause of blindness in leprosy affected persons and many do not have access to general eye care services. All persons affected by leprosy should have equal access to general eye care services. Education of health workers (including eye care staff) is required to ensure that leprosy patients gain access to eye care facilities.

4. Visual acuity and lagophthalmos should become the primary indicators for monitoring disability. Corneal hypoesthesia, corneal opacities, and uveitis should be removed from the leprosy disability grading scheme.

5. At the time of disease diagnosis all patients should be examined for lagophthalmos (any gap), visual acuity, a red eye, and the presence of a facial patch. All people with lagophthalmos, decreased vision, persistent red eye, and/or a facial patch in reaction should be referred by the peripheral general health worker to a higher level.

6. At the end of anti-leprosy treatment all patients must be educated regarding the risk of eye disease and informed that they should return for examination if they develop lagophthalmos, diminished vision, a red eye, or a facial patch in reaction. All patients with lagophthalmos should receive continued follow up. Explicit instructions regarding referral must be given to each discharged patient.

7. A training component that addresses the skills and activities of health workers in relation to care of eyes in leprosy should be introduced into national plans. The plan should address the needs at different levels and should include the needs of existing health workers through supplementary courses and of health workers currently in training through medical, nursing and paramedical curriculums. In every setting with a leprosy control programme, a practical referral system needs to be clearly defined. All staff at referral points need to be educated regarding the eye care needs of leprosy patients.

Exhibit 28
176

8. In settings where there are leprosy colonies/villages, it is recommended that annual (as a minimum) screening eye examinations and treatment are conducted. Furthermore, patients who have completed MDT but still suffer from the consequences of the disease should have, as a minimum, annual eye care examinations and management.

9. Lagophthalmos surgery should be provided to patients who need it. Evaluation of the need for lagophthalmos surgery should be based on one or more of the following conditions: size of lid gap, corneal exposure, corneal hypoaesthesia, visual acuity, and/or cosmetic difficulties. There are a number of surgical procedures being used for lagophthalmos surgery. Research is needed to determine the best possible surgical procedures to correct lagophthalmos and to improve functional and cosmetic outcomes. Standardised routine monitoring of the outcome of lagophthalmos surgery is recommended. There are many barriers that prevent patients from accepting lagophthalmos surgery, which need to be identified; programmes need to be developed to increase the uptake of lagophthalmos surgery. Finally, ophthalmologists and other relevant surgeons need to be trained in good quality lagophthalmos surgery.

10. Research shows that cataract surgery with IOL implantation, even in patients with evidence of chronic uveitis, can provide good quailty outcomes. IOL implantation, where available, should be promoted among leprosy patients who need cataract surgery. The outcomes of cataract surgical services need to be routinely monitored in all patients.

38

Exhibit 28
177

# SELECTED REFERENCES

1. Lubbers WJ, Schipper A, Hogeweg M, de Soldenhoff R. Eye disease in newly diagnosed leprosy patients in eastern Nepal. *Leprosy Review* 1994:65:231-38.

2. Courtright P, Hu LF, Li HY, Lewallen S. Multidrug therapy and eye disease in leprosy: A cross-sectional study in the People's Republic of China. *International Journal of Epidemiology* 1994:23:835-42.

3. Courtright P, Daniel E, Rao S, Ravanes J, Mengistu F, Belachew M, Cellona RV, ffytche T. Eye disease in multibacillary leprosy patients at the time of their leprosy diagnosis: Findings from the Longitudinal Study of Ocular Leprosy (LOSOL) in India, the Philippines and Ethiopia. *Leprosy Review* 2002:73:225-38.

4. Hogeweg M. Strategies for improvement of management of ocular complications in leprosy. *Indian Journal of Leprosy* 1998:70:61-70.

5. Lewallen S, Tungpakorn NC, Kim SH, Courtright P. Progression of eye disease in "cured" leprosy patients: Implications for understanding the pathophysiology of ocular disease and for addressing eye care needs. *British Journal of Ophthalmology* 2000:84:817-21.

6. Waddell K. The challenge: organizing services to prevent blindness in leprosy patients. *Indian Journal of Leprosy* 1998:70:131-138.

7. Hogeweg M, Kiran KU, Suneetha S. The significance of facial patches and Type 1 reaction for the development of facial nerve damage in leprosy. A retrospective study among 1226 paucibacillary leprosy patients. *Leprosy Review* 1991:62:143-49.

8. Courtright P and Lewallen S. Current concepts in the surgical management of lagophthalmos in leprosy. *Leprosy Review* 1995:66:220-23.

9. ffytche TJ. Role of iris changes as a cause of blindness in lepromatous leprosy. *British Journal of Ophthalmology* 1981:65:231-9.

10. Waddell KM and Saunderson PR. Is leprosy blindness avoidable? The effect of disease type, duration, and treatment on eye damage from leprosy in Uganda. *British Journal of Ophthalmology* 1995:79:250-56.

Exhibit 28

178

11. Kiran KU, Hogeweg M, Suneetha S. Treatment of recent facial nerve damage with lagophthalmos, using a semistandard steroid regimen. *Leprosy Review* 1991:62:150-54.

12. Courtright P, Kim, SH, Tungpakorn N, Cho BH, Lim YK, Lee HJ, Lewallen S. Lagophthalmos surgery in leprosy: findings from a pop ulation based survey in Korea. *Leprosy Review* 2001:72:285-91.

13. Courtright P, Lewallen S, Tungpakorn N, Cho BH, Lim YK, Lee HJ, Kim SH. Cataract in leprosy patients: cataract surgical coverage, barriers to acceptance of surgery, and outcome of surgery in a population based survey in Korea. *British Journal of Ophthalmology* 2001:85:643-7.

14. Courtright P, Lee HS, Lewallen S. Training for primary eye care in leprosy. *Bull WHO.* l990:68:347-51.

15. Courtright P and Lewallen S. Ocular manifestations of leprosy. In The Epidemiology of Eye Disease. 2nd Edition, Johnson GJ, Minassian DC, Weale R, West SH (ed). Chapman & Hall Medical 2002.

16. Mpyet C, Dineen BP, Solomon AW. Cataract surgical coverage and barriers to uptake of cataract surgery in leprosy villages of northeastern Nigeria. *British Journal of Ophthalmology.* 2005;89:936-938.

17. Hogeweg M, Keunen JEE. Prevention of blindness in leprosy and the role of the Vision 2020 programme. *Eye* 2005;19:1099-1015

18. Daniel E, ffytche TJ, Sundar Rao PSS, Kempen JH, Diener-West M, Courtright P. Incidence of ocular morbidity among multibacillary leprosy patients during a 2 year course of multidrug therapy. *British Journal of Ophthalmology.* 2006;90:568-573

19. Daniel E, ffytche T, Kenpen JH, Rao PSSS, Diener-West M, Courtright P. Incidence of ocular complications in multibacillary leprosy patients after completion of a two year course of multidrug therapy. *British Journal of Ophthalmology* 2006 (in press)

Annex 1: List of participants
Annex 2: Lagophthalmos form
Annex 3: Modified lateral tarsal strip procedure
Annex 4: Standardized clinical examination

40

Exhibit 28
179

## Annex 1: Eye Care Workshop Participants

Ebenezer Daniel (edaniel4@jhmi.edu)
    Schieffelin Leprosy Research & Training
    Centre, Karigiri, India

Essam el Toukhy (eeltoukhy@yahoo.com)
    University of Cairo, Egypt

Doug Soutar (dsoutar@ilep.org.uk)
    ILEP, UK

Gordon Johnson (g.j.johnson@btopenworld.com)
    International Centre for Eye Health
    London, UK

Jesus Ravanes (lwmcebu@cvis.net.ph)
    Leonard Wood Memorial
    Cebu City, Philipines

Keith Waddell (aim-uganda@aimint.net)
    Kampala, Uganda

Kirsteen Thomas (kirsteenjt@doctors.org.uk)
    Glasgow, UK

Kyaw Nyunt Sein (drtinshwe@mptmail.net.mm)
    Department of Health
    Yangon, Myanmar

Margreet Hogeweg (mhogeweg@bergsport.com)
    Delft, The Netherlands

Mary Tamplin (mtamplin@lepra.org.uk)
    ILEP, UK

Monica Maakaroun
    (monicamaakoroun@terra.com.br)
    Belo Horizonte, Brazil

Murray McGavin (anita.shah@lshtm.ac.uk)
    International Centre for Eye Health
    London, UK

Paul Courtright (pcourtright@kcco.net)
    BC Centre for Epidemiologic & International
    Ophthalmology, Vancouver, Canada and
    Kilimanjaro Centre for Community
    Ophthalmology, Moshi, Tanzania

Swapan Samanta
    (swapan_samanta1@rediffmail.com)
    Midnapore, West Bengal, India

Samson Akinyemi
    (care of: timnco@skannet.com)
    ECWA Hospital, Okegbale, Omuarau, Nigeria

Shyamala Anand (timkothara@satyam.net.in)
    Kothara Leprosy Hospital, PO Paratwada,
    Amravati Dt, Maharashtra 444805, India

Siobhan O'Dowd
    LEPRA, UK

Sundar Rao (psssrao2002@yahoo.co.in)
    Schieffelin Leprosy Research & Training
    Centre, Tamil Nadu, India

Susan Lewallen (slewallen@kcco.net)
    BC Centre for Epidemiologic & International
    Ophthalmology, Vancouver, Canada and
    Kilimanjaro Centre for Community
    Ophthalmology, Moshi, Tanzania

Taffessework Girma (taffessework@yahoo.com)
    ALERT, Addis Ababa, Ethiopia

Tang Xin (ruthw@ctimail.com)
    Guang Zhou, China

Timothy Ffytche (t.ffytche@thelondonclinic.co.uk)
    London, UK



## Annex 2: Lagopthalmos/Ectropion Surgery Outcomes Assessment

### Patient Enrolment & Pre Operative Form

Patient Name: _____Patient Number: _____

(family, given)

Date of Surgery: ____/____/____ Surgeon: _____ Location: _____

Mo.   Day   Yr.

City & country of surgery

**Demographics**

| 1. Date of Birth: ___/___/___ | 2. Patient Gender: | 3. Village of residence: | 4. Township of residence: |
|---|---|---|---|
| Mo.   Day   Yr. | ☐ Male ☐ Female | | |

**Clinical Information**

| 5. Primary patient complaints: (check all that apply) | 6. Other vision reducing pathology: | 7. Duration of lagophthalmos: |
|---|---|---|
| ☐ Tearing | ☐ Chronic uveitis | ☐☐ years |
| ☐ Blurred Vision | ☐ Cataract | |
| ☐ Pain | ☐ Other | |
| ☐ Disfigurement | | |
| ☐ Foreign Body sensation | | |

| | Right Eye | Left Eye |
|---|---|---|
| 8. Visual acuity: (a) Presenting (b) Corrected or with pinhole | _____ _____ | _____ _____ |
| 9. Facial patch involving the malar region: | ☐ + ☐ - ☐ Unknown | ☐ + ☐ - ☐ Unknown |
| 10. Drooping of the mouth: | ☐ + ☐ - | ☐ + ☐ - |
| 11. Condition of the lids: (a) Exposure of globe (open gaze) (b) Exposure of globe (with gentle closure) (c) Exposure of globe (with forced closure) (d) Ectropion of lower lid | ☐ mm ☐ mm ☐ mm ☐ Severe ☐ Moderate ☐ Mild ☐ None | ☐ mm ☐ mm ☐ mm ☐ Severe ☐ Moderate ☐ Mild ☐ None |
| 12. History of previous lagophthalmus surgery If yes, type of surgery | ☐ + ☐ - _____ | ☐ + ☐ - _____ |
| 13. Ectropion of lacrimal puncts: | ☐ + ☐ - | ☐ + ☐ - |
| 14. Trachomatous trichiasis: | ☐ + ☐ - | ☐ + ☐ - |
| 15. Cicatricial trachoma: | ☐ + ☐ - | ☐ + ☐ - |
| 16. Condition of the cornea: (a) Exposure keratitis (b) Corneal hypesthesia (c) Corneal opacity not involving visual axis (d) Corneal opacity involving visual axis (e) Diagram of corneal opacity | ☐ + ☐ - ☐ + ☐ - ☐ + ☐ - ☐ + ☐ - | ☐ + ☐ - ☐ + ☐ - ☐ + ☐ - ☐ + ☐ - |

▨ Extent of opacity

Exhibit 20

181

Patient Name: _____     Patient Number: _____

## Surgery

**Surgery:**
- ☐ Tarsal strip/horizontal shortening of lateral edge of lid
- ☐ Temporalis muscle transfer
- ☐ Lid suspension
- ☐ Tarsorrhaphy
- ☐ Other

**Surgical complications:**
- ☐ Overcorrection _____
- ☐ Undercorrection _____
- ☐ _____
- ☐ None

**Surgeon Name** _____:
- ☐ Ophthalmologist
- ☐ Team leader
- ☐ Other

## Clinical History of Leprosy (from patient file)

**Age at leprosy diagnosis:**

**Duration between leprosy diagnosis & onset:**
(in months)

**Leprosy type:**     Ridley-Jopling System:

- ☐ LL   ☐ BL   ☐ BB   ☐ BT   ☐ TT

Simplified:

- ☐ MB   ☐ PB

**Leprosy chemotherapy:**
- ☐ Prior history of dapsone monotherapy
- ☐ MDT only

**Compliance to regimen:**
- ☐ Compliance good (define: _____)
- ☐ Compliance poor (define: _____ )

**MDT regimen included:**
- ☐ Rifamplein    Duration _____ months
- ☐ Clofazimine   Duration _____ months
- ☐ Other:        Duration _____ months

**Current status:**
- ☐ Dapsone alone
- ☐ MDT
- ☐ Released from treatment (year of release _____)
- ☐ Other
- ☐ None

**Steroid use:**      ☐ Reported      ☐ Not reported

**History of reactions:**
- ☐ No reactions (Type I or Type II) reported
- ☐ Type I reaction reported (year of last reported reaction _____)
- ☐ Type II reaction reported (year of last reported reaction _____)

Exhibit 28
43
182

**Annex 3: Steps in the modified lateral tarsal strip procedure**

1. Inject local anesthetic (3-5 ml of xylocaine, 1% or 2 %) into the lateral part of both upper and lower lids. Clean and drape the area with a sterile drape. Instill one drop of topical anesthesia in the eye.

2. With scissors, make a cut to separate the upper from the lower lid (a lateral canthotomy). **(Figure 1)**

3. Direct the scissors downwards and laterally to cut the lower part of the lateral canthal tendon, thus separating the lower lid from its attachment to the bone (the lateral orbital rim). One or two cuts may be necessary to free the lower lid completely. **(Figure 2)**

4. Pull the lower lid laterally and upwards in the desired position so that the lower lid margin covers the lower part of the cornea by about 1-2 mm. There will be a slight relaxation after the surgery so mild overcorrection is required.

5. Mark the excess skin (a triangular- shaped piece) and cut it off with scissors. **(Figure 3)**

6. Use the tarsus at the lateral end of the lower lid to fashion a new ligament (lateral tarsal strip). This is done by removing of the overlying skin and muscle, cutting away the lashes and their follicles, and scraping off the conjunctiva on the back surface of the tarsus. **(Figures 4 & 5)**

7. Suture the newly fashioned strip to the periosteum of the lateral orbital wall using a 5/0 suture (a non-absorbable suture like ethibond is preferred over absorbable materials). **(Figure 6 a,b,c)**

8. Use the same suture (several interrupted sutures) to close the layers of skin and muscle making up the new lateral canthus. **( Figure 7)**

9. Throughout the procedure, bleeding can usually be controlled with pressure. Using epinephrine 1:100,000 mixed with the local anesthetic will markedly reduce the bleeding . The eye can be patched for 24 hours if needed.

44

Exhibit 28

183



**Figure 1**

**Figure 2**

**Figure 3**

**Figure 4**

Exhibit 28
45
184



Figure 5

Figure 6a

Figure 6b

Figure 6c

Figure 7

Exhibit 28
185

**Annex 4: Standardisation of Clinical Examination**

It is recognised that there is a multiplicity of lesions in ocular leprosy, but only those that threaten sight and are amenable to preventive measures or therapeutic intervention are considered here. The examination consists of the measurement of visual acuity and the objective examination of the various components of the face, lids and the eye that may be affected in the disease.

**VISUAL ACUITY MEASUREMENT**
Visual acuity should be measured and recorded in each eye independently using standard optotypes. Cases with visual acuity of less than 6/18 should he evaluated with correction or pinhole vision. The visual acuity should be sub-divided into four entities:
   1. Satisfactory vision defined as visual acuity of 6/18 or better
   2. Visual impairment defined as visual level less then 6/18 but equal to or greater than 6/60
   3. Severe visual impairment or moderate blindness (less than 6/60 but equal to or greater than 3/60)
   4. Severe blindness defined as visual acuity less than 3/60.

**FACE**
Pale flat maculae: reversal reactions in the face, with red and raised lesions.

**LIDS**
Abnormalities of function and lid deformity should be evaluated:
   1. Lid closure (unforced). Ask the patient to close the eyes as in sleep and main-tain the position for ten seconds - assess unforced closure. Measure (in mm) the lid gap.
   2. Lid closure (forced). Ask the patient to close the eyes with force and maintain the position for ten seconds - assess forced closure. Measure (in mm) the lid gap.
   3. Blink pattern. Incomplete and/or asymmetric blinking should be recorded.
      a. Normal
      b. Incomplete and/or asymmetric
   4. Lid deformity: should be evaluated by recording the presence of.
      a. No deformity
      b. Ectropion - eversion of the lid margins
      c. Entropion - inversion of the lid margins
      d. Trichiasis - one or more eyelashes rubbing on globe
      e. Dermatochalasis
   5. History of previous lid surgery

**DISCHARGE**
The presence or absence of discharge in the conjunctival sac should be noted (additionally, if increased by pressure on the lachrymal sac):
   a. No discharge
   b. Discharge: unchanged with pressure
   c. Discharge: increased with pressure

47

Exhibit 28
186

**ACUTE RED EYE**

The following differentiation should he made:

a. No red eye

b. Conjunctivitis - characterised by peripheral diffuse redness, discharge, mild discomfort; vision unaffected

c. Episcleritis or scleritis - characterised by a focal redness and tenderness with vision unaffected

d. Corneal ulcer or abrasion - characterised by haziness or opacity of cornea with focal redness and pain; positive fluorescein staining; vision affected

e. Iridocyclitis - characterised by circumcorneal redness, pain, photophobia, with no stickiness, small pupil; blurred vision

f. Acute glaucoma - characterised by pain, redness, corneal haze, fixed dilated pupil, hard eye, no stickiness; severely reduced vision.

**CORNEA**

Evaluation of sensation and the presence or absence of corneal opacities should be undertaken. Normal sensation is indicated by an involuntary blink when the centre of the cornea is touched with a wisp of cotton-wool.

1. Sensation is either:

a. Normal, or

b. Diminished

2. Opacities - these should be graded according to their effect on central vision:

a. No opacities

b. Generalised dullness (dull or rough) of the cornea; pupil visible

c. Central opacity; pupil partially visible

d. Opacity through which there is no view of the pupil

e. Peripheral opacity, central cornea clear

f. Corneal or limbal leproma or nodule

**PUPIL**

The iris and pupil reaction should be examined in subdued light and the following signs recorded:

1. Pupil size

a. Normal and reacting

b. Constricted and non-reacting

c. Dilated

2. Pupil shape

a. Regular

b. Irregular (posterior synechiae)

3. Colour of pupil

a. Black

b. Grey or white (indicating cataract with visual acuity <6/18)

4. History of previous cataract surgery

**GLOBE**

a. Normal

b. Hard eye (digital palpation)

e. Soft eye (digital palpation)

d. Staphyloma

e. Shrunken eye (phthisis) (regardless of intraocular pressure)

f. Absent eye



48

Exhibit 28

187

INTERNATIONAL JOURNAL OF LEPROSY

Volume 71, Number 1
Printed in the U.S.A.
(ISSN 0148-916X)

# Erythema Nodosum Leprosum and Orbital Involvement[1]

### Upreet Dhaliwal, Sandeep Mohanty, and Sambit N. Bhattacharya[2]

## ABSTRACT

This is the first report of ENL involving the orbit in a lepromatous patient with recurrent ENL, receiving MDT. Severe injury to the eye ensued, in spite of continued ENL and appropriate treatment of the reaction.

## RÉSUMÉ

Il s'agit du premier cas publié d'érythème noueux lépreux (ENL) de l'orbite de l'œil chez un patient lépromateux traité par la poly-chimiothérapie (PCT), avec ENL récidivant. Des lésions sévères de l'œil en ont été la conséquence, malgré le maintien sans interruption de la PCT et un traitement approprié de la réaction immunopathologique.

## RESUMEN

Este es el primer reporte sobre la aparición de una reacción tipo ENL en la órbita de un paciente con lepra lepromatosa y reacciones ENL recurrentes bajo tratamiento con poliquimioterapia. El daño severo en el ojo apareció no obstante el tratamiento apropiado de la reacción.

Erythema nodosum leprosum (ENL), or type II reaction, is an immunological reaction seen in patients with lepromatous leprosy ([9]), developing usually within the first yr of treatment though it has been described in untreated patients ([1, 9]). It is proposed to occur either as a result of immune complex disposition or enhanced cell mediated immunity, or both ([4, 9, 13]). Since lepromatous leprosy is a generalized disease, any organ may be involved in the ENL process ([9]). Lesions described included eruptions of tender, red nodules or papules that arise in apparently normal skin; neuritis; painful lymphadenopathy; enlargement of liver and spleen; epididymo-orchitis; arthritis; periosteitis; myositis; glomerulonephritis; peritonitis and oral destruction ([4, 9, 11]). Eye complications during ENL reactions have been described in the literature and include lagophthalmos, episcleritis, scleritis, uveitis, keratitis, and secondary glaucoma ([9, 10]).

We describe a patient with lepromatous leprosy (LL) who had recurrent episodes of ENL and presented with orbital involvement during the most recent episode. Orbital involvement in leprosy, or during reactions, has not been described before in the literature.

## CASE REPORT

A 39-year-old male first presented to the dermatology department in November 2000 with multiple, uncountable, evanescent and painful skin lesions of seven days duration. The lesions were erythematous and nodular, and present on the face, forearms, hands, and legs. He was febrile, and had thickened and tender ulnar and superficial peroneal nerves of both sides. The greater auricular, radial, median posterior tibial, lateral popliteal, and sural nerves were also thickened, though non-tender. Fine needle aspiration cytology of the skin lesions showed foamy macrophages and neutrophils, supporting the clinical diagnosis of lepromatous leprosy (LL) in type II reaction (ENL). The Bacterial Index was 4+ to 5+. His erythrocyte sedimentation rate was 40 mm in the first hr (Westergren's method; reference range for males 0–10 mm) and he was HIV negative (ELISA test). All other hematological and biochemical investigations were normal. He was admitted and treated with dapsone 100 mg/day, clofaza-

[1] Received for publication on 2 December 2002. Accepted for publication on 3 February 2003.

[2] U. Dhaliwal, M.S., Department of Ophthalmology; S. Mohanty, M.D., Department of Dermatology; S. N. Bhattacharya, M.D., Department of Dermatology, University College of Medical Sciences and GTB Hospital, Delhi.

Reprint requests to: Dr. Upreet Dhaliwal, Head, KH-6 New Kavi Nagar, Ghaziabad, 201002, UP, India. Telephone: 91-11-2582971 Ext. 242, FAX: 91-11-2590495, E-mail: upreetdhaliwal@hotmail.com.

Exhibit 29
188



Fig. 1.   Old and new skin lesions of ENL on the face, and proptosis of the left eye with complete ptosis.



Fig. 3.   Axial CT-scan showing marked thickening of the mucosa of the left ethmoidal sinuses.

mine 100 mg tds, rifampin 600 mg/month, and 600 mg/day of oral prednisolone—standard World Health Organization (WHO) regime for MB leprosy with ENL ([15]). During the next 2 months he did not develop any new lesions of ENL and prednisolone was gradually tapered ([15]). However, he developed fresh lesions along with orchitis in January 2001, whereupon the dose of prednisolone was again increased to 60 mg/day. After the condition stabilized, the prednisolone was again gradually tapered.

In April 2001, the patient who had been compliant with treatment, developed fever and fresh skin lesions of ENL. He also had orbital pain, loss of vision along with protrusion of and inability to open the left eye. He presented to the ophthalmology department 7 days after the onset of these symptoms. On examination, he has lesions of ENL all over the body. There was proptosis of the left eye with a firm, mildly tender mass palpable in the medial orbit, both su-

perior and inferior to the eyeball, in the absence of signs of acute inflammation (Fig. 1). There was no perception of light, complete ptosis, complete ophthalmoplegia, and the absence of corneal sensations suggesting involvement of the IInd, IIIrd, IVth, Vth, and VIth cranial nerves. There were findings suggestive of ocular ischemia viz. scleral melting, corneal edema, a large corneal epithelial defect, and very low intra-ocular pressure (Fig. 2). Examination of the other eye was normal, as were the testes and joints. Though the erythrocyte sedimentation rate was 120 mm in the first hr (Westergren's method), all other hematological and biochemical investigations, particularly kidney function tests, were normal.

A clinical diagnosis of LL in type II reaction, with left orbital apex syndrome and ocular ischemia was made. The patient continued to receive high doses of systemic steroids, and MB-MDT with 100 mg tds of clofazamine. For the ocular condition, he



Fig. 2.   Scleral melting and corneal edema, suggestive of ocular ischemia, left eye.



Fig. 4.   Axial CT-scan showing air in both orbits and an atrophic, shrunken eyeball on the left side.

Exhibit 29
189

was given systemic and local broad spectrum antibiotics and atropine 1% eye ointment. During FNAC of the swelling from the orbit, 2–3 ml of pus was aspirated, which was composed of degenerated cells with neutrophils against a necrotic background. The pus was negative for bacteria or fungus. Nasal smears were negative for AFB, while fine needle aspiration cytology of the skin lesions showed a Bacterial Index of 2+. Computerized tomography scan showed marked thickening of the mucosa of the left maxillary and ethmoidal sinuses (Fig. 3) and destruction of the medial wall of both orbits, with air in the orbits making further details difficult to delineate (Fig. 4). The left eyeball was proptosed, small, and irregular with shaggy outline suggestive of atrophy (Fig. 4). While the pain and proptosis have markedly reduced over the months of follow up, ophthalmoplegia has persisted and the eye has gone into phthisis bulbi.

## DISCUSSION

After passing through the cavernous sinus, the IIIrd, IVth, first branch of the Vth, and the VIth cranial nerves enter the orbit through the superior orbital fissure [7]. The optic nerve, along with the ophthalmic artery, enters the orbit through the optic canal. If an inflammatory process involves the orbital apex, it interrupts the nerves at a critical juncture, i.e., the bony canals, and can cause complete ophthalmoplegia, loss of vision, and decreased ocular sensations (the orbital apex syndrome). In addition, inflammatory processes associated with systemic vasculitis may affect the ophthalmic, posterior ciliary, or central retinal artery, thereby causing abrupt onset of blindness, while inflammation of the connective tissue around the blood vessels can produce proptosis [7]. Involvement of the ophthalmic artery, particularly, will produce ocular ischemia, while that of the ciliary or central retinal artery causes posterior segment ischemia. In orbital apex syndrome, when there is massive loss of vision, bony destruction, and large elevation of ESR, one must look for a systemic vasculitis [7]. While vasculitis due to Wegener's granulomatosis and periarteritis nodosa has been implicated in orbital apex syndrome [7, 14], it has not been described as a cause due to ENL in current literature.

The orbital disease may begin in an adjacent sinus, such as the ethmoid, and spread to the orbit, or, less commonly, it may arise as an isolated phenomenon by the fusion of multiple small areas of vasculitis in the orbit [14]. Involvement of the paranasal sinuses by the lepromatous process is well recognized [3, 5], with radiological changes occurring in the maxillary antrum, ethmoidal, and frontal sinuses [3]. Loss of the anterior nasal spine, the alveolar process of maxilla, the perpendicular part of the ethmoid and the vomer have also been described [8]. In the patient reported here, there was involvement of the left maxillary and ethmoidal sinuses, with destruction of the medial orbit wall. The disease probably started in the ethmoidal sinus and spread to the orbit.

Because ENL is characterized by an acute vasculitis in which tissue destruction is common, authors [11] have suggested that ENL ulceration, rather than primary lepromatous ulceration, is the major cause of destruction, perforation, or deformation of structures like the palate and uvula. In this patient too, acute vasculitis due to ENL probably caused the severe ocular morbidity described herein.

Features of MB leprosy with polymorphonuclear leukocyte inflammatory cell infiltrate and edema [2, 6], cellular infiltrates of blood vessels, and endothelial cell proliferation throughout the dermis [12], and often vasculitis [6] has been found on histopathology of ENL lesions. While we did not biopsy the orbital lesion, FNAC findings of necrosis and neutrophils from orbital pus in a patient with ENL, orbital apex syndrome and ocular ischemia contributed to the diagnosis of vasculitis involving the orbital vessels.

To prevent disabilities due to reactions in leprosy, it is critical to diagnose the reaction early and provide prompt and adequate treatment. The treatment of vasculitis due to ENL is to give high doses of systemic steroids, along with anti-leprosy treatment, in an effort to minimize systemic damage [15]. Clofazamine is an effective anti-inflammatory drug in ENL and is especially useful when corticosteroids are to be reduced or withdrawn. The patient reported seven days after the onset of ocular complaints, a time lag usually incompatible with visual recovery. It is possible that the severity of the vasculitis contributed as

Exhibit 29

190

71, 1                  *Dhaliwal*, et al.: *ENL Involving the Orbit*                  13

much to the ocular morbidity as the delay in reporting to an ophthalmologist.

In summary, we report a patient with MB leprosy and orbital involvement due to vasculitis associated with ENL. Orbital involvement in leprosy, or during reaction, has not been described previously.

## REFERENCES

1. BHARGAVA, P., KULDEEP, C. M. and MATHER, N. K. Recurrent erythema nodosum leprosum precipitated by anti-leprosy drugs. Int. J. Lepr. **64** (1996) 458–459.

2. BRAKEL, W. H. V., KWAWAS, I. B. and LUCAS, S. B. Reactions in leprosy: an epidemiological study of 368 patients in West Nepal. Lepr. Rev. **65** (1994) 190–203.

3. CHAUDHARY, H., THAPPA, D. M., KUMAR, R. H. and ELANGOVAN, S. Bone changes in leprosy patients with disabilities/deformities (a clinico-radiological correlation). Ind. J. Lepr. **71(2)** (1999) 203–215.

4. CHOUDHURI, K. The immunology of leprosy; unraveling an enigma. Int. J. Lepr. **63(3)** (1995) 430–447.

5. HAUHNAR, C. Z., MANN, S. B. S., SHARMA, V. K., KAUR, S., MEHTA, S. and RADOTRA, B. D. Involvement of maxillary mucosa in lepromatous leprosy. Int. J. Lepr. **60(3)** (1992) 390–395.

6. HUSSAIN, R., LUCAS, S. B., KIFAYET, A., JAMIL, S., RAYNES, J., UGAILI, Z., DOSKRELL, H. M., CHIANG, T. J. and MCADAM, K. P. W. J. Clinical and histopathological discrepancies in diagnosis of erythema nodosum leprosum reactions classified by assessment of acute phase proteins SAA and CRP. Int. J. Lepr. **63(2)** (1995) 222–230.

7. JAKOBIEC, F. A. and JONES, I. S. Orbital inflammations. In: *Clinical Ophthalmology*, Volume 2. Duane, T. D. and Jaeger, E. A., eds. Philadelphia: Harper and Row, 1986, pp. 1–35.

8. JOB, C. K., KARAT, A. B. A. and KARAT, S. The histopathological appearance of leprous rhinitis and pathology of septal perforation in leprosy. J. Laryngol. **80** (1996) 718–732.

9. NAAFS, B. Current views on reaction in leprosy. Ind. J. Lepr. **72** (2000) 97–124.

10. RAJAN, M. A. Longitudinal follow-up of eyes in leprosy. Ind. J. Lepr. **70** (1998) 109–114.

11. SCHEEPERS, A. and LEMMER, J. Erythema nodosum leprosum: a possible cause of oral destruction in leprosy. Int. J. Lepr. **60(4)** (1992) 641–643.

12. SEHGAL, V. N. and SHARMA, V. Reactions in leprosy—a prospective study of clinical, bacteriological, immunological, and histopathological parameters in thirty-five Indians. J. Derm. **15** (1998) 412–419.

13. SENGUPTA, U. Immunopathology of leprosy-current status. Ind. J. Lepr. **72** (2000) 381–391.

14. SNEBOLD, N. G. Noninfectious orbital inflammations and vasculitis. In: *Clinical Practice. Principals and Practice of Ophthalmology*, Volume 3. Albert, D. M. and Jakoblec, E. A., eds. Philadelphia: Saunders Co., 1994, pp. 1923–1942.

15. WHO EXPERT COMMITTEE ON LEPROSY. Seventh report. Geneva: World Health Organization, 1998. Tech. Rep. Ser. 874.



Exhibit 29
191

![DERMATOLOGY PRACTICAL & CONCEPTUAL]

www.derm101.com

# Enlarging plaque on the face with enlarged supraorbital nerve

Cesare Massone, M.D.[1], Andrea Clapasson, M.D.[2], Sergio Gennaro, M.D.[3], Enrico Nunzi, M.D.[4]

[1]Department of Dermatology, Division of General Dermatology, Medical University of Graz, Graz, Austria
[2]Unit of Social Dermatology, National Reference Center for Hansen's Disease, Azienda Ospedaliera Universitaria "San Martino," Genoa, Italy
[3]Department of Neurosurgery, University of Genoa and Azienda Ospedaliera Universitaria "San Martino," Genoa, Italy
[4]Department of Dermatology, Universidad Técnica Particular de Loja, Loja, Ecuador

Key words: tuberculoid leprosy, supraorbital nerve, downgrading reaction

Citation: Massone C, Clapasson A, Gennaro S, Nunzi E. Enlarging plaque on the face with enlarged supraorbital nerve. Dermatol Pract Conc. 2013;3(1):5. http://dx.doi.org/10.5826/dpc.0301a05.

Received: October 23, 2012; Accepted: November 15, 2012; Published: January 31, 2013

Copyright: ©2013 Massone et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

Funding: None.

Competing interests: The authors have no conflicts of interest to disclose.

All authors have contributed significantly to this publication.

Corresponding author: Cesare Massone, M.D.,Department of Dermatology, Medical University of Graz, Auenbruggerplatz 8, A-8036 Graz, Austria. Tel. +43.316.385.13235;

Fax: +43.316.385.14957. Email: cesare.massone@klinikum-graz.at.

## Case report

A 38-year-old Nigerian man, who had been living in Italy since 2008, presented with an annular lesion on the right temporal and frontal region that appeared two months prior to his visit. He reported a slow centrifugal enlargement of the lesion. The man complained about headache and pain radiating to the right frontal region. He was not taking any drugs. Physical examination disclosed an annular plaque of almost 10 x 8 cm in diameter (Figure 1). The margins were raised and slightly edematous, while the skin in the center was not infiltrated but dry and anaesthetic. Edema was observed around the right orbit. The supraorbital nerve was thickened and palpable (Figure 1, white arrow).

Skin biopsy showed a multifocal superficial and deep granulomatous dermatitis with epithelioid granulomas (Figures 2 and 3) with perineural distribution. The granulomas were also focally "touching" the epidermis (Figure 4). Multinucleated giant cells, discrete edema within the granulomas, and dilated superficial vessels were also observed. PAS and



Figure 1. Annular anesthetic plaque with raised margins on the right temporal and frontal region. [Copyright: ©2013 Massone et al.]

Grocott stains were negative. Fite-Faraco stain did not show *Mycobacteriae*. Polymerase chain reaction (PCR) for *Mycobacteriae* was not performed.

Exhibit 30
192



Figure 2. Multifocal superficial and deep granulomatous dermatitis with epithelioid granulomas (hematoxylin and eosin, original magnification 40x). [Copyright: ©2013 Massone et al.]



Figure 4. The granulomas are focally "touching" the epidermis. Moreover, multinucleated giant cells and slightly intra-granuloma edema are observed (hematoxylin and eosin, original magnification 100x). [Copyright: ©2013 Massone et al.]



Figure 3. Epithelioid granulomas without necrosis (hematoxylin and eosin, original magnification 200x). [Copyright: ©2013 Massone et al.]

Routine laboratory investigations were within normal limits and an HIV test was negative. Chest X-ray was normal. Ophthalmological consultation was unremarkable. Neurological consultation confirmed an enlargement of the supraorbital nerve without any neurological deficit. Magnetic resonance (MR) confirmed edema of the supraorbital nerve that was compressed at the *frontal notch*, explaining the origin of the unilateral headache and pain. A nerve biopsy was not performed.

### What is your diagnosis?
**Answer:** Tuberculoid leprosy with reversal reaction (also called "reactional tuberculoid leprosy" or "low resistant tuberculoid leprosy").

## Discussion

Leprosy or Hansen disease is a human chronic infectious disease associated with damaging inflammatory lesions in the skin and peripheral nerve caused by *Mycobacterium leprae*

*(M. leprae)*. Leprosy's clinical manifestations are determined by a dynamic interactionary process between *M. leprae* and cell-mediated immunity (CMI) of genetically predisposed subjects. According to Ridley and Jopling, leprosy patients are placed into a spectrum of clinico-pathological manifestations with polar tuberculoid (TT), lepromatous (LL) and intermediate types of borderline tuberculoid (BT), mid-borderline (BB) and borderline lepromatous (BL) leprosy. The spectrum is characterized by the balance between CMI and mycobacterial load: high CMI response means low number of bacilli (paucibacillary leprosy: TT and part of BT). Low CMI response means high number of bacilli (multibacillary leprosy: LL, BL, BB and part of BT) [1-6]. As Ridley wrote: "the spectrum is uninterrupted and there may be patients with an intermediate position among two groups" [5].

Anesthetic unilateral single lesions characterize TT leprosy, while bilateral asymmetrical distribution of lesions (macules, papules an plaques) characterize BT leprosy. Multiple symmetrically arranged macules and small or large nodules and plaques characterize BL and early LL. Loss of sensation is typical in TT and BT lesions, while it appears only late in BL and LL lesions. Early damage to autonomic nerve fibers impairs sweating and causes dry skin in TT and BT leprosy [1].

Leprosy reactions, divided into *type 1* (called also reversal reaction or RR) and *type 2* (called also erythema nodosum leprosum or ENL) reactions, are severe acute episodes that are common in immunologically unstable borderline patients, and involve an up-regulation of the host response to *M. leprae* antigens. RR is more frequent in BT patients during treatment and are due to an improvement of CMI against *M. leprae* (so-called upgrading RR) [1,7,8].

During RR, all three components of the peripheral nervous system are affected: sensory, motor and autonomic.

Exhibit 30
193

Sensory loss causes anesthesia, analgesia and inability to discriminate hot and cold. Motor deficit causes muscle weakness, paralysis and atrophy with irreversible nerve damage, leading to impairments and permanent disability [1].

The most common nerves involved in RR are the median, radial and ulnar nerves, the sural, posterior tibial and perineal nerves, great auricular and the facial nerve. In all leprosy patients, accurate neurological examination includes testing for loss of sensation on skin lesions, palpation of commonly involved peripheral nerves, evaluation of sensory function, and muscular strength. When involved, nerves appear enlarged at palpation [1,2].

Nerve involvement can be confirmed using electrophysiology and echography or MR. RR has to be immediately treated with steroids before nerve damage occurs. Moreover, nerve involvement may be caused by compression due to edema, and the granulomatous inflammation affecting the nerve and can be treated surgically by opening the anatomic tunnel and performing an external neurolysis [1,9].

Concerning our patient, the clinical differential diagnosis included, among others, mainly sarcoidosis, skin lymphoma, granuloma annulare, tinea faciei, discoid lupus erythematosus and lupus vulgaris. A centrifugally enlarging anaesthetic plaque with dry skin in a subject coming from an endemic area favors leprosy. A single unilateral anesthetic lesion is typically seen in TT. The presence of multifocal epithelioid granulomas without necrosis but with perineural distribution confirmed leprosy and excluded tuberculosis and the other differential diagnosis. According to Ridley and Jopling the patient was classified as TT. The negative Fite-Faraco stain is not surprising because in more than 50% of TT patients M. leprae are not seen in TT biopsies because the CMI has already eliminated the pathogens. For the same reason, also PCR is unremarkable in more than 50% of TT patients, and it was not performed by us because a negative PCR does rule out the diagnosis [1,10].

The presence of multinucleated giant cells on histopathology, discrete edema within the granulomas, and dilated superficial vessels were histopathologic signs of RR [11], are compatible with the clinical enlargement of the supraorbital nerve and the headache reported by the patient. The supraorbital nerve is a branch of the frontal nerve, it is a pure sensitive nerve that is not frequently involved in leprosy. When enlarged it is palpable on the forehead slightly lateral to the midline. Its involvement produces minimal clinical damage to the patient. The supraorbital nerve can rarely cause headache and pain in the orbital cavity [1,12].

TT is a stable form of leprosy with a stable CMI against M. leprae. In contrast with borderline patients (BT, BB and BL), TT patients usually do not suffer from RR and do not shift to another form of the disease [1,8]. RR occurs more frequently in BT or BB and has been only rarely reported in TT

[1,13-15]. Our case is interesting because the patient presented classic clinical and histopathological TT but also developed an RR of the supraorbital nerve. These cases have been previously reported as "reactional tuberculoid leprosy" or "low resistant tuberculoid leprosy." This unusual form of leprosy is represented by a solitary TT lesion with signs of RR (edema of the lesion and enlargement of the nerve) and can be explained by a changing of the CMI, in particular with decrease of CMI against M. leprae and development of RR [1,13-15]. If not promptly and correctly diagnosed and treated, our patient probably would have progressed in the spectrum of the disease and shifted to BT with the development of more lesions and maybe even more extensive nerve damage.

Multidrug therapy as recommended by the WHO for paucibacillary leprosy was started and the patient received rifampicin 600 mg/month, and dapsone 100 mg/day. Dapsone was subsequently substituted by minocycline 100 mg/day because of the onset of anemia. The therapy was continued for 6 months. Prednisone 30 mg/day (for 3 months with progressive tapering) was added to treat the concomitant RR. Because the headache and pain did not improve with the corticosteroid therapy, surgical enlargement of the frontal notch was performed with improvement of the pain. The therapy was well tolerated, and at 10-month follow-up the plaque disappeared and the supraorbital nerve was not enlarged anymore.

Leprosy patients have to be categorized correctly before starting therapy: during RR, multidrug therapy and steroids are needed, in order to control the disease and prevent irreversible nerve damage.

## References

1. Nunzi E, Massone C. Leprosy: A Practical Guide. Berlin: Springer, 2012.
2. Ridley DS, Jopling WH. Classification of leprosy according to immunity. A five-group system. Int J Lepr Other Mycobact Dis. 1966;34(3):255-73.
3. Ridley DS. Nature of the leprosy spectrum. In: Ridley DS (ed). Pathogenesis of Leprosy and Related Diseases. London: Wright, 1988:93-105.
4. WHO Enhanced Global Strategy for Further Reducing the Disease Burden Due to Leprosy (2011-2015). Operational Guidelines (Updated), 2009.
5. Talhari S. Bangkok Workshop on Leprosy Research. Diagnosis, classification and prognosis. Int J Lepr Other Mycobact Dis. 1996;64:S13-4.
6. Lockwood DN, Sarno E, Smith WC. Classifying leprosy patients—searching for the perfect solution? Lepr Rev. 2007;78(4):317-20.
7. Pfaltzgraff R E, Bryceson A. Clinical leprosy. In: Hastings RC. Leprosy. Edinburgh: Churchill Livingstone, 1985:140-176,
8. Naafs B. Treatment duration of reversal reaction: a reappraisal. Back to the past. Lepr Rev. 2003;74(4):328-36.
9. Van Veen NH, Schreuders TA, Theuvenet WJ, Agrawal A, Richardus JH. Decompressive surgery for treating nerve damage in leprosy. A Cochrane review. Lepr Rev. 2009;80(1):3-12.

Exhibit 30
194

10. Weedon D. *Weedon's Skin Pathology*. 3rd ed. London: Churchill Livingstone, 2009.
11. Lockwood DN, Lucas SB, Desikan KV, Ebenezer G, Suneetha S, Nicholls P. The histological diagnosis of leprosy type 1 reactions: identification of key variables and an analysis of the process of histological diagnosis. J Clin Pathol. 2008;61(5):595-600.
12. Desikan KV, Anbalagan J, Maheshwari PK. Pure neuritic leprosy of supraorbital nerve as unusual presentation. Indian J Lepr. 2001;73(1):47-50.
13. Alfieri N, Fleury RN, Opromolla DV, Ura S, de Campos I. Oral lesions in borderline and reactional tuberculoid leprosy. Oral Surg Oral Med Oral Pathol. 1983;55(1):52-7.
14. Leiker DL. Low-resistant tuberculoid leprosy. Int J Lepr Other Mycobact Dis. 1966;34(1):72-3.
15. Noto S, Clapasson A, Nunzi E. Classification of leprosy: the mystery of "reactional tuberculoid." G Ital Dermatol Venereol. 2007;142:294-5.

Exhibit 30
195

University of California, San Diego

## DESIGNATION OF PHYSICIAN FORM
(Workers' Compensation)

You can be treated immediately by your personal medical doctor (M.D.) or a doctor of osteopathy (D.O.) if the doctor has treated you in the past, has your medical records, and prior to the injury, the doctor agreed to treat you for work injuries or illnesses and you gave your employer the doctor's name and address in writing.

The above describes "pre-designating a personal physician." If you give your employer the name and address of a personal chiropractor (D.C.) or acupuncturist (L.A.C.) in writing, prior to the injury or illness, your claims administrator will arrange initial treatment with another doctor, then you may switch to the chiropractor or acupuncturist upon request during the first 30 days after your employer knows of your injury or illness.  You can notify your employer by completing the following form and returning it to your employer.

### EMPLOYEE (Complete this Section)

If I have a work-related injury or illness, I choose to be treated by:

Physician Name:  Dr. Tyler Forbes                              (circle one: MD, DO, DC and LAC)
Physician Street Address:  12925 El Camino Real, Suite J-24
Physician City, State, ZIP:  San Diego, CA 92130
Physician Telephone:  858 - 755 - 0808

**I understand that this doctor must have treated me in the past and must maintain my medical records.**

Employee Name:  Faisal Ahmed                    Employee ID#:  010572

Employee Signature:  *Ahmed*                            Date:  11/26/2008

(Note to Employee:  It is the employee's responsibility for asking the physician to complete and sign the section below)

### PHYSICIAN (Complete this Section)

**"I agree to treat the above-named individual should s/he have a work injury or illness.  I understand that medical services in the California workers' compensation system are subject to preauthorization of non-emergency services and diagnostic tests, utilization review, reporting requirements, and fees governed by the Official Medical Fee Schedule promulgated by the State Division of Workers' Compensation."**

Physician Name (please print):  Dr. Tyler Forbes

Physician Signature:
Street Address:  12925  El Camino Real  Suite J-24
Mailing Address (if different):  Same
Telephone:  858 - 755 - 0808                          Fax:  858 - 792 - 7290
Email:  tylerforbes@yahoo.com    Physician Tax ID#:  0526282

Employee must return completed and signed form to the:    Workers Compensation Office
                                                          9500 Gilman Drive, Mail Code 0925
                                                          La Jolla, CA  92093-0925

REV: 3/05

Exhibit 3
196

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Agreement") is made and entered into by and among University of California San Diego Medical Center ("Respondent"), and the United States Department of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices ("Office of Special Counsel").

WHEREAS, on January 25, 2011, the Office of Special Counsel initiated an independent investigation DJ# 197-12-195 against Respondent (the "OSC Charge") alleging unfair documentary practices based on citizenship status in violation of the unfair immigration-related employment practices provisions of 8 U.S.C. § 1324b (the "Act").

WHEREAS, on June 28, 2011, the Office of Special Counsel notified Respondent that it had uncovered separate and distinct unfair documentary practices based on citizenship status in violation of the Act.

WHEREAS, the Office of Special Counsel concluded based upon its independent investigation that there is reasonable cause to believe that Respondent engaged in a pattern and practice of unfair documentary practices based on citizenship status in violation of the Act against non-citizen employees during the period from January 1, 2004 to June 9, 2011.

WHEREAS, Respondent ended these practices that allegedly violated the Act on June 9, 2011.

WHEREAS, on December 6, 2011, the Office of Special Counsel filed an administrative complaint with the Office of Chief Administrative Hearing Officer (OCAHO) Case No. 12B00013 (the "Litigation"), alleging immigration-related unfair employment practices by Respondent.

WHEREAS, the Office of Special Counsel and Respondent wish to resolve the Litigation and the OSC Charge without further delay or expense and hereby acknowledge that they are voluntarily entering into this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises herein contained, it is agreed as follows:

1. To fully and finally resolve all disputes among the parties hereto as of the date of this Agreement, Respondent agrees to pay a civil penalty to the United States Treasury in the amount of One Hundred and Fifteen Thousand Dollars ($115,000.00).

2. The monies discussed in Paragraph 1 shall be paid by check payable to the "United States Treasury, c/o Mac McConkey," and mailed by express delivery service, along with a copy of the fully signed Agreement, to the following address, within fifteen (15) business days of Respondent's receipt of a fully signed copy of this Agreement:

> Luz V. Lopez-Ortiz
> U.S. Department of Justice

Exhibit 33

201

Office of Special Counsel
1425 New York Ave, NW, Room 9000
Washington, DC 20005

On the same day a copy of such check and the express delivery service tracking number for this mailing shall be sent to Luz V. Lopez-Ortiz, at luz.v.lopez-ortiz@usdoj.gov.

3. Respondent agrees that it shall not discriminate on the basis of citizenship status or national origin in violation of 8 U.S.C. § 1324b.

4. Respondent agrees that it will treat all individuals equally, without regard to citizenship or immigration status, or national origin, during the hiring, firing, and employment eligibility verification and reverification process. Respondent shall avoid discrimination in the employment eligibility verification and reverification process by (a) honoring documentation that on its face reasonably appears to be genuine, relates to the person, and satisfies the requirements of 8 U.S.C. § 1324a(b), (b) not requesting more or different documents than are required by law, and (c) permitting all employees to present any document or combination of documents acceptable by law.

5. Respondent agrees that it will not intimidate, threaten, coerce, or retaliate against any person for his or her participation in this matter or, in the future, the exercise of any right or privilege secured by 8 U.S.C. § 1324b.

6. Respondent agrees to post an English and Spanish version of the Office of Special Counsel "If You Have The Right to Work" poster ("OSC Poster"), in color and measuring no smaller than 18" x 24", an image of which is available at http://www.justice.gov/crt/about/osc/htm/worker.php#/, which will be provided by the Office of Special Counsel, in all places where notices to employees and job applicants are normally posted. The Notice will be posted within fourteen (14) days from the effective date of this Agreement and will remain posted for three (3) years thereafter.

7. Beginning not more than fourteen (14) days from the date that Respondent receives a fully signed copy of this Agreement, Respondent will provide a letter-size copy of the OSC Poster with all paper employment applications, and a mandatory electronic link to the English and Spanish versions of the OSC Poster with all electronic applications, and Respondent will continue to do so for two (2) years thereafter.

8. For three (3) years from the effective date of this Agreement, Respondent agrees to ensure that all employees who are responsible for formulating, carrying out, and/or conducting training on Respondent's hiring, firing, equal employment, and employment eligibility verification policies, including all managers and employees who have any role making employment eligibility verification decisions, such as completing the Form I-9 and/or using the E-Verify system ("Human Resources Personnel"), are in possession of the most current version of the Form I-9, and USCIS Employment Eligibility Verification Handbook for Employers (M-274) ("Handbook"), available at www.uscis.gov/I-9Central.

Exhibit 33
202

Future revisions of the Form I-9 and Handbook can be obtained from the United States Citizenship and Immigration Services at www.uscis.gov.

9.   Within thirty (30) days of receipt of a fully signed copy of this Agreement, Respondent will review its employment policies as they relate to nondiscrimination on the basis of citizenship status and national origin and shall, as necessary, revise such policies to:

    (a)   Prohibit (1) discrimination on the basis of citizenship status or national origin in the hiring and firing process; and (2) disparate treatment of individuals, on the basis of citizenship status or national origin, during the Form I-9 employment eligibility verification and reverification process;

    (b)   Refer applicants and employees who complain, formally or informally, of discrimination on the basis of citizenship status in the hiring, firing, or Form I-9 employment eligibility verification and reverification process immediately to the Office of Special Counsel by directing the affected individual to the OSC Poster, the Office of Special Counsel toll-free phone number, and the Office of Special Counsel website, and further advise the affected individual of his or her right to file a charge of discrimination with the Office of Special Counsel.

    (c)   Provide that Respondent shall not take any reprisal action against an employee for having opposed any employment practice made unlawful by 8 U.S.C. § 1324b, or for filing any charge, or participating in any lawful manner in any investigation or action under 8 U.S.C. § 1324b.

During the three years (3) following the effective date of this Agreement (the "Reporting Period"), Respondent shall provide any changes in employment policies as they relate to nondiscrimination on the basis of citizenship status to the Office of Special Counsel for review within thirty (30) days of the effective date of such revised policies.

10.   Within ninety (90) days of receipt of a fully signed copy of this Agreement, the Office of Special Counsel shall provide all Human Resources Personnel with training by the Office of Special Counsel on their responsibilities to comply with 8 U.S.C. § 1324b concerning the elimination of discrimination based on citizenship status and national origin in the employment eligibility verification process.   Additionally, University of California, Office of the President – Audit and Compliances Services will co-sponsor with the Office of Special Counsel a system-wide webinar that will be broadly advertised and offered to all human resources personnel working at the University of California's ten campuses, five medical centers and its National Laboratory.

    (a)   The training will consist of in-person training and/or a remote webinar presentation, the choice of which is at the Office of Special Counsel's discretion.   A recording of any webinar shall be provided by the Office of Special Counsel.

Exhibit 33

203

(b)     All employees will be paid their normal rate of pay, and the training will occur during their normally scheduled workdays and work hours. Respondent shall bear all costs associated with these training sessions;

(c)     For a period of three years from the effective date of this Agreement, all new Human Resources Personnel hired by Respondent after the training described in this paragraph has been conducted shall receive this training within fifteen (15) days of hire.

(d)     Individuals who comply with the training as described in this paragraph shall complete Attachment A, including signatures, as evidence of such compliance. The original of Attachment A, including signatures, will be mailed to the attention of Luz V. Lopez-Ortiz at the Office of Special Counsel by registered or certified mail, return receipt requested, or via email to luz.v.lopez-ortiz@usdoj.gov, within ten (10) days of the training session.

11.     During the Reporting Period, the Office of Special Counsel reserves the right to make reasonable inquiries to Respondent necessary to determine Respondent's compliance with this Agreement. As a part of such review, the Office of Special Counsel may, in addition to the reporting requirements set out in Paragraph 12 below, require written reports concerning compliance, inspect Respondent's premises, examine witnesses, and examine and copy Respondent's documents at the expense of the Office of Special Counsel.

12.     Every six (6) months during the Reporting Period, Respondent shall provide the Office of Special Counsel with copies of the completed Forms I-9, including attachments, for all non-U.S. citizen employees hired by Respondent in that six-month period. Respondent shall provide the documents in electronic form unless requested otherwise.

13.     If the Office of Special Counsel has reason to believe, as a result of information gathered pursuant to Paragraphs 11 and 12, that Respondent is in violation of any provision of this Agreement, the Office of Special Counsel shall promptly notify Respondent of the purported violation. Respondent will then be given a thirty (30) day period from the date it is notified by the Office of Special Counsel in which to cure the violation before Respondent is deemed by the Office of Special Counsel to be in violation of this Agreement.

14.     This Agreement resolves any and all differences between the parties known, related to, or arising from the OSC Charge and the Litigation through the date this Agreement is signed by all parties.

15.     Notwithstanding Paragraphs 13 and 14, this Agreement does not affect the right of any individual to file a charge alleging an unfair immigration-related employment practice against Respondent with the Office of Special Counsel, the authority of the Office of Special Counsel to investigate or file a complaint on behalf of any such individual, or the

4

Exhibit 33
204

authority of the Office of Special Counsel to conduct an independent investigation of Respondent's employment practices.

16. The Office of Special Counsel agrees to close the investigation subject to compliance with Paragraphs 1 and 2.

17. Within ten (10) days of compliance with Paragraphs 1 and 2, Respondent and the Office of Special Counsel shall file a stipulation in the form attached hereto as Attachment B, requesting that the Litigation be dismissed with prejudice.

18. This Agreement may be enforced in the United States District Court for the Northern District of California.

19. The Office of Special Counsel and Respondent agree that, as of the effective date of this Agreement, litigation concerning the violations of 8 U.S.C. § 1324b that the Office of Special Counsel has reasonable cause to believe that Respondent committed is not reasonably foreseeable. To the extent that either party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to this matter, the party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves either party of any other obligations imposed by this Agreement.

20. Should any provision of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement. Respondent, the Office of Special Counsel and the Charging Party agree that they will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Agreement invalid.

21. The Office of Special Counsel and Respondent agree to bear their own costs, attorneys' fees and other expenses incurred in this action.

22. This Agreement may be executed in multiple counterparts, each of which together shall be considered an original but all of which shall constitute one agreement. The parties agree to be bound by facsimile signatures.


**University of California, San Diego Medical Center**

By:  _Thomas McAfee_                              Dated: _01/03/12_

Thomas McAfee, MD
Interim Chief Executive Officer
UC San Diego Health System

5

Exhibit 33
205

Dated: 01/03/12

Mia I. Belk
Counsel – Litigation, Labor and Employment
University of California, Office of the President

**Office of Special Counsel for Immigration-Related Unfair Employment Practices**

By:

Dated: 1/4/12

Seema Nanda
Acting Deputy Special Counsel

C. Sebastian Aloot
Acting Special Litigation Counsel

Luz V. Lopez-Ortiz
Ronald Lee
Trial Attorneys

6

Exhibit 35
206

# Health Affairs

At the Intersection of Health, Health Care and Policy

Cite this article as:
Kathryn Pitkin Derose, José J. Escarce and Nicole Lurie
Immigrants And Health Care: Sources Of Vulnerability
*Health Affairs* 26, no.5 (2007):1258-1268
doi: 10.1377/hlthaff.26.5.1258

The online version of this article, along with updated information and services, is available at:
http://content.healthaffairs.org/content/26/5/1258

**For Reprints, Links & Permissions :**   http://content.healthaffairs.org/1340_reprints.php

**Email Alertings :** http://content.healthaffairs.org/subscriptions/etoc.dtl

**To Subscribe :**   https://fulfillment.healthaffairs.org

*Health Affairs* is published monthly by Project HOPE at 7500 Old Georgetown Road, Suite 600, Bethesda, MD 20814-6133. Copyright ©
by Project HOPE - The People-to-People Health Foundation. As provided by United States copyright law (Title 17, U.S. Code), no part of
may be reproduced, displayed, or transmitted in any form or by any means, electronic or mechanical, including photocopying or by information storage or retrieval systems, without prior written permission from the Publisher. All rights reserved.

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

Not for commercial use or unauthorized distribution

Exhibit 26

109

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

# Immigrants And Health Care: Sources Of Vulnerability

More opportunities for immigrants to obtain legal residency and citizenship may be the best route to expanded access to care.

**by Kathryn Pitkin Derose, José J. Escarce, and Nicole Lurie**

**ABSTRACT:** Immigrants have been identified as a vulnerable population, but there is heterogeneity in the degree to which they are vulnerable to inadequate health care. Here we examine the factors that affect immigrants' vulnerability, including socioeconomic background; immigration status; limited English proficiency; federal, state, and local policies on access to publicly funded health care; residential location; and stigma and marginalization. We find that, overall, immigrants have lower rates of health insurance, use less health care, and receive lower quality of care than U.S.-born populations; however, there are differences among subgroups. We conclude with policy options for addressing immigrants' vulnerabilities. [Health Affairs 26, no. 5 (2007): 1258–1268; 10.1377/hlthaff.26.5.1258]

IMMIGRANTS ARE OFTEN IDENTIFIED as a "vulnerable population"—that is, a group at increased risk for poor physical, psychological, and social health outcomes and inadequate health care.[1] Vulnerability is shaped by many factors, including political and social marginalization and a lack of socioeconomic and societal resources. Addressing the health care needs of immigrant populations is challenging both because of the heterogeneity of this group and because recent federal and state policies have restricted some immigrants' access to health care. These policies have exacerbated existing differences in access (for example, legal residents versus undocumented and long-term residents versus recent arrivals). The stigma associated with some forms of immigration status (for example, undocumented versus refugee) can also contribute to vulnerability.

■ **Size and makeup of U.S. immigrant population.** Immigrants to the United States represent a sizable and rapidly growing group that totaled approximately thirty-six million people, or 12 percent of the U.S. population, in 2005. This percentage has doubled since 1970 and shows no signs of decreasing. The influx of immigrants over the past two decades is having a profound effect on a growing number of communities, as immigrants settle in nontraditional destinations: Twenty-two

Kathryn Derose (derose@rand.org) is a health policy researcher at RAND in Santa Monica, California. José Escarce is a professor in the Departments of Medicine–General Internal Medicine and Health Services Research at the University of California, Los Angeles. Nicole Lurie is a senior natural scientist and the Paul O'Neill Alcoa Professor at RAND in Arlington, Virginia.

DOI 10.1377/hlthaff.26.5.1258 ©2007 Project HOPE–The People-to-People Health Foundation, Inc.

Exhibit 26
110

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

states that had relatively low percentages of immigrants saw these populations grow by more than 90 percent between 1990 and 2000.[2] In 2003, 53 percent of all foreign-born people in the United States were from Latin America, 25 percent were from Asia, 14 percent were from Europe, and 8 percent were from other regions.[3] Recent immigrants are largely from Latin America, and more of them are undocumented than was true of earlier cohorts. Of the estimated twelve million undocumented immigrants living in the United States in 2004, 81 percent were from Latin America, and 86 percent were thought to have arrived since 1990.[4]

■ **Legal-status groups.** Approximately a third of immigrants are now in each of the three principal legal-status groups (naturalized citizens, legal permanent residents, and undocumented immigrants). However, because current immigration policy places more restrictions and delays than in the past on immigrants' ability to adjust their status following illegal immigration, the number of undocumented immigrants is likely to continue to grow.[5]

■ **Eligibility for public programs.** The immigrant provisions of the 1996 welfare reform act, the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), have made most legal immigrants ineligible for publicly funded services such as Medicaid for the first five years of residence (undocumented immigrants were already ineligible), although states can preserve eligibility by fully funding these services themselves. PRWORA also extends the period of time that sponsors' income can be deemed available to immigrants and therefore counted as income for means-tested programs such as Medicaid. Finally, the law requires that state or local governments providing benefits to undocumented immigrants must pass a law to affirmatively establish their eligibility. These restrictions, aimed to discourage immigrants likely to seek public benefits from entering the United States, shift responsibility away from the government onto newcomers' sponsors and realize a large stream of new cost savings.[6]

With this policy context in mind, we now discuss the factors that influence immigrants' vulnerability in obtaining adequate health care.

## Factors That Influence Immigrants' Vulnerability

Much of the research on immigrants and health or health care has focused on the largest immigrant group, Latin Americans, and to some degree on the second-largest group, Asians, although these pan-ethnic terms obscure much within-group variation. More recent studies have focused on health care access and quality for black immigrants.[7]

■ **Socioeconomic background.** Educational attainment, type of occupation, and earnings directly and indirectly influence immigrants' access to health care resources. Overall, immigrants are less likely than U.S.-born populations to have graduated from high school and are more likely to work in service occupations and live in poverty, although important variations exist. For example, among Asian and African immigrants, the percentage of high school graduates equals the percentage for U.S.-

Exhibit 26
111

born populations (87 percent), whereas the percentage is much lower (38 percent) among immigrants from Mexico and Central America. The proportion of foreign-born workers in management and professional occupations is highest among those from Asia (47 percent) and lowest among those from Latin America (13 percent), compared to 36 percent for the U.S.-born. Finally, the proportion of Asian immigrants living below the federal poverty level is similar to that for U.S.-born populations (11 percent), whereas the proportion of Latin American immigrants is twice as high (22 percent).[8] Within immigrant subgroups, there are also large variations based on country of origin, perhaps greatest among Asian immigrants. For example, educational attainment is much higher among immigrants from India (89 percent high school graduates) than among those from Laos (46 percent).[9]

■ **Immigration status.** Legal status is another major determinant of immigrants' access to social services and jobs with benefits. Immigrants have consistently lower rates of health insurance coverage than U.S.-born populations, although there are differences among immigrants based on immigration status, time in the United States, and country of origin. Nearly half (45 percent) of noncitizen immigrants living in the United States lack health insurance, whereas noncoverage for naturalized citizens generally approximates that of the U.S.-born (15–20 percent). However, 65 percent of undocumented immigrants lack health insurance, compared with 32 percent of permanent residents. The percentage of uninsured immigrants varies widely depending on country of origin: for example, from 7 percent for immigrants from Germany to 58 percent for immigrants from Guatemala.[10] The higher risk of being uninsured among immigrants remains after adjusting for socioeconomic factors.[11]

These disparities in insurance extend to immigrants' children: U.S.-born children with noncitizen or naturalized parents also have lower rates of health insurance (both public and private) than U.S.-born children with U.S.-born parents.[12] The disparities are manifest in other measures of access as well, such as not having a regular source of care, not having a physician or dental visit in the past year, or having fewer visits, even after adjusting for health insurance and health status.[13]

■ **Limited English proficiency.** Although disparities in insurance and access to care for immigrants are attributable in part to socioeconomic status, sector of employment, and legal status, nonfinancial barriers, especially limited English proficiency, also play a major role. This is largely not an issue for immigrants from countries where English predominates (such as many Caribbean and African nations).[14] Adults with limited English proficiency and their children are much less likely to have insurance and a usual source of care, have fewer physician visits, and receive less preventive care than those who only speak English.[15] When groups with limited English proficiency are broken down by language subgroups, however, there are differences. For example, Spanish speakers in California were more likely than English speakers were to receive a Pap test in the past three years, whereas women who spoke Vietnamese, Cantonese, Mandarin, and Korean were all less likely.[16]

Limited English proficiency is also likely to affect the quality of care immigrants

Downloaded from http://content.healthaffairs.org/ by Health Affairs on April 3, 2016 by HW Team

Exhibit 26
112

receive; for instance, immigrants with limited proficiency report lower satisfaction with care and lower understanding of their medical situation. Those who need an interpreter but do not receive one fare the worst, followed by those who receive an interpreter and those who have a language-concordant provider or speak English well enough to communicate with the provider.[17] The quality of interpretation is also important, but professional, trained interpreters are rare in many settings, and much interpretation is provided by ad hoc interpreters (family members, janitorial staff, and other patients) and is suboptimal.

Not surprisingly, limited English proficiency also affects patient safety, increasing the probability of an adverse medication reaction resulting from problems in understanding instructions.[18] Providing written instructions in patients' native language is not always an effective solution, given that some immigrants—particularly those who are older and have less formal education—have limited literacy in their native languages as well.

Although Title VI of the Civil Rights Act of 1964 has been interpreted to mean that federally funded health facilities must provide interpretation for all patients who request it, implementation is uneven. Many patients are not aware of the law, and there are few financing mechanisms to support it (for example, only ten states require Medicaid to cover access to an interpreter).[19] Further, although the supply of Spanish-speaking physicians in places such as California may appear to be ample, the number of Spanish-speaking physicians willing to care for uninsured or Medicaid patients is inadequate.[20] The supply of physicians speaking other languages, although largely unstudied, is probably even lower.

Efforts to address the effects of limited English proficiency have increased; for example, in 2000, the U.S. Department of Health and Human Services Office of Minority Health issued national standards for culturally and linguistically appropriate services (CLAS) directed at health care organizations.[21] Federal law requires state Medicaid agencies and providers to overcome language barriers, a provision that is increasingly required by Medicaid managed care contracts as well. Under California's managed care contract, plans are required to collect data on the language needs of their Medicaid patients, provide access to interpretation and translation services, and create consumer advisory committees with representatives of immigrant communities to help develop policies on language access. Further, the California Department of Managed Health Care recently implemented regulations that require all California health plans to develop and implement language assistance programs for enrollees whose languages represent some minimal threshold of members.[22]

■ **Welfare reform.** Federal law has also affected immigrants' access to and use of health care. Nationally, PRWORA has been associated with an increase in uninsurance among foreign-born, less educated single women and among children of foreign-born women.[23] However, state programs to preserve eligibility have ameliorated some of the negative effects of PRWORA.[24] Further, it appears that expanded

Downloaded from http://content.healthaffairs.org/ by Health Affairs on April 3, 2016 by HW Team

Exhibit 26
113

coverage and outreach under the State Children's Health Insurance Program (SCHIP) and the federal guidance clarifying that use of publicly funded health insurance will not jeopardize citizenship applications have been effective in maintaining Medicaid/SCHIP coverage among immigrant children and their families post-PRWORA. By contrast, Medicaid/SCHIP participation has decreased among legal permanent resident and refugee adults at a rate that is three and seven times, respectively, that for U.S. citizens.[25]

■ **Residential location.** Immigrants' vulnerability can also be influenced by whether an immigrant's U.S. residence is in a traditional or new destination for immigrants. New destinations are less likely than established destinations to have well-developed safety nets, culturally competent providers, and immigrant advocacy or community-based organizations. Latinos in areas with relatively small Latino populations rely more on emergency departments (EDs) for their care than do Latinos in areas with relatively large Latino populations, and physicians in communities with small Latino populations report more language barriers and problems communicating with patients compared to physicians in major Latino centers.[26] Little is known about how immigrants from other regions fare, although some studies have noted a tendency among groups such as Somali refugees to rely on EDs.[27]

Immigrants in new destinations probably have a different set of social networks than those in traditional destinations. Recent immigrants in new destinations are likely to know relatively fewer immigrants who are long-term residents to whom they can turn for assistance and knowledge about the health care system. This may cause newer immigrants to delay care until the problem becomes unbearable, or they and their providers might encounter frustration when they do attempt to seek care. On the other hand, immigrants and native-born residents in smaller gateway communities (which are more likely to be newer destinations) tend to interact more frequently, impeding social isolation of new immigrants and facilitating intergroup interactions.[28] The ability to serve new immigrant populations seems to be related to the capacity of a locality's safety net.[29]

■ **Stigma and marginalization.** Immigrants' vulnerability can also be influenced by factors related to stigma and marginalization. A variety of factors can contribute to this: differences in appearance (for example, wearing traditional dress), cultural and religious practices, language barriers, speaking with an accent (even among immigrants who speak English), and skin tone.

Stigmatization of immigrant populations can be exacerbated by community concerns regarding the effects of immigration on community resources. A common theme in newspaper articles and opinion pieces of late is that immigrants, especially the undocumented, overburden the safety net and take away from "deserving" families, even though research suggests that immigrants in general and the undocumented in particular use relatively little health care.[30]

Being part of a stigmatized group can make immigrants reluctant to seek care because of concerns about poor treatment. If providers do not have adequate re-

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

Exhibit 2b
114

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

sources to serve immigrant groups, longer waits and frustration affect both patients and providers. As noted earlier, immigrants and those with limited English proficiency are generally less satisfied with their care than U.S.-born or English-speaking populations. Further, immigrants are more likely than U.S.-born populations to report discrimination in health care.[31] Perceptions of being discriminated against can reinforce feelings of stigmatization and lead to decreased use of health services in the future.

PRWORA has contributed to the stigmatization of certain immigrant groups and their resultant social stress. In essence, this law created two categories of immigrants—the "deserving" and the "undeserving"—and exacerbated differences between undocumented and legal immigrants; among different types of legal immigrants; and between legal immigrants and naturalized citizens. Although Congress later restored some benefits to elderly and disabled immigrants and legal immigrant children either already receiving these benefits or in the country at the time of PRWORA's enactment, this action might have contributed to the idea that some immigrant subgroups are more deserving than others.

In addition, PRWORA's devolution of federal responsibility for determining eligibility to the state level has led to large variations across state safety nets for noncitizen immigrants; coverage for immigrants tends to be more generous in states with large immigrant populations, strong safety nets, and higher per capita income.[32] However, even in states that have preserved eligibility, PRWORA seems to have diminished immigrants' enrollment in safety-net programs, which suggests confusion, fear, and a "chilling effect" whereby even eligible immigrants are discouraged from applying for or using publicly funded health coverage or services.[33] This fear revolves around concerns over the possibility of deportation for undocumented immigrants and their families, or the possibility that immigrants who seek health care might be putting future security (for example, residency or citizenship applications) at risk. The administration has clarified that receipt of food stamps, Medicaid, or SCHIP will not jeopardize immigrants' applications for naturalization, but concerns remain.

## Implications For Health

There is evidence that most immigrants, at least those who are young and come to the United States primarily for work, are relatively healthy and often experience better health outcomes, including lower mortality, than their U.S.-born counterparts.[34] However, immigrants' health appears to deteriorate over time in the United States and with increasing acculturation, and their health indicators approach those of native-born populations. Several factors may account for this, including adoption of unhealthy habits, living in unhealthy environments, and regression to the mean of a group that had better-than-average health upon arrival to the United States. However, poor access to care is likely to be a risk factor, too. This includes reduced access to both personal medical services and public health

Exhibit 26
115

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

services and programs (for example, immunizations). Local public health delivery systems, often comprising multiple governmental agencies and private organizations, are known to perform unevenly across communities, with size of the system (measured by the population residing within the jurisdiction) and local health department spending the most important predictors of performance.[35] Public health systems in more rural areas, particularly those facing recent influxes of immigrants, are less well equipped to achieve high levels of performance. Poor access to and the poor performance of the health care and public health systems vis-à-vis immigrants have serious implications for the health of immigrants and their children, and, ultimately, for the health of the nation.

## Implications For Policy

The factors that render immigrants vulnerable to poor health care can be modified in part through policies that are widely relevant to disadvantaged populations, such as policies related to living wages, access to education, decent housing, and safe jobs. However, health policies targeted specifically to immigrants will also likely be needed. Here we focus on such policies.

■ **Policy options to reduce immigrants' vulnerability.** *Expand health insurance coverage.* First, given the relatively low rates of health insurance among undocumented and legal immigrants, policies are needed to expand access to health insurance and to community clinics and other care venues. Access can be addressed to a large extent by reauthorizing and increasing funding for programs such as SCHIP, which has been effective in maintaining coverage among immigrant children and their families post-PRWORA. A somewhat harder sell politically is extending eligibility to parents of children eligible for Medicaid and SCHIP, although a number of states have done this and have found that it increases enrollment among children as well.[36] Also useful would be increased funding for community health centers and expanded outreach efforts through trusted sources such as community-based organizations whose culturally competent staff can help immigrants navigate the often overly complex application procedures for Medicaid and SCHIP.

Policies might also aim to increase employer-based health insurance among immigrants. These are particularly relevant, since immigrants are much less likely than their U.S.-born counterparts to receive such insurance.[37] Policies could include employer mandates that make insurance more affordable for employees, as well as educating those eligible about the value of insurance.

*Address limited English proficiency.* Second, because issues related to English proficiency remain an important source of vulnerability among immigrants, there is likely a sizable benefit from broader implementation and enforcement of CLAS standards and the expansion of Medicaid benefits to cover interpreter services in the forty states that do not do so. California's regulations provide one example of how implementation can be achieved. Further, researchers and community activists advocate for the use of Medicaid funds for community-based health promoters

Exhibit 26
116

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

that can reach underserved populations, especially immigrants. Finally, since language-concordant providers are generally preferable to interpreters, long-term solutions include investing in medical education of bilingual people or offering financial incentives such as additional pay for bilingual staff members.

*Expand and strengthen the safety net.* Third, policies to help build and support the safety-net infrastructure need to take into account the expansion of immigrant populations in many new destinations across the country, including places without the resources typical of large urban centers. Indeed, many of the new destinations for immigrants are in states with more-restrictive Medicaid policies, fewer interpreters and language-concordant providers, and weaker public health systems. Because of these disparities, it has been suggested that additional support is needed to increase the long-term viability of the safety net in these areas. Although private philanthropy has made contributions in some of these destinations, most communities view immigration as a national rather than a local issue. This perspective suggests a federal role in improving services for this population, whether by strengthening the safety net (such as building and staffing more community health centers) and public health systems, by developing health-promoting capabilities and resources within immigrant communities, or by expanding insurance coverage to enable immigrants to make better use of health care services.

*Revise PRWORA.* Finally, the immigrant provisions of PRWORA, which restrict access to government-sponsored or -subsidized health insurance, should be reconsidered. These policies were put in place to discourage future immigrants from coming to the United States; however, several studies have suggested that this end will not be achieved—that is, the largest driver of immigration and where immigrants settle within the United States is in fact the availability of jobs, not health and social services.[38] Moreover, continuing to restrict immigrants' access to Medicaid for primary care, while allowing their access to Medicaid for emergency services, creates perverse incentives for providers and patients alike.

■ **Intersection of health and immigration reforms.** The United States is in the midst of a heated debate on immigration policy, and a renewed debate on health care reform has also begun in anticipation of the 2008 presidential election. Both of these debates present an important opportunity to revisit health policies affecting immigrants and to craft solutions that are grounded in evidence about the vulnerability of immigrant groups and the potential consequences of lack of access for their health and the health of the nation. To do so, however, will require serious consideration of how various provisions of the immigration and health reform proposals might interact to affect immigrants' access to health care.

On the immigration reform side, what will temporary work visas and time limits on stays mean for immigrants' health care access and experiences? What are the implications for immigrants' health and mental health of provisions barring families from immigrating with a worker? Provisions that expand opportunities for legal residency and citizenship for undocumented immigrants already in the

Exhibit 26
117

country may go the farthest in the long run to expand immigrants' access to health insurance and care. However, when accompanied by steep financial and other costs, these opportunities may be unaffordable for low-income immigrants. Further, unless PRWORA's immigrant restrictions are repealed, newer immigrants will face the same challenges getting publicly funded health insurance.

On the health reform side, the most concrete proposals have so far emerged at the state rather than the national level. The Massachusetts legislature approved a plan in 2006 that combines elements of an individual mandate and an employer mandate to achieve universal coverage, although state assistance for low-income residents excludes undocumented immigrants. California Gov. Arnold Schwarzenegger has proposed a plan that also stresses an individual mandate but would extend Medi-Cal (California Medicaid) and Healthy Families (California SCHIP) to all uninsured children below 300 percent of poverty, regardless of residency status, and would offer Medi-Cal to legal resident adults with incomes below 100 percent of poverty, regardless of whether they have children (currently, only adults with children are eligible). Individual mandates are likely to be more effective in increasing coverage among the uninsured when they are accompanied by subsidies or low-cost health insurance options for low-income residents. However, when these subsidies are restricted to citizens and only certain types of immigrants (for example, legal permanent residents), they will probably not go very far in covering more immigrants. Employer mandates, although more difficult politically, will likely go much farther, because most immigrants work (and work for employers less likely to offer subsidized health insurance) and because the provisions of PRWORA do not apply to employer-sponsored insurance.

These state-level health reform policies—whether through an individual mandate, an employer mandate, expansion of publicly funded insurance, or a combination of these—provide a type of laboratory for understanding how different policies affect immigrants' health care experiences and, subsequently, their health status. Tracking these changes and their implications for access, quality, and cost of care for immigrants will be important if we are to make informed policy decisions in the future.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*This manuscript was supported in part by RAND Health's Comprehensive Assessment of Reform Options (COMPARE) Initiative, which receives funding from a consortium of sources including RAND's corporate endowment, individual donors, corporations, foundations, and other organizations. José Escarce was supported by an Investigator Award in Health Policy Research from the Robert Wood Johnson Foundation and a grant from the Russell Sage Foundation. The authors also thank Kristin Leuschner for her helpful comments on the manuscript, as well as Alexis Huynh and Lizeth Bejarano for their assistance with the manuscript.*

**NOTES**

1.   L.A. Aday, *At Risk in America: The Health and Health Care Needs of Vulnerable Populations in the United States* (San Francisco: Jossey-Bass, 2001); and J.H. Flaskerud and B.J. Winslow, "Conceptualizing Vulnerable Populations Health-Related Research," *Nursing Research* 47, no. 2 (1998): 69–78.

2.   R. Capps and J.S. Passel, *The New Neighbors: A User's Guide to Data on Immigrants in U.S. Communities* (Washing-

Downloaded from http://content.healthaffairs.org/ by *Health Affairs* on April 3, 2016 by HW Team

Exhibit 26

118

Downloaded from http://content.healthaffairs.org/ by Health Affairs on April 3, 2016 by HW Team

ton: Urban Institute, 2003).

3. L.J. Larsen, "The Foreign-Born Population in the United States: 2003," Current Population Reports no. P20-551, August 2004, http://www.census.gov/prod/2004pubs/p20-551.pdf (accessed 20 June 2007).

4. Only 9 percent of undocumented immigrants were from Asia, 6 percent from Europe and Canada, and 4 percent from Africa. See J.S. Passel, *Unauthorized Migrants: Numbers and Characteristics* (Washington: Pew Hispanic Center, 2005).

5. M. Fix, W. Zimmerman, and J.S. Passel, *The Integration of Immigrant Families in the United States* (Washington: Urban Institute, 2001).

6. M. Fix and J.S. Passel, *The Scope and Impact of Welfare Reform's Immigrant Provisions* (Washington: Urban Institute, 2002).

7. J.W. Lucas, D.J. Barr-Anderson, and R.S. Kington, "Health Status, Health Insurance, and Health Care Utilization Patterns of Immigrant Black Men," *American Journal of Public Health* 93, no. 10 (2003): 1740–1747; and J.S. Jackson et al., "Use of Mental Health Services and Subjective Satisfaction with Treatment among Black Caribbean Immigrants: Results from the National Survey of American Life," *American Journal of Public Health* 97, no. 1 (2007): 60–67.

8. Larsen, "The Foreign-Born Population in the United States"; and U.S. Bureau of the Census, Special Tabulations Program, Table FBP-1, "Profile of Selected Demographic and Social Characteristics: 2000, Population Universe: People Born in Africa, Geographic Area: UNITED STATES," http://www.census.gov/population/cen2000/stp-159/STP-159-africa.pdf (accessed 18 June 2007).

9. M. Niedzwiecki and T.C. Duong, *Southeast Asian American Statistical Profile* (Washington: Southeast Asia Resource Action Center, 2004).

10. For differences among immigrant subgroups, see D.P. Goldman, J.P. Smith, and N. Sood, "Legal Status and Health Insurance among Immigrants," *Health Affairs* 24, no. 6 (2005): 1640–1653; and O. Carrasquillo, A.I. Carrasquillo, and S. Shea, "Health Insurance Coverage of Immigrants Living in the United States: Differences by Citizenship Status and Country of Origin," *American Journal of Public Health* 90, no. 6 (2000): 917–923.

11. For example, foreign-born non-Hispanic black men have significantly higher rates of uninsurance than U.S.-born black and white men, even after employment status, income, and overall health status are controlled for. See Lucas et al., "Health Status."

12. For example, see Z.J. Huang, S.M. Yu, and R. Ledsky, "Health Status and Health Service Access and Use among Children in U.S. Immigrant Families," *American Journal of Public Health* 96, no. 4 (2006): 634–640; and L. Ku and S. Matani, "Left Out: Immigrants' Access to Health Care and Insurance," *Health Affairs* 20, no. 1 (2001): 247–256.

13. For example, see M.L. Berk et al., "Health Care Use among Undocumented Latino Immigrants," *Health Affairs* 19, no. 4 (2000): 51–64; and K.E. Lasser, D.U. Himmelstein, and S. Woolhandler, "Access to Care, Health Status, and Health Disparities in the United States and Canada: Results of a Cross-National Population-Based Survey," *American Journal of Public Health* 96, no. 7 (2006): 1300–1307.

14. It is estimated that 60 percent of Caribbean-born black immigrants speak English at home, and 60 percent of African-born black immigrants report that their English is "very good." F. Dodoo, "Assimilation Differences among Africans in America," *Social Forces* 76, no. 2 (1997): 527–546).

15. For example, see N. Ponce, R.D. Hays, and W.E. Cunningham, "Linguistic Disparities in Health Care Access and Health Status among Older Adults," *Journal of General Internal Medicine* 21, no. 7 (2006): 786–791; K.P. Derose and D.W. Baker, "Limited English Proficiency and Latinos' Use of Physician Services," *Medical Care Research and Review* 57, no. 1 (2000): 76–91; S.M. Yu et al., "Parental English Proficiency and Children's Health Services Access," *American Journal of Public Health* 96, no. 8 (2006): 1449–1455; and E.A. Jacobs et al., "Limited English Proficiency and Breast and Cervical Cancer Screening in a Multiethnic Population," *American Journal of Public Health* 95, no. 8 (2005): 1410–1416.

16. N.A. Ponce et al., "Is There a Language Divide in Pap Test Use?" *Medical Care* 44, no. 11 (2006): 998–1004.

17. D.W. Baker, R. Hayes, and J.P. Fortier, "Interpreter Use and Satisfaction with Interpersonal Aspects of Care for Spanish-Speaking Patients," *Medical Care* 36, no. 10 (1998): 1461–1470; and A.R. Green et al., "Interpreter Services, Language Concordance, and Health Care Quality: Experiences of Asian Americans with Limited English Proficiency," *Journal of General Internal Medicine* 20, no. 11 (2005): 1050–1056.

18. E. Wilson et al., "Effects of Limited English Proficiency and Physician Language on Health Care Comprehension," *Journal of General Internal Medicine* 20, no. 9 (2005): 800–806.

19. V. Grubbs et al., "Effect of Awareness of Language Law on Language Access in the Health Care Setting,"

Exhibit 26
119

Downloaded from http://content.healthaffairs.org/ by Health Affairs on April 3, 2016 by HW Team

*Journal of General Internal Medicine* 21, no. 7 (2006): 683–688; and L. Ku and G. Flores, "Pay Now or Pay Later: Providing Interpreter Services in Health Care," *Health Affairs* 24, no. 2 (2005): 435–444.

20. J. Yoon, K. Grumbach, and A.B. Bindman, "Access to Spanish-Speaking Physicians in California: Supply, Insurance, or Both," *Journal of the American Board of Family Practice* 17, no. 3 (2004): 165–172.

21. Office of Minority Health, U.S. Department of Health and Human Services, *National Standards for Culturally and Linguistically Appropriate Services in Health Care* (Washington: IQ Solutions, 2001).

22. This threshold ranges from 0.75 percent for plans with more than 1,000,000 members to 5 percent for plans with fewer than 300,000 members. See California Department of Managed Health Care, "Language Assistance Now a Reality for Limited-English Speaking California HMO Members," Press Release, 1 March 2007, http://www.dmhc.ca.gov/library/reports/news/pr_language_access_regs_3-1-07.pdf (accessed 1 June 2007).

23. N. Kaushal and R. Kaestner, "Welfare Reform and Health Insurance of Immigrants," *Health Services Research* 40, no. 3 (2005): 697–721.

24. E. Fuentes-Afflick et al., "Use of Prenatal Care by Hispanic Women after Welfare Reform," *Obstetrics and Gynecology* 107, no. 1 (2006): 151–160.

25. Fix et al., *The Scope and Impact of Welfare Reform's Immigrant Provisions.*

26. P. Cunningham et al., *Health Coverage and Access to Care for Hispanics in 'New Growth Communities' and 'Major Hispanic Centers,'* September 2006, http://www.kff.org/uninsured/upload/7551.pdf (accessed 15 November 2006).

27. P.J. DeShaw, "Use of the Emergency Department by Somali Immigrants and Refugees," *Minnesota Medicine* 89, no. 8 (2006): 42–45.

28. M.C. Waters and T.R. Jiménez, "Assessing Immigrant Assimilation: New Empirical and Theoretical Challenges," *Annual Review of Sociology* 31 (2005): 105–125.

29. For example, see A.B. Staiti, R.E. Hurley, and A. Katz, "Stretching the Safety Net to Serve Undocumented Immigrants: Community Responses to Health Needs," Issue Brief 104 (Washington: Center for Studying Health System Change, 2006), 1–4; and L.A. Blewett, M. Casey, and K.T. Call, "Improving Access to Primary Care for a Growing Latino Population: The Role of Safety Net Providers in the Rural Midwest," *Journal of Rural Health* 20, no. 3 (2004): 237–245.

30. D.P. Goldman, J.P. Smith, and N. Sood, "Immigrants and the Cost of Medical Care," *Health Affairs* 25, no. 6 (2006): 1700–1711.

31. For example, see Lasser et al., "Access to Care"; D.S. Lauderdale et al., "Immigrant Perceptions of Discrimination in Health Care: The California Health Interview Survey 2003," *Medical Care* 44, no. 10 (2006): 914–920; and Yu et al., "Parental English Proficiency."

32. W. Zimmerman and K.C. Tumlin, *Patchwork Policies: State Assistance for Immigrants under Welfare Reform* (Washington: Urban Institute, 1999).

33. Kaushal and Kaestner, "Welfare Reform and Health Insurance of Immigrants."

34. G. Jasso et al., "Immigrant Health-Selectivity and Acculturation," in *Critical Perspectives on Racial and Ethnic Differences in Health in Late Life,* ed. N. Anderson, R. Bulatao, and B. Cohen (Washington: National Academies Press, 2004), 227–266.

35. G.P. Mays et al., "Availability and Perceived Effectiveness of Public Health Activities in the Nation's Most Populous Communities," *American Journal of Public Health* 94, no. 6 (2004): 1019–1026; and G.P. Mays et al., "Institutional and Economic Determinants of Public Health System Performance," *American Journal of Public Health* 96, no. 3 (2006): 523–531.

36. L. Dubay and G. Kenney, "Expanding Public Health Insurance to Parents: Effects on Children's Coverage under Medicaid," *Health Services Research* 38, no. 5 (2003): 1283–1301; and A. Davidoff et al., "The Effect of Parents' Insurance Coverage on Access to Care for Low-Income Children," *Inquiry* 40, no. 3 (2003): 254–268.

37. For example, see T.C. Buchmueller et al., "Immigrants and Employer-Sponsored Health Insurance," *Health Services Research* 42, no. 1, Part 1 (2007): 286–310; and N.S. Shah and O. Carrasquillo, "Twelve-Year Trends in Health Insurance Coverage among Latinos, by Subgroup and Immigration Status," *Health Affairs* 25, no. 6 (2006): 1612–1619.

38. Berk et al., "Health Care Use among Undocumented Latino Immigrants"; and Fix et al., *The Scope and Impact of Welfare Reform's Immigrant Provisions.*

Exhibit 26
/20

61

Pollock, Newbold, Lafrenière, & Edge

# Discrimination in the Doctor's Office: Immigrants and Refugee Experiences

## Critical Social Work 13(2)

Grace Pollock,[1] K. Bruce Newbold[2], Ginette Lafrenière[1], and Sara Edge[2]

[1] Wilfrid Laurier University; [2] McMaster University

*Acknowledgements*

The authors acknowledge the financial support of Citizenship and Immigration Canada (CIC), Ontario Branch. The research and recommendations are the responsibility of the authors of the report and do not necessarily reflect the views of CIC

Abstract

There is a growing awareness of the role played by discrimination in the provision of health care services to immigrants and refugees across Canada. Very little research, however, has explored how perceived discrimination influences patient relationships with health care providers and the health care system in Ontario. This qualitative study documents perceptions of discrimination from a service user perspective in five small and medium-sized Ontario cities. Results of 26 interviews with immigrants and refugees highlight the complex nature and impacts of discrimination in shaping newcomer experiences as a basis for developing effective public policy in health care and social services.

*Key Words:* immigration, immigrants, discrimination, Canada

Exhibit 27

121

Pollock, Newbold, Lafrenière, & Edge

Newcomers represented two-thirds of the total population growth in Canada over the past ten years, with approximately 250,000 admitted each year of which 13 % are refugees (Citizenship and Immigration Canada, 2011). Foreign-born and visible minorities are anticipated to represent 28% and 32%, respectively, of the Canadian population by 2031 (Statistics Canada, 2010). While there is a growing body of research on the health of newcomers, there remains a paucity of research on how discrimination affects newcomers' health status, care experiences, and service utilization behaviours, despite over ten years of advocacy calling for the recognition of discrimination as a key determinant of health (e.g. Access Alliance, 2005; Hyman, 2009; Krieger & Sidney, 1998). These knowledge gaps inhibit comprehensive understandings of population health patterns and conditions across Canada, undermine Canada's mandate of universal access to health care services, and impede efforts to reduce social inequalities.

On average, immigrants experience rapidly declining health status after arrival in Canada and other countries such as the United States and Australia (De Maio & Kemp, 2010; McDonald & Kennedy, 2004). Known as the "healthy immigrant effect," the health advantage enjoyed by newcomers at the time of arrival is quickly eroded due to a number of effects, including the stress of acculturation and difficulty navigating the host country's health care system (Newbold & Danforth, 2003). Barriers to health care, including language, economic, geographic, socio-cultural, knowledge, and transportation barriers, have been widely identified within the literature as inhibiting use of the health care system by immigrants despite increased need for care (Ahmed, Stewart, Teng, Wahoush, & Gagnon, 2008; Asanin &Wilson, 2008; Dunn & Dyck, 2000; Gagnon, 2002; Lawrence & Kearns, 2005; McKeary & Newbold, 2010). Missing from many of these analyses is the potential role of discrimination on the part of health and social service providers and their staff.

The purpose of this paper is to report on immigrant and refugee perceptions of discrimination in health care services in order to further an understanding of the potential impacts of discrimination in the health care environment in five southern Ontario communities. Do immigrants and refugees perceive discrimination when they use health care services? If so, how might these perceptions affect the use, quality, and accessibility of health care services and relationships with health care providers? What changes could be made to health care provision and public policy in order to address the concerns of immigrants and refugees with respect to discrimination and improve health outcomes for New Canadians?

## Discrimination, Providers, and the Health of Newcomers

Discrimination takes on many forms at a variety of scales, from conscious and unconscious interpersonal interactions between individuals, to more institutionally engrained practices occurring at the systemic level. It can be defined as any practice, judgment, and action that creates and reinforces oppressive relations or conditions that marginalize, exclude, and/or restrain the lives of those encountering discrimination (Hyman, 2009; Karlsen & Nazroo, 2002; Krieger & Sidney, 1998). Individuals and groups can be discriminated against based on race, ethnicity, language, religion, culture, and other characteristics (Access Alliance, 2007; Carrasco, Gillespie, & Goodluck, 2009).

Exhibit 27
122

Pollock, Newbold, Lafrenière, & Edge

In the health care setting, documented encounters of perceived discrimination include incidents of insensitive, unfriendly, or ignorant treatment from providers, to racial slurs, stereotyping, and receipt of inferior care (Access Alliance, 2005; Beiser, Noh, Hou, Kaspar, & Rummens, 2001; Johnson et al., 2004; Magoon, 2005; Noh, Kaspar, & Wickrama, 2007; Stewart, Gagnon, Dougherty, Saucier, & Wahoush, 2008; Wahoush, 2009; Wang, 1997; Women's Health in Women's Hands, 2003). In some cases, for instance, immigrant women reported instances of health care providers becoming frustrated or angry when asked to acknowledge or respect religious or cultural beliefs and needs, such as a preference for female providers or for privacy and remaining clothed (Reitmanova & Gustafson, 2008). A study examining barriers to health care for refugees in Canada found that some health providers were unwilling to accept refugees as patients, with refugees perceived as more challenging due to complex health needs, linguistic barriers, and/or complicated insurance coverage schemes that can delay payment for services delivered (McKeary & Newbold, 2010). The limited evidence that is available suggests that the majority of discriminatory encounters are generally subtle, elusive or systemic relative to overt verbal and/or physical abuse.

Research demonstrating discrimination's detrimental effects upon health primarily focuses on the experiences of visible minorities and identifies potential pathways through which discrimination impacts health (e.g. disproportionate exposure to hazardous environments, psychosocial stressors, inadequate medical care, economic deprivation, lack of opportunities, social exclusion, etc.) (Branscombe, Schmitt, & Harvey, 1999; Harris et al., 2006; Karlsen, Nazroo, McKenzie, Bhui, & Weich, 2005; Kobayashi, Prus, & Zhiqui, 2008; Krieger, 2001; Krieger & Sidney, 1998; Nazroo, 2003; Taylor & Turner, 2002). Immigrant and newcomer service providers purport that discrimination inhibits educational and occupational achievement, compromises living conditions, reduces health status, and impedes access to health care services (Access Alliance, 2005, 2007; Fenta, Hyman, & Noh, 2006; Hyman, 2009; Kafele, 2004; Women's Health in Women's Hands, 2003). Adverse health outcomes associated with discrimination include poor physical health (e.g. self-rated, hypertension, cardiovascular, and respiratory), compromised mental health (e.g. psychological distress, depression, and anxiety), and risky lifestyle behaviours (e.g. smoking and drinking) (Beiser & Hou, 2006; Hyman, 2009; Krieger, 1990; Moghaddam, Taylor, Ditto, Jacobs, & Bianchi, 2001; Noh, Beiser, Kaspar, Hou, & Rummens, 1999; Noh & Kaspar, 2003; Williams, Neighbors, & Jackson, 2003). Whether cases of discrimination are understood as such, perceived negative experiences with health care providers can discourage individuals from seeking or following advice, inhibit meaningful patient/provider relationships, and contribute to feelings of isolation and despair (Beiser et al., 2001; Johnson et al., 2004; Magoon, 2005).

The increasing calls for cultural competency within the health care system suggest that health care professionals (along with patients) are aware of the potential for discrimination (Betancourt, Green, & Carillo, 2003; Brach & Fraser, 2000; Carillo, Green, & Betancourt, 1999; Mulvihill, Mailloux, & Atkin, 2011; Oxman-Martinez, Abdool, & Loiselle-Leonard, 2001). The intent of cultural competency training is to assist health and social service professionals reflect upon their own and others' cultural beliefs, behaviours, and communication strategies to enable practice skills that facilitate non-discriminatory care (Guilfoyle, Kelly, & St. Pierre-Hansen, 2008; Magoon, 2005; Reitmanova & Gustafson, 2008). Indeed, inadequate cultural competency and respect for alternative health values and practices are commonly cited barriers to health care

Exhibit 27

123

Pollock, Newbold, Lafrenière, & Edge

amongst racialized minority groups in Canada (Carrasco et al., 2009; Fenta et al., 2006; Kafele, 2004; Newbold, 2009; Noel, 1996; Oxman-Martinez et al., 2001; Reitmanova & Gustafson, 2008; Spitzer, 2004; Wang, 1997). Nevertheless, studies on provider attitudes toward immigrants and refugees and implications for differences in care remain very rare (Guilfoyle et al., 2008).

## Methodology

This qualitative research is broadly set within the southern Ontario communities of Hamilton, Guelph, Cambridge, and the Kitchener-Waterloo region, which lie slightly to the west and northwest of Toronto, Canada's largest immigrant reception city. As "second-tier" immigrant centers, the area's immigrant population is growing rapidly, owing both to primary settlement as well as to secondary settlement. Hamilton, for instance, attracts in excess of 3,000 immigrants and refugees each year, while Kitchener-Waterloo receives slightly less than 3,000 new arrivals each year (Citizenship and Immigration Canada, 2011). Prospective study participants were identified either through self-selection in response to recruitment posters distributed to various service agencies or through existing informal networks involving the researchers' contacts in the settlement service sector.

In total, 26 semi-structured, in-depth interviews were conducted with adult immigrant and refugee newcomers. The researchers invited participants to identify comfortable locations in their home cities where the interviews took place (e.g., coffee shops, service agencies, workplaces, university campus, or participants' homes). Designed to gauge perceptions of racism and discrimination in the health care environment, the interview guide included questions to generate a demographic profile of each participant and open-ended questions regarding his or her experiences with health care services and providers. Of the 26 individuals interviewed, seven were male and 19 were female. Nine participants self-identified as Middle Eastern, six as African, four as Latin American, three as South Asian, three as eastern European, and one as Caribbean. The age range for participants spanned 25 to 60 years old. Participants' proper names and other identifiers were converted to pseudonyms or removed from data to ensure confidentiality.

A community-based organization studying immigrant health care service gaps was invited to provide input on the interview script so that the project might assist the community's information needs and advocacy endeavors. Standard university ethics guidelines were followed and approved by the University Research Ethics Boards affiliated with the researchers' home institutions. Interpretation of collected data used open coding methods to produce descriptive and thematic codes which were then organized into a coding framework based on thematic patterns, with each theme being further divided into salient subcategories (Lincoln, Lynham, & Guba, 2011). Analysis followed grounded theory methods: constant comparison within and between accounts, with attention paid to the conditions under which phenomena arise and to the consequences associated with the phenomena (Charmaz, 2003, 2011). Grounded theory does not test or apply pre-formed theoretical assumptions; rather, it employs inductive and iterative processes and a systematic approach to qualitative research in order to generate a theory grounded in the lived experiences of the research participants and carefully deciphered through the researchers' immersion in data collection and analysis (Charmaz, 2011; Creswell, 2007). Data analysis resulted in the identification of the four key thematic areas discussed below.

Ex libit 27
124

Pollock, Newbold, Lafrenière, & Edge

## Results

When asked directly if they had "experienced racial discrimination or been treated unfairly by a health care worker or other staff in a hospital or clinic," 17 out of 26 participants replied they had personally experienced discrimination at least one time when interacting with a health care practitioner or clinic staff in Ontario. Instances of discrimination ranged in severity from overt forms (e.g. verbal abuse) to more subtle forms (e.g. rudeness). Reported incidents were broadly categorized in terms of refusal of health care; staff acting as gatekeepers; and communication barriers and cultural insensitivity. Responses to perceived discrimination also emerged as a key theme during data interpretation.

### Refusal of Health Care

Despite Canada's universal health care system, it was not uncommon to hear cases of refusal of medical services on the basis of immigrant or refugee status. For instance, participants reported being refused as new patients for a family practice. One participant, Lianne, was trying to find a family doctor and called an office where the receptionist asked her, "Are you an immigrant?" When Lianne replied "yes," the receptionist said, "[the doctor] doesn't have space" and hung up the phone. Lianne called the Ministry of Health to complain about the incident. She was "shocked" and "miserable" as a consequence of what she felt indicated "serious discrimination against immigrants." Like Lianne, a number of other participants were concerned that doctors labeled them as "immigrant" patients and turned away such patients because they viewed them as too time-consuming, emotionally overwrought, or exceptionally demanding.

With respect to government-sponsored refugees, Emily explained how she had confronted family doctors who refused to take refugees as patients. Refugees, whose health expenses are covered by the Interim Federal Health Program (IFHP) rather than provincial health insurance plans, experienced "exclusion just because of different coverage" (Emily). Emily had felt it necessary to advocate on behalf of refugee newcomers by informing reluctant doctors that denying service was not acceptable and would be reported to the Ontario College of Physicians and the Ministry of Health. In another case, Jessica, unable to find mental health support in her own community sought assistance through a social service agency in another city only to be told it was "not equipped to provide services." She felt that she was denied service because she is a "visible minority person" and the agency's mental health professionals "don't know how to treat women from other countries." Jessica subsequently filed a complaint with the Ontario Human Rights Commission.

### Staff as Gatekeepers

Lianne's account of being refused health services by a clinic receptionist points to the potential for staff to act as gatekeepers to the system. The initial screening question posed by the receptionist ("Are you an immigrant?") would have been made on the basis of Lianne's verbal expression and/or accent when speaking English, a form of discrimination commonly identified by participants. Participants also noted other forms of differential treatment. James, a black male, reported being treated with suspicion at a walk-in clinic when he forgot his health card at home. The white woman ahead of him in line had also forgotten her health card, but she was not denied

Exhibit 27
125

66

Pollock, Newbold, Lafrenière, & Edge

service. James, however, was required to go home and return with his health card. He stated: "I didn't get the same treatment….When you're an immigrant, it's assumed you don't qualify for health care…you're not a human being."

Emily and Gail reported difficulties in booking appointments over the phone to see their family doctor. Gail stated, "[it is] very hard to get an appointment to see the doctor, the secretary acts as gatekeeper and is not friendly." Emily recounted how her daughter was very sick and she had left messages on the doctor's office answering machine, but the receptionist didn't call back. When Emily and her daughter walked into the office, the receptionist didn't greet them but instead stated "you don't have any appointment." Emily responded by confronting the receptionist for being a "rude person," and the receptionist's behaviour changed. The receptionist began to listen and respond more politely. Emily's daughter was able to see the doctor. Emily suspected the receptionist's rude behaviour was "somehow racist" because of the change that happened when Emily confronted her.

## Communication Barriers and Cultural Insensitivity

A newcomer's language ability, accent and cultural differences were seen as potential sources of discriminatory behaviour not only on the part of clinic staff, but also on the part of health care providers. Nadia, for example, told a story involving two hospital nurses who had used a tone of voice that was "quite stern and seemed angry" when she had asked questions. She explained, "Maybe they thought me and my husband were uneducated, didn't have language skills." When Nadia explained that she could speak English to the nurse, the nurse became much friendlier. Nadia felt that initially the "nurses discriminated based on accent." Other participants reported that they spoke English with an accent and were treated like they were "stupid," "deaf," "mentally disabled," their "IQ level is lower" or they were "speaking gibberish" (Gail, Sophia, Lianne, Janna). Many participants felt that doctors were often "abrupt" or "aloof" and did not listen attentively when they communicated their health concerns (Abby, Amanda). Three participants explained how their health care providers' behaviour became friendlier immediately after they made known their education level or professional credentials, or after indicating members of their immediate families were health care professionals (Nadia, Janna, Lianne). These accounts further underscore the need for exploring experiences among newcomers who face increased barriers on the basis of language skills, education and socioeconomic status.

Inadequate communication was viewed a major obstacle to accessing health care services, while also compromising the quality of care by disrupting the clear exchange of information required for proper diagnosis and treatment. Poor listening was connected with doctors also not taking the time necessary to provide full medical explanations to newcomer patients less fluent with English. A participant named Mary asked several questions regarding hospital procedures surrounding childbirth. In response, she felt the obstetrician was "sometimes quite aggressive, other times sarcastic about my questions." Mary concluded the obstetrician was

> …applying one system that presumably fits everyone, regardless of faith, culture, upbringing, etc….[The doctor] assumed that I know the system. She never explained. Going to hospital was frightening, unfamiliar to me.

Exhibit 27
126

Pollock, Newbold, Lafrenière, & Edge

Maria, by contrast, attributed more intention to doctors' failure to provide information, explaining that "because they know I'm not from here, they don't tell me all I need to know....Doctors never treat me bad, but at the end of the day, it's discrimination—not the same treatment as Canadians."

Other participants were concerned that non-English speakers, who would then not be equipped to follow the doctor's instructions, might not understand issues involving complex medical terminology (Janna, Julia). Participants were also concerned about the risk of miscommunication and inappropriate medical care due to the deterioration of the patient's English fluency under stress. Danielle explained how patients who seek health services when English is not their first language can experience additional stress:

> *I think even mentally, emotionally, you're then, not only are you then sick physically but you're struggling to know what just happened to you. Going to the hospital, you feel lost...The whole experience before you even get to talk to the doctor can be overwhelming when you don't know the language.*

Under such circumstances, a person might repeat the wrong expression, know they are being misunderstood and feel unable to correct the communication problem (Kate). Some participants who struggled with speaking English noted feeling a sense of frustration, even despair, particularly when the doctor's mannerisms and communication style felt "very fast" or "rushed," as if "they don't have time to listen" (Maria). Gail stated, "I felt like I was a burden." Emily recalled being a cultural interpreter in an instance when the doctor interviewed a patient hastily and "left the room in two minutes." She followed the doctor and said, "you need to listen." The doctor came back and sat down with the patient until the situation was addressed. Emily posed the question "what if no other person advocated for them?"

Participants expressed concern that communication barriers were linked to and exacerbated by cultural insensitivity on the part of health care providers. Julia felt a doctor's lack of awareness of cultural differences might result in mental health issues or issues of a sensitive or sexual nature not being addressed. Julia explained, for example, that "women in a multicultural society" with diverse "religions, beliefs, and cultures" may request to be examined by a female doctor. Gynecological exams and routine Pap tests, in particular, would be perceived as "hard on [the women] or avoided." Julia suggested that male family doctors would need to understand this and provide a referral. Participants expressed concern that cultural ignorance might lead to improper care for refugees from war torn countries or immigrants experiencing post-traumatic stress disorder (Jessica, Sophia, Julia). Janna recalled how a doctor's lack of knowledge about a patient's culture led to an instance when the patient stopped taking important blood pressure medication during a religious fast and ended up in hospital emergency. Danielle explained that doctors were attributed a tremendous degree of authority and deference in her culture, and she worried that patients such as her father would nod without actually understanding the doctor because they "don't want to bother the doctor." Consequently, pain or other symptoms might not be mentioned by the patient unless the doctor anticipates and addresses them in a sensitive manner.

Exhibit 27

127

Pollock, Newbold, Lafrenière, & Edge

Being judged too quickly by a health care provider on the basis of their cultural background was another issue raised by participants. Sophia said Canadian doctors appeared "scared" when caring for African-born female patients who had undergone female genital mutilation. She said some doctors "marginalize or stereotype" the women, while also prescribing for those patients unnecessary Caesarean sections because they don't know how to attend the women during childbirth. Other participants felt they had been quite clear when communicating with a doctor, but their concerns were still disregarded, sometimes resulting in serious mistreatment. For example, Jack explained how doctors and paramedics ignored his complaints of pain until he presented at the hospital emergency with acute appendicitis. Jack and another participant named Kate wondered if their words had been dismissed as exaggerated or "psychologically disturbed" because they spoke English with an accent or because their expressions differed from Canadian ones.

For several participants, a lack of cultural understanding was associated with depersonalized forms of health care - with refusing to engage people in ways that would "develop a relationship through understanding the context of the client." Jessica said she repeatedly encountered doctors who would not say her name. In one instance, hospital staff had decided to change her name, using an anglicized form instead of her own name. Another participant named Patricia said:

> one doctor even made fun of my last name and advised me to change my last name and make it shorter in Canada ... it was awful...Imagine doctor making fun of your name.

Mary, who described feeling "vulnerable" and threatened by a nurse's response to her, recounted another example of outright discrimination. Mary was wearing a head scarf when she presented at the hospital with severe pain following a surgical procedure. "The moment the nurse saw me, listened to my accent, the nurse cursed me and said the 'f' word...she said 'f— you. I know you guys very well.'" In response to the nurse's verbal abuse, Mary started to cry and said, "please don't be aggressive." The nurse apologized, and when Mary later spoke with hospital management to report the incident, the manager responded, "What do you want more than an apology?" Mary said the incident "left me with a very bitter experience... I wouldn't want to go to a hospital...still don't feel safe." Since that time, Mary explained that she stopped wearing a head scarf so as not to appear "visibly Muslim" because she felt that "Muslim women who leave home and go into the community become targets."

Participants also recounted examples of cultural stereotyping and discrimination against their country of origin. For example, one female participant who had been a victim of family violence in her country of birth was asked by a doctor, "Isn't that normal in your country?" Another participant said that doctors she met had "assumed there is no health care in Egypt." James said he encountered health care providers who believed there were "no competent doctors in Africa." James explained, "where you come from matters...we're the bottom of the food chain, black people." Mark, also born in Africa, said "because of your origin, you may go through more layers of health checks." He said "you feel like you are being treated as a foreigner, but...you don't have the experience of how they treat other clients, Canadian clients." Mark felt that some health care providers think "maybe because they're black... they may have, they may be more open to certain types of disease." James said he would be asked "derogatory"

Exhibit 27

128

Pollock, Newbold, Lafrenière, & Edge

questions by doctors that implied he "must be poor" or his "diet must be poor." He added, "they think you have AIDS....it makes you feel terrible." James explained that perhaps doctors who ask such questions "do it for the right reasons," but would benefit from "cultural sensitivity training." He wasn't sure how his interactions with doctors were influenced by the doctor's personal perceptions, training, media exposure or culture. Mark voiced similar concerns regarding doctors who assumed he was "diseased...[they] generalize as soon as they know you come from that part of the world." He explained that it was "not openly racism...it was the same for people from certain groups, not against you as an individual, but prejudice anyway."

### Responses to Discrimination

Participants articulated a range of responses to discrimination. Although some participants acknowledged they felt a doctor's inattentiveness to their expressed concerns was likely to compromise the quality of care they received, they did not necessarily equate such behaviours with discrimination (Janna, Sara, Martha). One participant said she had repeatedly encountered behaviour which she believed was "not really racism, but it's just racial ignorance." Nevertheless, she also commented that stereotypical judgments made her feel like health care providers were "not even seeing a human being" (Jessica). Another participant said subtle negative associations referring to his "background" made him feel that "even though a citizen, you're still an outsider" (James). One other participant stated unequivocally that "ignorance is a type of racism" (Emma).

Of the 17 participants reporting a discriminatory incident, nine had deemed an incident serious enough to report it to a higher authority, including filing a formal complaint. The fact that one third of our participants took such measures may be reflective of the education levels, language proficiency, or duration of residence within Canada of our particular sample. Most participants expressed uncertainty regarding their ability to determine if one or more incidents involved discrimination. Four participants became visibly distressed when speaking about the negative experiences they associated with health care providers. Lianne, for example, felt her family physician had provided only cursory treatment when told her husband was experiencing severe mental health issues, which eventually led to acute crisis and the need for emergency care:

> *I don't know how I can complain about* [the doctor], *how I can complain about the system, its missing parts.... It's really problematic. If doctor ignores somebody, it means it's going be bigger problem later. If the same day, if* [the doctor] *behave appropriately, my husband didn't go to the emergency and maybe he didn't get this kind of problem or something. We are not in safe hands, you know.*

Lianne was not alone among the participants when she articulated the worry and despair she felt in response to a particular incident.

Lianne and others also expressed uncertainty about attributing discriminatory intent to a doctor's behaviour rather than to dysfunctional aspects of the health care system. A participant named Mark, for example, indicated the difficulty he had with identifying whether a doctor's actions were discriminatory. Instead, Mark's primary concern was that he felt the current health care system too often failed to provide health care professionals with training that would create a

Exhibit 27

129

Pollock, Newbold, Lafrenière, & Edge

greater awareness of the stressors facing newcomers. Mark explained how a lack of patient-focused care has health impacts that can be particularly detrimental for immigrant and refugee patients:

> *Doctors have a huge responsibility in the system—they are objective, busy, short of resources. They don't realize when they hurt, rush people too quickly, they don't take time to look at service in a wider way, treat a person holistically. Most difficulty is with a lack of understanding of immigrant challenges, processes of immigration itself. People can't see it and don't want to know about it....[As an immigrant] you're fragile, there's frustration feeling included...all of these things that already put you in a situation where you're scared. It's a health issue, the stress attached to the particular situation. It can be missed....the first four to five years were the most difficult. There's nothing to prepare you, little information to prepare you for the health care system, how to navigate, what to expect.*

Along with Mark, several participants were unsure if the doctor's behaviour signaled a personal judgment against them, a broader systemic issue regarding lack of time allotted to patient care or a subtle form of discrimination against cultural/language differences. Many were equally uncertain regarding the measures that could be taken to hold the health care providers accountable.

Feeling intimidated or threatened by the attitudes or judgments expressed by health care providers led some participants to avoid seeking out health care services at all (Anne, Kate, Mary, Gail). Emily reported that the hostility of the doctor's office receptionist deterred her from trying to see her family physician and made her reluctant to seek health care services in general. Another participant stated, "I avoid my doctor as much as possible" (Danielle). Other participants felt that going to see a doctor was pointless, except in cases of medical emergency when they would typically use an urgent care facility (Maria, Amanda). Some participants who had a negative experience with a health care provider had discontinued contact with that particular provider, but had sought out health care services with a new provider, although finding a new family doctor for some proved to be a time-consuming and difficult task.

Many participants also described ways in which they had learned "self-advocacy" was necessary in the Canadian health care system (Patricia). Nadia explained how living in Canada for five years made her "feel confident to address issues." Reflecting the staff-as-gatekeepers issue, she explained how she had been speaking with receptionists at a doctor's office whom she felt "were brushing me off. I felt they weren't listening to me. Now I feel able to address this promptly." Another participant named Amanda explained that she had waited for over two years to have a painful health issue addressed. She was told by the doctor who eventually treated her that it "should have been taken care of" sooner. Consequently, Amanda decided to "be my own advocate" and requested a referral to a specialist who shared her cultural background. Other participants enlisted friends or family to advocate for them with health care providers.

It is important to note that not all encounters with the health care system were negative. Participants, for example, mentioned cases when doctors had acted as allies to refugee families by providing care in exceptional circumstances or by helping newcomers navigate the health care

Exhibit 27
130

Pollock, Newbold, Lafrenière, & Edge

system and access appropriate care (Emily, Jessica). One participant was pleased that her family doctor "made an effort to pronounce my name properly" and that her dentist had "corrected my name pronunciation with the assistant" (Emily). Some health care providers were also viewed as being aware and openly critical of systemic barriers faced by immigrant newcomers (Mark); and while clinic staff, particularly those who book appointments, may act as an obstacle or deterrent to accessing care, it was commonly felt those encounters did not impact the quality of care provided by health care professionals.

Many participants felt that seeing a family physician who spoke their language and/or shared their culture was beneficial to their self-confidence and the quality of care they received (Lianne). They felt a shared background fostered good communication and mutual understanding, while also providing "continuity of care" (Lily). Anne, for example, had found a family doctor who shared her cultural background and was also able to access community-based services that she felt were personally supportive.

> *Going to a Polish doctor in Toronto makes things a lot easier for me. Also, accessing drop-in services at a place that is anti-oppressive and queer positive makes it easier to use health services. ... [But] having the time to seek out health care that is a greater distance from me makes it difficult to access these services. It is also difficult to access services because the services that I am comfortable using are often under-staffed and over-booked.*

Like Anne, other participants reported a lack of services available within their own communities. Consequently, they were travelling to other cities to access health care, including returning to country where they had previously lived (Jessica, Alex, Sophia, Emma, Lily). Many also sought alternative health care services from homeopathic, naturopathic or traditional Chinese medical practitioners (Alex, Danielle, Julia, Emily, Emma). These participants expressed that they found the "preventative" and "holistic" approach used by these health care providers was less alienating and more compatible with their cultural values than Western-style "curative" medicine that focused mostly on physical symptoms (Emily, Lisa). A number of participants endorsed family health teams, nurse practitioners, midwifery services and community health centres in Ontario, which they felt used a more holistic framework for addressing people's health care needs (Julia, Maria, Emily, and Lisa).

### Discussion

Incidents clearly identified as discriminatory were usually isolated events. Yet, the stress of a single incident seemed to increase levels of uncertainty and distrust regarding health care providers and continued to affect some participants' health and health-seeking behaviours. Participants noted, for example, their decreased use of health care, except in exceptional (i.e., emergency) situations, which could imply much costlier health interventions. Study results therefore echo existing research that discriminatory incidents potentially contribute to overall poorer health (Ng, Wilkins, Gendron, & Berthelot, 2008), lower quality care (i.e., Elliott & Gillie, 1998), and lower levels of health care use within the immigrant and refugee population (i.e., Pérez, 2002). The research also demonstrates how immigrants to Canada are less likely to

Exhibit 27

131

Pollock, Newbold, Lafrenière, & Edge

use preventative health care (Woltman & Newbold, 2007), and that discrimination could be one reason why this is so.

In addition to corroborating the negative health implications associated with discrimination, this study lends support to prior research documenting patient uncertainty as to whether differential treatment stems from their own personal attributes/inadequacies, prejudicial attitudes on the part of service providers, or some other factor (Noh et al., 2007; Wang, 1997). These studies suggest such ambiguity invokes additional stress and confusion for patients when determining how to appropriately respond. Difficulty with defining and interpreting behaviour as discriminatory was also evident among this study's participants, some of whom expressed reluctance to state unequivocally that they had experienced discrimination. While the outcomes of this study and others emphasize the value of moving towards a greater incorporation of indicators of discrimination, in future health surveys in order to better determine its impacts upon health status, it will be equally important for researchers to define discrimination carefully to prevent underreporting. Several participants of our study expressed greater willingness to attribute their negative experiences with health care providers at least in part to systemic issues such as work overload.

**Systemic Issues**

It is important to acknowledge, as did several study participants, that some health care providers may not themselves be discriminating against newcomers, but rather functioning as part of a system that constructs discriminatory barriers to care. One such barrier is the Interim Federal Health Program for refugees, a program which is fraught with payment difficulties. Indeed, the literature notes that the IFHP is a cumbersome entity and that many general practitioners and dentists will turn patients away because they do not wish to deal with the bureaucracy, payment delays, pre-approval process for some procedures and lower financial compensation (McKeary & Newbold, 2010; Merry, Gagnon, Kalim, & Bouris, 2011; Wales, 2010). This could therefore be seen as institutionally reinforced discrimination, as health care providers are deterred from serving patients who may incur extra costs in terms of time and labour.

Another barrier involves a shortage of health care providers and time with patients, leading to additional stress and work pressures that may impact a provider's demeanor. Spitzer (2004) draws similar conclusions, stating that broader health care reforms and cutbacks result in staff and supply shortages which can further compel nurses to avoid patients "presumed" to be challenging due to linguistic and cultural barriers. Likewise, standard emergency rooms procedures may involve extended wait times and patient isolation, which may be experienced negatively by service users and perceived as discrimination (Wahoush, 2009). Avoiding such situations requires rethinking and ameliorating the education, cultural interpreter services, and supports made available to health care providers so they can communicate the rationale behind health care procedures to immigrant newcomers and refugees in a way that minimizes the potential for miscommunication and misjudgment.

In part, the health care system is not yet prepared for Canada's multicultural population. While social workers in Ontario who practice in the health care sector are considered regulated

Exhibit 27

132

73

Pollock, Newbold, Lafrenière, & Edge

health professionals (or so-called 'allied health care workers') and would have received training in anti-oppressive practice, cultural competency training is often limited within most medical programs. Consequently, there remains need for evaluating whether prescribed adaptations in care provision do in fact improve upon patient/provider relationships and incidences of discrimination. Moreover, concerns about incidents of discrimination voiced by health care professionals themselves may be dismissed. As one key informant who worked at a health clinic offered:

> *Assumptions about who they are based on skin color. So somebody who's talking about even the issue of experiencing racism is not taken as a serious health related issue. Because we kind of don't have that here. We're accepting. You're here in Canada, everything is wonderful.*

Systemic issues involving the health care of newcomers reported by this study (e.g., inadequate provider/patient communication, lack of holistic, or patient-focused care) reflect broad concerns that are likely shared by both health care providers and Canadian-born service users. Policymakers seem currently unwilling or unable to address such issues, perhaps due to broader institutional influences that compel health policy to focus more narrowly on values such as "efficiency" and "objectivity."

Most study participants expressed satisfaction once they had established a long-term relationship with a family physician, and all participants indicated they had at least one positive experience with a health care practitioner. Yet, participants were very clear that they felt current education and training did not fully equip the majority of health care providers to address the needs of newcomer patients. It was felt that a health care system that knowingly overlooks the expressed health concerns of a particular group (i.e., immigrant and refugee patients) in the name of treating all patients "the same" is enacting a form of discrimination through refusing to recognize the diverse ways in which health care needs are expressed and met. While Canadian-born and newcomer service users have a reason to complain about systemic inadequacies, it was felt immigrant and refugee patients who were less familiar with Canadian health services and who already faced significant challenges associated with living in a new country would bear disproportionately negative health impacts compared with the general population.

Participants suggested several ways in which current policies, programs, and practices could be changed to better accommodate immigrant and refugee newcomers and decrease health disparities. Eight recommendations, inclusive of both institutional and personal issues, were identified:

1. Provide accurate information about Canadian health services to newcomers;
2. Provide better training and funding for cultural interpreters in health care settings;
3. Expand and sustain support community-based and mental health services for newcomers;
4. Improve cultural sensitivity in health care provision, including training for non-medical clinic staff;
5. Ensure immediate and adequate health insurance coverage for all newcomers;
6. Increase the diversity of health care providers;
7. Establish better monitoring and accountability of health care providers;

Exhibit 27
133

Pollock, Newbold, Lafrenière, & Edge

8. Provide newcomers with assistance navigating the health care system, including advocacy services.

**Future Research**

While this paper has moved to address some of the gaps in knowledge around newcomer perceptions of discrimination in Ontario health services, the area remains complex and continues to demand additional analysis. For example, additional insight is required with respect to discrimination across different immigrant classes or minority groups and how perceptions of discrimination change over time. There was some indication that perceptions of discrimination in health care provision may diminish over time, and this shift may be linked to the social integration of newcomers and/or increased exposure to the health care system. If confirmed, this outcome would contrast with U.S. studies indicating that perceptions of discrimination increase with length of residency due to increasing awareness of subservient societal position over time and cumulative impact of multiple discriminatory encounters (e.g., Gee, Ryan, Laflamme, & Holt, 2006). The possibility of drawing a connection between number of years living in Canada and differing perceptions of Canadian health care services could not be addressed by this study, although it should be an area for future inquiry.

Combating adverse health effects and related disparities from discrimination occurring within and beyond the confines of health care settings requires greater recognition of and attention towards systemic norms, structures, and power relationships that constrain the social positionalities and circumstances of newcomer populations. It is therefore imperative to link discriminatory encounters and inequities to wider social and systemic contexts, including employment, settlement, and acculturation. Additional research focusing on particular subgroups, such as older immigrants, refugees, immigrants living in poverty, LGBT immigrants, and so forth, would therefore be of interest. Future consideration should also specify the ways in which social determinants, health care providers, and the health care system influence how relationships with immigrant newcomers and refugees are developed, and how those contexts, behaviours, attitudes, services, and regulations can be changed and/or supported to achieve positive health effects in the lives of New Canadians.

**Study Limitations**

All participants surveyed for this study spoke English and had received a post-graduate education either inside or outside of Canada. The study, therefore, did not access immigrant newcomers who likely face increased marginalization due to language barriers, education level, or socioeconomic status. Though the researchers made an effort to include non-English speaking participants, a lack of resources for interpreter services prevented broad outreach to these members of immigrant and refugee communities. Consequently, discriminatory incidents may actually be more severe and frequent than reported herein. However, there is also the possibility that participants self-selected to discuss their experiences because they felt they had experienced discrimination. An alternative sampling method would be required to gauge the extent of discrimination in health care settings.

Exhibit 27

134

Pollock, Newbold, Lafrenière, & Edge

Certain characteristics associated with our sample contributed to strengthening aspects of this study. For example, several participants worked in health care or an allied profession. Among the interviewees were two nurses, 15 social workers or social work students, and 5 settlement workers working in community-based social services. Surveying health care and service providers who were themselves immigrants or refugees, provided rich explications of perceived discrimination in health care services. Participants shared their personal and professional perspectives, while also bringing many of their clients' perspectives into the discussion. Interviewing people who had lived in Canada for approximately 10-15 years and who had several experiences with the health care system contributed to nuanced accounts of discrimination and a sophisticated consideration of systemic barriers.

## Conclusion

The purpose of this study was to understand the potential role of discrimination in the health care environment on the perceptions and behaviours of immigrants and refugees in five smaller Ontario cities. Twenty-six interviews were undertaken to identify how discrimination impacts the participants' use of health care services, relationships with health care providers, and attitudes toward the Canadian health care system in general. More than half of the newcomers interviewed reported that they had experienced discrimination at least once when interacting with health care providers or clinic staff, with this paper documenting several types of personal and systemic discrimination encountered by newcomers along with their responses.

Instances of discrimination were related to refusal of medical services (including refusal due to type of insurance, language issues, or immigrant status); staff acting as gatekeepers; and communication barriers and cultural insensitivity on the part of providers and staff (including poor listening, stereotyping, and lack of awareness of social and cultural roles). At the level of provider/patient interaction, discrimination can lead to misdiagnosis and misuse of interventions, under-diagnosis, and the under-utilization of treatment and services. Participants reporting discrimination expressed heightened levels of distress. Some participants searched for another health care provider, while others avoided the health care system. In a few cases, discriminatory experiences prompted self-advocacy for better care.

Recommendations relevant to policymakers, educators, and practitioners in health care and related fields include the expansion of health insurance coverage for refugees and newcomers to Ontario, improved cultural competency training for all clinic staff along with medical professionals, and ensuring the use of trained cultural interpreters. These recommendations are broadly reflective of calls elsewhere in the literature and would help reduce the barriers facing newcomers relative to health care services. This study suggests measures taken to facilitate effective and sensitive communication between health care providers and service users will wield immediate as well as long-term health benefits for all Ontarians, while also improving health outcomes for immigrant and refugee newcomers in Ontario.

Exhibit 27
135

76

Pollock, Newbold, Lafrenière, & Edge

## References

Access Alliance. (2005). *Racialized groups and health status: A literature review exploring poverty, housing, race-based discrimination and access to health care as determinants of health for racialized groups.* Toronto, ON: Access Alliance Multicultural Community Health Centre.

Access Alliance (under the coordination of Yogendra Shakya). (2007). *Racialization of health inequalities: Focus on children. City of Toronto and neighbourhood highlights.* Toronto, ON: Access Alliance Multicultural Community Health Centre.

Ahmed, A., Stewart, D.E., Teng, L., Wahoush, O., & Gagnon, A.J. (2008). Experiences of immigrant new mothers with symptoms of depression. *Archive of Women's Mental Health, 11,* 295-303.

Asanin, J., & Wilson, K. (2008). I spent nine years looking for a doctor: Exploring access to health care among immigrant in Mississauga, Ontario, Canada. *Social Science & Medicine, 66*(6), 1271-1283.

Beiser, M., & Hou, F. (2006). Ethnic identity, resettlement stress and depressive affect among Southeast Asian refugees in Canada. *Social Science & Medicine, 63,* 137-150.

Beiser, M., Noh, S., Hou, F., Kaspar, V., & Rummens, J. (2001). Southeast Asian refugees' perceptions of racial discrimination in Canada. *Canadian Ethnic Studies, 33*(1), 46-59.

Betancourt, J.R., Green, A.R., & Carillo, J.E. (2003). Defining cultural competence: A practical framework for addressing racial/ethnic disparities in health and health care. *Public Health Reports, 118,* 293-302.

Brach, C., & Fraser, I. (2000). Can cultural competency reduce racial and ethnic health disparities? A review and conceptual model. *Medical Care Research and Review, 57*(Supp. 1), 181-217.

Branscombe, N., Schmitt, M., & Harvey, R. (1999). Perceiving pervasive discrimination among African Americans: Implications for group identification and well-being. *Journal of Personality and Social Psychology, 77,* 135-149.

Carillo, J.E., Green, A.R., & Betancourt, J.R. (1999). Cross-cultural primary care: A patient-based approach. *Annals of Internal Medicine, 130*(10), 829-834.

Carrasco, C., Gillespie, M., & Goodluck, M. (2009, January). *Accessing primary care in Canada: Giving voice to the perceptions and experiences of racialized immigrants (A systematic review).* Paper presented at the Ethnic and Pluralism Studies Student Conference, Toronto, ON.

Charmaz, K. (2003). Grounded theory. In S.N. Hesse-Biber & P. Leavy (Eds.), *Approaches to qualitative research: A reader on theory and practice* (pp. 496-521). New York, NY: Oxford University Press.

Charmaz, K. (2011). Ground theory methods in social justice research. In N.K. Denzin & Y.S. Lincoln (Eds.), *The SAGE handbook of qualitative research* (4th ed., pp. 359-380). Thousand Oaks, CA: Sage.

Citizenship and Immigration Canada (CIC). Research and Evaluation Branch. (2011). *Canada facts and figures. Immigration overview: Permanent and temporary residents.* . Retrieved from http://www.cic.gc.ca/english/pdf/research-stats/facts2010.pdf

Creswell, J.W. (2007). *Qualitative inquiry and research design: Choosing among five approaches* (2nd ed.). Thousand Oaks, CA: Sage.

Exhibit 27

136

Pollock, Newbold, Lafrenière, & Edge

De Maio, F.G., & Kemp, E. (2010). The deterioration of health status among immigrants to Canada. *Global Public Health, 5*(5), 462-478.

Dunn, J., & Dyck, I. (2000). Social determinants of health in Canada's immigrant population: Results from the National Population Health Survey. *Social Science and Medicine, 51*(11), 1573-1593.

Elliott, S.J., & Gillie, J. (1998). Moving experiences: A qualitative analysis of health and migration. *Health Place, 4*(4), 327-339.

Fenta, H., Hyman, I., & Noh, S. (2006). Mental health service utilization by Ethiopian immigrants and refugees in Toronto. *The Journal of Nervous and Mental Disease, 194*(12), 925-934.

Gagnon A. (2002). *Responsiveness of the Canadian health care system towards newcomers* (Discussion Paper 40. Catalogue No. CP32-79/40-2002E-IN ISBN 0-662-32964-3). Retrieved from http://www.publications.gc.ca/collections/Collection/CP32-79-40-2002E.pdf

Gee, G.C., Ryan, A., Laflamme, D.J., & Holt, J. (2006). Self-reported discrimination and mental health status among African descendants, Mexican Americans, and other Latinos in the New Hampshire REACH 2010 Initiative: The added dimension of immigration. *American Journal of Public Health, 96*(10), 1821-1828.

Guilfoyle, J., Kelly, L., & St. Pierre-Hansen, N. (2008). Prejudice in medicine: Our role in creating health disparities. *Canadian Family Physician, 54*, 1511-1513.

Harris, R., Tobias, M., Jeffreys, M., Waldegrave, K., Karlsen, S., & Nazroo, J. (2006). Racism and health: The relationship between experience of racial discrimination and health in New Zealand. *Social Science & Medicine, 63*, 1428-1441.

Hyman, I. (2009). *Racism as a determinant of immigrant health.* Report for the Strategic Initiatives and Innovations Directorate of the Public Health Agency of Canada and the Metropolis Project. Retrieved from http://canada.metropolis.net/pdfs/racism_policy_brief_e.pdf

Johnson, J.L., Bottorf, J.L., Browne, A.J., Grewal, J., Hilton, B.A., & Clarke, H. (2004). Othering and being othered in the context of health care services. *Health Communication, 16*(2), 253-271.

Kafele, K. (2004). *Racial discrimination in mental health: Racialized and Aboriginal communities.* Report for Ontario Human Rights Commission. Retrieved from http://www.ohrc.on.ca/en/racial-discrimination-and-mental-health-racialized-and-aboriginal-communities

Karlsen, S., & Nazroo, J.Y. (2002). The relationship between racial discrimination, social class and health among ethnic minority groups. *American Journal of Public Health, 92*, 624-631.

Karlsen, S., Nazroo, J.Y., McKenzie, K., Bhui, K., & Weich, S. (2005). Racism, psychosis and common mental disorder among ethnic minority groups in England. *Psychological Medicine, 35*, 1795-1803.

Kobayashi, K.M., Prus, S., & Zhiqui, L. (2008). Ethnic differences in self-rated and functional health: Does immigrant status matter? *Ethnicity & Health, 13*(2), 129-147.

Krieger, N. (1990). Racial and gender discrimination: Risk factors for high blood pressure? *Social Science & Medicine, 30*, 1273-1281.

Krieger, N. (2001). Theories for social epidemiology in the 21st century: An ecosocial perspective. *International Journal of Epidemiology, 30*, 668-677.

Exhibit 27
137

Pollock, Newbold, Lafrenière, & Edge

De Maio, F.G., & Kemp, E. (2010). The deterioration of health status among immigrants to Canada. *Global Public Health, 5*(5), 462-478.

Dunn, J., & Dyck, I. (2000). Social determinants of health in Canada's immigrant population: Results from the National Population Health Survey. *Social Science and Medicine, 51*(11), 1573-1593.

Elliott, S.J., & Gillie, J. (1998). Moving experiences: A qualitative analysis of health and migration. *Health Place, 4*(4), 327-339.

Fenta, H., Hyman, I., & Noh, S. (2006). Mental health service utilization by Ethiopian immigrants and refugees in Toronto. *The Journal of Nervous and Mental Disease, 194*(12), 925-934.

Gagnon A. (2002). *Responsiveness of the Canadian health care system towards newcomers* (Discussion Paper 40. Catalogue No. CP32-79/40-2002E-IN ISBN 0-662-32964-3). Retrieved from http://www.publications.gc.ca/collections/Collection/CP32-79-40-2002E.pdf

Gee, G.C., Ryan, A., Laflamme, D.J., & Holt, J. (2006). Self-reported discrimination and mental health status among African descendants, Mexican Americans, and other Latinos in the New Hampshire REACH 2010 Initiative: The added dimension of immigration. *American Journal of Public Health, 96*(10), 1821-1828.

Guilfoyle, J., Kelly, L., & St. Pierre-Hansen, N. (2008). Prejudice in medicine: Our role in creating health disparities. *Canadian Family Physician, 54*, 1511-1513.

Harris, R., Tobias, M., Jeffreys, M., Waldegrave, K., Karlsen, S., & Nazroo, J. (2006). Racism and health: The relationship between experience of racial discrimination and health in New Zealand. *Social Science & Medicine, 63*, 1428-1441.

Hyman, I. (2009). *Racism as a determinant of immigrant health.* Report for the Strategic Initiatives and Innovations Directorate of the Public Health Agency of Canada and the Metropolis Project. Retrieved from http://canada.metropolis.net/pdfs/racism_policy_brief_e.pdf

Johnson, J.L., Bottorf, J.L., Browne, A.J., Grewal, J., Hilton, B.A., & Clarke, H. (2004). Othering and being othered in the context of health care services. *Health Communication, 16*(2), 253-271.

Kafele, K. (2004). *Racial discrimination in mental health: Racialized and Aboriginal communities.* Report for Ontario Human Rights Commission. Retrieved from http://www.ohrc.on.ca/en/racial-discrimination-and-mental-health-racialized-and-aboriginal-communities

Karlsen, S., & Nazroo, J.Y. (2002). The relationship between racial discrimination, social class and health among ethnic minority groups. *American Journal of Public Health, 92*, 624-631.

Karlsen,S., Nazroo, J.Y., McKenzie, K., Bhui, K., & Weich, S. (2005). Racism, psychosis and common mental disorder among ethnic minority groups in England. *Psychological Medicine, 35*, 1795-1803.

Kobayashi, K.M., Prus, S., & Zhiqui, L. (2008). Ethnic differences in self-rated and functional health: Does immigrant status matter? *Ethnicity & Health, 13*(2), 129-147.

Krieger, N. (1990). Racial and gender discrimination: Risk factors for high blood pressure? *Social Science & Medicine, 30*, 1273-1281.

Krieger, N. (2001). Theories for social epidemiology in the 21st century: An ecosocial perspective. *International Journal of Epidemiology, 30*, 668-677.

Exhibit 27
137

Pollock, Newbold, Lafrenière, & Edge

Krieger, N., & Sidney, S. (1998). Racial discrimination and blood pressure: The CARDIA study of young black and white adults. *American Journal of Public Health, 86*(10), 1370-1378.

Lawrence J., & Kearns R. (2005). Exploring the 'fit' between people and providers: Refugee health needs and health care services in Mt. Roskill, Auckland, New Zealand. *Health and Social Care in the Community, 13*(5), 451-461.

Lincoln, Y.S., Lynham, S.A., & Guba, E.G. (2011). Paradigmatic controversies, contradictions, and emerging confluences, revisited. In N.K. Denzin & Y.S. Lincoln (Eds.), *The SAGE handbook of qualitative research* (4th ed., pp. 97-128). Thousand Oaks, CA: Sage.

Magoon, J. (2005). *The health of refugees in Winnipeg.* Report Prepared for Winnipeg Regional Health Authority. Winnipeg, MB. Retrieved from http://www.wrha.mb.ca/community/commdev/files/Diversity-RefugeeHealth.pdf

McDonald, J.T., & Kennedy, S. (2004). Insights into the 'healthy immigrant effect': Health status and health service use of immigrants to Canada. *Social Science & Medicine, 59*(8), 1613-1627.

McKeary, M., & Newbold, K.B. (2010). Barriers to care: The challenges for Canadian refugees and their health care providers. *Journal of Refugee Studies, 23*(4), 523-545.

Merry, L.A., Gagnon, A.J., Kalim, N., & Bouris, S.S. (2011). Refugee claimant women and barriers to health and social services post birth. *Canadian Journal of Public Health, 102*(4), 286-290.

Moghaddam, F.M., Taylor, D.M, Ditto, B., & Jacobs, K.M. & Bianchi, E. (2002). Psychological distress and perceived discrimination: A study of women from India. *International Journal of Intercultural Relations, 26*, 381-390.

Mulvihill, M., Mailloux, L., & Atkin, W. (2001). *Advancing policy and research responses to immigrant and refugee women's health in Canada.* Winnipeg, MB: The Centres of Excellence for Women's Health.

Nazroo, J. Y. (2003). The structuring of ethnic inequalities in health: Economic position, racial discrimination, and racism. *American Journal of Public Health, 93*(2), 277-284.

Newbold, K.B. (2009). Health care use and the Canadian immigrant population. *International Journal of Health Services, 39*(3), 545-65.

Newbold, K.B., & Danforth, J. (2003). Health status and Canada's immigrant population. *Social Science and Medicine, 57*(3), 1981-1995.

Ng, E., Wilkins, R., Gendron, F., & Berthelot, J.M. (2008). *Dynamics of immigrants' health in Canada: Evidence from the National Population Health Survey.* Ottawa, ON: Statistics Canada.

Noel, J. (1996). *Voices on health care: Afro Caribbean women's experience.* (Unpublished master's thesis). Dalhousie University, Halifax, NS.

Noh, S., Beiser, M., Kaspar, V., Hou, F., & Rummens, J. (1999). Perceived racial discrimination, depression and coping: A study of Southeast Asian refugees in Canada. *Journal of Health and Social Behavior, 40*, 193-207.

Noh, S., & Kaspar, V. (2003). Perceived discrimination and depression: Moderating effects of coping, acculturation, and ethnic support. *American Journal of Public Health, 93*(2), 232-238.

Noh, S., Kaspar, V., & Wickrama, K.A.S. (2007). Overt and subtle racial discrimination and mental health: Preliminary findings for Korean immigrants. *American Journal of Public Health, 97*(7), 1269-1274.

Exhibit 27
138

79

Pollock, Newbold, Lafrenière, & Edge

Oxman-Martinez, J., Abdool, S.N., & Loiselle-Leonard, M. (2001). Immigration, women and health in Canada. *Canadian Journal of Public Health, 91*(5), 394-395.

Pérez, C.E. (2002). *Health status and health behavior among immigrants.* (Supplement to Health Reports, Statistics Canada, Catalogue 82-003-SIE, 1-12, Ottawa, ON). Retrieved from http://www.statcan.gc.ca/pub/82-003-s/2002001/pdf/82-003-s2002005-eng.pdf

Reitmanova, S., & Gustafson, D.L. (2008). "They can't understand it": Maternity health and care needs of immigrant Muslim women in St. John's, Newfoundland. *Journal of Maternal and Child Health, 12*, 101-111.

Spitzer, D.L. (2004). In visible bodies: Minority women, nurses, time, and the new economy of care. *Medical Anthropology Quarterly, 18*(4), 490-508.

Statistics Canada. (2010). *Projections of the diversity of the Canadian population, 2006 to 2031.* (Catalogue 91-551-X, Ottawa, ON). Retrieved from http://www.statcan.gc.ca/pub/91-551-x/91-551-x2010001-eng.htm

Stewart, D., Gagnon, A.J., Dougherty, G., Saucier, J.F., & Wahoush, O. (2008). Postpartum depression symptoms in newcomers. *Canadian Journal of Psychiatry, 53*(2), 121-124.

Taylor, J., & Turner, R.J. (2002). Perceived discrimination, social stress and depression in the transition to adulthood: Racial contrasts. *Social Psychology Quarterly, 65*(3), 213-225.

Wahoush, E.O. (2009). Equitable health-care access: The experiences of refugees and refugee claimant mothers with an ill preschooler. *Canadian Journal of Nursing Research, 41*(3), 186-206.

Wales, J. (2010). Interim Federal Health: A public health perspective. *McMaster University Medical Journal, 7*(1), 50-52.

Wang, S. (1997). *The experiences of Chinese immigrant women with the health care delivery system in Canada.* (Unpublished master's thesis). Dalhousie University, Halifax, NS.

Williams, D.R., Neighbors, H.W., & Jackson, J.S. (2003). Racial/ethnic discrimination and health: Findings from community studies. *American Journal of Public Health, 93*(2), 200-208.

Woltman K., & Newbold, K.B. (2007). Immigrant women and cervical cancer screening uptake: A multilevel analysis. *Canadian Journal of Public Health, 98*(6), 470-475.

Women's Health in Women's Hands. (2003). *Racial discrimination as a health risk for female youth: Implications for policy and healthcare delivery in Canada.* Toronto, ON: The Canadian Race Relations Foundation.

Exhibit 27
139

**Print This Page**   |   **Close This Window**

Name: Natalie Marie Schenker | ▇▇▇▇▇▇▇▇▇▇ | PCP: Gary N. Bogart, DO

# Appointment Details

| After Visit Summary | |
|---|---|
| 4/17/2012 | Schenker,Natalie Marie  [MRN ▇▇▇ |
| **Your feedback is important to us** | |

We strive to provide a very good patient experience from compassion and caring to courtesy.  Please tell us about your experience by completing your patient satisfaction survey that you may receive in the mail or by e-mail.  We want to hear from you and are dedicated to gaining your loyalty.

If you have any questions regarding today's visit or have immediate concerns, please contact the Practice Manager at 858-657-8600.  Thank you!

**Patient Demographics**

**Visit Information**

| Date & Time | Provider | Department | Dept. Phone |
|---|---|---|---|
| 4/17/2012  3:00 PM | Bogart, Gary N., DO | UCSD LA JOLLA FAMILY AND SPORTS MEDICINE | 858-657-8600 |

**Visit Diagnosis**

Comments

Abscess - Primary

**Allergies as of 4/17/2012**

| | Noted | Reactions |
|---|---|---|
| Amoxicillin | 11/19/2008 | Rash |
| Cephalexin Monohydrate | 11/19/2008 | Rash |
| Sulfa Drugs | 11/19/2008 | Rash |







**Where to Get Your Medications**

| Information about where to get these medications is not yet available |
|---|
| *Ask your nurse or doctor about these medications* |

    clindamycin 300 MG capsule

    doxyCYCLINE 100 MG tablet

    HYDROcodone-acetaminophen 5-325 MG tablet

**Medication Refills**

Please contact your pharmacy to see if you have refills remaining on your prescription. If no refills are available, allow 3 business days for the pharmacy to request additional refills.

**Consult orders and/or orders performed in this visit**

CONSULT/REFERRAL TO HNS/ENT

    Scheduling Instructions:

        PLEASE CALL THE NUMBER LISTED BELOW 5 WORKING DAYS FROM TODAY to schedule your appointment. By that time, your authorization should be in our system and your appointment will be scheduled without delay.

        Ear Nose & Throat/Head & Neck Surgery clinic phone numbers:

        Hillcrest: 619-543-6631

        LaJolla: 858-657-8590

**Insurance Coverage Disclaimer**

Please note that any screening tests ordered are recommended, but you must check into your insurance coverage prior to undergoing these tests as your insurance may not cover them in your plan.

If your health care is delivered through a health maintenance organization (HMO), then please get confirmation from our staff of insurance approval before undergoing any tests or receiving care.



**Additional Information**

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

**Requests for Continuing Care Document**

You can download an electronic copy of your Continuing Care Document, a summary of your health information at UC San Diego Health. Log on to MyUCSDChart (https://myucsdchart.ucsd.edu) and go to "My Medical Record" > "Download Summary."

If you do not have MyUCSDChart and are interested signing up, please call MyUCSDChart Customer Service at (619) 543-5220 (Monday through Friday, 9AM to 4PM).

MyChart® licensed from Epic Systems Corporation, © 1999 - 2015.

 Gmail

**Faisal Ahmed <faisalahmed1@gmail.com>**

---

## Voicemail
8 messages

---

**Spire, Gregory** <gspire@mail.ucsd.edu>                                 Mon, Aug 26, 2013 at 10:07 AM
To: Faisal Ahmed <faisal@ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel" <ldean@ucsd.edu>

Hi Faisal,

I got you voicemail, but I am traveling today.

There is nothing that I can do on Recreation's end for you. You need to speak to your supervisor in your other department. I will not be given access to you by them until you have satisfied your 6 month probationary period. Once that occurs, then I should be able to get access to you and you can begin teaching for pay again.

For UCSD career staff that also work as a by-agreement instructor, your home department always needs to give the ok for you to work for us. Your main job at UCSD is that position. I am aware that you can work outside of the university without their permission, but when it is on campus, I need to access your payroll record and the only way to do that is with their permission.

Please keep me posted.

Greg

---

**Faisal Ahmed** <faisal@ucsd.edu>                                         Thu, Sep 5, 2013 at 2:30 PM
To: "Spire, Gregory" <gspire@mail.ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel" <ldean@ucsd.edu>

Hi Greg,

Thank you for replying to my message and calling me back last week. I am currently on medical leave due to a major illness, the treatment for which has been extremely time consuming and exhausting leaving me with very little time for correspondence. Thus I was only able to piece together this email since I haven't been able to manage to find the time to call you again during business hours.

I understand that your hands are tied, and that without permission from my main department you can't put me on the Recreation payroll. However, I am still trying to understand what occurred with the request for alternate access and who exactly is responsible for the decision. I have been given a bit of the run around by my home department.  My supervisor told me is that it was a decision made HR, and HR told me that this is some sort of "standard policy". That is why I wanted to speak to you, hoping that you could provide some clarity to this rather confusing situation.

I am to meet with my supervisor to negotiate these matters, and need to get my facts in order so I can effectively resolve this issue. I would like able to resume teaching as an instructor for Recreation as soon as possible. As you may know, I have been an instructor with Recreation for the past 10 years, and for about half of that time I have also been employed by UCSD in the department of medicine. Due to a series of four ACL injuries and the time required to rehab from the surgeries, I had to have a medical separation in December of 2012. In March of this year, I started working for the department of Neurosciences. Unfortunately, I became stricken with an illness that I am still trying to cope with, and due to which I've been absent from work. The past few years have been extremely challenging for me medically, but I hope to recover sometime soon. Without hope it would be difficult to keep going.

Please let me know who you spoke with regarding this matter, was it somebody in HR, or directly with my supervisor? Also is there some sort of standard policy for employees in their probationary period for the department of Neurosciences?  I assume it's not a UC Systemwide policy since I haven't encountered this issue in the past, unless it is a new policy.  I was hoping to have been through the probationary period by fall but because of the days I've been absent due to my recent illness my probationary period might be extended, so I am trying to negotiate the request for alternate access.  If there is a standard policy, is there any way to request a waiver, and whom would I request it from?  If I can't get a waiver, may I remain on the substitute teacher list as a volunteer? Thank you in advance for answering my questions regarding this matter.

Best regards,

Faisal
[Quoted text hidden]

---

**Spire, Gregory** <gspire@mail.ucsd.edu>                                   Thu, Sep 5, 2013 at 3:52 PM
To: Faisal Ahmed <faisal@ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel" <ldean@ucsd.edu>

Faisal,

Any non-student that wishes to work for Recreation who holds a career position on campus, needs to be approved by that home department.

The request is always sent to that department's HR contact.

Ellen Mathews was the contact in the Department of Neurosciences.

If you are on medical leave you cannot be working.  Based on the information below, once your home department gives Recreation alternate access we will need a medical release to continue your employment with us.

Greg

---

**From:** faisahmed1@gmail.com [mailto:faisahmed1@gmail.com] **On Behalf Of** Faisal Ahmed
**Sent:** Thursday, September 05, 2013 2:31 PM
**To:** Spire, Gregory
**Cc:** Cervantes, Alexia; Arashiro, Tami; Dean, Laurel
**Subject:** Re: Voicemail

[Quoted text hidden]

---

**Faisal Ahmed** <faisal@ucsd.edu>                                           Thu, Jan 9, 2014 at 1:48 PM
To: "Spire, Gregory" <gspire@mail.ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel" <ldean@ucsd.edu>

Dear Greg,

Please find attached the medical release form from my physician. I am still seeking to get approval from my home department to teach in Recreation but the issue is not yet resolved.

Alexia hired me on Mar. 1, 2013 and I starting teaching on Apr. 6, 2013.  Each week I taught class, I looked for the timesheet. When it wasn't there, I reported that fact to Alexia, and she assured me that sooner or later you would process the paperwork and make sure the timesheets were there.  I told her

that was fine as long as I was paid before the end of the quarter. I taught classes under the agreement that I would be paid for those classes, before being notified by Alexia on May 9, 2013 that I would not be paid for the classes I had already taught, and I could only teach the remaining classes for the quarter as a volunteer. During the same period, I was also teaching for the martial arts program, and filling out my timesheets there, assuming I would be paid for those hours. I never received pay for those hours either as I expected to, since the timesheets with my name were in the binder, and I filled them out following the appropriate procedures and deadlines.

Why did it take so long to determine that my department would not grant Recreation alternate access and to inform me of that fact? Can you suggest a way for me to be compensated for the hours I have already worked and not been paid for, if my department continues to refuse alternate access?

Now that I have been released back to work, would it be possible to act as a substitute for classes? I would like to be able to substitute teach, even if it is as a volunteer.


Thank you,

Faisal


[Quoted text hidden]

---

📄 **Return to Work Certification-Signed Updated 22_Nov_2013.pdf**
210K


**Spire, Gregory** <gspire@mail.ucsd.edu>                                          Thu, Jan 9, 2014 at 1:55 PM
To: Faisal Ahmed <faisal@ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel"
<ldean@ucsd.edu>, "Cuellar, Debbra" <dlcuellar@ucsd.edu>, "Mc Carthy, Leanne" <lemccarthy@ucsd.edu>


Faisal,


First, you home department needs to approve any additional work for Recreation.


Second, if they do, I see that you have work restrictions in place. I need to know what those are.


Greg


Gregory A. Spire

Business Officer

Department of Recreation

University of California, San Diego

Office Location ▶   RIMAC 4th Floor


858.534.5929 - direct line

gspire@ucsd.edu

**From:** faisahmed1@gmail.com [mailto:faisahmed1@gmail.com] **On Behalf Of** Faisal Ahmed
**Sent:** Thursday, January 09, 2014 1:48 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Faisal Ahmed** <faisal@ucsd.edu>                                          Thu, Jan 9, 2014 at 2:11 PM
To: "Spire, Gregory" <gspire@mail.ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel"
<ldean@ucsd.edu>, "Cuellar, Debbra" <dlcuellar@ucsd.edu>, "Mc Carthy, Leanne" <lemccarthy@ucsd.edu>
Bcc: jleibman@ucsd.edu, employeerelations@ucsd.edu

Hi Greg,

Please find attached the work restrictions. These apply to my office space with Neuroscience because of they apply
specifically to that building. Therefore, they do not apply to my position at Recreation, as I have never had such problems
in other buildings.

Are you saying that I need approval my home department even to be a <u>volunteer</u> and to work without pay?

Also, please address the other questions I asked in my previous message:

Why did it take so long to determine that my department would not grant Recreation alternate access and to inform me of
that fact? Can you suggest a way for me to be compensated for the hours I have already worked and not been paid for, if
my department continues to refuse alternate access?

Thank you,

Faisal
[Quoted text hidden]

---


**Wolf_Letter_18-Nov-2013.pdf**
119K

---

**Spire, Gregory** <gspire@mail.ucsd.edu>                                    Thu, Jan 9, 2014 at 2:19 PM
To: Faisal Ahmed <faisal@ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel"
<ldean@ucsd.edu>, "Cuellar, Debbra" <dlcuellar@ucsd.edu>, "Mc Carthy, Leanne" <lemccarthy@ucsd.edu>

If your home department approves you working for Recreation, we will need your physician to have a copy and/or
understanding of what you would like to do for Recreation and include that in the work restriction letter.

Faisal, when a UC employee has 2 work appointments, you still are considered to having only one employer (UC).
Anytime you are out on disability, you need to be released back to all jobs.

**From:** faisahmed1@gmail.com [mailto:faisahmed1@gmail.com] **On Behalf Of** Faisal Ahmed
**Sent:** Thursday, January 09, 2014 2:11 PM
**To:** Spire, Gregory
**Cc:** Cervantes, Alexia; Arashiro, Tami; Dean, Laurel; Cuellar, Debbra; Mc Carthy, Leanne
**Subject:** Re: Voicemail

[Quoted text hidden]

---

**Faisal Ahmed** <faisal@ucsd.edu>                                                    Thu, Jan 9, 2014 at 2:37 PM
To: "Spire, Gregory" <gspire@mail.ucsd.edu>
Cc: "Cervantes, Alexia" <alexia@ucsd.edu>, "Arashiro, Tami" <tarashiro@mail.ucsd.edu>, "Dean, Laurel"
<ldean@ucsd.edu>, "Cuellar, Debbra" <dlcuellar@ucsd.edu>, "Mc Carthy, Leanne" <lemccarthy@ucsd.edu>,
jleibman@ucsd.edu, employeerelations@ucsd.edu
Bcc: "A. Melissa Johnson" <mjohnson@spencerlawoffice.com>

Hi Greg,

I understand what you will need from my physician and will get it to you when I can but per my third request please
address the following questions:

1. **Are you saying that I need approval from my home department even to be a <u>volunteer</u> and to work for
   Recreation without pay?**
2. **Why did it take so long to determine that my department would not grant Recreation alternate access and
   to inform me of that fact?**
3. **Can you suggest a way for me to be compensated for the hours I have already worked and not been paid
   for, if my department continues to refuse alternate access?**

Thanks,

Faisal
[Quoted text hidden]

**Print This Page    |    Close This Window**

Name: Natalie Marie Schenker | ███████████████ | PCP: Gary N. Bogart, DO

# Appointment Details

| After Visit Summary | | |
|---|---|---|
| 4/17/2012 | Schenker,Natalie Marie [MRN███ | |
| **Your feedback is important to us** | | |

We strive to provide a very good patient experience from compassion and caring to courtesy. Please tell us about your experience by completing your patient satisfaction survey that you may receive in the mail or by e-mail. We want to hear from you and are dedicated to gaining your loyalty.

If you have any questions regarding today's visit or have immediate concerns, please contact the Practice Manager at 858-657-8600. Thank you!

**Patient Demographics**



**Visit Information**

| Date & Time | Provider | Department | Dept. Phone |
|---|---|---|---|
| 4/17/2012 3:00 PM | Bogart, Gary N., DO | UCSD LA JOLLA FAMILY AND SPORTS MEDICINE | 858-657-8600 |

**Visit Diagnosis**

Comments

Abscess - Primary

**Allergies as of 4/17/2012**

| | Noted | Reactions |
|---|---|---|
| Amoxicillin | 11/19/2008 | Rash |
| Cephalexin Monohydrate | 11/19/2008 | Rash |
| Sulfa Drugs | 11/19/2008 | Rash |



Case 3:17-cv-00709-MMA-NLS    Document 1    Filed 04/06/17    PageID.271    Page 271 of 392



**Where to Get Your Medications**

**Information about where to get these medications is not yet available**

*Ask your nurse or doctor about these medications*

    clindamycin 300 MG capsule

    doxyCYCLINE 100 MG tablet

    HYDROcodone-acetaminophen 5-325 MG tablet

**Medication Refills**

Please contact your pharmacy to see if you have refills remaining on your prescription. If no refills are available, allow 3 business days for the pharmacy to request additional refills.

**Consult orders and/or orders performed in this visit**

CONSULT/REFERRAL TO HNS/ENT

Scheduling Instructions:

    PLEASE CALL THE NUMBER LISTED BELOW 5 WORKING DAYS FROM TODAY to schedule your appointment. By that time, your authorization should be in our system and your appointment will be scheduled without delay.

Ear Nose & Throat/Head & Neck Surgery clinic phone numbers:

Hillcrest: 619-543-6631

LaJolla: 858-657-8590

**Insurance Coverage Disclaimer**

Please note that any screening tests ordered are recommended, but you must check into your insurance coverage prior to undergoing these tests as your insurance may not cover them in your plan.

If your health care is delivered through a health maintenance organization (HMO), then please get confirmation from our staff of insurance approval before undergoing any tests or receiving care.



**Additional Information**

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

**Requests for Continuing Care Document**

You can download an electronic copy of your Continuing Care Document, a summary of your health information at UC San Diego Health. Log on to MyUCSDChart (https://myucsdchart.ucsd.edu) and go to "My Medical Record" > "Download Summary."

If you do not have MyUCSDChart and are interested signing up, please call MyUCSDChart Customer Service at (619) 543-5220 (Monday through Friday, 9AM to 4PM).

MyChart® licensed from Epic Systems Corporation, © 1999 - 2015.

 Gmail                                                                     **Faisal Ahmed <faisahmed1@gmail.com>**

---

## New message from Alexia Cervantes
1 message

---

**Facebook** <notification+hrlvgccz@facebookmail.com>                          Mon, Apr 15, 2013 at 4:48 PM
Reply-To: Message Email Reply <m+3179acqm000000dpqf8t00002l0uo2g7fgkk1jodv9flz86r2bo@reply.facebook.com>
To: Faisal Ahmed <faisal@ucsd.edu>

> Conversation with Lauren Labagh, Alexia Cervantes and Faisal Ahmed
>
>  **Alexia Cervantes**                                            4:18pm Apr 15
> I am checking with HR on your time sheet. and I will make sure your roster is in
> the binder in the Rec Gym hallway closet Storage A for this Saturday. We have
> had some problems this quarter with rosters.
>
> Conversation History
>
>  **Faisal Ahmed**                                                12:20pm Apr 15
> Hi Lauren and Alexia,
>
> I looked for my time sheet and a roster for the class in both the Rec Gym and the Main
> Gym but wasn't able to find them. Are they some where else? Please let me know
> where to look for them.
>
> Thank you,
>
> Faisal

---

View Conversation on Facebook · Reply to this email to message everyone currently in this
conversation.
This message was sent to faisal@ucsd.edu. If you don't want to receive these emails from Facebook
in the future, please unsubscribe.
Facebook, Inc., Attention: Department 415, PO Box 10005, Palo Alto, CA 94303

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Ahmed, Faisal |
| **Sent:** | Tuesday, May 21, 2013 12:40 PM |
| **To:** | Walter, Sarah |
| **Cc:** | Gessert, Devon |
| **Subject:** | RE: Weekly touch base - Faisal - 4/26/2013 |
| **Attachments:** | Note_Bogart_20_May_2013.pdf; Eye 21-May-2013 AM.JPG; Eye 20-May-2013 PM3.JPG |

Hi Sarah,

As you may recall, last week during our meeting, after you were done giving me "informal feedback", I again requested that I be allowed to work in a different room, preferably one with a window so that I have access to fresh air and do not have to rely solely on the ventilation system. Even though you previously had offered other workspaces for me to use (see your email below), and the room directly across from my office is currently unoccupied, when I asked , you stated that you needed a doctor's note in order to consider my request. Please find the note attached along with pictures of my condition last night and this morning. Due to my condition I am waiting to see my physician again today, and I am unable to return to work. Furthermore, I do not think it would be wise for me to return to work in my current office, since exposure to that environment is potentially making my illness worsen. I trust that you will honor my reasonable request for accommodation and not continue to insist that I work in my current office that is potentially making me ill and also insist that I continue to take unpaid leave for the days that I am unable to work due to my illness. I hope that we can quickly resolve this matter internally so that I can return to the office and resume work as soon as possible.


Sincerely,

Faisal


Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Sarah Walter [mailto:swalter@ucsd.edu]
**Sent:** Friday, April 26, 2013 9:53 PM
**To:** Ahmed, Faisal
**Subject:** Re: Weekly touch base - Faisal - 4/26/2013

Hi Faisal,

In the future please speak to me in person about something like this before taking action. We do not currently have a flexible/telecommuting agreement in place for your position, and I cannot approve working from home without this in place.

I will find out from facility services if something can be done about the vents. If your office is not satisfactory there may be other work spaces available that you can use.

1

Let's discuss further.

Thanks!
Sarah

On Apr 26, 2013, at 3:20 PM, Ahmed, Faisal wrote:

Hi Sarah,

Thank you for following up with Linda and Jenkis. I decided to come home for lunch because it seems like the my office room was very cold, and I also sneeze a lot more when I'm in there. May the vent filters need to be cleaned out or replaced? It is okay with you, I would prefer to finish the ECS assignment using my desktop at home, although I will have to return to the office since I left some things there. I do have full access to my workstation from here via VNC.

Warm regards,

Faisal

On 4/26/13 2:19 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:

Hi Faisal,

Here are my notes from our conversation today. It's important that we wrap up these loose threads for the Perl course and practicum before your HBA assignments begin in earnest. Keep me posted on what your docs say.

**Task Priorities**
Today:  HBA ECS
Monday:  Perl Course - 2-3 hrs left to complete final assignment
By Tuesday lunch:  Practicum - 4 hrs - then send me what you've got
Database Schema - first draft next friday
Also to be assigned next week - experimental forms. Documenting diffs in administration for end users and to inform offline qc.

**Training Priorities**
1. GCP and HIPAA (Faisal following up with Jenkis on whether current trainings are ok)
2. Database training, practice session
3. Read ADCS Grant - review with Sarah (attached)
4. Review primary/secondary outcomes used by ADCS
ADAS-Cog (include Maze, Number Cancellation, Delayed word recall)
CDR
CGIC
ADCS-ADL

I also am following up with Linda Mellor for the ergo assessment and Jenkis on what UC policy is for health leave during probationary period.

Thanks,

2

Sarah

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel:  858-246-1347
Cell:  858-336-6701

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*



Eye 20-May-2013 PM3



Eye 21-May-2013 AM

**Ahmed, Faisal**

| | |
|---|---|
| **From:** | Thompson, Pamela M. |
| **Sent:** | Wednesday, March 07, 2012 12:59 PM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Kaplan, Linda; Kim, Hyong; Leedy, Deborah; Grill, Sandra R. |
| **Subject:** | RE: Your work related injury |

Yes, it is valid. You should give your dept a copy of the designation for your file.

However, as stated in paragraph 2 on the designation regarding chiropractors.....you need to be seen by the UCSD Occupational Medicine physician before treating with your designated chiropractor. Also, your orthopedist with whom you are treating is not the dr. you designated on the form. You cannot treat with your orthopedist at this time unless you are referred by the UCSD Occupational Medicine physician and it is authorized by Sedgwick, CMS. The fact that you are treating for a pre-existing condition for the same body part does not make a difference. If you wish to pursue medical treatment under workers' comp, you still must be seen by the UCSD Occupational Medicine physician.

If you still have questions, please call me to discuss. You may also contact your Sedgwick CMS Claims Examiner, Sandie Grill, at 619-321-1466.

*Pam Thompson*
Workers' Compensation Analyst
Workers' Compensation/Risk Management
Mail Code 0925
Phone: 858-822-2979
Fax:    858-534-5202
Email:  pmthompson@ucsd.edu
http://blink.ucsd.edu/safety/occupational/workers-comp/

**From:** Ahmed, Faisal
**Sent:** Wednesday, March 07, 2012 12:44 PM
**To:** Thompson, Pamela M.
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah; Grill, Sandra R.
**Subject:** RE: Your work related injury

Hi Pam,

Dr. Fronek is my orthopedic surgeon, not my chiropractor, and he has not been designated yet. Please allow me quote my previous email,

**"However, since this incident is related to a pre-existing injury, for which I am already receiving treatment, I would prefer not to jeopardize my recovery by switching doctors at this point. Since you state that I must switch my care provider in order to receive workers comp, it seems like this means I will not be able to use workers compensation for this incident."**

Please answer the following two questions for me:

1. Do I have to submit the Designation of Physician Form with my department in addition to the Workers Compensation Office for it to be valid?

1

2. This question is related to the question above. Is my designation of Dr. Tyler Forbes as my chiropractor valid, even though it is not in my personnel file with my department?

Thank you,

Faisal

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

**From:** Thompson, Pamela M.
**Sent:** Wednesday, March 07, 2012 7:47 AM
**To:** Ahmed, Faisal
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah; Grill, Sandra R.
**Subject:** RE: Your work related injury

Faisal,

Since you designated a chiropractor, please refer to paragraph 2 of the form. You will need to be seen by the UCSD Occupational Medicine physician prior to seeking treatment with your chiropractor. Also it appears you are treating with Dr. Fronek not the chiropractor you designated. Please contact UCSD Occupational Medicine to schedule an appointment.

If you have questions, please contact me.

*Pam Thompson*
Workers' Compensation Analyst
Workers' Compensation/Risk Management
Mail Code 0925
Phone: 858-822-2979
Fax:    858-534-5202
Email:   pmthompson@ucsd.edu
http://blink.ucsd.edu/safety/occupational/workers-comp/

**From:** Ahmed, Faisal
**Sent:** Wednesday, March 07, 2012 7:31 AM
**To:** Thompson, Pamela M.
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah
**Subject:** RE: Your work related injury

Hi Pam,

Please find attached a copy of the Designation of Physician Form which I submitted to the Workers Compensation Office, as it instructs at the bottom of the form, in November of 2008. I did not realize that I must submit one to my department as well. I will submit updated forms and file them with both the Workers Compensation Office and my department in case I experience a job related injury in the future. However, since this incident is related to a pre-

2

existing injury, for which I am already receiving treatment, I would prefer not to jeopardize my recovery by switching doctors at this point. Since you state that I must switch my care provider in order to receive workers comp, it seems like this means I will not be able to use workers compensation for this incident.

Thanks,

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL. ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED. IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.

**From:** Thompson, Pamela M.
**Sent:** Friday, March 02, 2012 4:42 PM
**To:** Ahmed, Faisal
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah
**Subject:** RE: Your work related injury

Faisal,

I s/w Debby in your dept and also with Greg in your other dept...recreation. Debby could not locate a completed dr designation in your file. Greg did find a dr designation from 2004 that you signed, but you did not indicate a dr name. Therefore, without a designation in you personnel file, you will need to treat with UCSD Occupational Medicine for this injury. Please contact the La Jolla Clinic @ 858-657-1600 to schedule an appointment ASAP. Treatment with your personal physician will not be accepted to substantiate your WC claim.

Please call me with any questions. Thank you for your cooperation.

*Pam Thompson*
Workers' Compensation Analyst
Workers' Compensation/Risk Management
Mail Code 0925
Phone: 858-822-2979
Fax:    858-534-5202
Email: pmthompson@ucsd.edu
http://blink.ucsd.edu/safety/occupational/workers-comp/

3

**From:** Thompson, Pamela M.
**Sent:** Friday, March 02, 2012 4:20 PM
**To:** Ahmed, Faisal
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah
**Subject:** RE: Your work related injury

You can email it to me.  The doctor must also agree to treat under workers' comp...i.e. billing, reporting, treatment authorization.  So, be sure that the dr. treats  workers' comp injuries.   The designation must indicate the name of the doctor...i.e. Dr. Smith not the facility...i.e. Scripps Clinic.  All treatment must be pre- authorized via our Third Party Administrator, Sedgwick, CMS.  Your claim has been submitted to Sedgwick CMS, an adjuster will be calling you to discuss your injury.

Thank you.

*Pam Thompson*
Workers' Compensation Analyst
Workers' Compensation/Risk Management
Mail Code 0925
Phone: 858-822-2979
Fax:    858-534-5202
Email:  pmthompson@ucsd.edu
http://blink.ucsd.edu/safety/occupational/workers-comp/

**From:** Ahmed, Faisal
**Sent:** Friday, March 02, 2012 4:14 PM
**To:** Thompson, Pamela M.
**Cc:** Kaplan, Linda; Kim, Hyong; Leedy, Deborah
**Subject:** RE: Your work related injury

Hi Pam,

I have a copy of the Doctor's Designation Form for Workers' Compensation that I submitted at home.  I will send it to you when I get home, if a pdf via email is okay or if it must sent via fax, I will send it to you on Monday.  Please let me know if email will be okay.

Best regards,

Faisal

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code:  7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax:  858-657-7107
e-mail:  f-ahmed@ucsd.edu

**From:** Thompson, Pamela M.
**Sent:** Friday, March 02, 2012 1:43 PM
**To:** Ahmed, Faisal

4

**Cc:** k33kim@ucsd.edu
**Subject:** Your work related injury
**Importance:** High

Faisal,

I have received your Employee Occupational Incident Report for your injury on 2/27/12 and I hope you will be feeling better soon. To be treated by your personal physician and the treatment to be paid as a benefit under workers' compensation, you must have a Doctor's Designation Form for Workers' Compensation in your personnel file. If you completed this form, please fax a copy of it to me at 858-534-5202..

If you did not complete a Doctor Designation Form before you were injured, and you wish to have follow-up treatment for this injury paid under the UCSD Workers' Compensation Program, please call one of the UCSD Occupational Medicine Clinics listed below to set up an appointment:

Campus location
8899 University Center Lane, Suite 160
San Diego, CA 92122
(858) 657-1600
Monday-Friday, 8 a.m.to 4:30 p.m.

OR

Hillcrest location
330 Lewis Street, Suite 100
San Diego, CA 92103
(619) 471-9210
Monday-Friday, 8 a.m. to 4:30 p.m.

If you need immediate treatment after work hours or on the weekend, you may also go the UCSD Thornton Emergency Room or the UCSD Emergency Room in Hillcrest. Both facilities are open 24/7.

For more information about the UCSD Workers' Compensation program and the benefits provided, please visit our web on Blink at: http://blink.ucsd.edu/safety/occupational/workers-comp/

Should you have any questions, please do not hesitate to contact me.

*Pam Thompson*
Workers' Compensation Analyst
Workers' Compensation/Risk Management
Mail Code 0925
Phone:  858-822-2979
Fax:     858-534-5202
Email:   pmthompson@ucsd.edu
http://blink.ucsd.edu/safety/occupational/workers-comp/

Jpn.J.Leprosy 69, 101-106(2000)

# Three Cases of Pure Neuritic (PN) Leprosy at Detection in Which Skin Lesions Became Visible During Their Course

Yutaka Ishida[1],[2],*, Sr./Dr. Lorella Pecorini[1] and Sr. Elena Guglielmelli[1]

1) Dhanjuri Leprosy Project-Khulna Branch (PIME Sisters), Dass Para Road, Boro Boyra, Khulna, 9,000, Bangladesh

2) International Medical Center of Japan, 1-21-1, Toyama, Shinjuku-ku, Tokyo, 162 8655, Japan

[Received: 12 Jul 2000 / Accepted: 14 Jul 2000]

Key words: pure neuritic leprosy, Bangladesh

Pure neuritic leprosy (PN leprosy) is a type of leprosy with nerve involvement, but without obvious skin lesions. It is not uncommon in the south of Bangladesh,[1] but its nature is less recognized than that in other types of leprosy. Male is dominant on its occurrence with higher disability grading. The histopathological study shows that the entire spectrum can be observed in nerves of PN leprosy.[2],[3] There was no relation among clinical parameters, such as the number and distribution of affected nerves, the immune response and its histopathology.[3] Therefore the treatment of PN leprosy is not well-established at field level. Out of 1,741 newly detected cases by Dhanjuri Leprosy Project-Khulna Branch (PIME Sisters) in Khulna, the south of Bangladesh from 1994 to 1998, 141, or 8.10 % were diagnosed as PN leprosy. 6 cases out of 1,741, or 0.34% were canceled afterwards because of wrong diagnosis, of which one misdiagnosed as PN leprosy. Three cases out of 140 of primary neuritic leprosy proved to have obvious skin lesions some time after their treatment started. The details of the three cases are described in this paper.

## Case 1.

Birth: 1971, Age: 25 years old at detection, Sex: Male, Race: Bengali, Birth Place: Pathikhalghata, Kathalia, the south of Bangladesh. Registered on 3/Sep./1996, Family history: His wife was detected as BT/PB leprosy on 28/Nov./1996. His son is described in Case 2. below.

**History of present illness:**
The disease began one year before detection. At first he got pain on the left hand and the ulnar nerve trunk. It was followed by the pain in bilateral radial, ulnar, median, radial cutaneous and common peroneal nerves. He first consulted a doctor at the Barishal Medical College Hospital near by and was told to take some medicine for one month. Afterwards he came along from far to Khulna for treatment voluntarily.

*Corresponding author :
Corresponding author: Yutaka Ishida, International Medical Center of Japan, 1-21-1, Toyama, Shinjuku-ku, Tokyo, 162-8655, Japan,
Tel:03-3202-7181, Fax:03-3205-7860
E-mail : yishida@it.imcj.go.jp

**Clinical findings and its course:**

Peripheral nerve involvement, manual muscle testing(MMT) and disability grading are shown in Table 1, 2, and 3, separately. Bilateral hands and foot-soles had sensory deficit. The muscle wasting of bilateral interosseous, thenar muscles and hypothenar was already shown. There was no skin lesion seen.

He was diagnosed as PN leprosy and WHO/MB regimen was started under steroid cover owing to ongoing neuritis. The routine slit skin smear was 4+ positive(Average of 3 sites) at detection. After 4 weeks' treatment, he developed ENL reaction and also the skin infiltration of extremities became visible. And then the classification was changed from PN to BL leprosy. He was released from treatment (RFT) on 2/Feb./1998 after taking 16 doses of WHO/MB regimen, because the shortened period(12 doses) of WHO/MB regimen started to be applied in Bangladesh in January 1998. Disability grading at RFT was the same as it was at detection. The very pale skin infiltrations of BL leprosy were not recognized by any staff including a medical officer at detection.

### Case 2.

A son of Case 1., Birth year: 1989, Age: 7 years old at detection, Sex: Male, Race: Bengali, Address: Pathikhalghata, Kathalia, the south of Bangladesh. Registered on 4/Oct./1996, Family history: His father got leprosy described above in Case 1. His

Table 1. Peripheral nerve involvement of case 1.

| Peripheral Nerve | Enlarged | | Tender | |
|---|---|---|---|---|
| | R | L | R | L |
| Ulnar nerve | (+) | (++) | (+) | (++) |
| Median nerve | (+) | (++) | (+) | (++) |
| Radial nerve | (+) | (+) | | |
| Radial cutaneous branch | (+) | (+) | | (+) |
| Common peroneal nerve | (+) | (+) | | |
| Posterior tibialis nerve | (+) | (+) | | |

Table 2. Manual Muscle Testing of case 1.

| | R | L |
|---|---|---|
| ADM | 2 | 0 |
| APB | 2+ | 0 |
| TA | 5 | 4 |
| Peroneal Group | 5 | 4 |

ADM: Abductor Digiti Minimi

APB: Abductor Polisis Brebis

TA: Tibialis Posterior

Table 3. Disability Grading of case 1.

| | R | L |
|---|---|---|
| Hand | 2 | 2 |
| Foot | 1 | 1 |
| Eye | 0 | 0 |

In.J.Leprosy 69, 101-106(2000)

mother was detected as BT/PB leprosy on 28/Nov./1996.

**History of present illness:**

The disease began 6 months before detection. At first he got the right ulnar, median and common peroneal nerves enlarged with pain. Though he did not have any visible skin lesions, his father suspected him to have caught leprosy and brought him to a leprosy clinic.

**Clinical findings and its course:**

Peripheral nerve involvement is shown in Table 4. Sensory deficit was unclear because he was 7-year old child at detection. MMT seemed to be normal. The routine slit skin smear was not taken because of his young age. There was no visible skin lesion at detection. He was diagnosed as PN leprosy and WHO/MB regimen was started under steroid cover owing to ongoing right ulnar nerve neuritis. On 16/July/1997 small hypesthetic hypo-pigmented maculae were discovered in the right cheek, chin, shoulder and heel at a clinic and the routine slit skin smear was negative. Skin lesions showed any signs of inflammation. They did not look like ENL reaction which patient's father had. The classification was

changed from PN to BT leprosy. He was released from treatment (RFT) on 3/Feb./1998 because of the shortening of the period of WHO/MB regimen. Disability grading was 0 both at detection and at RFT.

## Case 3.

Birth year: 1962, Age: 35 years old at detection, Sex: Male, Race: Bengali, Address: Khalishpur, Khulna, the south of Bangladesh. Registration on 20/Feb./1997.

**History of present illness:**

The disease began with hypesthesia of the left second toe 6 months before detection. He developed multiple nerve involvement gradually afterwards. He came to a leprosy clinic voluntarily.

**Clinical findings and its course:**

The right ulnar, common peroneal and posterior tibial nerves were enlarged with tenderness at registration. A big toe of the right foot, the second toe and a sole had sensory deficit. The routine slit skin smear was negative at detection. Disability grading was 1 because of the anesthesia of a foot sole. He was diagnosed as PN leprosy and WHO/PB regimen was

Table 4. Peripheral nerve involvement of case 2.

|  | Enlarged | | Tender | |
|---|---|---|---|---|
|  | R | L | R | L |
| Ulnar nerve | (++) | (+) | (+) | (+) |
| Median nerve | (+) |  | (+) |  |
| Radial nerve | (++) |  | (+) |  |
| Common peroneal nerve | (+) |  |  |  |

Table 5. Summary of 3 cases.

| CASE | AGE, SEX | No. of nerves involved | Treatment | BI | Skin lesion | Class | Remark |
|---|---|---|---|---|---|---|---|
| 1 | 25yo M | 12 | MB→MB | 4+ | infiltration | PN→BL | ENL, Neuritis |
| 2 | 7yo M | 4 | MB→MB | (-) | hypopigmented macules | PN→BT | Neuritis |
| 3 | 35yo M | 3 | PB→MB | (-) | ill definded hypopigmented macules | PN→BT |  |

BI: Bacterial Index (Average of 3 sites)

started. On 12/June/1997 when he completed 5 months' PB regimen, several skin lesions were discovered on bilateral forearms at a clinic, which were hypesthetic hypo-pigmented maculae with their margins ill-defined. There was no sign of inflammation around skin lesions and no further development of nerve damage on limbs. The classification changed from PN to BT and WHO/MB regimen was started. A slit smear test was negative again on 17/July/1997. He was released from treatment (RFT) on 2/July/1998.

## Discussion

Pure neuritic leprosy(PN leprosy) has been paid less attention than other types of leprosy, mainly because it lacks eruptions and is thought to be less important. Therefore, the less interest of field workers has been given on it. PN leprosy sometimes escapes for detection because the criteria of nerve involvement of it is not well defined. Also the clinical course of PN leprosy after its treatment being started has not been well described. These cases described above were detected as PN leprosy and treatments were started but skin lesions were recognized afterwards during their treatment.

Case 1 was a rare case with skin smear positive. Because the skin smear of PN cases is usually negative, the skin smear positivity was not expected. [2)4)] Skin lesions were not localized and the changes were minimal, which were hardly recognized on patient's dark skin. It could have been recognized together with the positive result of skin smear. Because the number of nerves involved was as many as 12 with symmetrical distribution and the slit skin smear was 4+(average of 3 sites) at detection, this case was thought to be quite advanced one. He could have come to a clinic when he got only a few nerves involved, if he had had proper knowledge of PN leprosy(Table 5).

Case 2 developed BT skin lesions 9 months after detection. It was interesting that he had neuritis in the right ulnar nerve at detection but that skin lesions did not show any signs of inflammation during its course after they were recognized. Case 1 and 2 were father and son, and they might have common genetic effects that skin lesions were difficult to recognize.

Case 3 also developed BT skin lesions 5 months after detection. This was the case which wrong treatment was given to due to wrong diagnosis given at detection.

The incidence of PN leprosy is high in the south of Bangladesh. The proportion of PN cases to newly detected cases was once 6.16% (46 out of 747 newly detected cases from June 1992 to Nov. 1993, M:F=33:13 in Khulna.1). It was 7.87% (137 out of 1,741 cases from 1994 to 1998, M:F=79:58) for the last 5 years (Table 6).

At field level the diagnosis of PN leprosy is only made on such clinical findings as thickened nerves, tenderness or sensory/motor paralysis. Over-diag-

Table 6. PN leprosy among new cases detected (1994-1998)

|        | Total | PN leprosy | Percentage |
|--------|-------|------------|------------|
| 1994   | 392   | 34         | 8.67%      |
| 1995   | 494   | 38         | 7.69%      |
| 1996   | 346   | 37         | 10.69%     |
| 1997   | 282   | 15         | 5.32%      |
| 1998   | 227   | 13         | 5.73%      |
| Total  | 1,741 | 137        | 7.87%      |

nosis can happen, for example when a great auricular nerve could be misdiagnosed a leprosy lesion in case it is visible or palpable. The self-healed cases to leave affected peripheral nerves thickened can be taken as PN leprosy. The detection of PN leprosy seems to be later than that of other types in classification of leprosy. The average time lag between recognition of symptoms by patients and detection was 28 months in our series and 29 months in India.[1,2] The mean age at detection was older as well. The main reason of delayed detection can be due to poor awareness of PN leprosy both in patients and in medical staff. The information on the symptom of PN leprosy is usually neglected in the health education on leprosy. The WHO/PB regimen tend to be considered for PN leprosy in Bangladesh,[5] which is sometimes inadequate such cases presented in this paper.

From our experiences among newly detected pure neural leprosy patients, there are a few of cases which skin lesions are missed at detection or skin lesions become visible afterwards, those cases may not be given proper treatment as well as case management.

More attention should be paid to PN leprosy for maximum detection and prevention of disability.

### References

1)  Ishida Y. High incidence of pure neural leprosy in the south of Bangladesh.(Japanese) Jpn. J. Lepr. (suppl) 50:116 (1944)(in Japanese)

2)  Grindhar BK. Neuritic leprosy. Ind. J. Lepr. 68 (1):35-42(1996)

3)  Kaur G, Girdhar BK, Girdhar A, Malaviva GN, Mukherjee A, Sengupta U, Desikan KV. A clinical, immunological, and histological study of neuritic leprosy patients. Int. J. Lepr. 59(3): 385-91(1991)

4)  Mahajan PM, Jogaikar DG, Mehta JM. A study of pure neuritic leprosy: clinical experience. Ind. J. Lepr. 68(2): 137-41(1996)

5)  The Expert Committee on Training of Leprosy Co-ordinating Committee of Bangladesh. Manual for Leprosy Control Assistants in Bangladesh (1995)

# 経過中に皮疹の存在を認めた純神経型ハンセン病
# (Pure Neuritic Leprosy) の3症例

石田　裕[1),2)] * Sr./Dr. Lorella Pecorini[1)] and Sr. Elena Guglielmelli[1)]

1) Dhanjuri Leprosy Project-Khulna Branch (PIME Sisters), Dass Para Road, Boro Boyra, Khulna, 9,000, Bangladesh

2) 国立国際医療センター国際医療協力局

キーワード：純神経型ハンセン病、バングラデシュ

　皮疹を認めず、末梢神経症状のみを呈する純神経型ハンセン病(pure neuritic leprosy or PN)はバングラデシュ南部では稀ではない。1994年から1998年の当施設の新患登録統計1,741名中では141例(8.10%)がPNと診断された。この内1例は診断の誤りとして登録を抹消された。また、3例は、経過中に明らかな皮疹を認めたため他の病型に変更された。このためPNの占める割合は137例(7.87%)であった。これらの経過中に皮疹を認めた3例について、詳細を報告した。ハンセン病コントロールにおける住民に対する啓発活動の中で、PNは無視されがちであり、それゆえ発見も遅れ勝ちである。このため末梢神経麻痺による障害度も高い。ことにPNの中で、経過中に皮疹の存在を認める症例や、初診時に皮疹の存在を見落としている症例が少数存在することがあり、治療も変更せざるを得ないことがあるので、注意を要する。

　症例1は、25才のベンガル人男性。広範囲なBLの皮膚浸潤を初診時に診断できなかった例であり、多発性神経症状よりWHO/MBを開始した。初診時の菌検査は4+(3箇所の平均値)であった。治療開始4ヶ月後、ENLを併発し、同時に皮疹の浸潤も確認された。

　症例2は、症例1の子、7才男児。初診時、皮疹を認めず、右側の尺骨神経炎を起こしていた。WHO/MBとステロイド剤による治療開始の9ヶ月後にBTと思われる皮疹を初めて確認した。皮疹確認時の菌検査は陰性であった。

　症例3は、35才のベンガル人男性。初診時、右側の尺骨神経、総腓骨神経、後脛骨神経の腫脹と圧痛を認めた。菌検査は陰性であった。PN/PBとしてWHO/PBの治療が開始された。5ヶ月後、両側の前腕に数個の知覚麻痺を伴う境界不明瞭な脱色素斑を認めたため、診断をBT/MBに変更し、WHO/MBの治療をやり直した。

*Corresponding author :

国立国際医療センター国際医療協力局派遣協力第二課

〒162-8655　東京都新宿区戸山1-21-1

Tel:03-3202-7181, Fax:03-3205-7860,

E-mail : yishida@it.imcj.go.jp

## Best Diagnostic Practices for Pure Neuritic Leprosy

Faisal Ahmed

One should start with the least invasive procedures such as Electromyography (EMG), High Resolution Ultrasound (HRUS), and laboratory tests. The usefulness of EMG in detecting neuropathy is well documented. In a study of patients with confirmed leprosy, 56 out of 59 patients (98%) had EMG abnormalities. According to DeFaria *et al.* (1990), "Full and precise EMG examination seems to be extremely helpful to the diagnosis of leprosy, since we can demonstrate neurophysiological abnormalities in at least 95% of the patients, including those of the indeterminate form, considered not having nerve damage."[1]

HRUS may also aid in determining the precise location and degree in nerve thickening:

> HRUS has proven to be useful in the context of leprosy. 3,6,10,11,12 Since the hallmarks of leprosy are nerve enlargement and inflammation, HRUS and colour Doppler (CD) imaging can be used to demonstrate nerve enlargement and inflammation. Currently five studies have evaluated the sonographic findings in leprosy (evaluating a total of 111 subjects.3,6,10,11,12 It has been found that HRUS is able to detect multifocal nerve enlargements.
> ...
> So, peripheral nerve ultrasound provides information on the exact location of nerve enlargement and morphological alterations in the nerve including echo texture, fascicular pattern and vascularity. 3,14 This information brings a new dimension to the diagnosis of PNL type of leprosy and the early recognition of leprosy neuritis especially during reactional phases of the disease.11
> ...
> Approximately 5–10% of all leprosy patients are of a pure or primary neuritic type, presenting with involvement of (a) nerve(s) without skin lesions and PNL carries the highest risk of deformity.15 – 17 Therefore, in countries where leprosy occurs it can be difficult to differentiate ulnar nerve neuropathy at the elbow from PNL and it requires a nerve biopsy or fine needle aspiration cytology for the correct diagnosis.18,19
> ...
> Moreover, it helped to localise from where to obtain the biopsy.[2]

The next step would be to move on to more specific yet more invasive procedures such as fine needle aspiration cytology and nerve biopsy (only if previous studies are inconclusive). It is important to note that even though Leprosy and especially PNL are rare in the U.S., leprosy is endemic in Bangladesh, up to 1.61 per 10,000 and PNL is not as uncommon. In particular, in the southern part of Bangladesh, such as the small town of Khulna where my family is from, it can make up more than 10% of leprosy cases. [3-5]

There are several articles regarding the prevalence of leprosy in Bangladesh. The first paper was discovered while reconciling the severity of my nerve pain experience with the fact that leprosy is widely thought to cause numbness (anesthesia) and not pain. However, I soon discovered that neuropathic pain is quite common among leprosy patients in Bangladesh.[1] There is also a robust discussion in the literature regarding leprosy mimicking many rheumatoid

arthritis symptoms. Multiple authors cite that approximately 75% of leprosy patients experience musculoskeletal symptoms.[6-13]

Chauhan *et al*. (2010) reports a study which took 32 Synovial Fluid (SF) samples from 25 cases of arthritis due to leprosy, and they were only able to detect *M. leprae* bacilli in 9 of these cases. He points out that even though detection of bacilli is the diagnostic gold standard, demonstration of bacilli in some cases is extremely challenging and serological test for detection of antibodies to the *M. leprae*-specific phosphoglycolipid-1 could be a useful additional tool. He also states:

> These antibodies are present in 90% of patients with untreated lepromatous disease, but only in 40-50% of patients with paucibacillary disease and 15% of healthy controls [27]. PCR for detection of *M. leprae* DNA-encoding-specific genes or repeat sequences is potentially highly sensitive and specific, since it detects *M. leprae* DNA in 95% of multibacillary and 55% of paucibacillary patients [28].

In conclusion he states, "To conclude, inflammatory joint manifestations are among the many facets of leprosy and should be considered in patients from endemic areas even in the Western world." [6]

Multiple authors also state that PNL is particularly challenging to diagnose due to the absence of cutaneous symptoms, and negative for the presence Acid Fast bacilli from slit skin smears. Even sural nerve biopsies have proven to be unreliable at showing lepra bacilli. In their conclusion Haroon *et al*. (2007) state:

> Recognition of the infective agent as an aetiological factor in rheumatic manifestations is important in the management of patients more so in the endemic regions. A combination of tenosynovitis and thickened nerves in association with/without symmetric polyarthritis should raise a suspicion of leprosy even in the absence of cutaneous features. [7]

Alam *et al*. (2014) also conclude that:

> Musculoskeletal manifestations are common in leprosy. Leprosy should be included in differential diagnosis in those patients who present with typical skin rash and musculoskeletal manifestation. Type 2 lepra reaction, ENL, can be recurrent and usually presents with systemic manifestation involving skin, nerves, joint, kidney and liver as it happened in our patient. Diagnosis of leprosy is easy but needs to be thought of especially in migratory population to non-endemic areas.[8]

In discussing the difficulty of differentiating between Rheumatoid Arthritis (RA) and Leprosy, Henriques *et al*. (2012) state:

> RF is reported as positive in 70–80% of patients with RA; however, its specificity is limited since RF is also detected in sera from healthy older individuals and patients with various other autoimmune and infectious diseases, including leprosy.[8] Anti-CCP antibodies are considered to be highly specific for the diagnosis of RA.[9]

Agarwal *et al.* (2004) point out that the prevalence of musculo-skeletal symptoms in both Type I and II reactions in Leprosy could be as high 70%, even though it may be less common in Leprosy in the absence of the reactional states. They also discuss acute arthritis as part of:

> Type II reaction, erythema nodosum leprosum (ENL), is an immune complex mediated reaction seen predominantly in patients with borderline lepromatous or polar lepromatous leprosy[1]. ENL related arthritis is usually acute, severe, associated with constitutional symptoms and lasts the duration of the reaction. Knee, proximal inter phalangeal, wrist, ankle and elbow are the joints commonly affected and often mimic RA[5]. It commonly occurs after first 6 months of the anti-leprosy therapy. The cytokine profile is typically $T_{H2}$ type (increased IL-6, IL-10)[3]. Synovial fluid examination shows predominance of polymorphonuclear leukocytes and cultures for Lepra bacilli are negative.[10]

Illarramendi *et al.* (2000) point out that:

> Even in endemic areas in which the clinical features of thickened nerves accompanied by nerve deficit are known to reflect neuritic leprosy, accurate diagnosis remains hard to come by and it is often delayed if diagnosed at all. As a result, there are greater opportunities for these patients to develop deformities and mutilations especially if we take into consideration that both clinical and electro-physiological abnormalities positively correlate to the duration of symptoms of leprosy.[6][11]

Laboratory tests such as the QuantiFERON®–TB Gold  (that you mentioned during our visit) should also be performed on my mother. In their study, Atkin *et al.* (1990) also performed the following laboratory tests:

1.   $\alpha_1$ Acid glycoprotein
2.   $\alpha_2$ macroglobulin
3.   C reactive protein
4.   IgM rheumatoid factor

In the discussion they state:

> $\alpha_2$ Macroglobulin and   $\alpha_1$ acid glycoprotein bind and transport potentially destructive enzymes released at the site of tissue destruction.[18] C reactive protein concentration rises in response to any chronic inflammatory disease affecting the synovial joint[19] and may rise particularly steeply in response to tissue damage by bacteria rather than by other agents. A significant fall in   $\alpha_1$ acid glycoprotein concentrations has been noted in other causes of an infective enthesis, suggesting its increased consumption[20]. In this case, however, an increase in C reactive protein would be expected, as seen in patients with leprosy and arthritis,[2 6 7]rather than a decrease as we report here. An alternative explanation is reduced synthesis of both reactants.

> Owing to the isolated environment of the leprosy colony no details of the incidence or prevalence of an enthesitis in patients with leprosy is available. This study highlights the possibility that an enthesitis may be a facet of leprosy infection and that significantly low concentrations of $\alpha_1$ acid glycoprotein and C reactive protein may mark the enthesitis in patients with leprosy.[13]

The ML Flow is an immunochromatographic test that detects IgM antibodies, specific to *Mycobacterium leprae* in serum or blood, and it can indicate the bacterial load of leprosy patients. Even though it should not used to as a diagnostic exam, it can be helpful in classifying leprosy patients and determining the appropriate treatment regimen. In addition Grossi *et al.* (2008) state "The use of a combination of clinical and laboratorial criteria, principally serological tests to detect antibodies specific to phenolic glycolipid I antigen of Mycobacterium leprae, for the correct classification of leprosy patients and distribution of the appropriate MDT regimen[10], could greatly benefit the control of the endemic." [14-15] My wife obtained the ML Flow test as a researcher from Instituto de Patologia Tropical e Saúde Pública, Departamento de Imunologia, Goiânia - GO - Brasil. Belgaumkar *et al.* (2007) concluded by stating that circulating cytokine profiles, such as **INF**γ and **IL-6** are also extremely useful in classifying leprosy patients.[16]

After extensively reviewing the literature it appears that the first step is using EMG and/or HRUS to quantify electrophysiological abnormalities. After identifying the location of greatest abnormality and the related nerve a Fine Needle Aspiration Cytology with PCR (if possible), would yield the highest probability of detection, while being minimally invasive. [17-21] Menicucci *et al.* (2005) utilized EMG to determine the site for nerve biopsy, choosing locations based on neural symptoms and electrophysiological features.[18] Multiple authors point out a "nerve sparing" procedure such Fine Needle Aspiration Cytology would yield as good, if not better results than a nerve biopsy. The best approach found in the literature is to combine Fine Needle Aspiration Cytology with a PCR that would increase by at least two fold the probability of detecting *M. leprae*. Theuvenet *et al.* (1996) even provides the nice diagram below as well detailing the method for performing a Fine Needle Aspiration Cytology:

in a patient comp...

Before aspiration the patient was screened for changes in motor function and light touch sensation with Semmes-Weinstein nylon monofilaments and this was repeated the day after the procedure.

*Method:* The skin was prepared with alcohol and a nerve block was done with 5 ml lidocaine 0.5%, proximal to the site of the cytological needle aspiration to be done. A new disposable needle (18G) was mounted and filled with physiological saline to be used as a carrier. The nerve to be aspirated from was fixed between the thumb and index fingers of one hand while with the other hand the needle was inserted into the nerve, as much parallel to its fascicles as possible. After positioning the tip of the needle, the body of the syringe was steadied between the thumb and index finger while with the ring and little finger the

plunger was pulled outwardly thus creating a negative pressure inside the syringe and needle (Fig.1).



Fig.1. Cytological needle aspiration of the left lateral popliteal nerve.

While maintaining the negative pressure with one hand, and with the other hand fixing the nerve, the needle was moved to and fro, three times over about 2 cm inside the nerve. In this way cells from inside the nerve were aspirated into the needle.

Hereupon the plunger was carefully released. An abrupt release would briefly create excessive positive pressure inside the syringe with consequent loss of aspirated material. The needle was disconnected, the plunger pulled back and the needle remounted. With the tip of the needle above a glass slide the plunger was pressed and the aspirated fluid inside the needle together with the saline discharged upon the slide.

The material was stained with the Ziehl-Neelsen method for staining acid-fast bacilli at the Mycobacterium Research Laboratory of our hospital.

## RESULT

In seven out of the eleven cases of suspected pure neural leprosy the aspirated nerve fluid showed multiple acid-fast bacilli.

[22]

## Acknowledgement

The author is grateful to his wife, Natalie for being both his muse and scribe, as well as being his sole caregiver.

# References

1. DeFaria CR, Silva IM. Electromyographic Diagnosis of Leprosy. Arq Neuropsiquiatr. 1990;48:403–13.

2. Jain S, Visser LH, Yerasu MR, Raju R, Meena AK, Lokesh B, et al. Use of High Resolution Ultrasonography as an Additional Tool in the Diagnosis of Primary Neuritic Leprosy: A Case Report. Lepr Rev. 2013;84:161–5.

3. Khondker L, Wahab M, Khan M, Hazra S. Leprosy: need early detection and early treatment. Med Today. 2012;24:44–7.

4. Hietaharju A, Croft R, Alam R, Birch P, Mong A, Haanpää M. Chronic neuropathic pain in treated leprosy. Lancet. 2000;356:1080–1.

5. Ishida Y, Pecorini Sr L, Guglielmelli Sr E. Three Cases of Pure Neuritic (PN) Leprosy at Detection in Which Skin Lesions Became Visible During Their Course. Nihon Hansen Gakkai Zasshi. 2000;69:101–6.

6. Chauhan S, Wakhlu A, Agarwal V. Arthritis in leprosy. Rheumatology. 2010;49:2237–42.

7. Haroon N, Agarwal V, Aggarwal A, Kumari N, Krishnani N, Misra R. Arthritis as presenting manifestation of pure neuritic leprosy--a rheumatologist's dilemma. Rheumatology. 2007;46:653–6.

8. Alam F, Emadi S AL. Case of Arthritis Secondary to Leprosy. Springerplus. 2014;3:734.

9. Henriques CC, Lopéz B, Mestre T, Grima B, Panarra A, Riso N. Leprosy and rheumatoid arthritis: consequence or association? BMJ Case Rep. 2012;2012:bcr1220115346.

10. Agarwal V, Singh ER, Chauhan S, Sachdev A, Mohan H. Pitting Oedema with Arthritis as the Presenting Manifestation of Type I Lepra Reaction. J Indian Rheumatol Assoc. 2004;12:123–6.

11. Illarramendi X, Jardim MR, Sales AM, Nery JA, Sarno EN. Acro-osteolysis prior to diagnosis of leprosy. Lepr Rev. 2000;71:382–7.

12. Agarwal V, Wakhlu A, Aggarwal A,Misra R. Tenosynovitis as the presenting manifestation of leprosy. J Indian Rheumatol Assoc. 2002;10:69–70.

13. Atkin SL, El-Ghobarey A, Kamel M, Owen JP, Dick WC. Clinical and Laboratory Studies in Patients with Leprosy and Enthesitis. Ann Rheum Dis. 1990;49:715–7.

14. Grossi MAF, Leboeuf MAA, de Andrade ARC, Lyon S, de Figueiredo Antunes CM, Buhrer-Sekula S. The influence of ML Flow test in leprosy classification. Rev Soc Bras Med Trop. 2008;41:34–8.

15. Grossi MAF, Leboeuf MAA, de Andrade ARC, Buhrer-Sekula S, Antunes, de Figueiredo CM. Risk factors for ML Flow seropositivity in leprosy patients. Rev Soc Bras Med Trop. 2008;41:39–44.

16. Belgaumkar VA, Gokhale NR, Majahan PM, Bharadwaj R, Pandir DP, Deshpande S. Circulating Cytokine Profiles in Leprosy Patients. Lepr Rev. 2007;78:223–30.

17. Skacel M, Antunes SL, Rodrigues MM, Nery JA, Valentim VD, Morais RP, et al. The diagnosis of leprosy among patients with symptoms of peripheral neuropathy without cutaneous lesions: a follow-up study. Arq. Neuropsiquiatr. 2000. page 800–7.

18. Menicucci LA, Miranda A, Antunes SLG, Jardim MR, da Costa Nery JA, Sales AM, Sarno EN. Microscopic leprosy skin lesions in primary neuritic leprosy. J Am Acad Dermatol. 2005;52:648–52.

19. Jardim MR, Antunes SLG, Santos AR, Nascimento OJM, Nery JAC, Sales AM, et al. Criteria for diagnosis of pure neural leprosy. J Neurol. 2003;250:806–9.
20. Kumar B, Pradhan A. Fine Needle Aspiration Cytology in Diagnosis of Pure Neuritic Leprosy. Patholog Res Int. 2011;Article ID 158712.
21. Wilder-Smith E. Diagnosis of pure neuritic leprosy. Neurol J Southeast Asia. 2002;7:61–3.
22. Theuvenet WJ, Miyazaki N, Roche P, Shreshtha I. Cytological needle aspiration for the diagnosis of pure neural leprosy. Indian J Lepr. 1996;68:109–12.

Neurosurg Rev (2005) 28: 131–136
DOI 10.1007/s10143-004-0372-3

**ORIGINAL ARTICLE**

**Ludwig Benes · Kiyoshi Shiratori · Mariana Gurschi ·
Ulrich Sure · Wuttipong Tirakotai · Boris Krischek ·
Helmut Bertalanffy**

# Is preoperative high-resolution magnetic resonance imaging accurate in predicting neurovascular compression in patients with trigeminal neuralgia?

## A single-blind study

Received: 23 July 2004 / Revised: 24 October 2004 / Accepted: 25 October 2004 / Published online: 5 January 2005
© Springer-Verlag 2005

**Abstract** High-resolution magnetic resonance imaging (HR-MRI) using three-dimensional fast imaging employing steady-state acquisition (3D-FIESTA) and double-dose contrast-enhanced three-dimensional fast spoiled gradient echo (3D-FSPGR) sequences is considered to be a useful tool in detecting neurovascular compression in patients with trigeminal neuralgia. The purpose of this study was to analyze the accuracy and preoperative diagnostic value of these high-resolution imaging techniques in patients with trigeminal neuralgia, in a single-blind study. The preoperative MRI images of 21 consecutive patients were matched to one neuroradiologist, who was blind as to which side exhibited the symptoms. The images and post-processing multiplanar reconstructions were compared with the video-documented operative observations. HR-MRI using only 3D-FSPGR sequences demonstrated neurovascular compression in accordance with the intraoperative finding in 11 patients (52.4%). In the subgroup where, additionally, 3D-FIESTA sequences were available, neurovascular compression was in accordance with the intraoperative finding in 71.4% ($n$=7). High-resolution magnetic resonance imaging using double-dose contrast-enhanced 3D-FSPGR and 3D-FIESTA sequences is currently not sufficient enough to make an accurate prediction of neurovascular compression in a single-blind setting. These 3D imaging techniques currently provide only limited information,
and one should consider their use carefully when identifying patients with trigeminal neuralgia from operation until image quality is improved by superior image resolution that can accurately discriminate vessels surrounding the trigeminal root entry zone.

**Keywords** Trigeminal neuralgia · Neurovascular compression · High resolution MRI · 3D-FIESTA · 3D-FSPGR · Trigeminal root entry zone

## Introduction

Trigeminal neuralgia (TN) is considered to be one of the most painful disorders to affect patients [12–14]. Although different treatment modalities have been proposed, the most effective and worldwide accepted treatment for TN is microvascular decompression of the trigeminal nerve root, which is capable of providing complete resolution of symptoms in the majority of cases [2, 7, 9]. A preoperative determination of microvascular compression in terms of exact localization of the compressing vessel, direction of the vessel and relationship between root entry zone (REZ) and vasculature could be of great value for the neurosurgeon.

Recently, due to the advancement of high-resolution magnetic resonance imaging (HR-MRI) using three-dimensional fast imaging employing steady-state acquisition (3D-FIESTA) and three-dimensional fast spoiled gradient echo (3D-FSPGR) sequences in patients with trigeminal neuralgia, such a procedure has emerged to be a useful tool for assessing neurovascular compression [1]. The combination of different 3D sequences was reported to provide excellent contrast of trigeminal nerve, REZ and compressing vessel [1, 4, 11, 15, 16].

The purpose of this study was to analyze the accuracy and preoperative diagnostic value of HR-MRI techniques, especially 3D-FSPGR and 3D-FIESTA, for the detection of neurovascular compression (NVC) in patients with

L. Benes (✉) · U. Sure · W. Tirakotai · B. Krischek ·
H. Bertalanffy
Department of Neurosurgery, Philipps University,
Medical Center,
Baldinger Strasse,
35043 Marburg, Germany
e-mail: benes@med.uni-marburg.de
Tel.: +49-6421-2866447
Fax: +49-6421-2866415

K. Shiratori · M. Gurschi
Department of Neuroradiology, Philipps University,
Medical Center,
Marburg, Germany

132

trigeminal neuralgia, in a study where the neuroradiologist was blind to the patients' symptoms.

## Patients, materials and methods

Twenty-one patients who underwent microvascular decompression for TN at our department could be included in the study and were preoperatively assessed by HR-MRI performed with a 1.5-T scanner with a head coil (Signa Horizon; GE Medical Systems, Milwaukee, Wis., USA). Patients with tumor compression at the trigeminal root were excluded. In our study we used a contrast-enhanced 3D-FSPGR technique with radio frequency and gradient spoiling with TR 8.6 ms, TE 1.7 ms, matrix 256×256 and 3 NEXs. Although our sequence was customized to be beneficial for the enhanced gradients of our MRI system, similar sequences for rapid contrast-enhanced 3D imaging are available with all current MRI systems. Both the cerebral vasculature and the trigeminal nerve could be determined with adequate spatial and contrast resolution.

To increase the signal of vascular structures, we injected intravenously a double dose of gadolinium-DTPA (30 ml). One half of the contrast medium (15 ml) was given at the beginning of the examination and the other half when the 3D-FSPGR sequences were started. In seven patients an additional 3D-FIESTA sequence (heavily T2-weighted sequence, equal to 3D-CISS sequences at a SIEMENS unit) were performed with the following parameters: TR 5,000 ms, TE 455 ms, matrix 512×256 and one NEX. For image analysis, multiplanar reconstructions (MPRs) from both sequences with slices parallel to each trigeminal nerve and coronal plains with 0.5-mm thickness and 0.8-mm gap were used. Processing was done at a SUN workstation (Sun Microsystems, Palo Alto, Calif., USA; Advantage Window, GE Medical Systems). The trigeminal root and the vessels were identified on each image and assessed. To avoid prejudice, we matched the images to one neuroradiologist (K.S.), who was blind as to which side exhibited the symptoms. The images and postprocessing multiplanar reconstructions were compared with the video-documented operative observations by the same neurosurgeon (L.B.).

## Results

The mean age of the patients was 62.4 years, ranging from 41 to 75 years. The symptoms of TN were found on the right side in 71.4% ($n$=15) and in 28.6% ($n$=6) on the left side. In 14.3% ($n$=3) the first division of the trigeminal nerve was involved in combination with the second branch. No patient had symptoms of the V1 dermatome alone. The second division of the nerve was affected in 28.6% ($n$=6) and the third division in 33.3% ($n$=7) of the individuals. A combination of the second and third division was clinically apparent in 23.8% ($n$=5) of the cases (see Table 1). In all patients microvascular decompression was performed. The intraoperatively found causative vessel for TN was the superior cerebellar artery (SCA) in 81.0% ($n$=17) or the

**Table 1** Clinically involved dermatomes of TN ($V$ division of trigeminal nerve)

| Dermatomes involved | Cases ($n$) | Cases (%) |
|---|---|---|
| V1 + V2 | 3 | 14.3 |
| V2 | 6 | 28.6 |
| V2 + V3 | 5 | 23.8 |
| V3 | 7 | 33.3 |

anterior inferior cerebellar artery (AICA) in 9.5% ($n$=2). In 4.8% ($n$=1) the Teflon interposition, and in 4.8% ($n$=1) venous compression, was likely responsible for the symptoms of the individuals. In 11 patients (52.4%) HR-MRI demonstrated neurovascular compression in accordance with the intraoperative findings. In the subgroup where, additionally, 3D-FIESTA was available ($n$=7), neurovascular compression was in accordance with the intraoperative finding in 71.4%. One HR-MR image predicted bilateral compression, and one patient had compression neither on MRI nor intraoperatively. The data is summarized in Tables 2 and 3.

Illustrative cases

*Patient 3 (intraoperative compression—neuroradiologically negative)*

The patient was a 60-year-old woman with a typical right-sided trigeminal neuralgia (V3) caused by the right SCA. The neuroradiologist did not identify microvascular compression. Multiplanar 3D-FSPGR reconstruction parallel to each trigeminal nerve did *not* clearly indicate compression of the REZ or the trigeminal nerve (Fig. 1a), because of a gap (white arrow) between the vessel (yellow arrow) and the trigeminal nerve (red arrow), possibly caused by a crossing vein (Fig. 1c, white arrow). Coronal reconstruction depicted the gap (white arrow) between the SCA and the REZ/trigeminal nerve (Fig. 1b). The neuroradiologist did not recognize this relation between vessel and trigeminal nerve as definite proof for microvascular compression, when blind as to which side exhibited the symptoms.

*Patient 8 (intraoperative compression—neuroradiologically positive)*

The patient was a 66-year-old-woman with right-sided trigeminal neuralgia in the second branch area. The radiological findings depicted superior compression of the trigeminal REZ by the right SCA (white arrow in Fig. 2a) corresponding to the intraoperative finding. The neuroradiologist was able to predict compression. Multiplanar 3D-FSPGR reconstruction parallel to each trigeminal nerve (Fig. 2a) and coronal reconstruction of the same patient depicted blood vessel and REZ (white arrow and yellow arrow, respectively, in Fig. 2b). Transversal 3D-FIESTA sequence (heavily T2-weighted sequence, equal to 3D-

**Table 2** Clinical data (*F* female; *M* male; *V1, V2, V3* first, second and third branch divisions of the trigeminal nerve; *SCA* superior cerebellar artery; *AICA* anterior inferior cerebellar artery)

| Patient no. | Gender/age (years) | Clinical findings | Neuroradiologically detected side with 3D-FSPGR sequences/3D-FIESTA sequences available | Intraoperative finding |
|---|---|---|---|---|
| 1 | F/58 | Left V1+2 | Left/no | Left SCA |
| 2 | F/71 | Right V2+3 | Left/no | Right SCA |
| 3 | F/60 | Right V3 | Left/no | Right SCA |
| 4 | M/75 | Right V1+2 | Right/no | Right SCA |
| 5 | F/69 | Right V3 | Left/no | Right SCA |
| 6 | F/61 | Right V2 | Left/no | Right SCA |
| 7 | M/61 | Right V2+3 | Right/no | Right AICA |
| 8 | F/66 | Right V2 | Right/yes | Right SCA |
| 9 | F/59 | Left V2 | Right/yes | Left SCA |
| 10 | M/63 | Right V1+2 | Right/yes | Right petrosal vein |
| 11 | F/67 | Left V2 | Right/yes | Left SCA |
| 12 | F/41 | Right V2 | Right/yes | Right SCA |
| 13 | F/73 | Right V2+3 | Right/yes | Right SCA |
| 14 | M/61 | Left V2 | Left/no | Left SCA |
| 15 | M/60 | Right V3 | Right/yes | Right AICA |
| 16 | M/45 | Left V3 | Left/no | Left SCA |
| 17 | F/60 | Left V3 | Left/no | Left SCA |
| 18 | M/66 | Right V3 | Left/no | Right SCA |
| 19 | F/65 | Right V3 | Left/no | Right Teflon |
| 20 | M/75 | Right V2+3 | No compression/no | Right AICA |
| 21 | M/55 | Right V2+3 | Left/no | Right SCA |

**Table 3** Intraoperative and neuroradiological findings

| Patient no. | Intraoperative compression and neuroradiological finding positive | Intraoperative compression and neuroradiological finding negative | Additionally, 3D-FIESTA sequences available |
|---|---|---|---|
| 1 | + | | |
| 2 | | + | |
| 3 | | + | |
| 4 | + | | |
| 5 | | + | |
| 6 | | + | |
| 7 | + | | |
| 8 | + | | + |
| 9 | | + | + |
| 10 | + | | + |
| 11 | | + | + |
| 12 | + | | + |
| 13 | + | | + |
| 14 | + | | |
| 15 | + | | + |
| 16 | + | | |
| 17 | + | | |
| 18 | | + | |
| 19 | | + | |
| 20 | | + | |
| 21 | | + | |

CISS at SIEMENS units), with the parameters TR 5,000 ms, TE 455 ms, matrix 512×256 and 1 NEX, showed compression of the SCA at the trigeminal root (white arrow in Fig. 2c).

*Patient 13 (intraoperative compression—neuroradiologically positive)*

The patient was a 73-year-old-woman with right-sided trigeminal neuralgia in the second and third division of the trigeminal nerve caused by a loop of the SCA that followed the trigeminal nerve (white arrow in Fig. 3a). The radiological finding was identical to the intraoperative finding (Fig. 3c). The neuroradiologist could correctly predict compression of the nerve without knowing the symptoms of the patient.

**Discussion**

There is still no evidence for the pathophysiological mechanism of trigeminal neuralgia in the pertinent literature. The most reasonable theory is vascular compression at the REZ adjacent to the pons, promoting ectopic stimulation from the altered nerve fibers and allowing transmission of painful impulses [11]. The worldwide, accepted, treatment modality is neurovascular decompression, promoted by Jannetta since 1967 [6]. In the past decade magnetic resonance tomography emerged as the diagnostic tool of

134





**Fig. 1 a, b** Images in a 60-year-old woman (patient 3) with right-sided trigeminal neuralgia (V3) caused by the right SCA, which was not identified as microvascular compression by the neuroradiologist. **a** Multiplanar 3D-FSPGR reconstructions parallel to each trigeminal nerve do *not* clearly indicate compression of the REZ or the trigeminal nerve. Note the gap (*white arrow*) between the vessel (*yellow arrow*) and the trigeminal nerve (*red arrow*). **b** Coronal reconstruction showing the gap (*white arrow*) between the SCA and the REZ/trigeminal nerve. **c** Intraoperative finding. Trigeminal nerve (*red arrow*) compressed by the right SCA (*yellow arrow*). Note the vein (*white arrow*) crossing the trigeminal nerve and the artery. This vein might be responsible for the gap between artery and nerve seen in the MRI and recognized by the neuroradiologist

choice for this pathological condition. The pertinent literature includes a growing number of reports pointing out the accuracy of high resolution MRI in predicting compression on the trigeminal root [4, 8, 11, 15]. Recent developments in 3D-FSPGR sequences has led to their increased value for vascular imaging [5]. The double-dose contrast-enhanced 3D-FSPGR sequences depict fast-flowing blood as high signal intensity and provide thin-slice images that can be processed for multiplanar reconstruction parallel and coronal to the trigeminal nerve to gain information of possible vascular compression. The contrast resolution of 3D-FSPGR, between cerebrospinal fluid and the trigeminal nerve, is not as satisfactory as for 3D-FIESTA. This high-resolution, heavily T2-weighted image is capable of contrasting both vascular structures and nerve from cerebrospinal fluid. A combination of both high-resolution imaging techniques is more likely to depict the causative

**Fig. 2a–c** Images in a 66-year-old woman (patient 8) with identical radiological and intraoperative findings of superior compression of the trigeminal REZ by the right SCA (*white arrow*). The neuroradiologist was able to predict compression. **a** Multiplanar 3 D-FSPGR reconstructions parallel to each trigeminal nerve (only right side exposed). **b** Coronal reconstruction of the same patient depicting blood vessel (*white arrow*) and REZ (*yellow arrow*). **c** Transversal 3D-FIESTA sequence (heavily T2-weighted sequence, equal to 3D-CISS at Siemens units) showing compression of SCA at the trigeminal root (*white arrow*)

vessel in patients suffering from trigeminal neuralgia if the investigator knows which side exhibits the symptoms. To overcome prejudice we analyzed the accuracy of high-resolution imaging for microvascular compression by



**Fig. 3a–c** Multiplanar 3D-FSPGR reconstruction parallel (a) and coronal (b) to each trigeminal nerve in a 73-year-old woman (patient 13) with right-sided trigeminal neuralgia (V2 and V3) caused by a loop of the SCA that followed the trigeminal nerve (*white arrow*). The radiological finding was identical to the intraoperative finding (c). Note the SCA loop (*white arrow*), which is compressing the trigeminal nerve (*black asterisk*). The neuroradiologist was able to predict the compression of the nerve

withholding the patients' clinical details from the neuroradiologist.

Our data demonstrate that high-resolution magnetic resonance imaging (HR-MRI) using double-dose contrast-enhanced 3D-FSPGR ($n$=21) and 3D-FIESTA ($n$=7) sequences in patients with trigeminal neuralgia is presently not sufficient enough for an accurate detection and assessment to be made of neurovascular compression when the neuroradiologist is blind as to which side exhibits the symptoms. Although 3D-imaging provided high resolution between the cerebrospinal fluid and the trigeminal nerve in only 52.4% of the individuals, neurovascular compression could be predicted in accordance with the intraoperative finding in our study. In the seven individuals where, additionally, 3D-FIESTA sequences were applied the accordance inclined to 71.4%. This detail conveys the impression that better spatial resolution of nerve, vessel and cerebrospinal fluid improves the diagnostic value of HR-MRI. Even stereoscopic views and fly-through movie-style images are helpful tools for studying the surrounding anatomy [8]. As neuroradiologists, in almost all cases, can depict a vessel in close relationship to the trigeminal nerve or REZ, they always have the difficulty of deciding whether this is the causative vessel for the patients' complaints.

Therefore, 3D-FIESTA, which contrasts liquid and solid structures, is a very helpful tool to determine whether there is cerebrospinal fluid between the vessel and the nerve. The additional use of complementary time-of-flight (TOF) MR angiography sequences with and without contrast enhancement as obtained by Yousry et al. [16] provides a reasonable tool to assess the neurovascular relationships between all roots of the trigeminal nerve. This complementary technique might have improved our results in terms of causative vessel detection.

Another problem of 3D-MRI imaging is the difficulty in examining and recognizing smaller arterial branches, or even veins. Small causative vessels can fail to be noticed by MRI due to overlap with the vertebro-basilar artery or other dominant large arteries [3]. However, our results reveal that the specificity and accuracy of these methods that mainly use 3D-FSPGR MRI and reconstructions are relatively low. The problem of image resolution might have influenced our results, while detecting the causative vessel for trigeminal neuralgia in this single-blind setting. Using only 3D-FSPGR sequences the investigator always had the difficulty of deciding whether visualized vessels were causative or not. These results, therefore, are contrary to some data presented in the literature, where up to 93% [10] of the vascular compression was identified by MR angiography, or 95% [1] after 3D reconstructed images of 3D-FISP and 3D-CISS sequences had been observed. To overcome these shortcomings we must achieve higher resolution MR images to gain better discrimination of different vessel types compressing the trigeminal nerve and its entry zone.

Our study had several limitations. First, the number of lesions was small. Second, 3D-FIESTA sequences were used only in seven individuals. Finally, withholding patient's clinical details from an investigator is not a realistic daily routine task, but it excludes prejudice in the present analysis.

Nevertheless, the 3D imaging techniques used in our study provided only limited information, and one should consider carefully their use as a tool for identifying patients with microvascular compression.

## Conclusion

High-resolution magnetic resonance imaging using double-dose contrast-enhanced 3D-FSPGR sequences is presently

136

not sufficient enough to detect neurovascular compression in a single-blind setting. The surgical decision making for microvascular decompression in patients with trigeminal neuralgia should still be made by clinical consideration. HR-MRI should presently not be regarded as a decision-making tool for routine clinical work until its image quality is improved by superior image resolution for the trigeminal nerve, the veins and the arteries. It should not be regarded as a *conditio sine qua non* for microvascular decompression surgery.

## References

1. Akimoto H, Nagaoka T, Nariai T, Takada Y, Ohno K, Yoshino N (2002) Preoperative evaluation of neurovascular compression in patients with trigeminal neuralgia by use of three-dimensional reconstruction from two types of high-resolution magnetic resonance imaging. Neurosurgery 51:956–961
2. Barker FG, Jannetta PJ, Bissonette DJ, Larkins MV, Jho HD (1996) The long-term outcome of microvascular decompression for trigeminal neuralgia. N Engl J Med 334:1077–1083
3. Chang JW, Chang JH, Park YG, Chung SS (2000) Microvascular decompression in trigeminal neuralgia: a correlation of three-dimensional time-of-flight magnetic resonance angiography and surgical findings. Stereotact Funct Neurosurg 74:167–174
4. Hastreiter P, Naraghi R, Tomandl B, Bonk A, Fahlbusch R (2003) Analysis and 3-dimensional visualization of neurovascular compression syndromes. Acad Radiol 10:1369–1379
5. Heiss SG, Shifrin RY, Sommer FG (2000) Contrast-enhanced three-dimensional fast spoiled gradient-echo renal MR imaging: evaluation of vascular and nonvascular disease. Radiographics 20:1341–1352
6. Jannetta PJ (1967) Arterial compression of the trigeminal nerve at the pons in patients with trigeminal neuralgia. J Neurosurg 26 [Suppl]:62
7. Jannetta PJ, Robbins LJ (1980) Trigeminal neuropathy—new observations. Neurosurgery 7:347–351
8. Kakizawa Y, Hongo K, Takasawa H, Miyairi Y, Sato A, Tanaka Y, et al (2003) "Real" three-dimensional constructive interference in steady-state imaging to discern microneurosurgical anatomy—technical note. J Neurosurg 98:625–630
9. McLaughlin MR, Jannetta PJ, Clyde BL, Subach BR, Comey CH, Resnick DK (1999) Microvascular decompression of cranial nerves: lessons learned after 4400 operations. J Neurosurg 90:1–8
10. Meaney JF, Eldridge PR, Dunn LT, Nixon TE, Whitehouse GH, Miles JB (1995) Demonstration of neurovascular compression in trigeminal neuralgia with magnetic resonance imaging. Comparison with surgical findings in 52 consecutive operative cases. J Neurosurg 83:799–805
11. Patel NK, Aquilina K, Clarke Y, Renowden SA, Coakham HB (2003) How accurate is magnetic resonance angiography in predicting neurovascular compression in patients with trigeminal neuralgia? A prospective, single-blinded comparative study. Br J Neurosurg 17:60–64
12. Rothman KJ, Monson RR (1973) Survival in trigeminal neuralgia. J Chronic Dis 26:303–309
13. Rovit RL (1992) Trigeminal neuralgia. Compr Ther 18:17–21
14. Wilkins RH (1979) Tic douloureux. N C Dent J 62:27–29; 31
15. Yoshino N, Akimoto H, Yamada I, Nagaoka T, Tetsumura A, Kurabayashi T, et al (2003) Trigeminal neuralgia: evaluation of neuralgic manifestation and site of neurovascular compression with 3D CISS MR imaging and MR angiography. Radiology 228:539–545
16. Yousry I, Moriggl B, Holtmannspoetter M, Schmid UD, Naidich TP, Yousry TA (2004) Detailed anatomy of the motor and sensory roots of the trigeminal nerve and their neurovascular relationships: a magnetic resonance imaging study. J Neurosurg 101:427–434

**Ahmed, Faisal**

| | |
|---|---|
| **From:** | Ahmed, Faisal |
| **Sent:** | Tuesday, February 28, 2012 10:17 AM |
| **To:** | Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra |
| **Subject:** | RE: Hurt Knee Again |

As I was trying to get over to clinic yesterday in a hurry I twisted my knee again, and later walking to the parking structure in the rain, I slipped off the pavement and landed awkwardly. Can't put weight on my right leg at all today without a lot of pain. I requested a temporary handicap placard from the doctor's office, and waiting for them to get back to me. The walk from the parking structure is too far for me in my current state. Hopefully they will get back to me today, otherwise I have an appointment with the doctor tomorrow afternoon and will obtain the placard tomorrow. If you need to contact me, please call 858-523-8445, and I will also be checking emails.

**From:** Kim, Hyong
**Sent:** Friday, February 17, 2012 9:15 AM
**To:** Ahmed, Faisal; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** RE: Hurt Knee Again

Hope it's not serious. Let me know what they find and recommend.
Feel better,
Nick

*Nick H. Kim, M.D.*
*Associate Clinical Professor of Medicine*
*Fellowship Program Director*
*Clinical Service Chief, Thornton*
*Pulmonary and Critical Care Medicine*
*UCSD Medical Center*
*La Jolla, CA*

*CONFIDENTIALITY NOTICE*
*The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please contact the sender and delete the material from any computer.*

*PRIVILEGED & CONFIDENTIAL: CA Evidence Code 1157 Protected*

**From:** Ahmed, Faisal
**Sent:** Friday, February 17, 2012 9:11 AM
**To:** Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** Hurt Knee Again

Hi All,

Hurt my right knee last night. Called my surgeon's office, and the nurse instructed me to go to urgent care. I don't think it's that bad, and can't afford to spend all day in waiting, so I'm seeing if it would be possible to just go get some x-rays. I will be in the office today but a bit later, if you need to reach me urgently please call at (858) 523 – 8445.

Thank you,

Faisal

1

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS
ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL. ANY REVIEW, RETRANSMISSION,
DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR
ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED. IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE
CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.

**Employee Occupational Incident Report for [ Faisal Ahmed ]**
ehswc@ucsd.edu
Sent: Friday, March 02, 2012 12:41 PM
To: ehswc@ucsd.edu
Cc: Ahmed, Faisal; Kim, Hyong

## EMPLOYEE OCCUPATIONAL INCIDENT REPORT

### Section 1:

| | |
|---|---|
| Last 4 Digits of Social Security Number: | 2913 |
| Name: | Faisal Ahmed |
| Sex: | Male |
| Address: | 4055 Porte La Paz #149 |
| City: | San Diego |
| Zip Code: | 92122 |
| Home Phone: | 858-245-8445 |
| Work Phone: | 858-657-7122 |
| Mail Code: | 7381 |
| Email: | f-ahmed@ucsd.edu |
| Department: | Pulmonary Medicine |
| Job Title: | SRA II |
| Supervisor Name: | Hyong Kim, MD |
| Supervisor Phone: | 858-657-7150 |
| Supervisor Mail Code: | 7381 |
| Supervisor email: | h33kim@ucsd.edu |
| Employment Type: | Full Time |
| Other Employment: | NO |
| Date of Incident: | 02/27/2012 |
| Time of Incident: | 3:30 PM and 6:00 PM |
| Time Shift Began: | |
| Address/Building name & room # of incident : | 9444 Medical Center Drive, 2nd floor, La Jolla, CA 92093 |
| State all parts of body and type of injuries invloved: | Right knee |

While rushing (because I was told to "hurry") to prepare a box to take to clinic, I turned to put the box down and twisted my already injured right knee. Later that day, while walking to the parking structure north of

| | |
|---|---|
| Describe how incident occurred: | the Sulpizio Cardiovascular Center, because my knee was extremely unstable at that point and the sidewalk was muddy from the rain, I slipped off the sidewalk landing awkwardly on the pavement. This caused further injury to my right knee. |
| Did this injuries/illness invlove recombinant DNA: | NO |

**Section 2:**

| | |
|---|---|
| Incident was reported to: | Dr. Hyong Kim |
| Date reported: | 2/28/2012 |

**Section 3:**

| | |
|---|---|
| Do you require medical treatment for this injury: | Treatment was/will be provided by: Dr. Tyler Forbes and Dr. Jan Fronek |

**Ahmed, Faisal**

| | |
|---|---|
| **From:** | Leedy, Deborah |
| **Sent:** | Friday, March 02, 2012 1:39 PM |
| **To:** | Ahmed, Faisal; Kaplan, Linda; Kim, Hyong |
| **Subject:** | RE: Hurt Knee Again |

Hi Linda,

There is a section on the Worker's Comp claim that a supervisor must also complete and fax...you should probably do this in Dr. Kim's absence.

Thanks,
Debby

Debby Leedy
858-246-0936
fax: 858-246-0940

---

**From:** Ahmed, Faisal
**Sent:** Friday, March 02, 2012 1:31 PM
**To:** Kaplan, Linda; Kim, Hyong
**Cc:** Leedy, Deborah
**Subject:** RE: Hurt Knee Again

Hi Linda,

I have filed an Incident Report and am stilling considering whether to pursue a Workers' Comp claim.


Thank you,


Faisal


Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu


**From:** Kaplan, Linda
**Sent:** Thursday, March 01, 2012 3:01 PM
**To:** Ahmed, Faisal; Kim, Hyong
**Cc:** Leedy, Deborah
**Subject:** RE: Hurt Knee Again

Hi Faisal,

I'm sorry you are having this trouble. Hope to see you tomorrow.

1

In the meantime, would you please advise as to whether or not you plan to pursue a Workers' Comp claim?

Thanks,
Linda


**From:** Ahmed, Faisal
**Sent:** Thursday, March 01, 2012 2:48 PM
**To:** Kaplan, Linda; Kim, Hyong
**Subject:** RE: Hurt Knee Again

Hi Linda and Dr. Kim,

Although my fiancée brought me the handicap placard from the DMV this afternoon, I discovered that I couldn't press the brakes on my car without severe pain in my right knee. Unfortunately, by that time, she had already gone back to work and is unable to come back to give me a ride today. However, she should be able to do so tomorrow. I will email when I get in to the office tomorrow.

Thank you,

Faisal


Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu


THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL. ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED. IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.


**From:** Kaplan, Linda
**Sent:** Thursday, March 01, 2012 10:53 AM
**To:** Ahmed, Faisal
**Cc:** Kim, Hyong
**Subject:** RE: Hurt Knee Again

Hi Faisal,

I'm sorry to hear of your injury and hope you will be back to 100% soon. Please email me so I know when you have returned to office and also advise whether or not you plan to pursue a Workers' Comp claim.

Thanks,
Linda

Linda Kaplan, MBA
Administrator
Division of Pulmonary and Critical Care Medicine
University of California, San Diego
9300 Campus Point Drive, MC 7381
La Jolla CA 92037-7381
Phone: 858-657-7125
Fax: 858-657-7107
Email: lakaplan@ucsd.edu

**From:** Ahmed, Faisal
**Sent:** Thursday, March 01, 2012 8:01 AM
**To:** Kim, Hyong
**Cc:** Kaplan, Linda; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra; Poch, David; Papamatheakis, Demosthenes; Whalen, Annette
**Subject:** RE: Hurt Knee Again

I was also hoping that it was not serious but the doctor's opinion is that I've injured my ACL in my right knee too, thus now I have two injured knees. He ordered a MRI to verify the extent of my injuries pending insurance authorization. It didn't feel this bad until the events on Monday, which may have caused further injury to an already unstable knee. The doctor wants me back on crutches, and has restricted my ability to work. I explained that you would need documentation, as you requested the last time I had work restrictions. I had him fill out the attached UCSD EMPLOYEE PHYSICAL FUNCTIONAL CAPABILITIES & RESTRICTIONS form, please find it attached (I will bring the hard copy for you to sign). He also filled out the form for a temporary disabled placard. I plan to be back in the office after getting the placard from the DMV today. However due to my work restrictions, I won't be able to get to and from clinic in a hurry, or anything else which requires healthy legs for possibly several months.

**From:** Ahmed, Faisal
**Sent:** Tuesday, February 28, 2012 10:17 AM
**To:** Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** RE: Hurt Knee Again

As I was trying to get over to clinic yesterday in a hurry I twisted my knee again, and later walking to the parking structure in the rain, I slipped off the pavement and landed awkwardly. Can't put weight on my right leg at all today without a lot of pain. I requested a temporary handicap placard from the doctor's office, and waiting for them to get back to me. The walk from the parking structure is too far for me in my current state. Hopefully they will get back to me today, otherwise I have an appointment with the doctor tomorrow afternoon and will obtain the placard tomorrow. If you need to contact me, please call 858-523-8445, and I will also be checking emails.

**From:** Kim, Hyong
**Sent:** Friday, February 17, 2012 9:15 AM
**To:** Ahmed, Faisal; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** RE: Hurt Knee Again

Hope it's not serious. Let me know what they find and recommend.
Feel better,
Nick

3

Nick H. Kim, M.D.
Associate Clinical Professor of Medicine
Fellowship Program Director
Clinical Service Chief, Thornton
Pulmonary and Critical Care Medicine
UCSD Medical Center
La Jolla, CA

CONFIDENTIALITY NOTICE
The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material.  Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited.  If you received this e-mail in error, please contact the sender and delete the material from any computer.

PRIVILEGED & CONFIDENTIAL: CA Evidence Code 1157 Protected

**From:** Ahmed, Faisal
**Sent:** Friday, February 17, 2012 9:11 AM
**To:** Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** Hurt Knee Again

Hi All,

Hurt my right knee last night.  Called my surgeon's office, and the nurse instructed me to go to urgent care.  I don't think it's that bad, and can't afford to spend all day in waiting, so I'm seeing if it would be possible to just go get some x-rays.  I will be in the office today but a bit later, if you need to reach me urgently please call at (858) 523 – 8445.


Thank you,

Faisal

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone:  858-657-7122
Fax:  858-657-7107
e-mail: f-ahmed@ucsd.edu


THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL.  ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED.  IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.

**Ahmed, Faisal**

| | |
|---|---|
| **From:** | Ahmed, Faisal |
| **Sent:** | Friday, February 24, 2012 9:57 AM |
| **To:** | Kim, Hyong |
| **Cc:** | 'Melissa A. Thrasher (mthrasher@ucsd.edu)'; Lombardi, Sandra; Annette Whalen |
| **Subject:** | RE: Hurt Knee Again |

The doctor's office and rescheduled the appointment for 2/29/2012. I'll have to leave at 2:30 on Wednesday day. I will be in the office all day Monday.

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

---

**From:** Ahmed, Faisal
**Sent:** Friday, February 17, 2012 3:57 PM
**To:** Kim, Hyong
**Cc:** 'Melissa A. Thrasher (mthrasher@ucsd.edu)'; Lombardi, Sandra; Annette Whalen
**Subject:** RE: Hurt Knee Again

Didn't hear back from them until mid day, so I decided to go on Monday to get x-rays. I don't think there is anything broken, but the doctors want to be able to rule out that possibility. I've got an appointment with the surgeon on 2/27/2012 and will be leaving the office at 3:00 PM that day.

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

---

**From:** Ahmed, Faisal
**Sent:** Friday, February 17, 2012 10:47 AM
**To:** Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** RE: Hurt Knee Again

Left a message for the nurse to put in the orders for the x-rays. I'm in the office now. When I hear back from their office, I might go and have the x-rays taken later today.

Faisal Ahmed
Clinical Research Coordinator

1

Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381
La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

**From:** Kim, Hyong
**Sent:** Friday, February 17, 2012 9:15 AM
**To:** Ahmed, Faisal; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** RE: Hurt Knee Again

Hope it's not serious. Let me know what they find and recommend.
Feel better,
Nick

*Nick H. Kim, M.D.*
*Associate Clinical Professor of Medicine*
*Fellowship Program Director*
*Clinical Service Chief, Thornton*
*Pulmonary and Critical Care Medicine*
*UCSD Medical Center*
*La Jolla, CA*

*CONFIDENTIALITY NOTICE*
*The information transmitted in this e-mail is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this e-mail in error, please contact the sender and delete the material from any computer.*

*PRIVILEGED & CONFIDENTIAL: CA Evidence Code 1157 Protected*

**From:** Ahmed, Faisal
**Sent:** Friday, February 17, 2012 9:11 AM
**To:** Kim, Hyong; Melissa A. Thrasher (mthrasher@ucsd.edu); Lombardi, Sandra
**Subject:** Hurt Knee Again

Hi All,

Hurt my right knee last night. Called my surgeon's office, and the nurse instructed me to go to urgent care. I don't think it's that bad, and can't afford to spend all day in waiting, so I'm seeing if it would be possible to just go get some x-rays. I will be in the office today but a bit later, if you need to reach me urgently please call at (858) 523 – 8445.


Thank you,

Faisal

Faisal Ahmed
Clinical Research Coordinator
Pulmonary Vascular Division
UCSD Medical Center
9300 Campus Point Drive # 7381
Mail Code: 7381

La Jolla, CA 92037 - 7381
Phone: 858-657-7122
Fax: 858-657-7107
e-mail: f-ahmed@ucsd.edu

THE INFORMATION TRANSMITTED IN THIS E-MAIL IS INTENDED ONLY FOR THE PERSON OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED MATERIAL. ANY REVIEW, RETRANSMISSION, DISSEMINATION OR OTHER USE OF OR TAKING OF ANY ACTION IN RELIANCE UPON THIS INFORMATION BY PERSONS OR ENTITIES OTHER THAN THE INTENDED RECIPIENT IS PROHIBITED. IF YOU RECEIVED THIS E-MAIL IN ERROR, PLEASE CONTACT THE SENDER AND DELETE THE MATERIAL FROM ANY COMPUTER.

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Friday, August 02, 2013 1:14 PM |
| **To:** | Ahmed, Faisal |
| **Subject:** | RE: Doctor's note(s) for absences - July 2013 |

| | |
|---|---|
| **Follow Up Flag:** | Follow Up |
| **Due By:** | Saturday, August 10, 2013 3:47 PM |
| **Flag Status:** | Flagged |

Hi Faisal,

Thank you for contacting me. I'm so glad to hear you're feeling better. When I spoke to the department last week they were going to put in the paperwork to get all of your equipment and furniture moved as you requested. I will follow up to see how things are going. We had also discussed getting an air filter. I'm concerned that you indicated you had an air filter on your desk before this latest flare-up but that did not seem to help your situation.

Thank you for the JAN link. I'm very familiar with the site. It provides good overall information but, as they note, cannot address each individual's situation. We must rely on each individual's medical provider to give us guidance in this regard.

I believe we should have another meeting to document the changes being made for you and see if you have any further requests/work restrictions to be considered. We have contacted EH&S and made arrangements for air testing to be done, both to your old office and new office to make sure there are no discernible irritants. Do I understand you do not expect to be well enough to return to work for at least 2 more weeks? We can schedule our IP for when you are released by your provider to return to work. When you bring in the release from your physician to return, if there are any restrictions or recommendations we can discuss at that time as well.

Best wishes for a speedy recovery! Please let me know how you're doing. Linda

**Linda Morgan**
**619-543-7709**

• Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Friday, August 02, 2013 12:41 PM
**To:** Morgan, Linda
**Subject:** RE: Doctor's note(s) for absences - July 2013

Hi Linda,

I received your phone calls inquiring about my condition. My condition is changing day by day, it was worse last week than it is now, so I hope that I am slowly but surely improving. Sorry for not calling you back, but I managed to drop my phone, breaking it during some severe pain I was experiencing. I hope to have a replacement soon.

Has there been any progress on my change of work environment request? If another IP meeting is necessary then it may be a couple of weeks before I would able to attend the meeting. Please let me know if there have been any new developments.

Providing this link regarding respiratory illness and job accommodations to the department may also be helpful in facilitating the IP.  Please feel free to do so if you agree.

Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Morgan, Linda
**Sent:** Wednesday, July 24, 2013 11:02 AM
**To:** Ahmed, Faisal
**Subject:** RE: Doctor's note(s) for absences - July 2013

Hi Faisal,

I'm so sorry you are having this health issue again!  I am happy to work with you regarding the move to an office with a window as recommended by Dr. Wolf and have requested a meeting be set up as soon as possible so that these arrangements can be made.  My suggestions would be to file a work comp claim since you feel strongly the work place is causing this health problem.  Workers' compensation is the system for employees who suffer illness/injury due to work (including the workplace).  You will be able to receive medical care, compensation for missing work and other benefits if you claim is accepted.  I know Ellen Mathews forwarded the information to your some time ago for filing a claim.  If you like, I can send again.

If you feel you need to obtain an attorney you should certainly do so.  If you wish to pursue internal remedies, you can call Aimee Gallagher, Labor Relations Specialist at 619-543- 5929; agallagher@ucsd.edu.  You may also want to contact the Ombuds Office: http://blink.ucsd.edu/HR/services/support/ombuds.html.

I am happy to work with you on the accommodation and I believe your office will be moved but I don't know how long it will take to make those arrangement.  I talked to Ellen this morning and she indicated the move is in the works.  I also don't know the department practice regarding the classes at the Rec Center or documentation for time missed.   Whatever rules are applied to all staff should also be applied to you.

**Linda Morgan**
**619-543-7709**

II Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

2

**From:** Ahmed, Faisal
**Sent:** Wednesday, July 24, 2013 9:54 AM
**To:** Morgan, Linda
**Subject:** FW: Doctor's note(s) for absences - July 2013

Hi Linda,

Now I am being singled out to provide doctors' notes for appointments that I had in the past as well as one's I will in the future.  As you may remember, I was also singled out by not being allowed to receive pay from my employment at UCSD's recreation center, which Ellen Matthews claimed was "standard policy" when we discussed it during our last IP meeting but this is the "reason" I got from Sarah Walter in an email originally regarding the issue:

> We received the request to grant alternate access for you to do some teaching with recreation, but based on the fact that you are on probation, have missed quite a few days already and are still learning the job, we feel it is in your best interest and the department's best interest at this time that you focus your efforts on learning this new job.

> If you have more questions and would like to speak with Ellen Mathews about this, we can do this.

Please see the attached email and also attached picture of my face as of today.

I've repeatedly requested to be allowed to use a different room so that I'm not exposed to whatever is making me sick. Instead of simply accommodating this reasonable request, they've singled me out by denying me the opportunity to officially teach at the recreation center and now are asking for additional documentation for doctor's appointments above and beyond what is required of other employees.  Unless you feel that you can mediate this matter, I feel the need to find legal representation to start dealing with the department.  Please let me know your thoughts.


Thank you,

Faisal


Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Devon Gessert [dgessert@ucsd.edu]
**Sent:** Wednesday, July 24, 2013 8:08 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Ellen Mathews; Walter, Sarah
**Subject:** Doctor's note(s) for absences - July 2013

3

Hi Faisal,

Can you please provide doctor's note(s) covering the time you have spent out of the office (even if these were partial day absences) for illness and doctor's appointments?

Prior to this week, I believe the absences were on 7/9, 7/10, 7/15 and 7/16 - please correct me if I'm mistaken. And then this week, it pertains to your hours absent yesterday 7/23 as well as this coming Friday, 7/26.

Thanks,
Devon

--
Devon Gessert
Director of Clinical Operations
Alzheimer's Disease Cooperative Study
University of California, San Diego
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-344-1699
Email: dgessert@ucsd.edu
http://www.adcs.org

Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Ahmed, Faisal |
| **Sent:** | Friday, November 29, 2013 2:48 PM |
| **To:** | Morgan, Linda |
| **Cc:** | Mathews, Ellen |
| **Subject:** | RE: Work Restrictions by Friday 11/22 |

Hi Linda,

Since the meeting will require expertise on the the collective bargaining agreement and it is uncertain whether my request for medical leave can be extended by one week to 12.09.2013, I must get the advice of my attorney, A. Melissa Johnson, with The Spencer Law Firm. I will tentatively accept the meeting invitation for Monday morning but I may have to reschedule depending on what she advises and if she feels it is necessary for her to be present for the meeting also. I will let you know first thing Monday morning.


Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

**From:** Morgan, Linda
**Sent:** Tuesday, November 26, 2013 4:44 PM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** RE: Work Restrictions by Friday 11/22

No worries Faisal. I look forward to speaking with you on Monday. I'm going to invite Aimee Gallagher to participate with us as she is the expert on the collective bargaining agreement and will be able to advise us on the status of your probationary period. Have a wonderful Thanksgiving! Linda

Linda Morgan
619-543-7709

Π Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Tuesday, November 26, 2013 4:15 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen
**Subject:** RE: Work Restrictions by Friday 11/22

Hi Linda,

Sorry I missed your calls, I had a couple of appointments this afternoon and didn't get a chance to call you back.   Yes, I am available to talk with you and Ellen at 11:00 AM on 12/02.  Thank you.


Happy Thanksgiving,


Faisal


*Sent from my Verizon Wireless 4G LTE DROID*


"Morgan, Linda" <lcmorgan@ucsd.edu> wrote:

Hi Again Faisal,

I spoke with Ellen today and we think it would be a great idea for us to talk with you regarding your return to work and accommodations so that we can understand directly from you what you need to return to work.  Ellen can also talk about the department's schedule during December.  **I would like to set up a telephone meeting for us to speak on Monday, 12/2/13 at 11 am.**

I left you a message just before noon today and just tried to call you again (it's about 3:10 pm).  I just got a message that your mailbox is full.  Please let me know if you are available at 11 am on Monday.  If not, please give me an alternate time.  I would like for us to make a plan as soon as possible.  Thanks, Linda

Linda  Morgan
619-543-7709

ᴨ Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Tuesday, November 26, 2013 11:01 AM
**To:** Morgan, Linda
**Subject:** RE: Work Restrictions by Friday 11/22

Hi Linda,

When would be a good time to call you today or tomorrow?


Best regards,

Faisal

**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Morgan, Linda
**Sent:** Monday, November 25, 2013 12:47 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Gallagher, Aimee; Quilter, Aimee; Mathews, Ellen; Cuellar, Debbra
**Subject:** RE: Work Restrictions by Friday 11/22

Hi Faisal,

I'm sorry to hear your recovery is not progressing as expected. As I'm sure you understand, your department is experiencing a severe hardship with regard to staffing and has an urgent need for the current staff to be available to work. It is unclear at this point whether or not your leave can be extended. We understand your intentions are to return to work as soon as you are able however your leave has been extended numerous times over the past six months leaving the department no clear expectation that 12/9/13 will be the actual date you will be able to return.

We're also confused with regard to the medical information you provided. Dr. Wolf indicated in his 7/18/13 letter that your condition may be due to "various environmental triggers that can exacerbate his respiratory condition." At that time Dr. Wolf recommended you be provided with a working window for access to fresh air and noted "an air purification system . . . would also be helpful." Dr. Wolf does note he has no idea whether or not these changes will help you but feels they may. So, is the air purification system an accommodation requirement

3

before you will be able to return to work or is this optional?  Based on his opinion discussed below, do you still need a window?

In his 11/18/13 letter Dr. Wolf indicates "Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face.  Facial pain as a result of this sensitivity to cold air blowing directly on these areas , as well as visual impairment from the injury near his eye during April and May of 2013, exacerbated his symptoms."  From this note we are given to understand the issue is with the temperature and force of the air rather than the air quality itself?  And has the situation changed from a respiratory problem to facial pain and eye strain such that an adjustment to the air flow and temperature in your office would be sufficient to address the issues?  Now that the weather is cooler we expect the air conditioner to provide warm, rather than cool air.  Will that make a difference?  Or, are you requesting a window, a change in the air vent and an air purification system before you could return to work?

Dr. Wolf advises you will need a larger computer monitor, at least 24 inches.  In my experience visual difficulties are aided by an increase in the size of the font rather than the size of the monitor.  We may need additional information on this requirement.

Dr. Wolf recommends you "begin at a 5 hour work day and gradually increase this to a full 8 hour work day in the first 2 weeks back."  Does this mean you can work 5 hours the first week and then increase to 8 hours the second week?  It is unclear what sort of graduated return to work is being requested.

Dr. Wolf seems to imply quite strongly that your current difficulties were caused by either the air quality in your office and/or the air temperature and directional flow from the air conditioning vent in your office and yet multiple attempts to encourage to file for workers' compensation have been ignored.  I'm confused about why you would not want to pursue a remedy that could potentially provide you with medical care, as well as an income benefit if you cannot work since you have repeatedly indicated your work environment caused your current medical issues.

We are very concerned that Dr. Wolf is not confident changes to the work environment will provide a safe environment for you.  We are also not clear on the specific accommodation(s) being requested.  Finally, based on the urgent staffing needs, it is not certain your leave can be extended to 12/9/13.  I would welcome a call to discuss these matters  and get clarification on your specific request.  I look forward to hearing from you.  Linda (619-543-7709)

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

Π Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Friday, November 22, 2013 9:23 PM
**To:** Mathews, Ellen; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: Work Restrictions by Friday 11/22

Hello Ellen,

Thank you, however I am not quite well yet and have not healed as much as expected during this week. As a result my physician felt that I would require an additional week to finish healing. Please find attached an updated Return to Work Certification, an updated Leave of Absence Request, and a note from the doctor.


Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

**From:** Mathews, Ellen
**Sent:** Tuesday, November 19, 2013 6:23 PM
**To:** Ahmed, Faisal; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** Work Restrictions by Friday 11/22

Hello Faisal,

Thank you for the update and glad you are better.

Please be sure to get us a note from your health care provider by this Friday 11/22/13 regarding any work restrictions. We need to review these before your actual return to work date of 12/02/13.

If you have any other questions, please let us know.

Regards,

# Ellen

Ellen Mathews
HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Monday, November 18, 2013 8:42 PM
**To:** Mathews, Ellen; Cuellar, Debbra
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen and Debbra,

Please attached a Return to Work Certification (a note to follow), and a Leave of Absence Request.

Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Monday, October 21, 2013 10:03 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Thank you Faisal.

Ellen

---

**From:** Ahmed, Faisal
**Sent:** Friday, October 18, 2013 6:33 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen,

Please find attached an updated note from my doctor.


Thank you,

Faisal

**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited. If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Tuesday, October 15, 2013 9:47 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Thank you for your reply. The dr's note with updated status may be faxed to my attention at 858-822-0411 or sent to my email,

We will expect hear from you and/or you doctor this Friday 10/18.

Ellen

---

**From:** Ahmed, Faisal
**Sent:** Tuesday, October 15, 2013 9:38 AM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee; Quilter, Aimee
**Subject:** RE: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Ellen,

Sorry, I did not see the email below before but I did receive your voicemail this morning. The next scheduled visit with my physician is on the afternoon of 10.18.2013. That is when I will be able to provide you an update as to the status of my leave.


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst
Alzheimer's Disease Cooperative Study
University of California, San Diego
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355
Email: f1ahmed@ucsd.edu
http://www.adcs.org



-------- Original message --------
From: "Mathews, Ellen" <ESMATHEWS@mail.ucsd.edu>
Date: 10/12/2013 12:38 PM (GMT-08:00)
To: "Ahmed, Faisal" <faahmed@ucsd.edu>
Cc: "Tobias, Deborah" <dtobias@ucsd.edu>,"Walter, Sarah" <swalter@ucsd.edu>,"Gessert, Devon" <dgessert@ucsd.edu>,"Cuellar, Debbra" <dlcuellar@ucsd.edu>,"Morgan, Linda" <lcmorgan@ucsd.edu>,"Gallagher, Aimee" <agallagher@mail.ucsd.edu>,"Quilter, Aimee" <aquilter@ucsd.edu>
Subject: URGENT REQUEST for Update on Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Faisal,

We have not heard from you since this last email below on your status. Hopefully your health has been improving.

We are trying to stay current on open Leave of Absence files due to personnel changes in our HR unit. It is important that you provide us with an updated status next week on your condition and estimated return to work or if your doctor will be extending your leave.

I also did not see a reply from you as to whether or not you applied for disability, and if so was the claim approved?

Please advise on your status as soon as possible.

Thank you,

# Ellen

Ellen Mathews
HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662

(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

**From:** Mathews, Ellen
**Sent:** Monday, September 16, 2013 1:42 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status AHMED, FAISAL-EST RTW 10/28/13

Hello Faisal,

Thank you for sending a leave status update and dr's note with an estimated return to work date of 10/28/13. Sorry to hear you are still not feeling well and are unable to return to your career position at the ADCS. For now, we will continue to report your status in payroll as no-pay.

Please plan on submitting your updated leave status no later than Friday 10/18/13 or if your doctor should release you to return to work earlier.

Did you by any chance complete disability paperwork with Lori Shonley in benefits?


# Ellen

Ellen Mathews
HR Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

**From:** Ahmed, Faisal
**Sent:** Friday, September 13, 2013 4:13 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** RE: Leave Status AHMED, FAISAL-Next Dr. Note due 09/16/13

Hello Ellen,

My most recent follow-up visit with my physician on was on Wednesday.  From the visit he determined that I will need additional time to recover.  Please find attached his note and a revised leave of absence request form.

Thank you,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

---

**From:** Mathews, Ellen
**Sent:** Friday, August 23, 2013 11:11 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status AHMED, FAISAL-Next Dr. Note due 09/16/13

Good morning Faisal,

We are sorry to hear you are still in recovery and will update your leave status in Payroll to reflect the return to work date of 09/23/13.

Please keep us informed on the status of your leave by providing us with an updated dr's note no later than Monday 09/16/13 (or sooner if anything changes).

Thank you,

Ellen

---

**From:** Ahmed, Faisal
**Sent:** Thursday, August 22, 2013 9:00 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** RE: Leave Status & Return To Work Date - AHMED, FAISAL

Hello Ellen,

My recovery has been slower than expected and my physician has extended my leave.  Please find attached certification from my doctor and a revised leave of absence request form.  I have also received your email dated 08.13.2013, although I have not had an opportunity to review it in detail.

Thank you,

Faisal

**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Mathews, Ellen
**Sent:** Thursday, August 22, 2013 12:31 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda; Gallagher, Aimee
**Subject:** Leave Status & Return To Work Date - AHMED, FAISAL
**Importance:** High

Hello Faisal,

We hope your recovery is going well and you will soon be released to return to work.  This office has not heard from you since 08/02/13 and it is important we know your current status.

Based on the last dr's note received your leave is due to end soon with a return to work date of 08/26/13.  Please confirm if you will be returning to work on this date and provide us with a dr's note indicating you have been released to return to work.  If your doctor is extending your leave, we will need an updated note with this information, otherwise you will be on unexcused absence.

Linda Morgan will be contacting you regarding setting up an Interactive Process meeting with you once you return to work to discuss reasonable accommodations and any work restrictions provided by your doctor. Per Linda's prior email to you, the ADCS was agreeable and able to move your workstation to an office with a window.  Any other changes/modifications can be discussed at the IAP meeting.  Aimee Gallagher from Employee Relations may be joining us for this meeting in the event you have any other personnel questions to be addressed.

Again, please contact me by response to this email or by phone to confirm your status and if we may expect to see you on Monday 08/26/13.

Thank you Faisal.

Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

# RICHARD N. WOLF, M.D.

INTERNAL MEDICINE
ENDOCRINOLOGY AND METABOLISM

12395 EL CAMINO REAL • SUITE 115 • SAN DIEGO, CA 92130
PH. (858) 724-1313 • FAX (858) 724-1314

July 18, 2013

To Whom It May Concern,

I am writing this letter on behalf of my patient, Faisal Ahmed, in support of his need for environmental control of his work environment. I am an Internist, Endocrinologist and Metabolic specialist and his current Primary Care Physician. It has recently come to my attention he has been having repeated respiratory difficulties and these may well be due to his new work environment at your facility.

It is well recognized that respiratory impairments can be aggravated by environmental triggers and it is therefore critical for Mr. Ahmed's health and benefit that the air quality in his work environment be well maintained. There are published guidelines that the U. S. EPA provides for improving the indoor air quality in any work place and the key ones include "providing an office or workspace that has working windows" and the "use of an air purification system throughout the building or in personal workstations". Please refer to An Office Building Occupant's Guide to Indoor Air Quality found at http://www.epa.gov/iaq/pubs/occupgd.html for more information.

What is needed on Mr. Ahmed's behalf, therefore, are steps to be taken to improve his air quality so that there is hopefully a reduction in the various environmental triggers that can exacerbate his respiratory condition. These steps would include a work space or office that has a window to allow in fresh air, and an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning. In addition, an air purification system within the aforementioned space or office would also be helpful.

# RICHARD N. WOLF, M.D.

INTERNAL MEDICINE
ENDOCRINOLOGY AND METABOLISM

12395 EL CAMINO REAL • SUITE 115 • SAN DIEGO, CA 92130
PH. (858) 724-1313 • FAX (858) 724-1314

Both I and Mr. Ahmed are hopeful these accommodations would help reduce the risk of further worsening of his condition, although due to the unpredictable nature of his illness and work environment the risk cannot be completely eliminated. Even though there is no guarantee that Mr. Ahmed will not experience more symptoms caused by respiratory illness, the above measures will help reduce the chances of such episodes in the future. Without these modifications, his current work environment puts him at an elevated risk, and obviously the goal is to reduce this risk as best as possible.

My hope would be the above measures will be successful. Should any further questions arise or there be a need for more information please don't hesitate to contact me.

Sincerely yours,

Richard N. Wolf, M.D.

[Print Form]

## RETURN TO WORK CERTIFICATION

SECTION I – To be completed by THE EMPLOYER

EMPLOYEE'S NAME (LAST, FIRST, MIDDLE INITIAL)
Ahmed , Faisal

EMPLOYEE'S DEPARTMENT
Neurosciences / ADCS

DEPARTMENT CONTACT
Debbra Cuellar

DEPARTMENT CONTACT'S MAILING ADDRESS
9500 Gilman Dr. M/C 0949. La Jolla, CA 92093

| PHONE | FAX | E-MAIL |
|-------|-----|--------|
| 858-534-2283 | 858-266-1416 | dcuellar @ucsd.edu |

SECTION II – To be completed by HEALTH CARE PROVIDER

NAME OF HEALTH CARE PROVIDER
Richard N. Wolf

ADDRESS
12395 El Camino Real ST 115 San Diego, CA 92130.

PLACE ADDRESS STAMP HERE

Richard N. Wolf, MD
~~12395 El Camino Real Ste 115~~
San Diego, CA 92130
(858) 724-1313

PLEASE COMPLETE THE FOLLOWING AND RETURN THE FORM TO THE EMPLOYEE

OR TO THE DEPARMENT CONTACT LISTED ABOVE PRIOR TO THE RETURN TO WORK DATE

Important: Please limit your answers below to the serious health condition for which the Employee has been on leave.

**THE GENETIC INFORMATION NONDISCRIMINATION ACT OF 2008 (GINA):** The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information,' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

1. Is the employee now able to perform those essential functions of his or her job that she could not previously perform because of the serious health condition for which the employee has been on leave?

   ☐ No.
   ☐ Yes.
   ☒ Yes, with restrictions

2. Employee released to return to work effective: ~~December 2, 2013~~ December 9, 2013 rev 11/22/13 [indicate date]

3. If the Employee is released to work but is restricted in his or her ability to perform the essential functions of his or her job as a result of the serious health condition for which the employee has been on leave, please describe those restrictions:

   Please see letter dated November 18, 2013

4. The foregoing restrictions are:

   ☒ Permanent
   ☐ Temporary, until: _____ [indicate date]

SIGNATURE

| SIGNATURE OF HEALTH CARE PROVIDER | DATE |
|-----------------------------------|------|
| Richard N. Wolf | 11/18/13 |

[Print Form]

# RICHARD N. WOLF, M.D.

INTERNAL MEDICINE
ENDOCRINOLOGY AND METABOLISM

12395 EL CAMINO REAL • SUITE 115 • SAN DIEGO, CA 92130
PH. (858) 724-1313 • FAX (858) 724-1314

November 18, 2013

To Whom It May Concern,

I am writing this letter on behalf of my patient Faisal Ahmed, as he is returning to work after a lengthy leave due to his acquired disability. I refer the reader to a letter dated July 18, 2013 in which recommendations were made in reference to certain accommodations necessary in his work environment. Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face. Facial pain as a result of this sensitivity to cold air blowing directly on these areas, as well as visual impairment from the injury near his eye during April and May of 2013, exacerbated his symptoms.

These symptoms impaired Mr. Ahmed's ability to perform his job duties and would have resulted in reduced productivity and accuracy. To help prevent this in the future it is recommended that prolonged exposure to direct cold air to the face from air conditioning be avoided as much as possible. In addition, to avoid eye strain and pain, it is recommended that he use a larger computer monitor (24 inch or larger).

As a result of the above it is recommended that he return to work gradually, allowing him to get reacclimated to his work environment. I recommend he begin at a 5 hour work day and gradually increase this to a full 8 hour work day in the first 2 weeks back.

I thank you in advance for your consideration of Mr. Ahmed's needs.

Sincerely yours,

Richard N. Wolf, M.D.

## Faisal Ahmed

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Wednesday, January 15, 2014 11:27 AM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah |
| **Subject:** | RE: Follow Up IP Meeting |

**Categories:**     ADCS

Good Morning Faisal,

I have information that the requested accommodations have been implemented in your office. The desk has been situation adjacent to the window which can be opened up to 6 inches. The vent previously near the window has been moved. A hepa filter, recommended by EH&S, has been purchased for your office. I believe this will meet the requirements outlined by Dr. Wolf to allow you to resume work. I did consult with our Occupational Medicine physician at COEM who indicated with the information we have, this filter will meet the need. If you want to bring in your own filter please feel free to do so.  To address you concern that your filter was found in another office when you returned to work on 1/7/14, this was done so that it would not be damaged in the process of rearranging the office furniture. It was Sarah's intention to move the filter herself to ensure there was no mishap but, as you now know, she was not able to come in to work on 1/7/14 due to her medical emergency. So, it is completely up to you if you wish to have your personal filter or use the newly purchased filter solely.

EH&S has been contacted to determine when air quality testing can be done in your office and they will be there tomorrow at 10:30 am.  As you know, since they do not have anything specific to test for it's my understanding they will be testing for humidity, temperature, and $CO2$ which could detect an issue with the ventilation system.  If additional medical investigation has been done and Dr. Wolf can provide more specific information about potential irritants in the environment we can submit those to EH&S as well.  I will meet you and Sarah at ADCS at 11:30 am tomorrow, 1/16/14 to make sure all the items are in place and see if there is any further follow up needed.  Should we request someone open the window in your office or start the air filter prior to your arrival?  If so, how far in advance?

I look forward to seeing you again tomorrow!  I hope the changes will allow you resume your work comfortably and without any further disruption.  Please let me know if you have questions/concerns prior to our meeting tomorrow. Thanks, Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

☐ Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Monday, January 13, 2014 9:48 AM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

This is truly great news. I really appreciate the time and effort you put into identifying a solution that satisfies my accommodation needs. I don't think it would have been accomplished without your endeavors. The following are some additional concerns I have.

Thank you for remembering and addressing the issue of paying for benefits premiums. Will you also be contacting Liberty Mutual again to let them know that the department will require an additional week to complete the necessary accommodations? I left a message for them last Thursday, letting them know that there was a slight delay in my return to work, but I think a follow-up by you would be beneficial.

A new concern has been raised regarding the air purifier I purchased. As we discussed in my reply to the department's questions regarding the air purifier being required before my arrival, I indicated that I had already purchased an air purifier and that it should have been moved along with the rest of my equipment when the office move was completed as indicated in your email dated August 5, 2013. I don't know by whom or for what purpose, but I can only presume that it was moved subsequently to another office which I had never occupied. The department failed even to secure and provide my own air purifier to me when I arrived at work as had been agreed upon. As a result, I had to go searching for this costly piece of equipment that is critical for my health in other people's offices.

Due to this, I no longer feel comfortable leaving my air purifier at work permanently. Therefore, I need the department to provide me with an air purifier. However, I do not want the procurement of an air purifier by the department to cause a further delay in my return to work, and I am willing to temporarily use my air purifier given the assurance that the department will procure one of equal or greater filtration standard and capacity for me within the next 30 days. This is a link to the air purifier I own. I also have the customized "Germ Defense" filter but do not know if this is the most appropriate additional filter, as air quality testing has not yet been performed.

You had indicated, in your email dated August 2, 2013, that you had contacted EH&S and made arrangements with them for air quality testing to be performed. I've been told that the department would prefer not to know the specifics of my medical condition, so I will send you a private email regarding what might be the appropriate things to test for. Ideally, especially if there is an issue with air quality in multiple offices in the suite, it would best to procure a higher capacity air purifier to ensure the health and safety of my colleagues who share those offices in addition to myself. Though others may not have the same symptoms I do, they may be experiencing different symptoms caused by the same airborne contaminants. I understand that procuring a higher capacity air purifier might take some additional time. Furthermore, if the entire suite is affected, perhaps the responsibility and cost for air filtration could and should be placed on the building management.

I will work with Ellen regarding the benefits premiums. Please let me know how you think my additional concerns can be addressed and when you have an update regarding my return to work date.


Thank you,

Faisal

**Faisal Ahmed**
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Morgan, Linda
**Sent:** Friday, January 10, 2014 4:05 PM

2

**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hi Faisal,

I met with Ellen and the department this morning to view/evaluate the office to which you are assigned. I'm happy to tell you than it will be possible to place your desk adjacent to the window where the opening to the outside is located. Further, we have learned the vent can be relocated to a different part of the room so that the vent is away from the window. This will require involvement with the building engineers as well as movers for the furniture. It seems it will take approximately a week to effect these changes. We discussed the difficulty in not being on pay status in terms of benefit costs. The department is willing to pay for your benefit costs for any time period after 1/7/14 when you are unable to work due to the additional changes required in the work area. Please work with Ellen on this as she will assist you in making payments required.

I understand you have additional concerns which we can address. I'm glad that we will be able to make the changes that will allow you to return to work very soon. I will keep in touch with you and the department regarding a return to work date. Take care, Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

◻ Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Friday, January 10, 2014 7:33 AM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hello Linda,

I understand that you are stretched thin, and were not able to meet me when I returned. However, as the IP summary you attached states, the reason that the department would not let me return to work when I was released by my physician and made me wait an entire month was that:

> Because there is a great deal of work that must be accomplished during this time with so few people working, it would be impossible for Sarah, Mr. Ahmed's supervisor, to provide the training/re-orientation/supervision required for him to be supported in a return to work effort during this time frame. The department would like Faisal to have the greatest opportunity for a successful return to work, especially since he is still in the probationary period. The department can provide the graduated return to work with full supervisory support in January, 2014. The department would like Faisal to remain off work until 1/7/14 and then begin the graduated return at that time, once all of the equipment is installed and the requested office environment can be provided.

However my supervisor was not at the office when I returned to work, nor did she call me or intend to be there upon my arrival as you were misled to believe. It seems absolutely nonsensical to have me return on a Tuesday that my supervisor would not be available to meet me upon my return to work after having me wait an entire month for their availability. Please see the email below [keycode removed]:

From:   Sarah Walter [swalter@ucsd.edu]
Sent:   Monday, January 06, 2014 5:07 PM
To:     Ahmed, Faisal
Subject: Fwd: Return to Work Tuesday, 01/07/14 @11:30am
Attachments:   RTW 01072014 Wolf Addendum Letter 20-Dec-2013_AHMED, FAISAL.pdf

Hi Faisal,
The keycode had changed for our suite - it is XXXXX - or you can just bang on the door when you arrive and either Cynthia or Iris will be looking for you.
Thanks!!
Sarah

Once again it is very difficult to comprehend how the following conclusive statement in Dr. Wolf's note dated 12/20/2013 addressing the placement of the workstation to provide clarification requested by the department could be any more clear or be misinterpreted so completely by anybody of reasonable mind [emphasis added]:

> As previously stated in my note of 07/18/13 Mr. Ahmed's office should have "...a window to allow in fresh air, and [there should be] an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning." **This means that his workstation should be located much closer to the window than the vent** but it is not necessary for the workstation to be directly adjacent to the window.

Again if the person responsible is not able to evaluate this correctly then their ability to evaluate anything even remotely technical is called into question, which causes me a great deal of worry. I especially worry if I have to rely on that person to ensure my health and safety, as well as be able to evaluate my performance in technical matters.

When I originally requested an accommodation, on 04/26/13, there was a vacant office (Room #9) directly across from my former office room with a suitable location, where my workstation could have been closer to the window than the vent. That office has been occupied by a new hire starting sometime between 5/21/13 to 7/7/13 (when I first had to go on medical leave due to the severity of my symptoms and the department kept refusing to approve my request for an accommodation); I do not know if any of the other offices with a window also has similar locations. I will look forward to hearing from you regarding your assessment of satisfactory accommodations.


Thank you,

Faisal

---

**From:** Morgan, Linda
**Sent:** Thursday, January 09, 2014 5:32 PM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hello Faisal,

I understand you are declining to meet with Ellen, Sarah and I tomorrow to review the current arrangement of your office to address your dissatisfaction with the situation due to your health concerns. We will meet and evaluate the office keeping your comments in mind. I do apologize for not meeting you at the office upon your return. Unfortunately I am the only person who works with accommodations for both the Health System and the Schools of Medicine & Pharmacy and as a result I find myself pulled in many directions at times. I simply was not able to meet with you on the day of your return. I believe Sarah indicated to you via e-mail and phone that she had every intention of meeting with you upon your arrival to ensure your comfort but had her own medical emergency which precluded her from doing so.

4

Thank you for pointing out the multiple instructions provided by the physician. Although you feel these recommendations are clear, the situation of a vent directly over the space adjacent to the window lead Sarah to believe you would be better served by being away from the window and the vent as indicated by the physician. So, situating your desk away from the window was an effort to keep you away from the vent rather than cause you suffering as you have accused the department. However, since the vent and the window are so close together maybe that space will not accommodate your needs at all. We will look at this tomorrow.

I will work with Ellen and Sarah, if she is able to return to work, tomorrow and let you know my ideas after that visit. With regard to your desire for a summary of our most recent IP meeting, I'm including the IP Summary again for your review. This is a summary of our IP Meeting only and not information brought up afterwards or independent of our conversation with Ellen.

As I understand your comments, exposure to the environment at ADCS definitely causes a reoccurrence of your symptoms. As you pointed out, you had to leave the environment almost immediately. Again, I advise you that your description of your illness seems to meet the definition of a workers' compensation injury and again provide you with means to report this as a work injury:

**Worker's Compensation:**     http://blink.ucsd.edu/safety/occupational/workers-comp/
http://blink.ucsd.edu/safety/occupational/reporting.html#1.-Notify-your-supervisor.
(Contact is Pam Thompson at pmthompson@ucsd.edu )

I will be in touch after the meeting and hope we can identify a solution that satisfies your accommodation needs.  Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

Π Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Wednesday, January 08, 2014 3:33 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

It is very unclear what effort, *if any*, was made to have the office arranged, since the desk I was moved to was in the same exact position as when I first saw it in March 2013 and has not been repositioned since then. The room seemed to not have been "set up" or rearranged in any manner whatsoever other than having the sit/stand station placed on the desk that was already there.  In fact, there wasn't even a chair at the desk for me to use.

Given the fact that the department demanded an extra month to supposedly set up the office according to the recommendations of my physician, it is absolutely absurd that I should have to help you, Ellen, and Sarah in implementing the necessary accommodations. The location of the workstation relative to the window and vent has been repeatedly addressed by Dr. Wolf as follows:

As stated in Dr Wolf's letter dated 7/18/2013:

"What is needed on Mr. Ahmed's behalf, therefore, are steps to be taken to improve his air quality so that there is hopefully a reduction in the various environmental triggers that can exacerbate his respiratory condition. These steps would include a work space or office that has a window to allow in fresh air, and an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air

from the air conditioning. In addition, an air purification system within the aforementioned or office would also be helpful."

As stated in Dr. Wolf's letter dated 11/18/2013:

"Mr. Ahmed has an injury that makes him sensitive to prolonged exposure to the direct airflow from air conditioning, especially on his head and face. Facial pain as a result of this sensitivity to cold air blowing directly on these areas, as well as visual impairment from the injury near his eye during April and May of 2013, exacerbated his symptoms. These symptoms impaired Mr. Ahmed's ability to perform his job duties and would have resulted in reduced productivity and accuracy. To help prevent this in the future it is recommended that prolonged exposure to direct cold air to the face from air conditioning be avoided as much as possible."

You requested further clarification in your email dated 12/12/2013 regarding the "the specific arrangement of [my] work station relative to the window in the new office" asking "Do you need to sit adjacent to the window or is it necessary only for there to be a window in the office?" This was addressed in Dr. Wolf's letter dated 12/20/2013:

"As previously stated in my note of 07/18/13 Mr. Ahmed's office should have '...a window to allow in fresh air, and [there should be] an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning.' This means that his workstation should be located much closer to the window than the vent but it is not necessary for the workstation to be directly adjacent to the window."

It should be clear that it is physically impossible for the workstation to be closer to the window than the vent, if the vent is between the workstation and the window. I do not believe that you need my assistance in understanding how the current placement of the desk I was to occupy completely contradicts the recommendation of my physician. All you need to do is go there and take a look for yourself.

In my previous experience with an accommodation specialist, they actually met me on site on my first day back to work, to verify that the accommodations had been implemented properly. However, on Tuesday morning, neither you nor Ellen nor Sarah were present to make sure the accommodations were what I needed. And this was after the department demanded an extra month to do the set up and schedule a date for my return. If you and Ellen were misled to believe that the accommodations were in place then the person who was making the evaluation is the responsible party, and obviously that person cannot be relied upon to ensure my health and safety. This is a major problem if the person is my supervisor, who is supposed to be responsible for my health and safety at work.

Once again, since anyone who has had basic geometry should know that it is impossible to have both the vent between the window and the workstation and have the workstation be closer to the window than the vent at the same time, it speaks to either the utter incompetence of the person doing the evaluation or their malicious intent to cause me harm by not following the recommendations of my doctor while saying that they have. In either case, I have very serious concerns about my health and safety due to either their lack of ability to provide for my safety or their intent to do me harm by negligence or actively retaliating against me for seeking an accommodation. I have already suffered and continue to suffer a great deal due to this.

There is no need for the window to be opened prior to my arrival, however I do need to have control over it and it was not made clear to me that I did, especially since the other occupant of the room is seated directly by the window. The issue of the door had not been addressed prior because previously I had been the sole occupant of the room, thus I had sole control of the door. I was never informed that I would no longer have my own office room prior to arriving at work yesterday. Therefore, I could not have known it was an issue that needed to be addressed. The other occupant of the room needs to understand and accept that because my need for air quality supersedes the need for temperature control, the temperature in the room might be uncomfortable at times. I feel really badly that they will have to be made uncomfortable and penalized on my account, but if this is the arrangement that our supervisor insists on, we have little choice in the matter.

Again, given that they have taken an additional month to supposedly set up my work environment and the clear directions provided by my physician, there is absolutely no reason my assistance should be required to set up the accommodations. In addition, I do not see the point of having what would essentially be another IP meeting with you moderating when you have failed as of yet to provide a summary of our last meeting that all parties could agree upon. I will only return to work once the agreed upon accommodations have been implemented and you can personally assure me that the accommodations are in place. Please let me know once you can do that.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Morgan, Linda
**Sent:** Tuesday, January 07, 2014 5:02 PM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen; Leibman, Jenni; Pourazary, Viviane; Walter, Sarah; Tobias, Deborah
**Subject:** RE: Follow Up IP Meeting

Hi Faisal,

I'm sorry your return to work did not go smoothly. It is my understanding Sarah made her very best effort to have your office arranged the way your physician indicated would be best. I know that there was some concern over which area of the office would be most compatible given your needs for fresh air and a situation in which the air vent was not directly above you. I believe Sarah did evaluate both items and had the office set up in a way that seemed to meet both requirements. I don't think the department realized the window should be opened prior to your arrival or that the size of the desk would be an issue. I do know the ability to have the window open or closed was to be entirely at your discretion regardless of the other occupant in the room. I don't know why the position of the door would not be up to you as well. I don't think we ever talked about the door being open or closed prior to this. If we need to have the window opened up prior to your arrival we can speak with the department about this.

Since the office set up is not suitable for you after the department's best effort, I think it would be best to all meet together and make the changes, as much as possible, with your direction. Your desk can be moved closer to the window if you don't think the vent will bother you.

Unfortunately I cannot meet until Friday, 1/10. Since you are released to work at 11:30 am **let's meet in your office on Friday, 1/10/14 at 11:30 am.** I spoke with Ellen and she is also available at that time. I am copying Sarah and Deb in the hopes that one of them is available at that time as well.

I will ask that someone opens up the window first thing in the morning and when we meet you can be by the window with the air purifier on to continue the conversation as to the arrangement of the office to meet your needs. Please advise if you wish to meet on Friday or wish consult the higher authority prior to moving forward. Thanks, Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

Π Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Tuesday, January 07, 2014 3:42 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen; Leibman, Jenni
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

Despite receiving confirmation yesterday from both you and Ellen that all accommodations had been made, when I arrived at work this morning, it was unclear which room I was to use, because my name placard was lying on the floor, not next to any office door, as if it had been taken out of its holder and tossed on the ground. I was only able to ascertain which office my workstation was in by asking one of my colleagues. After finding the office, I saw that the air purifier I had purchased was not in the room, much less plugged in and operational. I searched the other offices and was able to locate my air purifier in another office and to move it to the office with my workstation. By the time I set up the air purifier, I started to feel unwell and I realized that the window was completely closed. I had to request the other occupant of the office, whose desk is actually by the window, to open the window for me, because the desk with my workstation is located on the opposite side of the office from the window. After the window was opened, I also realized the air vents in the room are positioned between my desk and the window. The location of my workstation relative to the window and the vents completely contradicts the recommendation of my doctor, which was further clarified upon the request of the department.

Moreover, where I had greater control over my environment before, because I was the sole occupant of my previous office space, I now find myself with much less control over my environment because of having to share my space, and I do not have direct control over or access to the window. The accommodations I had requested were made under the assumption that I would again be the sole occupant of my office space, still being able to open or close the door, while obtaining a window for ventilation that I would also be able to open or close. The ability to open and close both the window and door is required for the environmental control I need. This would have resulted in giving me greater control over my environment so that I could have adequate control over the air quality in my workspace. Reducing my control over the door, and not providing a window over which I have direct control has resulted in me having less control over my environment, not greater, as recommended by my physicians.

It is difficult to comprehend how the department, despite having an additional month to set up an office for me and having additional clarification regarding the specifics of my doctor's recommendations, still failed to provide adequate accommodations. The preparation of my workspace seems to have been done haphazardly, to say the least. Through the interactive process, the notes from my doctor, and my answers to the department's questions, the specifics of my accommodations should have been abundantly clear. However, even with all of these clarifications, specifically regarding the location of my workstation relative to the window, to have it placed on the opposite side of the room from the window is indicative of either complete incompetence by the department or deliberate sabotage of my return to work and further retaliation for my request for accommodations. It should also have been very clear that my air purifier needed to be in the same office as my workstation, plugged in so that it was ready to use when I arrived.

Being crammed into the corner of a shared office, with very limited space, and being forced to work at a desk that is half the size of the one I previously used in an office that was much more spacious, seems to be penalization for my request for accommodations. Coincidentally, the person who used to use the desk where I've been placed seems to be the sole occupant of the office with a window that was previously vacant.

Until the agreed upon accommodations are adequately implemented, I cannot return to work without risking my health further. However, I refuse to incur any more financial loss or risk to my health again due to the failure of the department to provide reasonable accommodations so that I can work. Despite going through multiple interactive process meetings and several doctor's notes detailing the requested accommodations, we have not been able to resolve these issues. It seems that we may have to seek arbitration by a higher authority to resolve this matter satisfactorily.

I believe you were copied on the attached letter to Ellen Mathews from my attorney. Rest assured that they will be notified of the inadequate accommodations I found today. Please let me know if you have any questions or resolutions.

Sincerely,

Faisal

**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
**Alzheimer's Disease Cooperative Study (ADCS)**
**University of California, San Diego - Department of Neurosciences**
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

---

**From:** Morgan, Linda
**Sent:** Monday, January 06, 2014 3:45 PM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Hi Faisal,

Happy New Year to you too! I hope 2014 turns out to be a great year. Yes, I believe that is the plan. I hope your return to work goes very well. I believe all of the accommodations requested are in place. I look forward to hearing from you as to how things are going. Please let me know right away if you need additional assistance. Take care, Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

II Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

---

**From:** Ahmed, Faisal
**Sent:** Monday, January 06, 2014 3:06 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

Happy New Year, I hope you had a good holiday. Since I have not heard anything further since receiving your message, I trust it is okay for me to report to work at 11:30 tomorrow morning. I will do so, unless I hear otherwise.


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Morgan, Linda
**Sent:** Monday, December 23, 2013 10:39 AM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Thank you Faisal. This is helpful. I'm glad you got the doctor to comment on the screen size and the schedule especially. I will be off until 1/6/13 as well and will forward this note to Sarah so that she will understand what's needed. I hope your holiday is great! Take care, Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

⌐⌐ Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

---

**From:** Ahmed, Faisal
**Sent:** Friday, December 20, 2013 6:14 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

Please find attached the note from my physician.


Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**

http://www.adcs.org

**From:** Morgan, Linda
**Sent:** Monday, December 16, 2013 8:41 AM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Thank you Faisal.  We appreciate your comments/claification that allow us to make your return to work most comfortable for you.  Take care,  Linda

**From:** Ahmed, Faisal
**Sent:** Friday, December 13, 2013 4:36 PM
**To:** Morgan, Linda
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

I believe that the question regarding "... the specific arrangement of your work station relative to the window..." has already been addressed in Dr. Wolf's note dated July 18, 2013, where he states that the office should have ".... a window to allow in fresh air, and an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning."  However, I will ask Dr. Wolf to revise his note so that it also addresses this specific question. The note is expected to be ready next week, I will forward it to you once I have received it.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

**From:** Morgan, Linda
**Sent:** Thursday, December 12, 2013 8:55 AM
**To:** Ahmed, Faisal
**Cc:** Mathews, Ellen
**Subject:** RE: Follow Up IP Meeting

O.K. Faisal. We will wait to hear from you to schedule another conversation. There is a question about the specific arrangement of your work station relative to the window in the new office.  Do you need to sit adjacent to the window or is it necessary only for there to be a window in the office?

Neither Ellen nor I can discuss your insurance premiums as we have no information on this topic.  We can talk only about the requested accommodation and implementation of it.  I will review the IP Agreements today and forward a document

11

that, in my mind, reflects our conversation on 12/2/13 only.  Any discussion after that date can be documented separately.  The IP Summary is just that, a summary of the conversation we had on the telephone on 12/2/13.

I'm sure the department will consider any additional information you submit.  Per your request, we will wait to hear from you regarding the next IP meeting once there is updated information from Dr. Wolf.  Take care,  Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

ΙΙ Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above.  If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Wednesday, December 11, 2013 4:29 PM
**To:** Morgan, Linda
**Subject:** RE: Follow Up IP Meeting

Hi Linda,

I requested another meeting in order to discuss the insurance premiums, not "to continue our conversation on [my] return to modified work date".  If you and the department do want to discuss the issue of the insurance premiums, I would be available on Friday afternoon to discuss that issue.

As for the modified return to work schedule, I am still in the process of obtaining the clarifications that the department requested regarding the accommodations from my doctor.  Also there may be changes to the modified work schedule due to the delayed return date. Therefore, it would make more sense to wait until I have an updated note from the doctor to address those issues again.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
**http://www.adcs.org**

*Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.*

# RICHARD N. WOLF, M.D.

INTERNAL MEDICINE
ENDOCRINOLOGY AND METABOLISM

12395 EL CAMINO REAL • SUITE 115 • SAN DIEGO, CA 92130
PH. (858) 724-1313 • FAX (858) 724-1314

December 20, 2013

To Whom It May Concern:

Please allow this note to serve as an addendum to clarify my previous notes dated 07/18/2013 and 11/18/13. Please also note that all previously stated restrictions are permanent.

Due to his work environment while working from 07/08/13 to 07/22/13, Mr. Ahmed's symptoms were also exacerbated and became severe enough to make it necessary for him to take a medical leave at that time (as stated in my note of 07/24/13). This was in addition to the period in April and May, when he also had to take a medical leave.

I have been made aware that Mr. Ahmed's return to work date has been delayed until 01/07/14. Due to his need for additional time in the morning to recover from his medical treatment regimen, his restricted work schedule upon return to work should be modified as follows: 6 hours/day for the first week (starting at 11:30 and including a 30 minute lunch), 7 hours/day the second week (starting at 10:30 and including a 30 minute lunch), up to 8 hours/day the third week (starting at 9:30 with a 30 minute lunch) and he can resume working overtime as required for his job starting the fourth week.

The only monitor that has been tested and verified not to cause Mr. Ahmed's problems is a 24 inch monitor with a resolution of 1920x1200dpi. Therefore that is the only monitor that I can recommend. How Mr. Ahmed's symptoms would be affected by other configurations, such as a dual monitor, is not clear.

As previously stated in my note of 07/18/13 Mr. Ahmed's office should have "...a window to allow in fresh air, and [there should be] an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning." This means that his workstation should be located much closer to

# RICHARD N. WOLF, M.D.

INTERNAL MEDICINE
ENDOCRINOLOGY AND METABOLISM

12395 EL CAMINO REAL • SUITE 115 • SAN DIEGO, CA 92130
PH. (858) 724-1313 • FAX (858) 724-1314

the window than the vent but it is not necessary for the workstation to be directly adjacent to the window. In addition, ideally any monitor should be oriented perpendicularly to the window in order to reduce glare and minimize eye strain. Mr. Ahmed can be the best judge of his needs and should be allowed to modify his workstation as he requires, within the limitations of his workplace.

As before, I thank you in advance for your consideration of Mr. Ahmed's needs.

Sincerely yours,

Richard N. Wolf, M.D.

# THE SPENCER LAW FIRM

2727 Camino del Rio South • Suite 140 • San Diego, CA  92108
(619) 233-1313 telephone • (619) 296-1313 facsimile

Melissa Johnson
Direct: 619-270-8188
Email: mjohnson@spencerlawoffice.com

A. Melissa Johnson
Thomas J. McCammon
Arthur H. Skola, *of counsel*
  *also admitted in New York*
  *also admitted in Nevada*
Marilynn Mika Spencer

January 6, 2014

*via United States Mail and email*
*at esmathews@ucsd.edu*

Ellen Mathews
HR Operations Mgr., Department of Neurosciences
UCSD School Of Medicine
9500 Gilman Drive, MC 0662
La Jolla, California 92093-0662
Attention:

*Re:    Our client Faisal Ahmed*

DearMs. Mathews:

Our office represents Faisal Ahmed regarding his employment with the University of California San Diego.

On October 7, 2003, Mr. Ahmed began working for the UCSD Recreation Department as a part-time Martial Arts Instructor.  Mr. Ahmed was later hired by the UCSD Department of Medicine on September 15, 2008 and continued working for both the Recreation Department and the Department of Medicine, without issue, until he separated from employment on December 12, 2012.

On March 1, 2013, Mr. Ahmed auditioned and was hired as a Yoga instructor by the UCSD Recreation Department.  On April 5, 2013 he began teaching one Yoga class per week on Saturday afternoons.

University of California San Diego
January 6, 2014
Page 2

On March 4, 2013 Mr. Ahmed began work as a Senior Data Analyst with the Department of Neuroscience.

Within his first week or work, Mr. Ahmed began to experience rashes and, as a result, he had multiple dermatology appointments. It is important to note that Mr. Ahmed had never before experienced such rashes for no apparent reason. On April 1 and 2, 2013, Mr. Ahmed was absent from work because of flu-like symptoms. Mr. Ahmed believed that he was feeling ill because of the ventilation in his workspace.

On April 26, 2013 Mr. Ahmed's manager wanted to begin having mandatory weekly meetings to discuss his performance and productivity. At the time when the meeting was scheduled, Mr. Ahmed was feeling very ill and nearly left work before the meeting. However, he attended the meeting. Mr. Ahmed informed his supervisor that there may be a problem with the ventilation in his office. His manager indicated that she would find out from facility services if something could be done about the vents. She also stated that if Mr. Ahmed's office was not satisfactory, there may be other work spaces available for his use.

After Mr. Ahmed took sick days from work, and especially after he requested an accommodation, his supervisor began to treat him differently than other employees.

On April 27, 2013 Mr. Ahmed made his first written request to his manager for a change in his workspace, as follows: "Perhaps another workspace, possibly one with a window that allows for fresh air to come in, would be better suited for me."

Mr. Ahmed was very ill from April 26, 2013 through April 30, 2013. On April 30, 2013 he saw his doctor and was prescribed medication for his symptoms. Mr. Ahmed attempted to return to work on May 1, 2013, but was told to leave and not return without a doctor's note because he had been absent for 3 continuous days. Mr. Ahmed returned to work on May 2, 2013 with a note from his doctor for the absence from work from April 29, 2013 through May 2, 2013.

On May 3, 2013 Mr. Ahmed's department made him retroactively change his already approved timesheets from April 29, 2013 through May 2, 2013 from sick leave to unpaid leave. From this point forward, while UCSD continued to deny Mr. Ahmed's requests for an accommodation to move his office to the unoccupied office across the hall, which had a window so he could have access to fresh air as needed, the department forced him to take leave without pay for any additional absences.

On May 9, 2013 Mr. Ahmed received an email from Alexia Cervantes, Director of UCSD FitLife Program requesting that he call her ASAP regarding his position with the Recreation Department. As requested, Mr. Ahmed called Ms. Cervantes and spoke with her. During that telephone call, Ms. Cervantes told Mr. Ahmed that his

University of California San Diego
January 6, 2014
Page 3

department (Neuroscience) would not allow him to teach recreation classes. Further, even though Mr. Ahmed had been teaching the Yoga classes since April 5, 2013, he was told that he would not be paid for his time. Ms. Cervantes indicated that if Mr. Ahmed wanted to continue to teach the remainder of the classes, he would have to do it as a volunteer.

Greg Spire told Mr. Ahmed that this was your decision because it was in Mr. Ahmed's "best interest." Mr. Ahmed asked Laurel Dean, Director of Recreation Classes, if she previously had this happen with other employees. She indicated in an email on August 27, 2013, that it was extremely unusual and she was "... more than a little confused by what's going on with [Mr. Ahmed's] teaching...." It was equally confusing to Mr. Ahmed that he would be permitted to continue to teach the class on a volunteer basis, but not for pay, and that he would not be paid for the classes that he already taught.

On May 10, 2013, during the weekly meeting with his supervisor, Mr. Ahmed again requested a room change because of his health. He was now told that his employer required a doctor's note before a room change would be considered. Because Mr. Ahmed was forced to continue to work in an office without adequate ventilation, his health continued to fail.

On May 16, 2013 Mr. Ahmed was able to see his doctor and on May 21, 2013 he received a letter from his doctor, Gary N. Bogart, M.D. Mr. Ahmed provided this letter to his employer. The letter from Dr. Bogart indicated that Mr. Ahmed was being evaluated for sinusitis and discussed his need for an accommodation, which included a room change with alternate ventilation as follows:

"It is the case that his symptoms are exacerbated by air conditioning. I am apprised, his current work condition is such that he is in a room that places him at risk, and as such he needs to be changed to a room more conducive to his long term health."

By May 21, 2013, Mr. Ahmed's health deteriorated such that he could not continue to work.

On May 29, 2013 Mr. Ahmed had an Interactive Process Meeting during which the department's position was that Dr. Bogart's note was not sufficiently specific regarding Mr. Ahmed's illness and necessary accommodation. In response, Mr. Ahmed provided yet another doctor's note requesting the accommodation of a room change.

On June 6, 2013 Mr. Ahmed was copied on an email from Linda Morgan to Dr. Bogart, which indicated that the department did not want to have the special sit/stand work station, computers and phone moved only to realize the problem had not been resolved.

University of California San Diego
January 6, 2014
Page 4

While Mr. Ahmed was also attempting to understand his medical condition and provide the department with the clarification for his requested accommodation, he was forced to return to work on July 8, 2013 in the same environment which was causing him to be ill. Accordingly, Mr. Ahmed's symptoms continued to worsen each day he was at work in the unchanged environment.

On July 19, 2013 Mr. Ahmed provided a second doctor's note from Richard Wolf, M.D. and he again requested that he be moved to the vacant office across the hall. Dr. Wolf's correspondence articulated that Mr. Ahmed suffered from a medical condition and he required an accommodation. Dr. Wolf's correspondence states, in pertinent part:

"What is needed on Mr. Ahmed's behalf, therefore, are steps to be taken to improve his air quality so that there is hopefully a reduction in the various environmental triggers that can exacerbate his respiratory condition. These steps would include a work space or office that has a window to allow in fresh air, and an attempt to reduce the airflow from the air conditioning in the office so that he has access to more fresh outside air rather than the air from the air conditioning. In addition, an air purification system within the aforementioned space or office would also be helpful."

Mr. Ahmed worked on July 22, 2013, but with the requested accommodation still not having been granted, he was unable to work on July 23 and 24, 2013 due to the severity of his symptoms which he believes were caused from his presence in his office on July 22, 2013.

On July 24, 2013, even though his supervisor was informed of his prior doctor's appointments for which she did not ask for the documentation, Mr. Ahmed received an email from Devon Gessert, retroactively demanding doctor's notes for all previous appointments. This is in clear violation of ADSC Timekeeping Policy which states: "if an illness is 3 days or longer, a doctor's note should be given to your Department Human Resources contact and a copy to your supervisor." In any event, Mr. Ahmed provided the requested doctor's notes.

While Mr. Ahmed received an email from Linda Morgan on August 5, 2013 indicating the office change was completed pursuant to his request, this was too little, too late and Mr. Ahmed was unable to return to work at that time because his work environment had exacerbated his condition such that he required additional time off work to recover.

In November 22, 2013 Mr. Ahmed had recovered sufficiently such that he and Dr. Wolf believed he was fit to return to work. As such, Dr. Wolf prepared a Return to Work Certification and Letter regarding Mr. Ahmed's return to work and the necessary accommodations. Dr. Wolf indicated that Mr. Ahmed was cleared to work on a gradually increasing basis as of December 9, 2013.

University of California San Diego
January 6, 2014
Page 5

In order to facilitate Mr. Ahmed's return to work, a second Interactive Process Meeting took place on December 2, 2013. The department agreed on the following accommodations:

1. Mr. Ahmed's office would be moved to a space with a window (which apparently has already been accomplished);
2. Mr. Ahmed's work space will not be in an area which is directly beneath a vent;
3. Mr. Ahmed will be permitted to use an air purifier (which he purchased prior to returning to work on July 8, 2013);
4. Mr. Ahmed will be provided a standing/sitting work station;
5. Mr. Ahmed will be provided with either a 24" monitor or a second monitor.

In spite of the fact that Mr. Ahmed's physician cleared him to return to work on December 9, 2013, his department insisted on extending his leave until January 7, 2014. While Mr. Ahmed agreed to this condition, only because he had no choice in the matter, the truth of the matter is that he was ready, willing and able to return to work on December 9, 2013. UCSD's failure to return him to work caused Mr. Ahmed to suffer additional and unnecessary economic loss.

In summary, Mr. Ahmed originally requested an accommodation on April 27, 2013. In spite of his numerous requests, which were supported by documentation by his physician, UCSD continually denied his request for an accommodation, even though a suitable officespace was readily available. In the meantime, the department required Mr. Ahmed to continue working in a harmful environment that was exacerbating his illness and he became severely ill, requiring him to take two leaves of absence. Then, when Mr. Ahmed was cleared to return to work, UCSD unnecessarily delayed his return by nearly 30 days.

Further, once Mr. Ahmed complained about his work environment which he believed was causing him to become ill, his department retaliated against him by scheduling weekly meetings, micromanaging his work, denying him the right to teach classes for the Recreation Department, ordering him to obtain retroactive doctor's notes and failing to accept doctor's documentation which called for a reasonable accommodation.

It is my understanding that Mr. Ahmed is scheduled to return to work on January 7, 2014 with the aforementioned accommodations. We sincerely hope that Mr. Ahmed's return to work will be successful and the accommodations will allow him to be productive in his position. In the meantime, our office will continue to monitor this matter.

Please feel free to contact me if you have questions or concerns, or if you wish to discuss this matter with me.

University of California San Diego
January 6, 2014
Page 6


Sincerely,

THE SPENCER LAW FIRM


A.  Melissa Johnson


CC:    Linda Morgan at lcmorgan@ucsd.edu
       Faisal Ahmed at faisahmed1@gmail.com


AMJ/AMG

# UNIVERSITY OF CALIFORNIA, SAN DIEGO

## UCSD



BERKELEY • DAVIS • IRVINE • LOS ANGELES • MERCED • RIVERSIDE • SAN DIEGO • SAN FRANCISCO          SANTA BARBARA • SANTA CRUZ

DEPARTMENT OF MEDICINE
Business Office
9500 Gilman Drive
La Jolla, CA 92093-0912
(858) 246-0936
(858) 246-0940 FAX

November 30, 2012

Faisal Ahmed
4055 Porte La Paz #149
San Diego CA 92122

Dear Faisal:

SUBJECT:  Notice of Intent to Medically Separate from Employment

The UC San Diego Department of Medicine/Pulmonary Division recently conducted a careful review of documentation regarding your job related abilities and restrictions. During the interactive job accommodation process, we have discussed with you the work limitations' effects on your abilities to perform your assigned job functions and we have provided you with opportunities to propose and consider possible job accommodation options.  Regretfully, we have concluded that no reasonable accommodation options will enable you to continue to perform the essential functions of your Staff Research Associate II position at UC San Diego.

Therefore, I am writing to notify you of the intent to separate you from this position with UC San Diego.  This separation is a result of the functional limitations that preclude you from performing your job and will be effective on December 17, 2012.

I encourage you to submit to me any additional information, including your ideas for additional possible job accommodation options that may alter this decision and allow you to remain employed in this department. If you have such information, provide it to me in writing within (10) calendar days, or by Monday, December 10, 2012.

Sincerely,

Debby Leedy
Human Resources Manager

Attachment:  Proof of Mail Service

Encl:  Job Accommodation/Interactive Process Form

cc:     Nick H. Kim, MD
        Linda Kaplan
        Employee File
        Employee & Labor Relations (8912)
        ACCES (0944)
        UPTE-RX
        Disability Benefits Coordinator (8912)

# PROOF OF SERVICE

**PART I:**     <u>**Delivery by U.S. Mail:  Proof of Service by Mail**</u>

I declare that I am over the age of eighteen years and not a party to this action.

My business address is:  9500 Gilman Drive, 0912

                 La Jolla CA 92093

_____

On   <u>November 30, 2012</u>  , I sent the attached <u>FMLA extension letter</u> by placing a true copy enclosed in a sealed envelope with postage fully prepaid in the United States mail, addressed as follows:

<div align="center">

Faisal Ahmed

_____

**(Addressee's Name)**

4055 Porte La Paz #149
San Diego CA 92122

_____

**(Addressee's Address)**

</div>

**PART II:**     <u>**Personal Delivery:**</u>

I declare that on  _____ I personally delivered the attached  _____ .

**PART III:**     I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on_____   11/30/2012   _____ at
                           (Date)

  <u>La Jolla</u>_____, California.
(City)

  <u>Debby Leedy</u>_____
(Type or print name)                  (Signature)

**Faisal Ahmed**

**From:** Ahmed, Faisal
**Sent:** Thursday, May 02, 2013 1:03 PM
**To:** Ng, Chung (Jenkis)
**Subject:** RE: Dr's Note Requested Upon Return to Work
**Attachments:** F. Ahmed.Work Absence.PDF

Hi Jenkis,

Please find attached the note from my doctor.

Thank you,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Ahmed, Faisal
**Sent:** Wednesday, May 01, 2013 10:19 PM
**To:** Mathews, Ellen
**Cc:** Walter, Sarah; Ng, Chung (Jenkis); Tobias, Deborah
**Subject:** RE: Dr's Note Requested Upon Return to Work

Dear Ellen,

I have requested a note from my doctor, and they will provide me with one tomorrow but not prior to my regular start time. As soon as I have the note I will return to work and provide it to Jenkis. Thank you for your kind offer to assist me, and I will let you know if there something you can help me with.

Best regards,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**

http://www.adcs.org

**From:** Mathews, Ellen
**Sent:** Wednesday, May 01, 2013 6:17 PM
**To:** Ahmed, Faisal
**Cc:** Walter, Sarah; Ng, Chung (Jenkis); Tobias, Deborah
**Subject:** Dr's Note Requested Upon Return to Work

Hello Faisal,

I am sorry to hear that you have not been feeling well.

Since you have been absent for the past 3 days, please be sure to provide a doctor's note to Jenkis Ng (ADCS Timekeeper) upon your return to the office tomorrow.

Is there anything we can help you with?  If your absence will continue, please provide a doctor's note for how long and Jenkis (ADCS HR) will also send you information about filing for a leave of absence.

Thank you,

Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*



**ABSENCE AUTHORIZATION**

To Whom It May Concern

Upon examination, it is my recommendation that _Faisal Ahmed_ remain home from: Work [ ]  School [ ] for the period of _4/29/13 - 5/2/13_

If you have any questions, feel free to call upon me.

Thank you,

**Back In Motion Chiropractic & Rehabilitation**
11199 Sorrento Valley Road, Suite 201
San Diego, CA 92121
858-768-6111

Dr. Signature _____    Date _05/02/2013_

 Gmail

**Faisal Ahmed <faisahmed1@gmail.com>**

---

### Please contact me ASAP regarding your position with Recreation
1 message

---

**Cervantes, Alexia <alexia@ucsd.edu>**                             Thu, May 9, 2013 at 1:07 PM
To: Faisal Ahmed <faisal@ucsd.edu>

Call me on my cell phone after 2:30pm today. 858-395-4559.


Thanks.


**Alexia Cervantes**

Director of FitLife

UC San Diego Recreation

(858) 822- 3160


# Triton Games

## May 11th, 9am-12noon

### *mAY THE ODDS BE EVER IN YOUR fAVOR*


**CLICK HERE TO SEE TRITON GAMES VIDEO**

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Ahmed, Faisal |
| **Sent:** | Friday, May 10, 2013 5:10 PM |
| **To:** | Walter, Sarah |
| **Subject:** | Re: Rec position |

**Categories:** ADCS

Hi Sarah,

As I expressed to you during our discussion, I understand that there is concern due to me being on probationary period and my recent absences that having another work commitment might cause problems. However, I fail to see how by not granting alternate access for me to teach a class once a week on Saturday afternoons, well outside of my work hours here at the ADCS benefits anyone. With all due respect to Ms. Mathews, I am capable of determining what is in my own best interest and it is certainly not in my best interest to teach a class as a volunteer instead of being compensated for me time. The answer from HR leaves me with a very unsatisfied feeling.


Thanks,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
9500 Gilman Dr., MC 0949
La Jolla, CA 92093-0949
Tel: 858-246-1355
Email: f1ahmed@ucsd.edu
http://www.adcs.org

On 5/10/13 4:52 PM, "Sarah Walter" <swalter@ucsd.edu> wrote:

Hi Faisal,

Here's the answer from HR:

We received the request to grant alternate access for you to do some teaching with recreation, but based on the fact that you are on probation, have missed quite a few days already and are still learning the job, we feel it is in your best interest and the department's best interest at this time that you focus your efforts on learning this new job.

If you have more questions and would like to speak with Ellen Mathews about this, we can do this.

Thanks,
Sarah

Sarah Walter
ADCS Clinical Operations
swalter@ucsd.edu
Tel: 858-246-1347
Cell: 858-336-6701

1

https://drive.google.com/drive/u/0/folders/0By9JvbLAmSTfMkI1NXYzRlF4OE0

IMG_3875.JPG



4/21/16, 8:08 PM

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Mathews, Ellen |
| **Sent:** | Tuesday, August 13, 2013 2:04 PM |
| **To:** | Ahmed, Faisal |
| **Cc:** | Tobias, Deborah; Walter, Sarah; Gessert, Devon; Cuellar, Debbra; Morgan, Linda |
| **Subject:** | RE: Doctor's note(s) for absences - July 2013 |

Hello Faisal,

We received your most recent dr's note covering the period of absence from 07/24/13 thru 08/26/13 as well as your Leave of Absence Request for leave starting 07/24/13 with anticipated return of 08/26/13.

Since Jenkis is no longer with Neurosciences, Debbra Cuellar (dlcuellar@ucsd.edu ) from our Neuro HR Unit will be your HR point of contact.

Please see responses to your 08/02/12 email below.

Before you return to work, please be sure to provide me or Debbra with a dr's note releasing you to return to work. Also, keep us posted if your anticipated return to work date should change.

Thank you,

Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA  92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal
**Sent:** Friday, August 02, 2013 12:21 PM
**To:** Mathews, Ellen
**Cc:** Tobias, Deborah; Walter, Sarah; Ng, Chung (Jenkis); Gessert, Devon
**Subject:** RE: Doctor's note(s) for absences - July 2013

Dear Ellen,

Thank you for explaining in detail the additional requirements for medical documentation on Devon's behalf.  I regret if my question regarding whether this requirement would now be standard for me was misconstrued.  I was not questioning if this could be required of me, and have done my best to provide the documentation barring the one note, which I will hopefully be able to provide soon as well.  However, I felt obliged to read your explanation and unfortunately I am confused by it.  I also regret having to discuss the specifics of my health condition(s) with you, and would have preferred not to have had to discuss the details of my condition

1

with you as well. However since there is a possible relationship between my work environment and my condition we have no choice but to discuss these details for my health and safety as well as that of my colleagues. As previously advised, if you feel there is a possible relationship between your work environment and your health condition, it is highly recommended you file a WC claim.   Here is the link with instructions on filing a claim:  http://blink.ucsd.edu/safety/occupational/workers-comp/

Thank you, for the answer to my question where you state "Until further notice, if you have any partial day absences for any illness, you must provide a doctor's note in order for this to be an excused absence. Otherwise, if a note is not provided, you will not be paid for the time you are absent. This is a standard practice of the department for any employee in a similar situation and who is still in their probationary period." Does this mean that in addition to having to provide a doctor's note for any occasional full-day absences, if I am unable to obtain a doctor's note for a particular partial-day absence, since as an exempt employee I am not allowed to take anything less than a full day of leave that it will be considered an unexcused absence and I will not be paid for that entire day of work? If you are ill for a partial day, you will need to provide a dr's note in order to paid for the entire day, otherwise, yes you will only be paid for the time at work as the other time will be considered unexcused time.  If you have recurring scheduled dr's appts it is fine to have your doctor complete the medical certification Jenkis forwarded you that allows for chronic conditions requiring two or more visits per year, follow-up treatment appointments (how many hours), reduced work schedule or episodic flare-ups (frequency ??times per wk(s) ??month(s) and duration ??hrs or ??days per episode. It can become very complicated in these types of situations to track and accurately report in timekeeping. The dr's note can cover a period of time for the above and for separate medical conditions if unrelated.

I was asking if I should plan on providing this documentation in the future so that I can obtain the required documentation during my doctor's appointments rather than having to obtain them retroactively.  Since calling the doctor's offices following the appointments and waiting for them to fax the documents takes significant time and effort, it would be much less time consuming to obtain the documents during my appointments. Some offices require multiple follow-up requests as is the case for the one remaining note. Yes, it would be best for you to request the note at that time of your dr. visit. In my prior message, I also explained that I wasn't aware that this documentation was necessary based on the information I had previously received. Had I been informed by my supervisor when I gave her advance notice of the appointments, I would have already provided the documentation. Jenkis advised you prior to provide Dr.'s note for your absences. Since there continues to be recurring absences, it is important we receive a dr's note when your absence is illness related to ensure we are accurately reporting/tracking this time. Also, with your still being in your probationary period, we are tracking excused absences to determine if any extension of your probationary period is warranted.  I was not informed of additional requirements in advance by my supervisor nor was I ever informed that I "... needed to provide a doctor's note for any illness related absences ..." I am certain that I never received information in writing prior to Devon's email requesting the documentation retroactively. With recurring absences the request for dr's note for your sick leave absences is justified and you were advised prior to your return to work by Jenkis when you went out on your first leave as of 05/21/13. You have now also received this in writing.

In your email you quote from UPTE contract Article #39:

2

**3. The University may require reasonable documentation of an employee's sick leave absence** when an absence exceeds three (3) consecutive scheduled days of work, or **for shorter periods when:**
**a. it appears to be justified and,**
**b. notice has been provided to the employee prior to his or her return to work, that documentation will be required, or**
**c. the employee has been given advance written notice that documentation will be required.**

Section 3b. refers to notice prior to return to work and section 3c. refers to "advance written notice". As I stated above, advance notice was not provided. You are correct that advance written notice was not given, however, Jenkis previously advises you to provided dr's notes as of your leave that started 05/21/13. Are you stating that your email dated July 25, 2013 serves as written notice and that I am not obligated to provide the missing note retroactively? If not, then how far back would the retroactive documentation be required? Providing the documents becomes increasingly difficult the further back the actual appointments occurred and if I am expected to provide additional documentation, then it is important for me to start immediately to contact the doctors' offices and request the necessary documentation. Dr.'s note for any sick leave absences since 05/21/13 are required in order for the time to be considered "excused" absences.

Furthermore, section 3a. refers to the need to decide if documentation is required based on specific circumstances on a case by case basis whether "it appears to be justified", which implies that this is not a matter of "...standard practice of the department for any employee in a similar situation and who is still in their probationary period." Which is the case here? If it is a matter of "standard practice", are these standards for an EE such as myself, who has "...exhausted all sick leave accruals" available somewhere that I may view them and learn what policies I am subject to when I am able to return to work? Due to recurring absences during your probationary period, the request for dr's note for any sick leave absences is justified and you have been noticed to provide a dr's note for any sick leave absences prior to your return to work.

You also referred to these "standard practices" for employees who are still in their probationary period during our last IP meeting on 05.29.2013 as the reason that the request for alternate access for me to teach classes with recreation was denied by the department. I was also surprised at that time to learn of these practices. If these "standard practices" are provided to me in writing, then I would be able to avoid asking these policy questions in the future and avoid these misunderstandings. I am also confused with regards to why the policy provided to new hires, who often do not have any sick hours accrued and are in their probationary period, contains a time keeping policy which does not apply to them. Shouldn't the "standard" practices you refer to be provided to them instead? Sorry for my confusion, please help me understand. As we have discussed on several occasions, it is important everything possible is done to assist in your focus on your career position to successfully learn the job as well as to pass probation. As an exempt employee, there may be a need for you to work hours outside of normal work hours to get the job done (especially to make up for a substantial amount of time lost due to absences). The Recreation department fully supports departments including Neurosciences in ensuring effort is to an employee's career position first and foremost. Again, this matter can be readdressed once probation has been successfully completed.   In addition, timekeeping policy is the same for all employees.  Most new hires do have accrued sick leave (accrual starts at hire and may be used the month following leave accrued).   Unfortunately, because you have been absent for more than 52 full days

since your hire date of 03/04/13, your accrued sick/vac leave is minimal. While on no-pay, you do not accrue sick/vac leave.

Finally if my work environment is causing or exacerbating my condition and I am unable to work due to this, please help me understand how I am going to be able to start "... perhaps coming in early, staying longer in the evening, or coming in on the weekend to get work done" without worsening my condition, especially since "... It is not a matter of working from home..." and I must be in the building that may be exacerbating my illness at times when none of my colleagues would be present to interact with and all the resources I use to do my work are available over the internet? Again, if your work environment is causing or exacerbating your condition (still to be confirmed) as you repeatedly state, then it is in your best interest to file a workers comp claim. Here is the link to do so: http://blink.ucsd.edu/safety/occupational/workers-comp/ . The department and others are doing everything possible to accommodate reasonable work restrictions provided by your doctor(s) as well as make accommodations for work environment conditions that your drs state "may well be due to your new work environment..." (see dr's note date 07/18/13). Requests for accommodations without specifics from the drs on what is in fact causing your condition becomes problematic. Since the department wants to support your recovery, and per Linda Morgan's email to you dated 08/05/13, your work space has been switched to an office with a window to hopefully improve your condition enough that you can return to full duty.    When I started working at the ADCS, I was "...staying longer in the evening, or coming in on the weekend to get work done." That is when I became stricken with the illness that is still ongoing. I've made many unanswered requests for reasonable accommodations regarding a change in work environment so that I can work in an environment that does not put me at an increased risk for illness and hampers my ability to perform at an optimal level to meet the expectations of my SRA III position. Please let me know how can I be expected to do as you suggest until my requests are honored. I am open to your suggestions. Thank you.

Sincerely,

Faisal

Faisal Ahmed
Senior Data Analyst - Clinical Operations
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Mathews, Ellen
**Sent:** Thursday, July 25, 2013 4:54 PM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Walter, Sarah; Ng, Chung (Jenkis); Gessert, Devon
**Subject:** RE: Doctor's note(s) for absences - July 2013

4

Hello Faisal,

Sorry to hear you are still not feeling well.

Unfortunately the timekeeping policy you were given at hire was just general information. As situations or issues arise, there may be additional actions or information required. Since you were out on a leave of absence for a serious health condition (per your doctor was dermatologic/allergy related) that your doctor, Dr. Bogart, felt was possibly related to your working environment, Jenkis informed you at that time you needed to provide a doctor's note for any illness related absences including your serious health condition(s). Though Dr. Bogart released you to return to work without any restrictions, you are now seeing another doctor (Dr. Wolf) due to an ongoing serious health condition(per his note for respiratory difficulties).

We received similar notes from Dr. Wolf and Dr. Bogart you were being treated for serious health condition(s) possibly caused or exacerbated by the work environment at the ADCS. Dr. Wolf stated that "fresh air" and "use of an air purification system throughout the building or in personal workstation" might reduce various environmental triggers (not specifically identified) so as to not exacerbate your condition. Though we do not need to know and prefer not to know specifics of your health condition(s), the fact your doctors' are concerned your work environment is causing or exacerbating your condition and you are unable to work due to this, yes, we continue to require doctor's notes for your absences in order for them to be excused. Since you may also have absences related to illnesses other than "serious" health conditions, we are still requiring you to provide a doctor's note for all absences related to illness. As we have informed you before, if you feel your illness is work-related, it is in your best interest to file a Worker's Comp claim. Here is the link for details:  http://blink.ucsd.edu/safety/occupational/workers-comp/

You have exhausted all sick leave accruals. As an exempt employee you are only required to report absences in full day increments. Until further notice, if you have any partial day absences for any illness, you must provide a doctor's note in order for this to be an excused absence. Otherwise, if a note is not provided, you will not be paid for the time you are absent. This is a standard practice of the department for any employee in a similar situation and who is still in their probationary period.

AHMED, FAISAL
EMPLOYEE ID: 10577

LEAVE ACTIVITY
SUMMARY REPORT
AS OF 06/30/2013

For questions or corrections contact
NGUYEN, VIVIAN HUYEN
Neurosciences
PHONE: (858)246-1314
TIMEKEEPER CODE: 000304-19

Maximum Vacation Accrual: 240.0 Hours

| MONTH | EARNING BASE | | LEAVE RATE | EARNED | ACTIVITY USED | OVER MAX | ADJUSTMENTS EARNED | USED | OVER MAX | BALANCE | MONTHS TO MAX |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12/12 | 6% | VAC SICK COMP | 16.00 8.00 ... | | 308.00 | | | | | -215.00 -8.00 | 45.5 |
| 01/13 | 0% | VAC SICK COMP | 10.00 8.00 ... | | | | | | | -7.00* | 24.7 |
| 03/13 | 95% | VAC SICK COMP | 10.00 8.00 ... | 9.23 7.59 | | | | | | 7.23 7.39 | 23.8 |
| 04/13 | 86% | VAC SICK COMP | 10.00 8.00 ... | 8.77 7.01 | -16.00 | | | | | 11.00 -1.60 | 22.9 |
| 05/13 | 91% | VAC SICK COMP | 10.00 8.00 ... | 9.60 7.75 | | | | | | 20.60 6.15 | 21.9 |
| 06/13 | 20% | VAC SICK COMP | 10.00 8.00 ... | 1.65 | | | | | | 22.54 6.15 | 21.7 |

"*" INDICATES WHERE BALANCE HAS BEEN ADJUSTED AT REQUEST OF DEPARTMENT

Here is information from the UPTE contract regarding the University requesting reasonable documentation of an employee's sick leave absence:

## Article 39 – Sick Leave
### D. SICK LEAVE NOTIFICATION AND VERIFICATION
1. No sick leave pay shall be payable to an employee unless the employee's immediate supervisor or designee is notified of the illness/disability and the probable duration thereof as soon as possible, but in no event later

5

than the beginning of the employee's work day except when the University determines that the employee's failure to notify is due to extreme circumstances beyond the control of the employee. Subsequent to an employee's notice of illness/disability, no time for which the employee has requested and/or received sick leave authorization may be charged to accumulated/anticipated compensatory time, leave with pay, vacation, or holiday time, except as provided in Article 18 - Leaves of Absence.

2. Any employee who anticipates a series of three (3) or more medical appointments which will require a repeated use of sick leave, or who knows in advance the date and/or time of scheduled appointments, shall inform his or her immediate supervisor of the anticipated or known schedule of treatment.

**3. The University may require reasonable documentation of an employee's sick leave absence** when an absence exceeds three (3) consecutive scheduled days of work, or **for shorter periods when:**

**a. it appears to be justified and,**

**b. notice has been provided to the employee prior to his or her return to work, that documentation will be required, or**

**c. the employee has been given advance written notice that documentation will be required.**

4. Employees who have unscheduled absences due to illness on a scheduled work day preceding or following a holiday may be required to bring a medical verification of illness to the employee's supervisor on the employee's return to work in order for the absence to be authorized.

5. When medical documentation is required by the University, it shall be from a health practitioner licensed by the state in which he or she practices to diagnose and certify illness or disability or from an authorized representative of a recognized treatment program.

Lastly, your supervisor has had numerous discussions with you relating to difficulties you are having learning the job as well as meeting clearly defined expectations. As an exempt employee if there is a need to work additional hours to make up for regular time lost, you should speak with your supervisor in this regard. It is not a matter of working from home, but perhaps coming in early, staying longer in the evening, or coming in on the weekend to get work done. You are still in your probationary period. We are looking at extending your probation for the period of time your doctors' excused you due to illness (written notice of this will be forthcoming), however, the expectation is that you still need to demonstrate the ability and willingness to do whatever you can to learn and be successful at this SRA 3 position.

Please let me know if you have any questions regarding the above matters.

Again we hope you feel better and will be able to return to full duty soon.

Ellen

Ellen Mathews
HR Staff Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

---

**From:** Ahmed, Faisal [mailto:faahmed@ucsd.edu]
**Sent:** Thursday, July 25, 2013 6:48 AM
**To:** Gessert, Devon
**Cc:** Tobias, Deborah; Ellen Mathews; Walter, Sarah
**Subject:** RE: Doctor's note(s) for absences - July 2013

6

Hi Devon,

Please find attached all of the requested doctors' notes except the one for 07.10.2013, which I will do my best to forward as soon as possible. The ADCS timekeeping policy I received when I was hired states, "If an illness is 3 days or longer, a doctor's note should be given to your Department Human Resources contact and a copy to your supervisor". Had I known that this additional documentation would be necessary, I would have obtained them during the doctor's visits but my supervisor didn't mention this being a requirement when I notified her in advance of the appointments. Will the requirement of "...doctor's note(s) covering the time you have spent out of the office (even if these were partial day absences) for illness and doctor's appointments..." be expected of me from now on as well as the ones that you requested retroactively?

As the attached note from Dr. Wolf states, I am experiencing "... a potentially serious health issue..." and will need to be on "... a medical leave ... to especially not risk being contagious to others & seek proper care."  Please find also attached a Leave of Absence Request Form with the corresponding information.


Thank you,

Faisal


**Faisal Ahmed**
**Senior Data Analyst - Clinical Operations**
Alzheimer's Disease Cooperative Study (ADCS)
University of California, San Diego - Department of Neurosciences
**9500 Gilman Dr., MC 0949**
**La Jolla, CA 92093-0949**
**Tel: 858-246-1355**
**Email: fahmed1@ucsd.edu**
http://www.adcs.org

---

**From:** Devon Gessert [mailto:dgessert@ucsd.edu]
**Sent:** Wednesday, July 24, 2013 8:09 AM
**To:** Ahmed, Faisal
**Cc:** Tobias, Deborah; Ellen Mathews; Walter, Sarah
**Subject:** Doctor's note(s) for absences - July 2013

Hi Faisal,

Can you please provide doctor's note(s) covering the time you have spent out of the office (even if these were partial day absences) for illness and doctor's appointments?

Prior to this week, I believe the absences were on 7/9, 7/10, 7/15 and 7/16 - please correct me if I'm mistaken. And then this week, it pertains to your hours absent yesterday 7/23 as well as this coming Friday, 7/26.

Thanks,
Devon

--
Devon Gessert
Director of Clinical Operations
Alzheimer's Disease Cooperative Study
University of California, San Diego
9500 Gilman Dr., MC 0949

7

La Jolla, CA 92093-0949
Tel: 858-344-1699
Email: dgessert@uosd.edu
http://www.adcs.org

Confidentiality Notice- This e-mail message from the Alzheimer's Disease Cooperative Study (including all attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, copying or distribution is strictly prohibited.  If you are not the intended recipient, please contact me by reply e-mail and destroy all copies of the original message.

Ahmed, Faisal (MRN: 1713851-2) DOB: 07/04/1976
**Admission/Discharge Information**

| Admission Date | Discharge Date |
|---|---|
| 07/02/2013 | -- |

**Progress Notes signed by Bogart, Gary N., DO at 7/4/2013 1:55 PM**

| Author: | Bogart, Gary N., DO | Service: | (none) | Author Type: | Physician With Courtesy Privileges |
|---|---|---|---|---|---|
| Filed: | 7/4/2013 1:55 PM | Note Time: | 7/2/2013 2:35 PM | Note Type: | Progress Notes |

Faisal Ahmed returns at ~3 weeks with his wife in attendance for follow up to again discuss his resolving dermatitis above this (L) eye and into eyebrow area. See prior notes for history of that concern.
Has been off of work for 6 weeks now on disability..
Leave of absence through Monday and can go back to work as of next Monday on 7/ 8 /2013.

Using fexofenadine and Netti pot daily for his congestion..
Will be seeing an ENT specialist on his own soon in follow up..

Mr Ahmed has asserted that it is his belief, based on patterns he has noted, that his office environment (at UCSD Neurosciences) is the cause of "allergies and environmental sensitivities". I have been contacted by Ms Morgan to further delineate the recommendations and modifications needed to accommodate Mr Ahmed.
He appears to have mild environmental allergies, probably with sensitivity to allergens in the office environment that can be treated with appropriate medical treatment. I do not think his office has to be modified to accommodate him until that is done. He states he is requesting only to be not solely dependent on the air condition ventilation and wants just to be in a room the the window can be opened and that a A/C duct can be blocked and perhaps an air purifier can be used.

He had requested a CT for fear of retroorbital mass and was told pointedly that his fears were not founded nor based on any symptoms or findings apart from his apprehension; he was told that I did not think it was an study based on the entirely of his case.. Apparently he was seen by opthalmology who acquiesced and ordered that study; it was entirely normal with only maxillary and ethmoid mild sinus inflammation

Also, notes he stubbed his (R) 5th toe about a month ago and had a negative x-ray the next day . Still pain with ambulation and is requesting an other xray to be sure it is into broken

Retroorbital MRI Findings:
There is mild left periorbital soft tissue swelling with mild enhancement. No evidence of abnormal post-septal enhancement. There is no evidence of an orbital mass. The globes are unremarkable. The optic nerves are normal in caliber and demonstrate normal enhancement. The extraocular muscles as well as the lacrimal glands are normal.

The brain parenchymal volume is appropriate for age. The ventricles, sulci, and basal cisterns are normal. There is mild mucosal thickening within the ethmoid air cells bilaterally and within the frontal sinuses. The remaining visualized paranasal sinuses as well as the mastoid air cells are essentially clear. The skull and extracranial soft tissues are otherwise unremarkable.

Impression:
Mild left periorbital soft tissue swelling with mild enhancement. No evidence of an orbital mass.

LMG        7/4/2013 6:26:58 PM   PAGE   6/( )    Fax Server



# ATTENDING PHYSICIAN'S STATEMENT

**Liberty Mutual INSURANCE**

ils form is to be completed without expense to Liberty Mutual Insurance and returned along with your original claim for benefits or by the date requested by the Liberty Mutual Insurance Claims Dept.

Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7209
London, KY 40742-7209
Phone No.: (800) 838-4461 Ext. 41621
Secure Fax No.: (603) 334-3540

**Return To**   Tina Weeks

EMPLOYEE/CLAIMANT NAME:   FAISAL AHMED

CLAIM NO:   4660494               S.S. NO:
EMPLOYER/SPONSOR:   UNIVERSITY OF CALIFORNIA      DATE OF BIRTH: 7/4/1976

## AUTHORIZATION TO OBTAIN AND RELEASE INFORMATION

I authorize any licensed physician, medical provider, hospital, medical facility, HMO, pharmacy, government agency, including the Social Security Administration and Veterans Administration, insurance or reinsurance company, credit or consumer reporting agency, financial/educational institutions and any current or former employer to release any and all medical information with respect to my physical or mental condition and/or treatment of me, including confidential information regarding AIDS/HIV infection, communicable diseases, alcohol and substance abuse, mental health and any non-medical information to the particular Company in the Liberty Mutual Insurance of companies to which I am submitting a claim, or to its legal representative, or to the Plan Sponsor (if Self-Insured Plan), or to persons or other organizations providing claims management services.

I understand the Company or Plan Sponsor will use the information obtained under this Authorization or directly from me to determine eligibility for insurance benefits, which may include assessing ongoing treatment. Any information obtained will not be released to any person or organizations EXCEPT to the Plan Sponsor, reinsuring companies, other companies in the Liberty Mutual Insurance of companies to which I am submitting a claim, Employee Assistance Programs (EAP) or other disease management or assistance programs providing services to the Plan Sponsor and/or to the Company, persons or other organizations providing claims management and claim advisory services to the Plan Sponsor and/or to the Company, the Group Policyholder or its agents/vendors for purposes of auditing the Company's administration of claims under the policy and/or assessing statistical claim data related to its benefit programs, and persons or organizations providing medical treatment or services in connection with my claim, or as may be otherwise permitted or required by law.

If I receive a disability benefit greater than that which I should have been paid, I understand that the Company has the right to recover such overpayment from me, including the right to reduce future disability benefits, if any.

I understand that any person who knowingly and with intent to injure, defraud, or deceive the Company and/or Plan Sponsor, files a statement or claim containing any false, incomplete, or misleading information may be guilty of a criminal act punishable under law.

I know that I may request a copy of this Authorization. I agree that a photographic copy of this Authorization shall be as valid as the original. This Authorization shall become effective on the date appearing next to my signature below. I understand that this Authorization shall be valid for two years from the date appearing below with my signature and that I have the right to revoke this Authorization at any time by written notification to the Company in the Liberty Mutual Insurance of companies to which I submit a claim and/or the Plan Sponsor.

_____            _____
Date                      Claimant's Signature (or Authorized Representative)

*(Left margin, vertical: PART A - TO BE COMPLETED BY EMPLOYEE)*

## PHYSICIAN'S INSTRUCTIONS

**PLEASE NOTE: IF ANY PORTION OF THIS FORM IS NOT COMPLETED, WE WILL BE REQUIRED TO REQUEST THE INFORMATION WHICH WILL RESULT IN A DELAY IN DETERMINATION OF YOUR PATIENT'S DISABILITY BENEFITS.**

**THE CLINICAL INFORMATION, IN COMBINATION WITH THE PHYSICAL FACTORS OF YOUR PATIENT'S JOB AND THE CONTRACTUAL PROVISIONS UNDER WHICH HE/SHE IS COVERED, WILL BE USED TO ESTABLISH THE MOST APPROPRIATE WORK ABSENCE DURATION.**

1. DIAGNOSIS
   Primary   *Periorbital Edema*    ICD9   *782.3*
   Secondary   *Allergic Sinusitis*    ICD9   *477.9*
                            ICD9
   Has patient ever had the same or a similar condition? Yes _____ No _X_
   If "Yes", state when and describe.

   What is your prognosis? _____

   For Pregnancy:
   EDC _____    Date of Delivery _____    Type _____

2. DATES OF TREATMENT
   (a) Date of First Visit    *5/3/13*    (mo/day/yr)
   (b) Date of Last Visit    *5/21/13*    (mo/day/yr)
   (c) Frequency of Visits    *Weekly*    Monthly _____   Other (Specify)
   (d) Date of First Treatment    _____
   (e) Date Symptoms First Appeared / Accident Occurred    _____ (mo/day/yr)
   (f) Date Patient Advised to Cease Work    _____ (mo/day/yr)
   (g) Estimated Return to Work Date    _____

*(Left margin, vertical: PART B - TO BE COMPLETED BY ATTENDING PHYSICIAN)*

DP-402 Rev 02-08             PHYSICIANS PLEASE COMPLETE THE REVERSE SIDE OF THIS FORM

LMG ⟨3/4/2013 6:26:58 PM PAGE 7/⟨ ⟩ Fax Server

3. Please describe in detail your PROPOSED TREATMENT PLAN. Please list all medications the patient is taking for this condition. Include your prognosis as a result of this treatment plan. IDENTIFY ANY RESTRICTIONS you have imposed on your patient at this time.

4. **PHYSICAL IMPAIRMENT**
   [X] Class 1 - No limitation of functional capacity: capable of heavy work.
   ___ Class 2 - Medium manual activity.
   ___ Class 3 - Slight limitation of functional capacity: capable of light work.
   ___ Class 4 - Moderate limitation of functional capacity: capable of clerical/administrative activity.
   ___ Class 5 - Severe limitation of functional capacity: incapable of minimum activity.

   REMARKS:

5. **MENTAL/NERVOUS IMPAIRMENT**
   [X] Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitations).
   ___ Class 2 - Patient is able to function in most stressful situations and engage in most interpersonal relations (slight limitations).
   ___ Class 3 - Patient is able to engage in only limited stressful situations or engage in interpersonal relations (marked limitations).
   ___ Class 4 - Patient is unable to engage in stressful situations or engage interpersonal relations (marked limitations).
   ___ Class 5 - Patient has significant loss of psychological, physiological, personal, and social adjustment (severe limitations).

   REMARKS:

6. **CARDIAC IMPAIRMENT (if applicable)**
   Functional Capacity:       [X] Class 1: No Limitation          ___ Class 2: Slight Limitation
   (per American Heart Assn)   ___ Class 3: Marked Limitation      ___ Class 4: Complete Limitation
   Blood Pressure (last visit): _____
                                (systolic/diastolic)

7. **Date of Next Scheduled Visit**
   Are you still treating the patient?   [X] Yes   ___ No
   If patient has been referred to another physician, please indicate the name of physician, address, telephone number, and reason for referral.
   Was patient referred to you by another physician? _____ Yes  [X] No.

8. Has patient been hospital confined? _____ Yes  [X] No
   Dates of Confinement:   From _____   to _____
   Was surgery performed? ___ Yes  ___ No   If "Yes", please indicate procedure(s) performed:
   CPT Code: _____   Date Performed _____
   Name and Address of Hospital:

9. After you have completed this form, please attach copies of the following materials:
   - Office notes for the period of treatment or for the last two years
   - Test Results showing medical evidence
   - Hospital discharge summary (if applicable)
   - Consulting physician's reports (if applicable)

10. REMARKS: MR AHMED HAS HAD SOME MILD ALLERGIC SINUSITIS BASED ON SYMPTOMS. IT IS HIS THEORY THAT HE HAS JOB-BASED ENVIRONMENTAL SENSITIVITIES. THIS HAS NOT BEEN CONFIRMED. I PERSONALLY DO NOT THINK THIS IS SO

Gary N. Bogart, D.O.
Attending Physician (PRINT)
9333 GENESEE AVE, SUITE 200
SAN DIEGO, CA 92121
PHONE (858) 657-8800
FAX (858) 657-8825
City/State/Zip Code

Degree/Specialty          SS No. or Tax ID No.

( ) _____
Telephone No.              Fax No

Signature                  Date

DP 402 Rev. 02/08

Ahmed, Faisal (MRN 1713851-2) DOB 07/04/1976



**Admission/Discharge Information**

| Admission Date | Discharge Date |
|---|---|
| 06/11/2013 | -- |

**Progress Notes signed by Bogart, Gary N., DO at 6/13/2013 7:30 AM**

| Author: | Bogart, Gary N., DO | Service: | (none) | Author Type: | Physician With Courtesy Privileges |
|---|---|---|---|---|---|
| Filed: | 6/13/2013 7:30 AM | Note Time: | 6/11/2013 3:15 PM | Note Type: | Progress Notes |

Faisal Ahmed returns again today In follow up regarding his (L) eye skin issues and concerns.

Completed his one month course of PO ketoconazole about a week ago. States marked benefit of his scalp dermatitis with resolution of symptoms
Was seen by an outside dermatologist whom I am informed "thought it was staph or strep and treated it with antibiotics. Now is much less swollen and symptomatic, but Faisal is concerned about scarring and recurrence of the swelling. Has series of photos detailing course of episode.

He is trying to get his employer, UCSD< to change the work environment due to his perception of his work space causing his allergic skin and sinus issues. I have written a note indicating such a change would be worth pursuing, but the hypothesis is unconfirmed. .
They need more information due to apparent confusion about the claim and what is needed.
Contact person is Linda Mason @ 619-543-7709



UC San Diego Health System, 200 W Arbor Dr, S.D., CA 92103

Mon Jul 15, 2013 1:53 PM

**Print This Page**   |   **Close This Window**

Name: Faisal Ahmed | DOB: 7/4/1976 | MRN: 1713851-2 | PCP: Gary N. Bogart, DO

# (No subject)

To:

      Faisal Ahmed

From:

      Gary Bogart

Received:

      6/3/2013  8:11 PM PDT

---

I will be glad to support you with appropriate documentation however needed for your disability situation, or speak with Ms Morgan about your concerns when she contacts us.

You do not offer what the dermatologist you saw said about your skin issue on your face.
I am not sure why you may have manifested a fever, as that is not a symptom we had discussed at your prior 3 office visits
We have discussed scalp fungus, allergic sinusitis, and your periorbital swelling, none of which is a febrile illness. New symptoms may warrant reevaluation

GNB

MyChart® licensed from Epic Systems Corporation, © 1999 - 2013.

**Print This Page**   |   **Close This Window**

Name: Faisal Ahmed | DOB: 7/4/1976 | MRN: 1713851-2 | PCP: Gary N. Bogart, DO

# symptoms

To:

        Faisal Ahmed

From:

        Gary Bogart

Received:

        6/16/2013  8:35 PM PDT

---

So the pain from the inflammation prevents you from doing any work at all. ? It must be quite bad
I will pass this along to your employer when I write the letter

Dr Bogart

MyChart® licensed from Epic Systems Corporation, © 1999 - 2013.



**Liberty Mutual.**
**INSURANCE**

Group Benefits Disability Claims
Liberty Life Assurance Company of Boston
P.O. Box 7209
London, KY 40742-7209
Phone No.: (800) 838-4461   Ext. 41621
Secure Fax No.: (603) 334-3540

August 1, 2013

Faisal Ahmed
4055 Porte La Paz #149
San Diego, CA 92122

RE:    University Of California
        STD/Supplemental Disability Benefits
        Denial Notice / No Response to Request
        Claim #: 4679807/ 4660494

Dear Mr. Ahmed:

Our role in administering your claim for Disability Benefits is to provide a fair, thorough and objective evaluation as it relates to your disability and the provisions of your plan.

This letter is in reference to your Short Term Disability Claim. Since, we do not have the required information we must deny your claim for Short Term Disability benefits. The University of California's Short Term and Supplemental Disability Policy requires that to process a disability claim you must provide notice and proof of disability as stated below:

***Notice and Proof of Claim***
    *1.   Notice*
        *a.   Written notice of your claim must be given to Liberty Mutual Insurance within 30 days of the date of the loss on which your claim is based, if that is possible. If that is not possible, Liberty Mutual Insurance must be notified as soon as it is reasonably possible to do so.*
        *b.   When Liberty has the written notice of claim, Liberty will send you your claim forms. If the forms are not received within 15 days after written notice of claim is sent, you can send Liberty written proof of claim without waiting for the claim.*

    *2.   Proof*
        *a.   Proof of your claim must be given to Liberty Mutual Insurance. This must be done no later that 30 days after the end of the Elimination Period..*
        *b.   Failure to furnish such proof within such time shall not invalidate nor reduce any claim if it was not reasonable possible to furnish such proof within such time. Such proof must be furnished as soon as reasonably possible.*
        *c.   Proof of continued Disability or Partial Disability, when applicable, and regular attendance of a Physician must be given to Liberty within 30 days of the request for the proof.*
        *d.   The proof must cover, when applicable:*
            *i.   the date Disability or Partial Disability started;*

ii.     the cause of Disability or Partial Disability; and
iii.    the degree of Disability or Partial Disability.

On June 4, 2013 a fax was sent to Dr. Gary Bogart requesting the completion of the Attending Physician Statement and medical records from May 1, 2013 to the present. Additional request were faxed on June 19, 2013 and July 5, 2013 to Dr. Bogart.

We wrote to you on June 19, 2013 requesting that you provide the Attending Physician Statement and medical records from May 1, 2013 through the present. On July 11, 2013 we received three letters from Dr. Gary Bogart. The letters indicate you are excused from work for chronic allergic sinusitis. Letters are dated May 20, 2013, June 27, 2013, and July 2, 2013. The letter from Dr. Bogart dated July 2, 2013 is releasing you to return to work on July 8, 2013.

To date we have not received a response from Dr. Bogart for the Attending Physician Statement and your medical records from May 1, 2013 through July 8, 2013 to that provide a more in depth outline of your condition and any resulting restrictions and limitations that would support a disabling medical condition.

Since we have not been provided with the documentation necessary to process this claim, we must deny your claim for benefits.

This claim determination reflects an evaluation of the claim facts and plan provisions. We reserve the right to make a determination on any additional information that may be submitted.

You may request a review of this denial by writing to:

Liberty Life Assurance Company of Boston
Attn: Tina Weeks
P.O. Box 7209
London, KY 40742

The written request for review should be sent within 60 days of your receipt of this letter and state the reasons why you feel your claim should not have been denied. In your request for review, include documentation such as the attending Physician Statement, progress notes, lab reports, medication list, chest x-rays, specific restrictions and limitations and the medical evidence to support them from Dr. Gary Bogart and any other treating providers not already in our file which you feel will support your claim. You may request to receive, free of charge, copies of all documents relevant to your claim.

Under normal circumstances, you will be notified of the final decision within 60 days of the date that your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision within 120 days after your request for review is received. Under the state of California's Fair Claims Settlement Practice Regulations you may have this matter reviewed by the California Department of Insurance if you believe you have been wrongfully denied. You may send your request for review to:

California Dept. of Insurance
Consumer Services Division

300 S. Spring Street
Los Angeles, CA  90013
1(800)927-4357 or (213)897-8921

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned plan, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

If you have any questions about this determination please call me.

Sincerely,

Tina M. Weeks

Tina Weeks
Disability Case Manager II
Phone No.: (800) 838-4461   Ext. 41621
Secure Fax No.: (603) 334-3540

# UCSanDiego
## HEALTH SCIENCES

### Interactive Process Meeting

Date: 12/2/13
Department: Department of Neurosciences; ADCS

Participants:

| | | |
|---|---|---|
| Employee: | Faisal Ahmed, SRA 3 | Ext: 858-245-8445 |
| HR Mgr: | Ellen Matthews | Ext: 858-534-9546 |
| DM: | Linda Morgan | Ext: 619-543-7709 |
| Other: | Aimee Gallagher (agallagher@ucsd.edu) | Ext: 619-543-5929 |
| | Labor & Employee Relations | |

**Summary:** Mr. Ahmed reported a severe allergic type reaction to his current office environment. He was hired on 3/4/13 and has missed work due to his medical condition over 180 days since then. He attributes his medical condition/lost days to his reaction to his office environment/air conditioning. After some sporadic absences prior to 5/20/13, Faisal was off work from 5/21/13 to 7/7/13; worked from 7/8/13 to 7/22/13 and was off again from 7/23/13 to the present. Mr. Ahmed presented a note releasing him to return to work on 12/2/13 and then presented a revised note with the return to work date of 12/9/13 with the restrictions noted below. He would like to return to work with accommodations on 12/9/13.

---

Work Restrictions: Temporary __ __ __   In effect __ __ __ __ To __ __ __ __ __   Permanent _____

    Unknown duration, presumed permanent. Note from 7/18/13: Mr. Ahmed needs a work space or office that has a window to let in fresh air; reduce the airflow from the air conditioning; air purification system would also be helpful. 11/18/13 note: avoid prolonged exposure to direct cold air to the face from air conditioning; use a larger computer monitor (24 inch or larger); begin at a 5 hour work day and gradually increase this to a full 8 hour work day in the first 2 weeks back.

    Physician giving restrictions:   Richard N. Wolf, M.D., Treating Physician

---

Essential functions employee is not able to perform: Mr. Ahmed has been able to perform no work functions as he is experiencing such severe symptoms he has been unable to work since 5/20/13. He will be unable to work until his office space has been moved to provide a window that opens, he is provided with an air purifier, the HVAC vent in his office is diverted; he is provided with a 24 inch monitor or a second standard monitor; he can gradually increase his work time.

---

Accommodations suggested by employee: Mr. Ahmed is requesting to be moved to a nearby office where there is a window that can be opened to let in outside air, as well as placement of his desk away from the air duct, an air purifier and a 24 inch computer monitor. He is also requesting a graduated return to work that is unspecified by his physician except to start a 5 hours and increase to 8 hours over a 2 week period.

---

Other accommodations suggested - The department would like Mr. Ahmed return to work in January when all equipment required can be available and his supervisor is available to provided training/support.

---

Discussion: Ellen indicated Mr. Ahmed's office has been moved to a space with a window. He understands the window opens only 6" per the building regulations and feels this will be adequate for fresh air. Mr. Ahmed feels he will be safe from direct air from the air conditioner as long as his desk is not directly beneath the vent. Dept. will ensure the desk is away from the vent. Mr. Ahmed purchased an air purifier prior to returning to work on July 8 and can use this as indicated by Dr. Wolf.

UC San Diego Health Sciences,   Disability & Accommodation Services
200 W. Arbor Drive, San Diego, CA  92103-8912

IP Meeting- F.Ahmed- Page 2

We discussed the need for a large computer monitor. Faisal indicated a second smaller monitor would also meet his needs to view multiple tables/data at one time and manipulate the information. He will ask Dr. Wolf to specify that the second monitor this will be a reasonable accommodation in lieu of the 24" monitor.

We reviewed the need to return to work on a graduated basis. Faisal indicated the ability to come in to work later in the mornings would be helpful to him. Linda noted that without specific information about the needed schedule it would be up to the department to determine the schedule. If Faisal has a medical need for a specific schedule he will speak to Dr. Wolf about providing additional information.

Ellen noted the department traditionally has a "skeleton" crew in December due to the holidays. Because there is a great deal of work that must be accomplished during this time with so few people working, it would be impossible for Sarah, Mr. Ahmed's supervisor, to provide the training/re-orientation/supervision required for him to be supported in a return to work effort during this time frame. The department would like Faisal to have the greatest opportunity for a successful return to work, especially since he is still in the probationary period. The department can provide the graduated return to work with full supervisory support in January, 2014. The department would like Faisal to remain off work until 1/7/14 and then begin the graduated return at that time, once all of the equipment is installed and the requested office environment can be provided. Faisal reasserted that he and his doctor believe that returning to work sooner rather than later would be better for him. Linda reaffirmed that the department is not able to accommodate his needs before 1/7/14. Faisal has concerns that his disability benefits will be terminated as of 12/9/13. Linda will communicate with Liberty Mutual regarding the accommodation date to determine if benefits can continue until January. If not, we will have a follow up conversation about the return to work date.

It was noted that the six months of medical leave awarded by the RX collective bargaining agreement is concluded and Mr. Ahmed will need to request personal leave at this time. He felt disability leave taken prior to 5/20/13 should not be counted toward the aggregate six months of medical leave. Aimee advised all time taken for disability related purposes will be counted toward the six month allotment. Mr. Ahmed indicated he would discuss the matter with his attorney. Aimee invited him to have his attorney contact her directly with questions or claims.

Outcome: Ellen will talk with Sarah about obtaining either a 24" monitor or a second monitor. She will make sure the new office for Faisal has the capability for the desk to be away from the HVAC vent and the air purifier remains in the office. Faisal will remain off work until all of the equipment has been obtained and his supervisor is available on a consistent basis to support his re-entry to the work place on 1?7/14. Linda will contact Liberty Mutual regarding the delay in providing the required accommodation and communicate with Faisal once information is available regarding his benefits. Faisal will also communicate with Liberty Mutual as well as his attorney and doctor.

This document accurately summarizes the IP Meeting:

Faisal Ahmed

12.04.2013
Date

UC San Diego Health Sciences,   Disability & Accommodation Services
200 W. Arbor Drive, San Diego, CA  92103-8912

IP Meeting- F. Ahmed- Page 3

_____        _____
Aimee Gallagher                         Date


_____        _____
Ellen Matthews                          Date


_____        7-23-13
Linda Morgan, Disability & Accomm Services    _____
                                        Date


UC San Diego Health Sciences,   Disability & Accommodation Services
200 W. Arbor Drive, San Diego, CA  92103-8912

**Faisal Ahmed**

| | |
|---|---|
| **From:** | Morgan, Linda |
| **Sent:** | Wednesday, December 11, 2013 11:26 AM |
| **To:** | Ahmed, Faisal; Mathews, Ellen |
| **Cc:** | Gallagher, Aimee |
| **Subject:** | RE: IP Summary (FA) |

Hi Faisal,

I'm very confused about the IP Summary at this point. I will sent out a new copy for signature. Thanks, Linda

Linda Morgan
619-543-7709

· Think Green before printing this e-mail.
CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

**From:** Ahmed, Faisal
**Sent:** Tuesday, December 10, 2013 8:27 PM
**To:** Morgan, Linda; Mathews, Ellen
**Cc:** Gallagher, Aimee
**Subject:** RE: IP Summary (FA)

Hi Linda,

I hadn't noticed your signature on the last page of the document I signed and sent you. The date of your signature is 7-23-13, which was well before our meeting on 12-2-13. In order to reduce the chances of miscommunications and mistakes slipping into the final document, perhaps it would be better for us to edit an unsigned tracked copy of the document and only sign once a final version is agreed upon? Please find attached an unsigned version of the IP summary with the edits that I sent you yesterday and your signature removed (tracked) in a Word document so that you and Ellen can add your edits (please track all changes).

Thank you,

Faisal

**From:** Ahmed, Faisal
**Sent:** Tuesday, December 10, 2013 5:34 PM
**To:** Morgan, Linda; Mathews, Ellen
**Cc:** Gallagher, Aimee
**Subject:** RE: IP Summary (FA)

Hi Linda,

  To the best of my recollection, the IP summary you originally sent on the day of the meeting and the one I signed and returned to you yesterday, with my edits, more accurately represent the actual IP discussion we had last week. It should be noted that, though my signature appears on the documents both you and Ellen sent me today, I did not actually sign

1

HR Operations Manager
Department of Neurosciences
UCSD School of Medicine
9500 Gilman Drive, MC 0662
La Jolla, CA 92093-0662
(858) 534-9546 Work/(858) 822-0411 Fax
esmathews@ucsd.edu

*Note: If you are not the intended recipient, please note that any dissemination, disclosure, distribution, or copying of this communication is strictly prohibited. Anyone who receives this communication in error is respectfully requested to notify the sender immediately by telephone or e-mail and to destroy all instances.*

**From:** Morgan, Linda
**Sent:** Tuesday, December 10, 2013 9:43 AM
**To:** Ahmed, Faisal; Mathews, Ellen
**Cc:** Gallagher, Aimee
**Subject:** IP Summary (FA)

Good Morning Faisal and Ellen,

Faisal, I have edited your revisions to more closely reflect IP discussion, in my opinion. Ellen, please take a look at this summary and advise as to the accuracy of this IP Summary from your recollection. I understood the basis for delaying Faisal's return to modified work from December to January was based on the department's need for time to move the desk away from the air vent, obtain the computer monitor, either the extra screen or the 24" monitor, as well as the availability of the supervisor during the months of December to assist Faisal in his re-entry into the job, re-orientation to the current work load and feedback on job performance after an extended absence and during the probationary period. The department, as I understood it, was certainly willing to have Faisal return at any time over the period of disability except that, maybe unfortunately, the University supports many employees taking time off in December so because of the reduced schedule and unabated work load the modified return is not possible at this time. Please let me know if I have not communicated this adequately in this summary. Thank you both. Linda

**Linda Morgan** | Disability & Accommodation Services |UC San Diego, Health Sciences Human Resources | T: 619.543.7709 | F: 619-471-9332 | lcmorgan@ucsd.edu

· Think Green before printing this e-mail.

CONFIDENTIALITY NOTICE: This e-mail communication and any attachments may contain confidential and privileged information for the use of the designated recipients named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, disclosure, dissemination, distribution or copying of it or its contents is prohibited.

ORIGINAL ARTICLE

# Immigrant Perceptions of Discrimination in Health Care
## The California Health Interview Survey 2003

*Diane S. Lauderdale, PhD,* Ming Wen, PhD,† Elizabeth A. Jacobs, MD, MPP,‡ and Namratha R. Kandula, MD, MPH‡§*

**Background:** U.S. healthcare disparities may be in part the result of differential experiences of discrimination in health care. Previous research about discrimination has focused on race/ethnicity. Because immigrants are clustered in certain racial and ethnic groups, failure to consider immigration status could distort race/ethnicity effects.

**Objectives:** We examined whether foreign-born persons are more likely to report discrimination in healthcare than U.S.-born persons in the same race/ethnic group, whether the immigration effect varies by race/ethnicity, and whether the immigration effect is "explained" by sociodemographic factors.

**Research Design:** The authors conducted a cross-sectional analysis of the 2003 California Health Interview Survey consisting of 42,044 adult respondents. Logistic regression models use replicate weights to adjust for nonresponse and complex survey design.

**Outcome Measure:** The outcome measure of this study was respondent reports that there was a time when they would have gotten better medical care if they had belonged to a different race or ethnic group.

**Results:** Seven percent of blacks and Latinos and 4% of Asians reported healthcare discrimination within the past 5 years. Immigrants were more likely to report discrimination than U.S.-born persons adjusting for race/ethnicity. For Asians, only the foreign-born were more likely than whites to report discrimination. For Latinos, increased perceptions of discrimination were attributable to sociodemographic factors for the U.S.-born but not for the foreign-born. Speaking a language other than English at home increased discrimination reports regardless of birthplace; private insurance was protective for the U.S.-born only.

**Conclusions:** Immigration status should be included in studies of healthcare disparities because nativity is a key determinant of discrimination experiences for Asians and Latinos.

From the *Department of Health Studies University of Chicago, Chicago, Illinois; the †Department of Sociology, University of Utah, Salt Lake City, Utah; the ‡Collaborative Research Unit, John H. Stroger, Jr. Hospital of Cook County & Rush University Medical Center, Chicago, Illinois; and the §Division of General Internal Medicine, Northwestern University, Chicago, Illinois.
Supported by a Research Scholars Grant CPHPS 107922 from the American Cancer Society, Atlanta, Georgia.
Reprints: Diane S. Lauderdale, PhD, Department of Health Studies, University of Chicago, 5841 S. Maryland Ave. MC 2007, Chicago, IL 60637. E-mail: lauderdale@uchicago.edu.
Copyright © 2006 by Lippincott Williams & Wilkins
ISSN: 0025-7079/06/4410-0914

**Key Words:** immigrants, discrimination, health disparities

(*Med Care* 2006;44: 914–920)

The 2002 Institute of Medicine (IOM) report *Unequal Treatment* summarized research on racial and ethnic disparities in health care defined as "racial or ethnic differences in the quality of healthcare that are not due to access-related factors or clinical needs, preferences, and appropriateness of intervention."[1] The report documented extensive disparities in health care; however, the mechanisms underlying these disparities are less well understood and are likely multifactorial. One possible mechanism may be systematic bias or discrimination within the healthcare context, which would decrease quality of care, or patient perceptions of discrimination, which would influence care-seeking behavior and adherence. Studies have documented an association between perceptions of racial/ethnic discrimination and a delay in seeking treatment,[2–4] lower adherence to treatment regimens,[4,5] and lower rates of follow up.[4] The great majority of research on perceptions and experiences of discrimination in healthcare has focused on blacks,[3,6–21] and there is a "relative paucity" of research on other groups.[22]

Research about discrimination in health care has largely been organized around race/ethnicity, and there is less information about whether immigrants to the United States are more likely to perceive or experience discrimination than the U.S.-born. Clearly, immigrants face numerous structural and linguistic barriers to accessing health care in the United States.[23] Because immigrants are clustered in certain racial and ethnic groups, failure to account for immigration status could distort the measurement of race/ethnicity effects on discrimination. Immigration status could also be an effect modifier with a different impact for different racial or ethnic groups. In this study, we use data from a large, population-based sample of California residents to investigate whether foreign-born persons are more likely to report racial/ethnic discrimination in healthcare than U.S.-born persons of the same race/ethnicity, whether foreign birth has the same impact on discrimination perceptions for persons in different racial and ethnic groups, and whether the immigration effect is "explained" by language use, insurance, source of care, or socioeconomic factors.

**914**

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

## METHODS

### Data

We used cross-sectional data from the 2003 California Health Interview Survey (CHIS). CHIS is a population-based telephone survey of 42,000 civilian households, selected through random digit dialing, with oversampling of Vietnamese and Koreans (by surname) and blacks and Latinos (from Alameda County). CHIS is designed to provide population-based estimates for California's overall population and its major racial/ethnic groups.

One adult per household was randomly selected and asked to give verbal consent. Respondents were interviewed in English, Spanish, Mandarin, Cantonese, Vietnamese, or Korean. Major content areas for the 2003 survey include health-related behaviors, health status and conditions, health insurance, access to health care, social support, and neighborhood environment. Data were collected between August 2003 and February 2004. For the CHIS adult sample, the adult interview response rate was 60%,[24] comparable to telephone surveys carried out by the National Center for Health Statistics.

CHIS 2003 data are weighted to account for the complex sample design and adjust for nonresponse and households without telephones. The final CHIS 2003 estimates are consistent with the 2003 California Department of Finance Population Projections of the state population.[25] The sample for this analysis was restricted to adults, 18 years and older.

### Dependent Variable

The main dependent variable was self-reported perception of discrimination in a healthcare setting within the past 5 years. Adult respondents were first asked "Was there ever a time when you would have gotten better medical care if you had belonged to a different race or ethnic group?" If the answer was yes, they were then asked when that last happened. The "lifetime" question is very similar to a question asked in the Commonwealth Fund 2001 Health Care Quality Survey.[6] We present the percentages reporting lifetime and recent 5-year discrimination, but focus on 5-year discrimination in the analysis because recent experiences reflect the contemporary healthcare environment and because the foreign-born have had fewer years of contact with U.S. health care relative to their age than have the U.S.-born.

### Independent Variables

The main independent variables were self-reported race/ethnicity and immigration status. Individuals were classified as non-Hispanic white, Latino, black/African American, Asian, Native American, or other. The other category includes Native Hawaiians, Pacific Islanders, those who identified as "other race" or multiple races. Although the tables include the "other" race group, they are not discussed in the text because of heterogeneity. U.S.-born individuals were those born in the United States, Puerto Rico, or other U.S. territories. All others were classified as foreign-born. There are very few foreign-born Native Americans, and the unstable estimates for this group are also not discussed.

Demographic variables included marital status, sex, and age, categorized as 18–29 years, 30–39 years, 40–49 years, 50–64 years, or 65+ years.

Socioeconomic status (SES) was measured by education and poverty income ratio (PIR). Education was categorized as: "less than high school," "high school graduate," "some college," and "college graduate." PIR is a ratio in which the numerator is a family's household income and the denominator is the appropriate poverty threshold (federal poverty level [FPL]) given the family's size and composition. Poverty thresholds are revised each year by the Census Bureau. Thus a FPL of less than 100% indicates that the household is living below the poverty threshold. PIR was categorized as: "0–99% of FPL," "100–199% FPL," "200–299% FPL" and "300% FPL and above." Education and PIR were each entered as single ordinal variables in the regression models.

Access to care was represented by health insurance and usual source of care. Insurance status was categorized as "currently being insured by employer or private insurance," "currently being insured by Medicaid and/or Medicare," or "currently uninsured." Usual source of care was categorized into 7 levels: "doctor's office/HMO/Kaiser," "community clinic, government clinic, community hospital clinic," "emergency room," "urgent care," "some other place," "no one particular place," and "no usual source of care." Insurance and source of care are entered into models as sets of indicator variables.

Language use at home was categorized as "speaks only English at home," "speaks English and another language at home," or "does not speak English at home."

For the foreign-born, years in the United States are reported in categories, which we grouped into 3 levels: in the United States less than 5 years, 5 to 14 years, and 15 years or longer.

We did not adjust for self-reported health because of concerns that the question does not elicit comparable information from non-Hispanic whites, Latinos, and Asians.[26–28] Instead, we accounted for differences in illness burden by including self-report of a history of a serious chronic disease (asthma, diabetes, high blood pressure, heart disease, heart failure, epilepsy, or cancer).

### Statistical Methods

All estimates and analyses (except Table 1, which shows actual numbers of respondents) were weighted using replicate weights, provided by CHIS, to adjust for nonresponse and the complex survey design. The primary analyses are a sequential series of logistic regression models, in which the outcome is reported discrimination in health care. All of the models are adjusted for sex, age, and marital status. The first model includes the race/ethnicity groups with whites as the referent. The next model adds a single term for foreign birth. The third model adds a set of interaction terms between race and foreign birth. The fourth model adds controls for education and PIR. (Although few "American Indian/Alaskan Natives" are foreign-born, the set of interaction terms must include all race categories.) Because persons residing in the United States for less than 5 years have not been at risk for

*© 2006 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Lauderdale et al*                                               *Medical Care* • Volume 44, Number 10, October 2006

**TABLE 1.** Actual Numbers of Respondents Aged 18 and Older by Race/Ethnicity and Nativity (not weighted)*

|  | Total | U.S.-Born | Foreign-Born | Percent Foreign-Born |
|---|---|---|---|---|
| All races | 42,044 | 31,624 | 10,420 | 24.8% |
| White | 26,506 | 24,269 | 2237 | 8.4% |
| Black/African American | 2691 | 2536 | 155 | 5.8% |
| Latino | 7135 | 2531 | 4604 | 64.5% |
| Asian | 3875 | 807 | 3068 | 79.2% |
| American Indian/ Alaskan native | 580 | 543 | 37 | 6.4% |
| Other/multiple/ Pacific Islander | 1257 | 938 | 319 | 25.4% |

*2003 California Health Interview Survey.

experiencing discrimination for the full 5-year time window, we carried out a sensitivity analysis omitting them from each of these 4 models. We do not present the full sensitivity analysis but describe the results in the text.

Because of collinearity among language use, race, and nativity, home language use cannot be entered into the models including the interaction terms between race and nativity. We construct models stratified by nativity to explore the role of home language use. These models include education, PIR, home language use, chronic disease, usual source of care, and insurance. Indicator variables for duration of residence in the United States are also included in the model for the foreign-born. All analyses were conducted using the svr suite of commands in STATA, which use replicate weights to account for the complex survey design (Stata Corp., College Station, TX). This secondary data analysis was approved by the University of Chicago Institutional Review Board.

## RESULTS

The sample included 42,044 adult respondents. Table 1 presents the actual number of respondents in CHIS 2003 by race/ethnicity and nativity. Overall, 24.8% of respondents were foreign-born, but the percentage foreign-born ranged by race/ethnicity from 5.8% of African American/blacks to 79.2% of Asians.

Table 2 presents the characteristics of the sample by race/ethnicity group. For socioeconomic variables and home language use, variation across race/ethnicity groups is substantial. The modal education category is "less than high school" for Latinos, "high school graduate" for Native Americans, "some college" for blacks and other race, and "college graduate" for whites and Asians. The percentages of uninsured range from 9% for whites to 34% for Latinos. Only 20% of Asians and 11% of Latinos speak English exclusively at home.

The percentage of respondents reporting that they would have gotten better medical care if they had belonged to a different race or ethnic group varied by race/ethnicity (Table 3). For all of the race/ethnicity groups, the percentages reporting lifetime discrimination were about double the percentages reporting recent discrimination. For 5-year discrimination reports, blacks, Latinos, and Native Americans all had

relatively higher rates (6–7%) that were similar to each other. Asians had somewhat lower percent reporting discrimination (3.9%) that was nonetheless much higher than whites (1.5%).

Table 4 presents the results of 4 sequential logistic regression models all adjusted for age, sex, and marital status. Odds ratios are presented and are here a good approximation of the relative proportions in these models because the positive outcome is infrequent. Model 1 shows that all of the race/ethnicity groups have significantly greater odds of reporting discrimination than whites. Model 2 adds foreign birth to the model, and the term is highly significant. All of the race/ethnicity groups remain significantly more likely to report discrimination than whites, but the magnitude of the effects (compared with whites) is reduced for Latinos and Asians when foreign birth is in the model.

Model 3 adds interaction terms between race/ethnicity and foreign birth. In the interaction models (models 3–4), the foreign birth coefficient represents the effect of being born outside the United States for whites and the race/ethnicity coefficients represent the race/ethnicity effect for the U.S.-born. For example, the coefficient for blacks in these models represents the odds of reporting discrimination by U.S.-born blacks compared with U.S.-born whites. The significance of the interaction terms tests whether the foreign-birth effect is different for each race/ethnicity group from the foreign-birth effect for whites. Among the U.S.-born, blacks, Latinos, and Native Americans have significantly higher odds of reporting discrimination than whites, but U.S.-born Asians do not. The foreign-birth effect is not significant for the referent category (whites), and the foreign-birth effects for blacks and Native Americans are not significantly different from the foreign-birth effect for whites. For Asians and Latinos, however, the foreign-birth effect is significantly different than it is for whites; foreign birth greatly increases the odds of experiencing discrimination for these 2 groups.

Adding controls for education and PIR (model 4) modestly reduces the magnitude of all race/ethnicity and nativity effects except for Asians.

In the sensitivity analyses, in which those in the United States for less than 5 years are omitted, all of the coefficients in models 1 through 4 are similar to those including the full sample. For example, the odds ratio for foreign birth in model 2 is 2.19 ($P < 0.001$) in Table 4 and 2.23 ($P < 0.001$) in the sensitivity analysis (data not shown).

Table 5 presents models stratified by nativity so that home language may be added as a covariate. Both models for the U.S.-born and foreign-born are adjusted for access to care, home language, and SES. For both the U.S.-born and foreign-born, speaking a language other than English at home similarly and significantly increases the odds of reporting discrimination. With language use and the other covariates in the model, duration of residence in the United States is not associated with discrimination experiences for the foreign-born. With these controls in the model, U.S.-born Latinos have similar odds of reporting discrimination to U.S.-born whites. U.S.-born Asians may be *less* likely than whites to report discrimination ($P = 0.06$). This is not the case for the foreign-born: foreign-born blacks, Latinos, and Asians are all

**916**

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Medical Care* • Volume 44, Number 10, October 2006      *Immigrant Perceptions of Discrimination*

**TABLE 2.** Estimates of Sample Characteristics by Race/Ethnicity, Weighted to Adjust for Nonresponse and the Complex Survey Design*

| | White | Black | Latino | Asian | Native American | Other/ Multiple/ Pacific Islander |
|---|---|---|---|---|---|---|
| Mean age | 48 | 44 | 38 | 43 | 43 | 41 |
| Male (%) | 49 | 46 | 51 | 47 | 49 | 51 |
| Married (%) | 58 | 37 | 51 | 62 | 40 | 49 |
| Chronic condition (%) | 41 | 48 | 29 | 32 | 47 | 40 |
| Education (%) | | | | | | |
|   Less than high school | 7 | 12 | 48 | 11 | 23 | 17 |
|   High school graduate | 23 | 29 | 24 | 19 | 32 | 29 |
|   Some college | 29 | 34 | 16 | 21 | 30 | 30 |
|   College graduate | 40 | 24 | 11 | 50 | 14 | 24 |
| Poverty income ratio (%) | | | | | | |
|   0–99% | 6 | 18 | 33 | 15 | 23 | 13 |
|   100–199% | 12 | 20 | 32 | 17 | 22 | 23 |
|   200–299% | 14 | 16 | 14 | 13 | 16 | 16 |
|   300%+ | 68 | 46 | 22 | 55 | 39 | 48 |
| Insurance (%) | | | | | | |
|   Private | 66 | 56 | 42 | 65 | 49 | 59 |
|   Medicare/Medicaid | 25 | 31 | 24 | 22 | 29 | 22 |
|   Uninsured | 9 | 13 | 34 | 13 | 22 | 20 |
| Home language (%) | | | | | | |
|   English | 85 | 87 | 11 | 20 | 69 | 50 |
|   English + other | 11 | 10 | 56 | 50 | 21 | 36 |
|   Other | 3 | 2 | 34 | 30 | 10 | 14 |
| In United States <5 yr | 1 | 1 | 8 | 10 | 3 | 3 |
| Usual source of care (%) | | | | | | |
|   Doctor's office/HMO | 79 | 69 | 47 | 77 | 57 | 63 |
|   Community/government clinic | 9 | 18 | 8 | 10 | 24 | 19 |
|   Emergency room | 1 | 3 | 2 | <1 | 1 | 2 |
|   Urgent care | <1 | <1 | <1 | <1 | 1 | 1 |
|   Some other place | <1 | <1 | <1 | <1 | 1 | 1 |
|   No one particular place | <1 | <1 | <1 | <1 | 2 | 1 |
|   No usual source of care | 1 | 1 | 23 | 1 | 15 | 15 |

*2003 California Health Interview Survey. There are significant ($P < 0.05$) differences by race for all of the variables in the table.

significantly more likely to report discrimination than foreign-born whites after adjustment for access to care, home language, and SES. Greater education is not protective for either the U.S.- or foreign-born; income is strongly protective for the U.S.-born ($P < 0.001$) and also protective for the foreign-born ($P = 0.03$). For the U.S.-born, type of insurance is associated with discrimination perceptions; both publicly insured and uninsured are significantly more likely to report discrimination than the privately insured. Private insurance is not similarly protective for the foreign-born. For the foreign-born, source of usual care is associated with discrimination reports. Specifically, foreign-born persons who use the emergency room as a usual source of care are significantly more likely to report discrimination in health care.

## DISCUSSION

We have found that blacks, Asians, Latinos, and Native Americans in California are all more likely than whites to report that they would have gotten better medical care if they had belonged to a different race/ethnicity group. However, it is a small minority of persons in each of these race/ethnicity groups (4–7%) that report such experiences in the past 5 years. Immigration status is a significant additional predictor of perceived discrimination and modifies the effects of race/ethnicity. The race effects are different for the U.S.-born and the foreign-born. Among the U.S.-born, Asian Americans are actually less likely than whites to report discrimination. U.S.-born blacks and Native Americans are more likely than U.S.-born whites to report discrimination, even after controlling for access to care and SES. For U.S.-born Latinos, however, the increased odds of reporting discrimination, compared with U.S.-born whites, are attributable to lower average SES, worse access to care, and language. For the U.S.-born in general, socioeconomic factors, specifically higher income and private health insurance, are strongly protective against perceived discrimination.

*© 2006 Lippincott Williams & Wilkins*      **917**

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Lauderdale et al*                                    *Medical Care* • Volume 44, Number 10, October 2006

**TABLE 3.** Percentages of Adult Respondents in CHIS 2003 Reporting Lifetime Experience of Racial or Ethnic Discrimination in Health Care and Experience Within the Past 5 Yr of Racial or Ethnic Discrimination in Health Care*

| Race Group | All | 95% CI | U.S.-Born | 95% CI | Foreign-Born | 95% CI |
|---|---|---|---|---|---|---|
| | | | | Lifetime Experience of Discrimination (%) | | |
| White | 2.8 | 2.5–3.1 | 2.8 | 2.5–3.1 | 3.3 | 2.4–4.1 |
| Black/African American | 13.2 | 11.5–14.8 | 13.1 | 11.4–14.9 | 13.8 | 5.6–22.1 |
| Latino | 13.4 | 12.3–14.4 | 6.9 | 5.7–8.1 | 16.3 | 15.0–17.7 |
| Asian | 7.4 | 6.3–8.4 | 3.6 | 1.8–5.3 | 8.4 | 6.1–9.6 |
| American Indian/Alaskan native | 11.3 | 6.5–16.0 | 8.5 | 5.0–11.8 | 33.1 | 5.8–60.5 |
| Other/multiple/Pacific Islander | 8.6 | 6.3–10.8 | 7.8 | 5.4–10.1 | 10.6 | 5.6–15.6 |
| | | | | 5-Year Experience of Discrimination (%) | | |
| White | 1.5 | 1.3–1.7 | 1.5 | 1.2–1.7 | 1.9 | 1.2–2.6 |
| Black/African American | 6.5 | 5.3–7.8 | 6.4 | 5.1–7.6 | 9.3 | 1.6–17.0 |
| Latino | 7.0 | 6.3–7.7 | 3.5 | 2.7–4.3 | 8.6 | 7.6–9.5 |
| Asian | 3.9 | 3.1–4.6 | 1.2 | 0.4–1.9 | 4.6 | 3.7–5.5 |
| American Indian/Alaskan native | 6.0 | 2.8–9.2 | 5.4 | 2.9–7.8 | 10.8 | 0–31.2 |
| Other/multiple/Pacific Islander | 4.3 | 2.8–7.7 | 3.9 | 2.4–5.4 | 5.3 | 2.1–8.5 |

*Estimates are weighted to adjust for nonresponse and the complex survey design. 2003 California Health Interview Survey.
CI indicates confidence interval.

**TABLE 4.** Logistic Regression Models Predicting Perceived Racial or Ethnic Discrimination in Health Care During the Previous 5 Yr, 2003 California Health Interview Survey*

| | Model 1 OR | Model 2 OR | Model 3 OR | Model 4 OR |
|---|---|---|---|---|
| White (referent) | Referent | Referent | Referent | Referent |
| Black | 4.12§ | 4.22§ | 4.06§ | 3.39§ |
| Latino | 4.25§ | 2.51§ | 2.07§ | 1.56‡ |
| Asian | 2.48§ | 1.44† | 0.69 | 0.69 |
| Native American | 3.75§ | 3.63§ | 3.43§ | 2.57§ |
| Other | 2.59§ | 2.25§ | 2.43§ | 2.19‡ |
| Foreign-born | | 2.19§ | 1.34 | 1.28 |
| White* foreign-born | | | Referent | Referent |
| Black* foreign-born | | | 1.13 | 1.19 |
| Latino* foreign-born | | | 1.98‡ | 1.55 |
| Asian* foreign-born | | | 3.36‡ | 3.00† |
| Native American* foreign-born | | | 1.48 | 1.31 |
| Other* foreign-born | | | 1.09 | 0.93 |
| Education | | | | 0.98 |
| Income | | | | 0.73§ |

*All models are also adjusted for age, sex, and marital status.
†*P* < 0.05.
‡*P* < 0.01.
§*P* < 0.001.
OR indicates odds ratio.

Among Asians and Latinos, foreign birth significantly increases reports of discrimination. Among blacks, foreign birth did not significantly increase the odds of reporting discrimination. Foreign-born Asians and Latinos have significantly greater perceptions of discrimination than foreign-born whites, and the increased odds persist after adjustment for language, SES, and access to care. Better SES is only weakly protective for the foreign-born. These findings suggest that being foreign-born alone is a risk factor for experiencing or perceiving discrimination in health care. This may result, for example, from cultural differences in health beliefs that lead to conflicting expectations in the medical encounter or from structural barriers that immigrants face accessing U.S. health care.

The Commonwealth Fund 2001 Health Care Quality Survey, a national cross-sectional telephone survey, is the largest prior study of reported discrimination in health care to include sizable samples of both Latinos and Asians. Respondents were asked whether there was ever a time when they thought they would have received better medical care had they belonged to a different race/ethnic group.[6] Sixteen percent of blacks, 15% of Latinos, 13% of Asians, and 1% of whites reported this perception. The greater probability for blacks, Latinos, and Asians relative to whites persisted after adjustment for SES, self-rated health, and source of care. The authors reported that controlling for primary language and nativity did not affect findings, and so they were not included in the final models. The percentages reporting lifetime discrimination in CHIS 2003 are similar for blacks and Latinos (13–14%), but the percentage of Asians reporting lifetime discrimination is lower in CHIS (7.4%; 95% confidence interval, 6.3–8.4). The other point of difference is our finding in CHIS of significant effects for language and nativity. There are several possible explanations for these differences between the surveys. First, the lower reported discrimination for Asians in California may reflect a true geographic effect. The substantial Asian presence in California may reduce discrimination experiences there relative to the rest of the country. Another possibility is that the Asians in the Commonwealth study were on average longer in the United States than the

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

**TABLE 5.** Separate Logistic Regression Models for the U.S.-Born and the Foreign-Born Predicting Perceived Racial or Ethnic Discrimination in Health Care During the previous 5 Yr, 2003 California Health Interview Survey*

| | U.S.-Born OR | Foreign-Born OR |
|---|---|---|
| White (referent) | Referent | Referent |
| Black | 2.90§ | 4.45‡ |
| Asian | 0.51 | 1.86‡ |
| Latino | 0.97 | 2.56§ |
| Native American | 2.09§ | 3.28 |
| Other | 1.73† | 1.92 |
| Education | 0.97 | 1.03 |
| Income | 0.78§ | 0.86† |
| In United States 15+ yr | | Referent |
| In United States 5–14 yr | | 1.15 |
| In United States <5 yr | | 1.02 |
| Home language | | |
| English | Referent | Referent |
| English + other | 1.81‡ | 2.33† |
| Other | 3.31§ | 2.31† |
| Chronic disease | 1.08 | 1.52‡ |
| Usual source of care | | |
| MD office/HMO | Referent | Referent |
| Community/government clinic | 1.26 | 1.31 |
| Emergency room | 1.07 | 2.35† |
| Urgent care | 0.66 | 0.60 |
| Other | 1.82 | 2.38 |
| No one particular | 1.32 | 4.39 |
| None | 1.03 | 1.47† |
| Insurance | | |
| Private | Referent | Referent |
| Public | 2.08§ | 1.02 |
| No insurance | 1.69‡ | 1.04 |

*Models are also adjusted for age, sex, and marital status.
†$P < 0.05$.
‡$P < 0.01$.
§$P < 0.001$.
OR indicates odds ratio.

Asians in CHIS and thus had more opportunities to interact with the healthcare system over the course of their lifetimes. Ngo-Metzer and others reported that 90% of the Asian Americans in the Commonwealth survey spoke English as their primary home language,[29] which would be consistent with longer average duration in the United States. Finally, there may not be a difference between the studies concerning the effects of nativity and language because the Commonwealth study focused on whether these were confounders of the race effects. We also found that including foreign birth as a confounder did not greatly alter the evidence of race/ethnicity effects (Table 4, model 2), but nativity was an effect modifier of race/ethnicity. It is only when we stratified by nativity that we found that adjustments for SES and source of care "explained" the race/ethnicity effect, but just for U.S.-born Latinos.

There are several important limitations to this study. First, these are California data. Although California is the best state for this study in terms of ethnic heterogeneity and

representation of the foreign-born, that very heterogeneity may make the experience of being an immigrant or nonwhite different in California than the rest of the country. The healthcare environment in California is also different than most states because of the large health maintenance organization presence. Second, we use the aggregate Asian race category rather than more specific Asian subgroup classification (eg, Korean). Although CHIS 2003 data allow the partial disaggregation of the Asian population by subgroup, there are too few reports of discrimination within ethnicity–nativity groups to create models with interaction terms for each ethnic group. Third, this study relies on self-reports of discrimination, and the accuracy of self-reports may vary by race/ethnicity, immigration, and language. However, CHIS did conduct interviews in 6 languages. We are unaware of validity or reliability studies of the discrimination question, and the question itself may be ambiguous because respondents must infer the referent group, which is not explicitly stated. For nonwhites, whites may be the obvious comparison group, but for whites, particularly ones without a strong ethnic identity, the referent may be unclear. In addition, there may be a selection bias because CHIS (like the Commonwealth Fund 2001 Health Care Quality Survey) is a telephone survey. Finally, a richer measure of discrimination would also include outcomes such as receipt of recommended screening or procedures, follow-up care, or mortality after an event or diagnosis. However, perceptions have been shown to affect behavior,[2–5] and perceptions may exert a stronger effect than outcomes on utilization.

This study underscores the complexity of experiencing discrimination in health care. Prior studies have focused on race/ethnicity. Race is a key factor for blacks and Native Americans; these groups are significantly more likely to report discrimination than whites, even after taking into account their worse access to care and SES. Higher SES is, however, highly protective for the U.S.-born. For all persons, speaking a language other than English at home increases reports of discrimination, even if some English is spoken at home. For Asians and Latinos, however, race/ethnicity in itself is less likely to be the reason for discrimination; our analysis suggests that factors unique to be being foreign-born influence the manner in which U.S. health care is experienced. For the foreign-born, higher SES is only weakly protective. These data cannot identify what the key cultural, structural, or psychologic factors are that increase perceptions of discrimination among the foreign-born, or the extent to which the reports are accurate or reflect differences in expectations or sensitivities. Omitting immigration status in describing the problem of discrimination in health care could be misleading because nativity is a key predictor of perceived discrimination among Asians and Latinos.

## REFERENCES

1. Smedley BD, Stith AY, Nelson AR. *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care*. Washington, DC: National Academy Press; 2003:4.
2. Spencer MS, Chen J. Effect of discrimination on mental health service utilization among Chinese Americans. *Am J Public Health*. 2004;94: 809–814.
3. Van Houtven CH, Voils CI, Oddone EZ, et al. Perceived discrimination

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

*Lauderdale et al*                                                              *Medical Care* • Volume 44, Number 10, October 2006

and reported delay of pharmacy prescriptions and medical tests. *J Gen Intern Med*. 2005;20:578–583.

4. Blanchard J, Lurie N. R-E-S-P-E-C-T: patient reports of disrespect in the health care setting and its impact on care. *J Fam Pract*. 2004;53:721–730.

5. Bird ST, Bogart LM, Delahanty DL. Health-related correlates of perceived discrimination in HIV care. *AIDS Patient Care STDs*. 2004;18:19–26.

6. Johnson RL, Saha S, Arbelaez JJ, et al. Racial and ethnic differences in patient perceptions of bias and cultural competence in health care. *J Gen Intern Med*. 2004;19:101–110.

7. Schulz A, Israel B, Williams D, et al. Social inequalities, stressors and self reported health status among African American and white women in the Detroit metropolitan area. *Soc Sci Med*. 2000;51:1639–1653.

8. Barnes LL, Mendes De Leon CF, Wilson RS, et al. Racial differences in perceived discrimination in a community population of older blacks and whites. *J Aging Health*. 2004;16:315–337.

9. Chen FM, Fryer GE Jr, Phillips RL Jr, et al. Patients' beliefs about racism, preferences for physician race, and satisfaction with care. *Ann Fam Med*. 2005;3:138–143.

10. Carlson ED, Chamberlain RM. The black–white perception gap and health disparities research. *Public Health Nurs*. 2004;21:372–379.

11. Bird ST, Bogart LM. Perceived race-based and socioeconomic status(SES)-based discrimination in interactions with health care providers. *Ethn Dis*. 2001;11:554–563.

12. Broman CL. The health consequences of racial discrimination: a study of African Americans. *Ethn Dis*. 1996;6:148–153.

13. Peters RM. Racism and hypertension among African Americans. *West J Nurs Res*. 2004;26:612–631.

14. Watson JM, Scarinci IC, Klesges RC, et al. Race, socioeconomic status, and perceived discrimination among healthy women. *J Womens Health Gend Based Med*. 2002;11:441–451.

15. Schuster MA, Collins R, Cunningham WE, et al. Perceived discrimination in clinical care in a nationally representative sample of HIV-infected adults receiving health care. *J Gen Intern Med*. 2005;20:807–813.

16. Schulz A, Williams D, Israel B, et al. Unfair treatment, neighborhood effects, and mental health in the Detroit metropolitan area. *J Health Soc Behav*. 2000;41:314–332.

17. Jackson JS, Brown TN, Williams DR, et al. Racism and the physical and mental health status of African Americans: a thirteen year national panel study. *Ethn Dis*. 1996;6:132–147.

18. Williams DR, Neighbors H. Racism, discrimination and hypertension: evidence and needed research. *Ethn Dis*. 2001;11:800–816.

19. Williams DR, Williams-Morris R. Racism and mental health: the African American experience. *Ethn Health*. 2000;5:243–268.

20. Williams DR, Jackson PB. Social sources of racial disparities in health. *Health Aff (Millwood)*. 2005;24:325–334.

21. Wyatt SB, Williams DR, Calvin R, et al. Racism and cardiovascular disease in African Americans. *Am J Med Sci*. 2003;325:315–331.

22. Smedley BD, Stith AY, Nelson AR. *Unequal Treatment: Confronting Racial and Ethnic Disparities in Health Care*. Washington, DC: National Academy Press; 2003:249.

23. Kandula NR, Kersey M, Lurie N. Assuring the health of immigrants: what the leading health indicators tell us. *Annu Rev Public Health*. 2004;25:357–376.

24. The California Health Interview Survey 2003 Response Rates. Los Angeles: UCLA Center for Health Policy Research, 2003. Available at: http://www.chis.ucla.edu/pdf/response_rates_chis03.pdf. Accessed September 15, 2005.

25. The 2003 California Health Interview Survey Sample Weights. Los Angeles: UCLA Center for Health Policy Research, 2003. Available at: http://www.chis.ucla.edu/pdf/weighting_summary_chis03_020705.pdf. Accessed September 15, 2005.

26. Meredith LS, Siu AL. Variation and quality of self-report health data. Asians and Pacific Islanders compared with other ethnic groups. *Med Care*. 1995;33:1120–1131.

27. Saxena S, Eliahoo J, Majeed A. Socioeconomic and ethnic group differences in self reported health status and use of health services by children and young people in England: cross sectional study. *BMJ*. 2002;325:520.

28. Finch BK, Hummer RA, Reindl M, et al. Validity of self-rated health among Latino(a)s. *Am J Epidemiol*. 2002;155:755–759.

29. Ngo-Metzger Q, Legedza AT, Phillips RS. Asian Americans' reports of their health care experiences. Results of a national survey. *J Gen Intern Med*. 2004;19:111–119.

*© 2006 Lippincott Williams & Wilkins*

Copyright © Lippincott Williams & Wilkins. Unauthorized reproduction of this article is prohibited.

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS090097
Cashier ID: lcarried
Transaction Date: 04/07/2017
Payer Name: FAISAL AHMED
----------------------------------------
CIVIL FILING FEE
  For: FAISAL AHMED
  Case/Party: D-CAS-3-17-CV-000709-001
  Amount:          $400.00
----------------------------------------
CHECK
  Check/Money Order Num: 621
  Amt Tendered:  $400.00
----------------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00


There will be a fee of $53.00
charged for any returned check.
```

